FELIX S. LEE (CSB No. 197084)
flee@fenwick.com
CHRISTOPHER J. STESKAL (CSB No. 212297)
csteskal@fenwick.com
CASEY O'NEILL (CSB No. 264406)
coneill@fenwick.com
CLAIRE MENA (CSB No. 339324)
cmena@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Telephone:      650.988.8500
Facsimile:      650.938.5200

(California Attorneys will comply with
LR IA 11-2 within 14 days)

JOHN D. TENNERT III (Nevada Bar No. 11728)
jtennert@fennemorelaw.com
WADE BEAVERS (Nevada Bar No. 13451)
wbeavers@fennemorelaw.com
FENNEMORE CRAIG, P.C.
7800 Rancharrah Parkway
Reno, NV 89511
Telephone: 775.788.2212
Facsimile: 775.786.1172

Attorneys for Plaintiff
TETSUYA NAKAMURA

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TETSUYA NAKAMURA,<br><br>             Plaintiff,<br><br>     v.<br><br>SUNDAY GROUP INCORPORATED, SGI TRUST, TOSHIKI (TODD) MITSUISHI, JAMES PACK, and JOHN DOES 1-10,<br><br>             Defendants. | Case No.: 2:22-cv-01324<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

Plaintiff Tetsuya Nakamura ("Dr. Nakamura"), by and through his undersigned attorneys, alleges as follows for his complaint against Defendants Sunday Group Incorporated ("Sunday Group"), SGI Trust, Toshiki (Todd) Mitsuishi, James Pack (collectively, "Defendants"), and John Does 1-10.

**NATURE OF THE ACTION**

1. This action arises from a series of phony investments solicited by a fraudulent enterprise and associated individuals working within the digital currency and blockchain industry.

2. Defendants Toshiki (Todd) Mitsuishi and James Pack, doing business from Nevada, led what they claimed was a promising blockchain-industry startup called Sunday Group. They had contacts in Japan and traveled there to pitch investors. One of those investors is the plaintiff in this action, Dr. Nakamura, a prominent Japanese medical industry professional and executive.

3. Initially, Defendants induced Dr. Nakamura, along with several other investors, to purchase equity in Sunday Group. In so doing, Defendants made claims which they knew were materially untrue at the time made.

4. Once Dr. Nakamura had invested, Defendants breached the applicable investment contract, by failing to issue shares in the company as promised and by refusing to permit Dr. Nakamura access to company financial statements despite his contractual entitlement to review them.

5. Next, Defendants solicited an additional investment from Dr. Nakamura, by making false and knowingly unrealistic statements about the stage of development and imminent success of a Sunday Group cryptocurrency project, as well as other facts such as that a renowned professor from the University of California Los Angeles was a member of Sunday Group's board of directors. Dr. Nakamura relied on those false claims in deciding to invest. In that instance, Dr. Nakamura invested with digital currency, rather than the U.S. dollar or Japanese yen. The sum of digital currency Dr. Nakamura transferred to Sunday Group is worth millions of U.S. dollars today. And yet, Dr. Nakamura has received no value for his investment, not even the basic digital currency units he was promised in exchange for what he transferred.

2

6. Finally, Defendants solicited a third investment from Dr. Nakamura, this time by promising that Defendants would help place Dr. Nakamura's funds with a third-party investment network engaged in digital currency "mining", which purportedly would generate millions of U.S. dollars in returns per month. The third-party investment network turned out to be a Ponzi scheme, and at least one person associated with the scheme has been charged criminally by the U.S. government. Here, again, Dr. Nakamura was deceived and did not receive what he was promised. Nor has he received reimbursement of the digital currency with which he invested, which is worth millions of U.S. dollars today.

7. Dr. Nakamura brings this action to vindicate his rights as an investor. He seeks an accounting, rescission and compensatory and other damages based on Defendants' contractual breaches and misstatements.

**PARTIES**

8. Plaintiff Tetsuya Nakamura is a Japanese citizen domiciled and residing in Japan. Dr. Nakamura is the Chairman and CEO of IMS Group, one of the largest general medical and welfare groups in Japan. Dr. Nakamura made relevant investments in his personal capacity.

9. Defendant Sunday Group is a Nevada corporation with its principal place of business in Nevada.

10. Defendant SGI Trust is a private trust operated out of Nevada and is, upon information and belief, controlled by defendant Toshiki (Todd) Mitsuishi.

11. Defendant Toshiki (Todd) Mitsuishi is upon information and belief a United States citizen domiciled and residing in California. Mr. Mitsuishi is a principal and director of Sunday Group. At the time Dr. Nakamura made his three investments, Mr. Mitsuishi was Sunday Group's President and CEO as well.

12. Defendant James Pack is upon information and belief a United States citizen domiciled and residing in California. Mr. Pack is a Sunday Group director and Sunday Group's current President and CEO. Mr. Pack previously served as Sunday Group's Treasurer and Secretary.

## JURISDICTION AND VENUE

13. This Court has original subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(2), as there is complete diversity between Dr. Nakamura and Defendants. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State (Nevada or California) and a citizen or subject of a foreign state (Japan).

14. This Court has personal jurisdiction over Defendants Sunday Group and SGI Trust (a) pursuant to one or more applicable contractual provisions, (b) because both entities are domiciled in Nevada, (c) because both entities engaged from Nevada in the transactions which give rise to Dr. Nakamura's claims, and (d) because both entities otherwise availed themselves of Nevada as a forum such that it is foreseeable for them to be sued there.

15. This Court has personal jurisdiction over Messrs. Mitsuishi and Pack (a) pursuant to one or more applicable contractual provisions, (b) because those two individuals, through Sunday Group and SGI Trust, engaged from Nevada in the transactions which give rise to Dr. Nakamura's claims, and (c) because those two individuals otherwise availed themselves of Nevada as a forum such that it is foreseeable for them to be sued there.

16. Venue for this action lies in the District of Nevada pursuant to 28 U.S.C. §§ 1391(b)(2) or (b)(3). A substantial part of the events giving rise to Dr. Nakamura's claims occurred in this district as contemplated by § 1391(b)(2). Alternatively, venue in this district is appropriate because Defendants are subject to personal jurisdiction in this district as contemplated by § 1391(b)(3).

## BACKGROUND ON DIGITAL CURRENCIES AND BLOCKCHAIN CONCEPTS

17. Digital currencies—also referred to as cryptocurrencies, tokens, or coins—are digital assets typically designed to function as a medium of exchange or a store of value, to provide other functionalities and features, or to do a combination thereof. As a medium of exchange, they are used for payments and remittances. As a store of value, they may serve as an alternative to a commodity such as gold or silver.

18. Digital currency ownership and transaction records are stored in an online ledger, essentially a digital database of inputs and outputs to digital currency "wallets", or "wallet addresses." Typically, digital currency transactions are verified in a decentralized manner by market participants who run sophisticated software that confirms and records transactions. Blocks of verified transactions are periodically added to the ledger, and hence the term "blockchain" developed and is used to describe the ledger on which digital currency transactions are recorded.

19. Some digital currency transactions are vetted through a "proof of work" ("PoW") protocol. Market participants run software which confirms transactions in a complex and highly secure way, viewed as minimizing fraud risk. Those who expend the resources to run that software often receive units of the digital currency in return, which is known as "mining". The digital currency bitcoin is a well-known example of a PoW protocol.

## SERIES AA INVESTMENT IN SUNDAY GROUP

20. In April 2015, Mr. Mitsuishi, then-CEO of Sunday Group and acting on its behalf, visited Japan to solicit equity investments in Sunday Group. He described Sunday Group as a blockchain industry startup company that, among other things, operated or would operate ATMs where bitcoin could be deposited or withdrawn. Mr. Mitsuishi told Dr. Nakamura that an equity investment in Sunday Group would be a rare opportunity for Dr. Nakamura and other investors to make an early-stage investment in a U.S. startup.

21. Based on Mr. Mitsuishi's representations regarding Sunday Group, Dr. Nakamura entered into a Series AA Preferred Stock Subscription Agreement (the "Subscription Agreement") dated April 19, 2015, whereby he purchased 4,000 shares of Series AA preferred stock of Sunday Group, at a purchase price of $5 USD per share, for total consideration of $20,000 USD. Dr. Nakamura thereafter increased his investment to $350,000 USD pursuant to his preemption and anti-dilution rights in the Subscription Agreement.

22. Section 1(b) of the Subscription Agreement obligates Sunday Group to promptly deliver to Dr. Nakamura one or more certificates reflecting his share ownership. Sunday Group never did so, thereby breaching the agreement – a breach which is continuing – and calling into question whether the shares were ever issued.

23. Section 4 of the Subscription Agreement further obligates Sunday Group to provide Dr. Nakamura copies of the company's balance sheet, statement of income and statement of cash flows for each fiscal year. Despite Dr. Nakamura's requests, at no point has Sunday Group provided access to those statements, which is another continuing breach of the Subscription Agreement.

24. In addition to those breaches, in the more than five years of Sunday Group's existence, the company has yet to produce a single viable product. It is entirely unclear how Sunday Group has utilized the Series AA capital it raised from Dr. Nakamura and others.

## "MOBBY" CRYPTOCURRENCY INVESTMENT

25. In late 2017, Sunday Group and its representative, namely, Mr. Mitsuishi successfully solicited further capital investment from Dr. Nakamura and others. This occurred through the private sale of cryptocurrency tokens associated with a so-called "Mobby Project" that Sunday Group claimed to be developing. The stated theory for the project was to use blockchain concepts to allow internet users to establish and maintain their online reputation. The so-called "M-Tokens" Sunday Group offered for sale were to be used as currency for the project.

26. Sunday Group representatives, including Mr. Mitsuishi, through text messages, emails, and oral conversations, made a variety of materially false statements about the Mobby Project to Dr. Nakamura and other investors.

Significantly, Mr. Mitsuishi represented to Dr. Nakamura that Professor Leonard Kleinrock of the University of California Los Angeles was a member of Sunday Group's board of directors and would have a central role in product development. Professor Kleinrock is a storied computer science expert who was instrumental in the development of the internet. As such, his purported involvement favorably impressed Dr. Nakamura. Unfortunately, Professor Kleinrock has since confirmed that the representation regarding his involvement was untrue, and that he has only served as a Sunday Group contractor providing occasional, high-level conceptual advice unrelated to any specific product development or engineering.

Additionally, Mr. Mitsuishi represented that (a) project technology had reached the prototype stage, (b) exchange listing of M-Tokens was imminent, and (c) the value of the Mobby

6

token once listed would increase at least tenfold, and potentially as much as several hundred to several thousand times its value.

Each of these statements was false at the time made and made with knowledge of falsity.

27. Relying on Sunday Group's misrepresentations, Dr. Nakamura entered into a Memorandum of Understanding to Participate in Private Sale dated November 28, 2017 (the "Mobby MOU"). Article 5 of the Mobby MOU states that it shall be governed by the laws of Japan. Pursuant to the Mobby MOU, Dr. Nakamura tendered approximately 4,228.14 ether, a digital currency similar to bitcoin, to the digital wallet address designated by Sunday Group, in exchange for the right to receive an allotment of 200 corresponding units of M-Tokens at a valuation of $10,000 USD per unit. The ether Dr. Nakamura transferred to Sunday Group for this investment is currently worth approximately $4.8 million USD.

28. Sunday Group has since failed to transmit any M-Tokens to Dr. Nakamura as promised. Instead, Sunday Group and Messrs. Mitsuishi and Pack, through investor newsletters, emails, and oral conversations, have made a lengthy series of false statements stating that Mobby Project development has been going well, and that the Mobby tokens and wallet were already in place, while manufacturing numerous false and pretextual reasons why the M-Tokens had not completed development, been issued or listed. This includes the representation that Sunday Group has entered into a non-disclosure agreement ("NDA") with the U.S. Securities and Exchange Commission (the "SEC") prohibiting Sunday Group from sharing information about the Mobby Project. Upon information and belief, no such NDA exists. Indeed, upon information and belief the SEC does not and never would enter into an NDA with a market participant, as a matter of protocol and in light of the SEC's public regulatory role.

**CRYPTOCURRENCY MINING INVESTMENT**

29. In early 2018, Mr. Mitsuishi, acting on behalf of SGI Trust, solicited still a third investment from Dr. Nakamura. He induced Dr. Nakamura to invest in a purported cryptocurrency mining center, whereby his capital investment would be used to acquire computers which would validate cryptocurrency transactions and receive cryptocurrency in return, from which Dr. Nakamura would be paid his pro rata share. Mr. Mitsuishi promised Dr.

7

Nakamura that he would receive high returns derived from his mining investment and showed him a simulation table showing profits of at least several hundred million Japanese yen a month, or, well over $1 million USD per month. Mr. Mitsuishi represented that they would transfer the capital Dr. Nakamura invested to a third-party mining company, BitClub Network ("BCN"), with whom they had a relationship, and that BCN would operate the mining center.

30. Relying on those representations, Dr. Nakamura entered into a March 1, 2018 Cloud Mining Agreement with SGI Trust, which was executed by Mr. Mitsuishi on behalf of SGI Trust. In accordance with that agreement and instructions received from Mr. Mitsuishi, Dr. Nakamura transferred approximately 545.455 bitcoin (presently worth approximately $11 million USD) to one or more designated digital wallet addresses. He did so on the premise that the funds would, in turn, be invested in BCN.

31. Thereafter, save in two instances, Dr. Nakamura did not receive the monthly distributions he was promised or the corresponding reports he was contractually entitled to receive due to his mining investment. Further, upon information and belief (a) Sunday Group, Mr. Mitsuishi, and SGI Trust never transferred Dr. Nakamura's investment to BCN, and (b) Mr. Mitsuishi, and SGI Trust knew of and concealed that BCN was a fraudulent scheme that solicited money from investors in exchange for shares of purported cryptocurrency mining pools and rewarded existing investors for recruiting new investors into the scheme. *See* https://www.justice.gov/usaonj/pr/california-man-admits-securities-and-tax-offenses-related-722-million-bitclubnetwork.

32. At no point have Mr. Mitsuishi and SGI Trust been able to substantiate that they had in fact made the contractually obligated payment to BCN.

33. The distributions Dr. Nakamura received from this purported opportunity were less than a tenth of the value of his initial investment, a fraction of the returns that had been represented to induce Mr. Nakamura to invest.

**DEMAND MADE**

34. Given the aforementioned breaches of contract and false inducements, Dr. Nakamura has demanded that Defendants return to him the $350,000 USD, 4,228.14 ether and 545.455 bitcoin Dr. Nakamura invested. To date, Defendants have refused to do so.

35. As a consequence, Dr. Nakamura has sustained compensable economic damages, among other harms, which he is entitled to recover in cash (for the U.S. dollar Series AA investment) and in kind (for the ether- and bitcoin-denominated Mobby Project and mining center investments), along with attorneys' fees, costs, and other appropriate forms of relief.

**CAUSES OF ACTION**

36. With respect to each of the following causes of action, Dr. Nakamura reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 through 35.

**COUNT I – BREACH OF CONTRACT**

*(Against Sunday Group and Toshiki (Todd) Mitsuishi)*

37. In April 2015, Toshiki (Todd) Mitsuishi, as an agent of Sunday Group, visited Japan and made representations and omissions to Dr. Nakamura which culminated in the formation of a valid investment contract with Dr. Nakamura, a Series AA Preferred Stock Subscription Agreement (the "Subscription Agreement"), dated April 19, 2015.

38. Sunday Group and Mr. Mitsuishi thereafter breached the Subscription Agreement by failing to deliver to Dr. Nakamura one or more share certificates to which he is entitled. Sunday Group and Mr. Mitsuishi further breached the Subscription Agreement by failing to provide Dr. Nakamura access to financial statements to which he is entitled. Both breaches are continuing.

39. Both contractual breaches are a proximate cause of damage to Dr. Nakamura. As a direct consequence of the breaches, Dr. Nakamura has suffered economic and other harm, including but not limited to the loss of the $350,000 USD he invested pursuant to the Subscription Agreement.

## COUNT II – FRAUD / INTENTIONAL MISREPRESENTATION

*(Against Sunday Group and Toshiki (Todd) Mitsuishi)*

40. In April 2015, Toshiki (Todd) Mitsuishi, as an agent of Sunday Group, visited Japan and made representations and omissions to Dr. Nakamura which culminated in the formation of a valid investment contract with Dr. Nakamura, the Subscription Agreement.

41. Those representations and omissions were both material and false and were made with the knowledge and belief that they were false as well as without a sufficient foundation. These include but are not limited to representations that Dr. Nakamura would receive stock certificates reflecting his share ownership, that he would receive contractually obligated financial updates and information upon request, and that the invested capital would be used to develop various cryptocurrency projects (none of which have ever come to fruition).

42. Sunday Group and Mr. Mitsuishi intended to and did induce Dr. Nakamura's justifiable reliance on the representations and omissions made.

43. The representations and omissions made are a proximate cause of damage to Dr. Nakamura. As a direct consequence of the representations and omissions, Dr. Nakamura has suffered economic and other harm, including but not limited to the loss of the $350,000 USD he invested pursuant to the Subscription Agreement.

## COUNT III – FRAUDULENT INDUCEMENT

*(Against Sunday Group and Toshiki (Todd) Mitsuishi)*

44. In April 2015, Toshiki (Todd) Mitsuishi, as an agent of Sunday Group, visited Japan and made representations and omissions to Dr. Nakamura which culminated in the formation of a valid investment contract with Dr. Nakamura, the Subscription Agreement.

45. Those representations and omissions were both material and false and were made with the knowledge and belief that they were false as well as without a sufficient foundation. Those representations and omissions were both material and false and were made with the knowledge and belief that they were false as well as without a sufficient foundation. These include but are not limited to representations that Dr. Nakamura would receive stock certificates reflecting his share ownership, that he would receive contractually obligated financial updates and

information upon request, and that the invested capital would be used to develop various cryptocurrency projects (none of which have ever come to fruition).

46. Sunday Group and Mr. Mitsuishi intended to and did induce Dr. Nakamura's justifiable reliance on the representations and omissions made.

47. The representations and omissions made are a proximate cause of damage to Dr. Nakamura. As a direct consequence of the representations and omissions, Dr. Nakamura has suffered economic and other harm, including but not limited to the loss of the $350,000 USD he invested pursuant to the Subscription Agreement.

## COUNT IV – NEGLIGENT MISREPRESENTATION

*(Against Sunday Group and Toshiki (Todd) Mitsuishi)*

48. In April 2015, Toshiki (Todd) Mitsuishi, as an agent of Sunday Group and in the course of his and Sunday Group's business, profession, and employment and in an action in which Sunday Group and Mr. Mitsuishi have a pecuniary interest, visited Japan and made representations and omissions to Dr. Nakamura which culminated in the formation of a valid investment contract with Dr. Nakamura, the Subscription Agreement.

49. Those representations and omissions were both material and false and were supplied for the guidance of Dr. Nakamura in his business transactions.

50. Sunday Group and Mr. Mitsuishi failed to exercise reasonable care or competence in obtaining and communicating information to Dr. Nakamura.

51. Sunday Group and Mr. Mitsuishi intended to and did induce Dr. Nakamura's justifiable reliance on the representations and omissions made.

52. The representations and omissions made are a proximate cause of damage to Dr. Nakamura. As a direct consequence of the representations and omissions, Dr. Nakamura has suffered economic and other harm, including but not limited to the loss of the $350,000 USD he invested pursuant to the Subscription Agreement.

## COUNT V – BREACH OF FIDUCIARY DUTY

*(Against Toshiki (Todd) Mitsuishi and James Pack)*

53. In April 2015, Toshiki (Todd) Mitsuishi, as an agent of Sunday Group, visited Japan and made representations and omissions to Dr. Nakamura which culminated in the formation of a valid investment contract with Dr. Nakamura, the Subscription Agreement.

54. Pursuant to the Subscription Agreement, Dr. Nakamura purchased 4,000 shares of Series AA preferred stock of Sunday Group, at a purchase price of $5 USD per share, for total consideration of $20,000 USD. Dr. Nakamura thereafter increased his shareholding pursuant to preemption and anti-dilution rights in the Subscription Agreement. Continuously from April 19, 2015 through the present, Dr. Nakamura has been a shareholder of Sunday Group.

55. Continuously from April 19, 2015 through the present, Mr. Mitsuishi has been a principal and director of Sunday Group. He also previously served as its President and CEO. Likewise, continuously from April 19, 2015 through the present, James Pack has been a Sunday Group director. He also previously served as Sunday Group's Treasurer and Secretary, and currently serves as the company's President and CEO.

56. In their director and officer roles, and in their roles as majority shareholders, at all times relevant to this action, Messrs. Mitsuishi and Pack owed Dr. Nakamura, a minority shareholder, fiduciary duties, including the duties of care, loyalty, and good faith.

57. Messrs. Mitsuishi and Pack breached those duties by, among other things, failing to issue Dr. Nakamura one or more share certificates to which he is entitled and by failing to provide Dr. Nakamura access to financial statements to which he is entitled. Messrs. Mitsuishi and Pack further breached their fiduciary duties by failing to produce a single viable product despite more than five years of Sunday Group's existence and by failing to account for the Series AA capital raised from Dr. Nakamura.

58. Those breaches of fiduciary duty are a proximate cause of damage to Dr. Nakamura. As a direct consequence of the breaches, Dr. Nakamura has suffered economic and other harm, including but not limited to the loss of the $350,000 USD he invested pursuant to the Subscription Agreement.

## COUNT VI – UNJUST ENRICHMENT

*(Against Sunday Group, Toshiki (Todd) Mitsuishi and James Pack)*

59. In April 2015, Toshiki (Todd) Mitsuishi, as an agent of Sunday Group, visited Japan and made representations and omissions to Dr. Nakamura which culminated in the formation of a valid investment contract with Dr. Nakamura, the Subscription Agreement.

60. Pursuant to the Subscription Agreement, Dr. Nakamura purchased 4,000 shares of Series AA preferred stock of Sunday Group, at a purchase price of $5 USD per share, for total consideration of $20,000 USD. Dr. Nakamura thereafter increased his investment to $350,000 USD pursuant to preemption and anti-dilution rights in the Subscription Agreement.

61. Continuously from April 19, 2015 through the present, Mr. Mitsuishi has been a principal and director of Sunday Group. He also previously served as its President and CEO. Likewise, continuously from April 19, 2015 through the present, James Pack has been a Sunday Group director. He also previously served as Sunday Group's Treasurer and Secretary, and currently serves as the company's President and CEO.

62. By virtue of Dr. Nakamura's Series AA investment in Sunday Group, a benefit was conferred upon Sunday Group and Messrs. Mitsuishi and Pack, all three of whom are aware of and fully appreciate that benefit and accepted and retained the benefit. As such, all three have been enriched unjustly.

63. As an alternative to recovery on the contract (the Subscription Agreement), recovery on grounds of unjust enrichment is due.

## COUNT VII – RESCISSION OF CONTRACT UNDER CCA OF JAPAN

*(Against Sunday Group and Toshiki (Todd) Mitsuishi)*

64. Article 4 of the Consumer Contract Act ("CCA") of Japan allows consumers to rescind an offer or acceptance of a consumer contract under certain prescribed grounds and Article 4, Paragraph 1, item (i) provides that consumers may rescind an offer or acceptance of a consumer contract, if such consumer is told something that diverges from the truth with regard to an Important Matter, the consumer mistakenly believes that what is told is true, and such mistaken belief caused the consumer to offer or accept the consumer contract. Article 4,

Paragraph 5, items (i)-(iii) of the CCA define the term "Important Matter" used in the Article 4, Paragraph 1, item (i), and specifically, Article 4, Paragraph 5, items (i) mentions that one of the "Important Matters" is the quality, purpose of use, and other details of the goods, rights, services, or other things for the purpose of the consumer contract which would normally influence a consumer's decision as to whether to enter into that contract.

65. In late 2017, Toshiki (Todd) Mitsuishi, as an agent of Sunday Group, made representations and omissions to Dr. Nakamura regarding a "Mobby Project" which culminated in the formation of a valid contract with Dr. Nakamura, the Mobby MOU.

66. Those representations and omissions, such as the ones regarding Professor Leonard Kleinrock's purported involvement with Sunday Group, were both material and false, and were made with the knowledge and belief that they were false as well as without a sufficient foundation.

67. Dr. Nakamura mistakenly believed that Dr. Kleinrock was leading the development of the project as a member of Sunday Group's board of directors and accepted Sunday Group's offer of the Mobby MOU. Professor Leonard Kleinrock's involvement in the project falls under the "Important Matters" in Article 4, Paragraph 5, item (i) of the CCA stated above. Therefore, Dr. Nakamura has the right to rescind his acceptance to Sunday Group's offer of the Mobby MOU under Article 4, Paragraph 1, item (i) of the CCA stated above.

68. Dr. Nakamura noticed his intent to rescind the Mobby MOU pursuant to Articile 4, Paragraph 1 item (i) of the CCA by letter to Sunday Group dated February 18, 2022.

69. As a direct consequence of the rescission of the Mobby MOU, Dr. Nakamura has the right to demand return of 4,228.14 ether itself as the right to restore what was already performed to the original state before the formation of the Mobby MOU under Japanese law.

**COUNT VIII – RESCISSION OF CONTRACT UNDER CIVIL CODE OF JAPAN**

*(Against Sunday Group and Toshiki (Todd) Mitsuishi)*

70. Article 96, Paragraph 1 of the Civil Code of Japan provides that a manifestation of intention based on fraud or duress is voidable. The requirements to avoid a manifestation of intention (i.e., an offer or acceptance of a contract) based on this provision consist of (i) intention

to defraud by the other party, (ii) act of defrauding, (iii) mistake caused by the act of defrauding, (iv) manifestation of intention based on the mistake, and (v) rescission of the manifestation of intention.

71. In late 2017, Toshiki (Todd) Mitsuishi, as an agent of Sunday Group, made representations and omissions to Dr. Nakamura regarding a "Mobby Project" which culminated in the formation of a valid contract with Dr. Nakamura, the Mobby MOU. Article 5 of the Mobby MOU states that it shall be governed by the laws of Japan.

72. Those representations and omissions, such as the ones regarding Professor Leonard Kleinrock's purported involvement with Sunday Group, were both material and false, and were made with the knowledge and belief that they were false as well as without a sufficient foundation.

73. Dr. Nakamura was defrauded by Mr. Mitsuishi, as an agent of Sunday Group, and the representations and omissions misled Dr. Nakamura, and he manifested the intention to accept Sunday Group's offer of the Mobby MOU. Therefore, Dr. Nakamura has the right to rescind his acceptance to Sunday Group's offer of the Mobby MOU under Article 96, Paragraph 1 of the Civil Code of Japan.

74. Dr. Nakamura noticed his intent to rescind the Mobby MOU pursuant to Article 96, Paragraph 1 of the Civil Code of Japan by letter to Sunday Group dated February 18, 2022.

75. As a direct consequence of the rescission of the Mobby MOU, Dr. Nakamura has the right to demand return of 4,228.14 ether itself as the right to restore what was already performed to the original state before the formation of the Mobby MOU under Japanese law.

## COUNT IX – BREACH OF DUTY TO EXPLAIN

*(Against Sunday Group, Toshiki (Todd) Mitsuishi)*

76. In late 2017, Toshiki (Todd) Mitsuishi, as an agent of Sunday Group, made representations and omissions to Dr. Nakamura regarding a "Mobby Project" which culminated in the formation of a valid contract with Dr. Nakamura, the Mobby MOU. The Mobby MOU contained a choice of law provision that provided that the agreement would be governed by the law of Japan.

77. Article 709 of the Civil Code of Japan provides that a person that has intentionally or negligently infringed the rights or legally protected interests of another person is liable to compensate for damage resulting in consequence. The claim under the article is called a general tort claim in Japan. A person who is a party of contract has the duty not to make false representations and omissions in material facts.

78. Defendants' representations and omissions, such as the ones regarding Professor Leonard Kleinrock's purported involvement with Sunday Group, were both material and false, and were made with the knowledge and belief that they were false as well as without a sufficient foundation.

79. Dr. Nakamura accepted Sunday Group's offer of the Mobby MOU based on representations and omissions of Mr. Mitsuishi, as an agent of Sunday Group, which were material and false. Therefore, Dr. Nakamura's rights or legally protected interests were infringed by the representations and omissions.

80. The breach of the duty to explain is a proximate cause of damages to Dr. Nakamura. As a direct consequence of the breach, Dr. Nakamura suffered economic and other harm, including but not limited to, the loss of the 4,228.14 ether he invested pursuant to the Mobby MOU.

**COUNT X – BREACH OF CONTRACT**

*(Against SGI Trust)*

81. In early 2018, Toshiki (Todd) Mitsuishi, an officer of SGI Trust, made representations and omissions to Dr. Nakamura regarding a purported opportunity to invest in a cryptocurrency mining center which culminated in the formation of a valid contract with Dr. Nakamura, a March 1, 2018 Cloud Mining Agreement (the "Mining Agreement"), which Mr. Mitsuishi executed on behalf of SGI Trust.

82. SGI Trust thereafter breached the Mining Agreement by (a) upon information and belief, never transferring Dr. Nakamura's investment to its intended destination, BCN, and (b) not facilitating Dr. Nakamura's receipt of monthly distributions of capital he was promised or the corresponding reports to which he was entitled. Those breaches are continuing.

83. Those contractual breaches are a proximate cause of damage to Dr. Nakamura. As a direct consequence of the breaches, Dr. Nakamura has suffered economic and other harm, including but not limited to the loss of the 545.455 bitcoin he invested pursuant to the Mining Agreement.

## COUNT XI – FRAUD / INTENTIONAL MISREPRESENTATION
*(SGI Trust and Toshiki (Todd) Mitsuishi)*

84. In early 2018, Toshiki (Todd) Mitsuishi, as agent of SGI Trust, made representations and omissions to Dr. Nakamura regarding a purported opportunity to invest in a cryptocurrency mining center which culminated in the formation of a valid contract with Dr. Nakamura, the Mining Agreement.

85. Those representations and omissions, such as the failure to disclose that BCN was a Ponzi scheme, were both material and false, and were made with the knowledge and belief that they were false as well as without a sufficient foundation.

86. SGI Trust and Mr. Mitsuishi intended to and did induce Dr. Nakamura's justifiable reliance on the representations and omissions made.

87. The representations and omissions made are a proximate cause of damage to Dr. Nakamura. As a direct consequence of the representations and omissions, Dr. Nakamura has suffered economic and other harm, including but not limited to the loss of the 545.455 bitcoin he invested pursuant to the Mining Agreement.

## COUNT XII – FRAUDULENT INDUCEMENT
*(Against SGI Trust and Toshiki (Todd) Mitsuishi)*

88. In early 2018, Toshiki (Todd) Mitsuishi, as agent of Sunday Group affiliate SGI Trust, made representations and omissions to Dr. Nakamura regarding a purported opportunity to invest in a cryptocurrency mining center which culminated in the formation of a valid contract with Dr. Nakamura, the Mining Agreement.

89. Those representations and omissions, such as the failure to disclose that BCN was a Ponzi scheme, were both material and false, and were made with the knowledge and belief that they were false as well as without a sufficient foundation.

90.     SGI Trust and Mr. Mitsuishi intended to and did induce Dr. Nakamura's justifiable reliance on the representations and omissions made.

91.     The representations and omissions made are a proximate cause of damage to Dr. Nakamura. As a direct consequence of the representations and omissions, Dr. Nakamura has suffered economic and other harm, including but not limited to the loss of the 545.455 bitcoin he invested pursuant to the Mining Agreement.

## COUNT XIII – NEGLIGENT MISREPRESENTATION

*(Against SGI Trust and Toshiki (Todd) Mitsuishi)*

92.     In early 2018, Toshiki (Todd) Mitsuishi, as agent of Sunday Group affiliate SGI Trust, and in the course of Mr. Mitsuishi's, and SGI Trust's business, profession, and employment and in an action in which Mr. Mitsuishi, and SGI Trust have a pecuniary interest, made representations and omissions to Dr. Nakamura regarding a purported opportunity to invest in a cryptocurrency mining center which culminated in the formation of a valid contract with Dr. Nakamura, the Mining Agreement.

93.     Those representations and omissions, such as the failure to disclose that BCN was a Ponzi scheme, were both material and false and were supplied for the guidance of Dr. Nakamura in his business transactions.

94.     Mr. Mitsuishi and SGI Trust failed to exercise reasonable care or competence in obtaining and communicating information to Dr. Nakamura.

95.     Mr. Mitsuishi and SGI Trust intended to and did induce Dr. Nakamura's justifiable reliance on the representations and omissions made.

96.     The representations and omissions made are a proximate cause of damage to Dr. Nakamura. As a direct consequence of the representations and omissions, Dr. Nakamura has suffered economic and other harm, including but not limited to the loss of the 545.455 bitcoin he invested pursuant to the Mining Agreement.

**COUNT XIV – UNJUST ENRICHMENT**

*(SGI Trust and Toshiki (Todd) Mitsuishi)*

97. In early 2018, Toshiki (Todd) Mitsuishi, as agent of Sunday Group affiliate SGI Trust, made representations and omissions to Dr. Nakamura regarding a purported opportunity to invest in a cryptocurrency mining center which culminated in the formation of a valid contract with Dr. Nakamura, the Mining Agreement.

98. Pursuant to the Mining Agreement, Dr. Nakamura transferred 545.455 bitcoin to SGI Trust.

99. By virtue of Dr. Nakamura's mining investment, a benefit was conferred upon Mr. Mitsuishi, and SGI Trust, each of whom are aware of and fully appreciate that benefit and accepted and retained the benefit. As such, each have been enriched unjustly.

100. As an alternative to recovery on the contract (the Mining Agreement), recovery on grounds of unjust enrichment is due.

**PRAYER FOR RELIEF**

WHEREFORE, Dr. Nakamura prays for judgment as follows:

1. That the Court compel an accounting of Defendants' assets, including all blockchain-based assets, such that Dr. Nakamura may ascertain the extent thereof and the current location of his capital contributions;

2. That the Court order the above-discussed Subscription Agreement, Mobby MOU, and Mining Agreement rescinded;

3. That compensatory, exemplary, punitive and all other damages available at law be awarded Dr. Nakamura, as against Defendants, jointly and severally;

4. That injunctive relief be ordered, compelling Defendants to return to Dr. Nakamura, in kind, 4,228.14 ether and 545.455 bitcoin;

5. That all fees and costs, including but not limited to attorneys' fees, be awarded to Dr. Nakamura to the maximum extent allowable by law; and

6. That Dr. Nakamura be granted such further relief as the Court may deem just and proper.

Plaintiff hereby demands a trial by jury.

Dated: August 16, 2022.

**FENWICK & WEST LLP**

By: */s/ Felix S. Lee*
    Felix S. Lee
    Christopher J. Steskal
    Casey O'Neill
    Claire Mena

(California Attorneys will comply with LR IA 11-2 within 14 days)

    *and*

**FENNEMORE CRAIG, P.C.**

By: */s/ John D. Tennert III*
    John D. Tennert III (Nevada Bar No. 11728)
    Wade Beavers (Nevada Bar No. 13451)

Attorneys for Plaintiff
TETSUYA NAKAMURA