FELIX S. LEE (CSB No. 197084)
flee@fenwick.com
CHRISTOPHER J. STESKAL (CSB No. 212297)
csteskal@fenwick.com
CASEY O'NEILL (CSB No. 264406)
coneill@fenwick.com
CLAIRE MENA (CSB No. 339324)
cmena@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
Telephone:     650.988.8500
Facsimile:     650.938.5200

JOHN D. TENNERT III (Nevada Bar No. 11728)
jtennert@fennemorelaw.com
WADE BEAVERS (Nevada Bar No. 13451)
wbeavers@fennemorelaw.com
FENNEMORE CRAIG, P.C.
7800 Rancharrah Parkway
Reno, NV 89511
Telephone: 775.788.2212
Facsimile: 775.786.1172

Attorneys for Plaintiff
TETSUYA NAKAMURA

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| TETSUYA NAKAMURA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SUNDAY GROUP INCORPORATED, SGI TRUST, TOSHIKI (TODD) MITSUISHI, JAMES PACK and JOHN DOES 1-10,<br><br>　　　　　Defendants. | Case No.: 2:22-cv-01324-MMD-EJY<br><br>**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |

1

# TABLE OF CONTENTS

| | | | PAGE(S) |
|---|---|---|---|
| I. | INTRODUCTION | | 5 |
| II. | FACTUAL BACKGROUND | | 6 |
| | A. | The Subscription Agreement | 6 |
| | B. | The "Mobby" Cryptocurrency Investment | 7 |
| | C. | The Cryptocurrency Mining Investment | 8 |
| III. | ARGUMENT | | 9 |
| | A. | Defendants' Argument that the Mobby Claims Must Be Brought in Japan is Based on a Mistranslation of the Governing Contract. | 9 |
| | B. | Dr. Nakamura's Claims Are Timely Filed. | 10 |
| | | 1. Breach of Contract – Failure to Deliver Share Certificates | 11 |
| | | 2. Fraud, Misrepresentation, and Breach of Fiduciary Duty | 12 |
| | | 3. Dr. Nakamura's Unjust Enrichment Claim Is Timely | 13 |
| | C. | The Economic Loss Doctrine Does Not Bar Dr. Nakamura's Claims. | 14 |
| | | 1. The Economic Loss Doctrine Has No Applicability to Fraud-Based Claims. | 14 |
| | | 2. Negligent Misrepresentation Claims Are Not Barred. | 15 |
| | | 3. Fiduciary Duty Claims Are Not Barred. | 16 |
| IV. | CONCLUSION | | 16 |

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Bank of Am. v. Bailey*,
2016 WL 3410174 (D. Nev. June 15, 2016) ....................16

*Bemis v. Estate of Bemis*,
967 P.2d 437 (Nev. 1998) ....................10, 11, 12

*Cohen v. Mirage Resorts, Inc.*,
62 P.3d 720 (Nev. 2003) ....................16

*Color Switch LLC v. Fortafy Games DMCC*,
377 F. Supp. 3d 1075 (E.D. Cal. 2019), *aff'd*, 818 F. App'x 694 (9th Cir. 2020) ....................10

*Contreras v. Am. Fam. Mut. Ins. Co.*,
135 F. Supp. 3d 1208 (D. Nev. 2015) ....................15

*Davis v. Beling*,
278 P.3d 501 (Nev. 2012) ....................16

*Erie R.R. Co. v. Tompkins*,
304 U.S. 64 (1938), *aff'd*, 758 F. App'x 599 (9th Cir. 2019) ....................11

*Forman v. United Health Prods., Inc.*,
2020 WL 1308326 (D. Nev. Mar. 19, 2020) ....................10

*Giles v. Gen. Motors Acceptance Corp.*,
494 F.3d 865 (9th Cir. 2007) ....................14

*Golden Nugget, Inc. v. Ham*,
589 P.2d 173 (Nev. 1979) ....................13

*Grolsche Bierbrouwerij Nederland, B.V. v. DoveBid, Inc.*,
2011 WL 3359913 (N.D. Cal. Aug. 2, 2011) ....................9

*Guar. Trust Co. v. York*,
326 U.S. 99 (1945) ....................11

*Halcrow, Inc. v. Eighth Jud. Dist. Ct.*,
302 P.3d 1148 (Nev. 2013) ....................15, 16

*In re Amerco Deriv. Litig.*,
252 P.3d 681 (Nev. 2011) ....................10, 12, 14

*In re Zappos.com, Inc.*,
2013 WL 4830497 (D. Nev. Sept. 9, 2013) ....................15

*Jinks v. Richland Cnty., S.C.*,
538 U.S. 456 (2003) ....................11

*Lei v. Amway Corp.*,
2014 WL 12596787 (C.D. Cal. July 23, 2014) ....................10

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005)..................................................................................................16

*Metro. Water Dist. of S. Cal. v. State*,
  665 P.2d 262 (Nev. 1983) .........................................................................................12, 13, 14

*Peri & Sons Farms, Inc. v. Jain Irr., Inc.*,
  933 F. Supp. 2d 1279 (D. Nev. 2013) ......................................................................................14

*Phillips v. Dignified Transition Sols.*,
  2014 WL 4294972 (D. Nev. Aug. 28, 2014) ...........................................................................15

*Rattagan v. Uber Techs., Inc.*,
  19 F.4th 1188 (9th Cir. 2021) ..................................................................................................14

*Silver State Broad., LLC v. Beasley FM Acquisition Corp.*,
  2012 WL 4049481 (D. Nev. Sept. 12, 2012) ...........................................................................16

*Terracon Consultants W., Inc. v. Mandalay Resort Grp.*,
  206 P.3d 81 (Nev. 2009) .........................................................................................................15

*Urban Outfitters, Inc. v. Dermody Operating Co.*,
  572 F. Supp. 3d 977 (D. Nev. 2021) ........................................................................................12

*Walker v. State Farm Mut. Auto. Ins. Co.*,
  259 F. Supp. 3d 1139 (D. Nev. 2017) ......................................................................................11

**STATUTES**

Nev. Rev. Stat.
  § 11.190(1)(b) ..........................................................................................................................11
  § 11.190(2)(c) ..........................................................................................................................14
  § 11.190(3)(d) ...................................................................................................................12, 14
  § 78.138.1 ................................................................................................................................16

## I.  INTRODUCTION

This action is the product of a familiar fact pattern: a technology startup capitalizes on investor enthusiasm for the burgeoning blockchain industry with a high-concept sales pitch, larded with promises of high returns, accompanied by a dense technical whitepaper authored by a prominent academic, and touting the prospect that shareholders could be involved from the outset in the creation of a revolutionary cryptocurrency.  Defendants Sunday Group, Inc. ("Sunday Group"), SGI Trust, Toshiki (Todd) Mitsuishi and James Pack were the architects of this project, which over time was revealed to be a sophisticated fraud.  After luring Dr. Tetsuya Nakamura (and others) into investing millions of dollars' worth of crypto assets into Sunday Group and related projects, Defendants have not honored their most rudimentary of obligations to shareholders – share certificates have not been issued; contractually required financial information has not be provided; the "Mobby" cryptocurrency has never materialized; the professor who co-authored the Mobby whitepaper has disclaimed all material involvement with the project; and investor funds were solicited for a crypto-mining operation that is now being prosecuted by the U.S. Department of Justice as an alleged criminal Ponzi scheme.

In response to Dr. Nakamura's complaint, Defendants attempt to skirt responsibility for their misdeeds by advancing a variety of arguments in their motion to dismiss that have no legal or factual basis.  They begin by asserting that the claims regarding the Mobby token must be litigated in Japan, a demonstrably false claim premised on an inaccurate translation of the Japanese-language Mobby contract.  And even if Defendants' defective translation were considered – which it should not be, given that no information has been proffered to support its authenticity – at best it would simply create a material issue of fact regarding which translation is correct, an issue that cannot be resolved on a motion to dismiss.

Defendants fare no better with their claim that various causes are time-barred.  With regard to Sunday Group's refusal to provide contractually required share certificates, Defendants' arguments are premised on a misreading of the relevant contractual provisions, and in particular, an incorrect interpretation of when share certificates had to be provided, which in turn renders their statute of limitations analysis entirely inaccurate.  Equally fatal to Defendants' arguments is

their failure to address the "discovery rule" under Nevada law—which states that the statute of limitations does not run until a Plaintiff knows or should reasonably know about the basis for his claims.  Defendants' Motion does not address this doctrine at any point – much less the fact that Defendants actively and successfully concealed their fraudulent conduct for years – which nullifies any argument that the statute of limitations has lapsed on any of Dr. Nakamura's claims.

Defendants' "economic loss doctrine" arguments are equally infirm, as established by Defendants' ***own authorities***, which definitively state that intentional torts such as fraud and fraudulent inducement are not subject to the doctrine.  The same holds true for negligent misrepresentations regarding financial matters, or breach of fiduciary duty based on intentional misconduct, neither of which is subject as a matter of law to the economic loss doctrine.

For all of these reasons, Defendant's motion to dismiss should be denied.

## II.    FACTUAL BACKGROUND

### A.    The Subscription Agreement

In April 2015, Defendant Mitsuishi, then-CEO of Sunday Group, visited Japan to solicit equity investments in Sunday Group.  ¶ 20.[1]  In urging Dr. Nakamura to invest, Mr. Mitsuishi represented, among other things, that an investment in Sunday Group would be a rare opportunity to be involved at an early stage in a U.S. cryptocurrency startup, and that investor funds would be used to launch a variety of crypto-related projects.  *Id.*  Based on Mr. Mitsuishi's representations, Dr. Nakamura entered into a Series AA Preferred Stock Subscription Agreement (the "Subscription Agreement") whereby he purchased 4,000 shares of Series AA preferred stock of Sunday Group, at a purchase price of $5 USD per share, for total consideration of $20,000 USD.  ¶ 21.  Dr. Nakamura thereafter increased his investment to $350,000 USD pursuant to his preemption and anti-dilution rights in the Subscription Agreement.  *Id.*

Sunday Group subsequently failed to honor any of its primary contractual obligations under the Subscription Agreement.  ¶ 22.  Section 1(b) of the Subscription Agreement obligates Sunday Group to promptly deliver to Dr. Nakamura one or more certificates reflecting his share

---

[1] Unless otherwise noted, all paragraph references are to Plaintiff's Complaint.

ownership after the funding round closed, which Sunday Group never did, thereby breaching the agreement and calling into question whether the shares were ever issued. *Id*. Section 4 of the Subscription Agreement further obligates Sunday Group to provide Dr. Nakamura copies of the company's balance sheet, statement of income and statement of cash flows for each fiscal year, which Sunday Group also inexplicably failed to do at any point. ¶ 23. Sunday Group has never provided an explanation for why it would refuse to provide such basic contractually mandated information to its investors, underscoring the fraudulent nature of the enterprise. *Id*. And, even more fundamentally, in the more than five years of Sunday Group's existence, the company has never produced a single viable product. ¶ 24.

### B. The "Mobby" Cryptocurrency Investment

In late 2017, Sunday Group and Defendant Mitsuishi successfully solicited further capital investment from Dr. Nakamura and others into a cryptocurrency project dubbed "Mobby", that Sunday Group claimed to be developing. ¶ 25. Sunday Group representatives, including Mr. Mitsuishi, made a variety of materially false statements about the Mobby Project to Dr. Nakamura and other investors. ¶ 26. Significantly, Mr. Mitsuishi represented to Dr. Nakamura that Professor Leonard Kleinrock of the University of California Los Angeles was a member of Sunday Group's board of directors and would play a central role in product development, a representation that has subsequently been proven to have been false, with Professor Kleinrock denying any operational involvement in the Mobby project. *Id*. Additionally, Mr. Mitsuishi represented that (a) project technology had reached the prototype stage, (b) exchange listing of M-Tokens (the trade name of the Mobby cryptocurrency) was imminent, and (c) the value of the Mobby token once listed would increase at least tenfold, and potentially as much as several hundred to several thousand times its value. *Id*. Not one of these representations was true, and all of them were knowingly false and misleading when made. *Id*.

Relying on Sunday Group's misrepresentations, Dr. Nakamura entered into a Memorandum of Understanding to Participate in Private Sale dated November 28, 2017 (the "Mobby MOU"). ¶ 27. Pursuant to the Mobby MOU, Dr. Nakamura tendered approximately 4,228.14 ether to the digital wallet address designated by Sunday Group, in exchange for the right

FENWICK & WEST LLP
ATTORNEYS AT LAW

to receive 200 units of M-Tokens at a valuation of $10,000 USD per unit. *Id*. The ether Dr. Nakamura transferred to Sunday Group was worth approximately $4.8 million USD at the time the Complaint was filed. *Id*.

Sunday Group never transmitted any M-Tokens to Dr. Nakamura as promised. ¶ 28. Instead, Defendants Sunday Group, Mitsuishi and Pack, through investor newsletters, emails, and oral conversations, have made a lengthy series of false statements stating that Mobby Project development has been going well and that the Mobby tokens and wallet were already in place, while manufacturing numerous false and pretextual reasons why the M-Tokens had not completed development, been issued or listed. *Id*.

### C. The Cryptocurrency Mining Investment

Defendants' campaign of deceit continued in early 2018, when Defendant Mitsuishi, acting on behalf of SGI Trust, solicited a third investment from Dr. Nakamura. ¶ 29. He induced Dr. Nakamura to invest in a purported cryptocurrency mining center operated by a third-party mining company, BitClub Network ("BCN"), whereby his investment would purportedly be used to acquire computers which would validate cryptocurrency transactions and receive cryptocurrency in return, from which Dr. Nakamura would be paid his pro rata share. *Id*. Mr. Mitsuishi promised Dr. Nakamura that he would receive massive returns derived from his mining investment and showed him a simulation table showing profits of well over $1 million USD per month. *Id*.

Relying on those representations, Dr. Nakamura entered into a March 1, 2018 Cloud Mining Agreement with SGI Trust, executed by Mr. Mitsuishi on behalf of SGI Trust. ¶ 30. In accordance with that agreement and instructions received from Mr. Mitsuishi, Dr. Nakamura transferred approximately 545.455 bitcoin (worth approximately $11 million USD at the time the Complaint was filed) to digital wallet addresses to be invested in BCN. *Id*.

Dr. Nakamura did not receive the monthly distributions he was promised (except for in two isolated instances, presumably conveyed for the purpose of deflecting suspicion about the validity of the project) or the corresponding reports he was contractually entitled to receive as a part of his mining investment. ¶ 31. At no point have Mr. Mitsuishi and SGI Trust substantiated

8

that they made the contractually obligated payment to BCN. ¶ 32. The distributions Dr. Nakamura received from this purported opportunity were less than a tenth of the value of his initial investment, and a miniscule fraction of the returns that had been represented to induce Mr. Nakamura to invest. ¶ 33.

### III.     ARGUMENT

#### A.   Defendants' Argument that the Mobby Claims Must Be Brought in Japan is Based on a Mistranslation of the Governing Contract.

Defendants move to dismiss the claims arising from the Mobby MOU (Counts 7-9) based on the demonstrably false assertion that it contains a forum selection clause requiring such claims be brought "in a local court in the city in which the address of [Dr. Nakamura] is registered." Mot. 2-3. As a *certified translation* of the MOU demonstrates, however, Defendants' translation is inaccurate, and Article 5 of the MOU actually states that: "[t]he address of **Defendant** shall be the exclusive court of jurisdiction for first instance . . " Lee Decl., Ex. A (emphasis added); *see Grolsche Bierbrouwerij Nederland, B.V. v. DoveBid, Inc.*, 2011 WL 3359913, at *2 n.3 (N.D. Cal. Aug. 2, 2011) (taking judicial notice of certified translation of a contract). The key discrepancy between Plaintiff's and Defendants' respective translations is the character "被告", which is correctly translated as "Defendant". Lee Decl., Ex. A. Defendants inexplicably mistranslate this character as "[Dr. Nakamura]". Mot., Ex. 1.

> 第5条　（準拠法及び管轄裁判所）
> 本覚書の準拠法は日本法とし、本覚書に起因し又は関連する一切の紛争については、訴額に応じ、被告の住所地を第一審の専属的合意管轄裁判所とする。

Consequently, this key provision of the Mobby MOU mandates that claims for breach of contract be brought in Nevada, where Defendant Sunday Group is incorporated and where each Defendant maintains his/her/its residence and/or principal place of business (which Defendants' Motion does not dispute). ¶¶ 9-12.

Notably, the translation of the Mobby MOU that Defendants attach to their motion is *not* certified and does not identify the translator or otherwise provide any information supporting the

1   translation's authenticity – a fact that by itself requires that the motion to dismiss be denied. *Lei*
2   *v. Amway Corp.*, 2014 WL 12596787, at *8 n.3 (C.D. Cal. July 23, 2014) (denying motion to
3   dismiss relying upon a translation of a foreign language document that had no accompanying
4   "declaration or proof of certification"). And, even if Defendants' translation was considered, the
5   parties' two competing translations do nothing more than create a factual dispute about which
6   translation is correct, a matter that cannot be resolved as a matter of law at the pleading stage. *Id.*

7   It should be further be noted that, even if Defendants' mistranslation of the Mobby MOU
8   was ignored, their forum argument is still defective for multiple reasons. **First**, "[t]he appropriate
9   way to enforce a forum selection clause pointing to a state or foreign forum is through the
10  doctrine of *forum non conveniens*", and Defendants make no mention of this doctrine, must less
11  demonstrate how they satisfy its requirements. *Color Switch LLC v. Fortafy Games DMCC*, 377
12  F. Supp. 3d 1075, 1082 (E.D. Cal. 2019) (internal quotation marks and citation omitted), *aff'd*,
13  818 F. App'x 694 (9th Cir. 2020). **Second**, a prerequisite to enforcing a forum selection clause is
14  the validity and enforceability of the contract in which the clause sits. *Color Switch LLC*, 377 F.
15  Supp. 3d at 1082. Here, Defendants apparently dispute the "validity and enforceability" of the
16  MOU, which bars any attempt to enforce the forum provision therein. Mot. at 3 n.1 ("Defendants
17  do not admit the validity or enforceability of the Mobby MOU . . . .").

18  For all of these reasons, Defendants' motion to dismiss Counts 7-9 should be overruled.

19  **B.   Dr. Nakamura's Claims Are Timely Filed.**

20  Defendants fare no better with their assertion that Counts 1 through 6 are time-barred.
21  Mot. at 4-6. In each instance, Defendants' arguments fail because they: (1) incorrectly identify
22  when the initial injury occurred; and (2) wholly ignore the "discovery rule", which tolls the
23  statute of limitations "until the injured party discovers or reasonably should have discovered facts
24  supporting a cause of action", and mandates that "[d]ismissal on statute of limitations grounds is
25  only appropriate when **uncontroverted evidence irrefutably demonstrates** plaintiff discovered or
26  should have discovered the facts giving rise to the cause of action." *Bemis v. Estate of Bemis*, 967
27  P.2d 437, 440 (Nev. 1998) (internal quotation marks and citation omitted); *see also In re Amerco*
28  *Deriv. Litig.*, 252 P.3d 681, 703-04 (Nev. 2011); *Forman v. United Health Prods., Inc.*, 2020 WL

FENWICK & WEST LLP
ATTORNEYS AT LAW

1308326, at *5 (D. Nev. Mar. 19, 2020).[2]

### 1. Breach of Contract – Failure to Deliver Share Certificates

In Count 1, Dr. Nakamura alleges that Sunday Group and Defendant Mitsuishi breached the Subscription Agreement by: (1) failing to deliver to Dr. Nakamura one or more share certificates; and (2) failing to provide contractually obligated financial statements. ¶¶ 22-23, 37-39. The statute of limitations for a breach of contract claim in Nevada is six years. Nev. Rev. Stat. § 11.190(1)(b).

With regard to the failure to deliver share certificates, Defendants improperly contend that the statute of limitations began to run when the Subscription Agreement was executed on April 19, 2015, because "[t]he agreement does not specify a time frame for delivery of the share certificates". Mot. at 5. This assertion is directly contradicted by the plain language of the Subscription Agreement (incorporated by reference into the Complaint), which states that the share certificates must delivered "[p]romptly following the **Closing Date**." Lee Decl., Ex. B ¶ 1(c) (emphasis added). The "Closing Date", in turn, occurs either on:

> 1) the "Initial Closing Date," defined as "after the Company has received subscriptions for Series AA Preferred representing at least $1,000,000"; ***or***
>
> 2) "if Purchaser is purchasing the Shares subsequent to the Initial Closing Date, the issuance of the Shares shall occur upon payment of the Purchase Price by Purchaser and acceptance of Purchaser's Subscription Agreement by the Company."

*Id.*. Defendants' Motion does not state – much less substantiate – when the Closing Date occurred. Mot. at 5. Since that is the ***earliest*** possible date that the claim would have accrued, Defendants have failed to carry their burden of demonstrating that the six-year limitations period has lapsed. *Bemis*, 967 P.2d at 440.

Furthermore, the discovery rule requires that Defendants establish that Dr. Nakamura knew or reasonably should have known that sufficient Series AA subscriptions had been received

---

[2] A federal court sitting in diversity, as this one sits, must apply the state law of the forum in which it sits. *Walker v. State Farm Mut. Auto. Ins. Co.*, 259 F. Supp. 3d 1139, 1144 (D. Nev. 2017) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), *aff'd*, 758 F. App'x 599 (9th Cir. 2019)). Statutes of limitation are outcome-determinative, thus substantive, and so this Court must look to Nevada law for the applicable statutes. *Jinks v. Richland Cnty., S.C.*, 538 U.S. 456, 465 (2003) (citing *Guar. Trust Co. v. York*, 326 U.S. 99 (1945)).

11

by Sunday Group to trigger the Closing Date, and by extension, to trigger the obligation to deliver the share certificates. *Bemis*, 967 P.2d at 440. The Motion makes no such showing, providing an independent reason why the motion to dismiss should be overruled. *Id.* Thus, Defendants have not provided "uncontroverted evidence" to "irrefutably show" that Dr. Nakamura "knew or should have known" of a contractual breach more than six years before filing the complaint, and thus the motion to dismiss these claims must be overruled.[3] *See Urban Outfitters, Inc. v. Dermody Operating Co.*, 572 F. Supp. 3d 977, 994 (D. Nev. 2021).[4]

## 2. Fraud, Misrepresentation, and Breach of Fiduciary Duty

In pleading Counts 2 through 4, Dr. Nakamura alleges that Sunday Group and Mr. Mitsuishi made false and material representations and omissions to Dr. Nakamura which induced execution of the Subscription Agreement. ¶¶ 40-52. In pleading Count 5, Dr. Nakamura alleges that Messrs. Mitsuishi and Pack breached their fiduciary duties in their director and officer roles, including duties of care, loyalty, and good faith which they owed to Sunday Group and its shareholders. ¶¶ 53-58.

Under the applicable Nevada law, fraud, negligent misrepresentation, and the breach of fiduciary duty claim are subject to a three-year statute of limitations. *In re Amerco*, 252 P.3d at 703; Nev. Rev. Stat. § 11.190(3)(d). As with the breach of contract claim, these causes of action "accrue upon the discovery by the aggrieved party of the facts constituting the fraud or mistake." Nev. Rev. Stat. § 11.190(3)(d); *see also Metro. Water Dist. of S. Cal. v. State*, 665 P.2d 262, 265 (Nev. 1983) (interpreting Nev. Rev. Stat. § 11.190(3)(d) to mean that the statute of limitations was tolled until the plaintiff "knew, or had reason to know, that its rights had been violated . . .

---

[3] Although not dispositive, Defendants also fail to acknowledge a tolling agreement Dr. Nakamura and Defendants executed, which tolled Dr. Nakamura's claims from March 15, 2022 to May 1, 2022.

[4] Defendants' Motion also does not address the fact that Count 1 also alleges that the Subscription Agreement was breached because Sunday Group failed to provide required financial statements on an ***annual basis***, which are separate and ongoing yearly breaches that continue to the present, and thus would not be remotely barred by the statute of limitations. ¶ 38. Notably, the Subscription Agreement expressly states that "no delay or omission to exercise any right, power or remedy to any party, upon any breach, default or noncompliance by another party…shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach, default or noncompliance thereafter occurring." Lee Decl., Ex. B ¶ 7(j).

12

."); *Golden Nugget, Inc. v. Ham*, 589 P.2d 173, 175 (Nev. 1979) ("when a party who is relied upon in a fiduciary capacity fails to fulfill his obligations thereunder, and does not tell the other party of his failure, his omission constitutes constructive fraud, tolling the statute of limitations until the facts constituting the fraud are discovered, or should have been discovered").

The complaint alleges misrepresentations such as: (1) Dr. Nakamura would receive share certificates; (2) Dr. Nakamura would receive annual financial updates and information upon request; and (3) Dr. Nakamura's invested capital would be used to develop various cryptocurrency projects. ¶¶ 40-52. The Complaint also alleges corresponding fiduciary breaches, due to the failure to issue Sunday Group share certificates, provide access to financial statements, or produce a single viable product, as well as the failure to account for Dr. Nakamura's Series AA capital. ¶¶ 53-58.

With regard to the failure to provide share certificates and financial information, Counts 2 through 5 are timely for the same reason the breach of contract claim was timely, *i.e.*, the Motion incorrectly specifies when the share certificates were due to be delivered, and thus Defendants fail to carry their burden of showing that the claims are untimely, and the failure to deliver financial information on an annual basis is an ongoing violation that continues to the present. *Id.*; s*ee also* Section III.B.1, *supra*. With regard to representations about how Dr. Nakamura's invested capital would be used, he did not discover or have reason to discover that Defendants had misrepresented their intentions with respect to Sunday Group until late 2019 at the earliest, continuing through 2020 and 2021, when it became apparent that Sunday Group had developed no viable product and had made multiple misrepresentations about its projects, including but not limited to the involvement of Professor Kleinrock in the Mobby project. ¶¶ 24, 26, 28. The Motion makes no allegation to the contrary, and indeed does not address the discovery rule at any point, and thus the motion to dismiss these claims should be overruled. *Metro. Water Dist. of S. Cal.*, 665 P.2d at 265.

### 3. Dr. Nakamura's Unjust Enrichment Claim Is Timely

For Count 6, Dr. Nakamura alleges unjust enrichment as an alternative to recovery on the contract, as Dr. Nakamura's Series AA investment in Sunday Group conferred an unjust benefit

upon Defendants. ¶¶ 59-63. The statute of limitations for an unjust enrichment claim is four years. Nev. Rev. Stat. § 11.190(2)(c); *In re Amerco*, 252 P.3d at 703.

As for his other claims, Dr. Nakamura's unjust enrichment claim did not accrue until late 2019 at the earliest. Dr. Nakamura did not discover or have reason to discover that Defendants were unjustly enriched until late 2019, when it became apparent that Sunday Group had developed no viable product, refused to provide financial statements or otherwise account for Dr. Nakamura's investment. ¶¶ 24, 26, 28; *see also Metro. Water Dist. of S. Cal.*, 665 P.2d at 265 (interpreting Nev. Rev. Stat. § 11.190(3)(d) to mean that the statute of limitations was tolled until the plaintiff "knew, or had reason to know, that its rights had been violated . . . ."). Indeed, the very authority upon which Defendants rely confirms as much. *See In re Amerco*, 252 P.3d at 703 (noting questions of fact as to whether unjust enrichment statute had run).

### C. The Economic Loss Doctrine Does Not Bar Dr. Nakamura's Claims.

#### 1. The Economic Loss Doctrine Has No Applicability to Fraud-Based Claims.

Finally, Defendants badly mischaracterize Nevada law[5] in asserting that Dr. Nakamura's claims of fraudulent and/or negligent misrepresentations are barred by the economic loss doctrine.[6] To the contrary, Nevada law expressly permits Dr. Nakamura's claims, as is confirmed by Defendants' **own authority**. *Giles*, 494 F.3d at 880 (holding that fraudulent inducement claim was not barred by economic loss doctrine because the claim was "based on behavior outside the contractual obligations and in violation of the duty imposed under Nevada law not to commit fraud."); *Peri & Sons Farms, Inc. v. Jain Irr., Inc.*, 933 F. Supp. 2d 1279, 1291 (D. Nev. 2013) ("As for plaintiff's fraudulent concealment claim, the court cannot conclude that the economic

---

[5] As with the foregoing timeliness analysis, Nevada state law governs and defines the contours of the economic loss doctrine. *See*, *supra* § III(B) n.2; *see also Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 879 (9th Cir. 2007) (applying Nevada state law on economic loss doctrine in diversity case); *Rattagan v. Uber Techs., Inc.*, 19 F.4th 1188, 1190 (9th Cir. 2021) ("Federal courts sitting in diversity, as here, apply state substantive law and federal procedural law . . . . Application of the economic loss rule is substantive and thus governed by [state] law.") (citations omitted).

[6] Counts 2 (fraud / intentional misrepresentation) and 3 (fraudulent inducement) allege misrepresentations in conjunction with the Subscription Agreement, and Counts 11 (fraud / intentional misrepresentation) and 12 (fraudulent inducement) alleged misrepresentations with regard to the Mining Agreement. ¶¶ 41, 45, 84, 88.

14

loss doctrine would bar this claim under Nevada law."). Because the economic loss doctrine does not bar intentional torts, it does not bar claims of intentional misrepresentation. *Halcrow, Inc. v. Eighth Jud. Dist. Ct.*, 302 P.3d 1148, 1154 n.2 (Nev. 2013). Put differently, the existence of a written contract does not bar a claim that intentional and material representations or omissions fraudulently induced the execution of that contract. Because the fraud claims allege intentionally misleading statements and omissions distinct from contractual breaches, those claims are not barred by the economic loss doctrine as a matter of law. *Id*.

### 2. Negligent Misrepresentation Claims Are Not Barred.

Similarly, Counts 4 and 13 assert negligent misrepresentation based on the Subscription Agreement and the Mining Agreement respectively. The Nevada Supreme Court has explicitly "left open the door" for exceptions to the economic loss doctrine for certain negligent misrepresentation claims, such as those involving "negligent misstatements about financial matters." *Halcrow*, 302 P.3d at 1153 (citing *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 206 P.3d 81, 86 (Nev. 2009). Liability off the contract in such cases is proper because of the risk that "the law would not exert significant financial pressures to avoid such negligence." *Id*. Thus, federal courts in this district applying Nevada law have refused to dismiss negligent misrepresentation claims under the economic loss doctrine. *Contreras v. Am. Fam. Mut. Ins. Co.*, 135 F. Supp. 3d 1208, 1224 (D. Nev. 2015) (economic loss doctrine did not bar negligence claim because there were no contractual provisions "delineat[ing] each party's risks and liabilities in case of negligence" or "exert[ing] significant financial pressures to avoid such negligence.") (citing *Halcrow*, 302 P.3d at 1153); *Phillips v. Dignified Transition Sols.*, 2014 WL 4294972, at *7 (D. Nev. Aug. 28, 2014) (economic loss doctrine did not bar negligent misrepresentation claim based on negligent misstatements about financial matters) (citing *Halcrow* 302 P.3d at 1153); *In re Zappos.com, Inc.*, 2013 WL 4830497, at *4 (D. Nev. Sept. 9, 2013) ("The Nevada Supreme Court does recognize some exceptions [to the economic loss doctrine], such as for negligent misrepresentation claims.").

As with the fraud claims, the Complaint alleges that Defendant negligently misrepresented or omitted material facts about financial matters, which induced Dr. Nakamura to enter into the

Subscription Agreement and the Mining Agreement on false pretenses. ¶¶ 48-52, 92-96. Counts 4 and 13 therefore are not barred by the economic loss doctrine.

### 3. Fiduciary Duty Claims Are Not Barred.

Finally, Count 5 alleges that Messrs. Mitsuishi and Pack breached fiduciary duties. "The economic loss doctrine does not . . . bar the recovery of purely economic losses when the defendant intentionally breaches a duty that is imposed independently of the obligations arising from contract." *Davis v. Beling*, 278 P.3d 501, 514 (Nev. 2012). Thus, just as intentional torts such as fraud are not barred by the economic loss doctrine, courts in this district permit fiduciary breach claims to proceed because they are rooted in duties which exist as a matter of law, apart from any contract. *See, e.g.*, *Bank of Am. v. Bailey*, 2016 WL 3410174, at *4 (D. Nev. June 15, 2016) (holding that economic loss doctrine did not bar claim for breach of fiduciary duty); *Silver State Broad., LLC v. Beasley FM Acquisition Corp.*, 2012 WL 4049481, at *5 (D. Nev. Sept. 12, 2012) (same).

Defendants, by virtue of their director and officer roles with, and their majority shareholdings in, Sunday Group, owed Dr. Nakamura and other Sunday Group shareholders conventional, corporate fiduciary duties. ¶¶ 56-57; Nev. Rev. Stat. § 78.138.1 ("The fiduciary duties of directors and officers are to exercise their respective powers in good faith and with a view to the interests of the corporation."); *see Cohen v. Mirage Resorts, Inc.*, 62 P.3d 720, 728 (Nev. 2003) (discussing fiduciary duties owed by majority shareholders to minority shareholders). Those duties, of care, loyalty, and good faith, exist irrespective of any contract. For that basic reason, the economic loss doctrine does not bar Count 5 either.[7]

## IV. CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety.[8]

---

[7] For the same reasons as the other claims, the economic loss doctrine does not bar Defendant' unjust enrichment claims (Counts 6 and 14) as the doctrine only applies to unintentional torts, and as noted these claims are premised on intentional conduct. *Halcrow*, 302 P.3d at 1154 n.2; *see also* Sections III.C.1 – 3, *supra*.

[8] If the Court grants any part of the Motion, Plaintiff respectfully requests leave to amend, which is routinely and liberally granted. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

16

Respectfully submitted,

Dated: December 2, 2022

FENWICK & WEST LLP

By: *Felix S. Lee*
Felix S. Lee
Christopher J. Steskal
Casey T. O'Neill
Claire Mena

*and*

Dated: December 2, 2022

FENNEMORE CRAIG, P.C.

By: *John D. Tennert*
John D. Tennert III (Nevada Bar No. 11728)
Wade Beavers (Nevada Bar No. 13451)

Attorneys for Plaintiff
TETSUYA NAKAMURA

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of December 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which provided electronic service to all counsel of record.

/s/ *John D. Tennert*
John D. Tennert III