Mark L. Smith (NV Bar #14762)
msmith@sffirm.com
Jacob L. Fonnesbeck (NV Bar #11961)
jfonnesbeck@sffirm.com
**SF FIRM, LLP**
6345 South Pecos Road, Suite 202
Las Vegas, NV 89120
Telephone:  (725) 666-8701
Facsimile:  (725) 666-8710

*Attorneys for Defendants*

Keith M. Woodwell (UT Bar # 7253)
kmw@clydesnow.com
Aaron D. Lebenta (UT Bar # 10180)
adl@clydesnow.com
Timothy R. Pack (UT Bar # 12193)
trp@clydesnow.com
Thomas A. Brady (UT Bar # 12454)
tab@clydesnow.com
**CLYDE SNOW & SESSIONS PC**
201 South Main Street, Suite 2200
Salt Lake City, UT 84111
Telephone: (801) 322-2516

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| TETSUYA NAKAMURA, an individual,<br><br>                    Plaintiff,<br><br>          v.<br><br>SUNDAY GROUP INCORPORATED, a<br>Nevada corporation, *et al.*,<br><br>                    Defendants. | Case No.: 2:22-cv-01324-MMD-EJY<br><br><br>**COUNTERCLAIMANTS'<br>MEMORANDUM IN OPPOSITION TO<br>PLAINTIFF'S MOTION TO DISMISS<br>THE FIRST AMENDED<br>COUNTERCLAIM** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

I.     **INTRODUCTION** ................................................................................................. 1

II.    **STATEMENT OF FACTS** ............................................................................. 2

  A.  Overview of Sunday Group and the Mobby Project ........................................ 2

  B.  Nakamura and His Investment in the Mobby Project ...................................... 3

  C.  Nakamura's Campaign of Harassment of Extortion ........................................ 4

      *1.  March 4, 2021* ............................................................................. 4
      *2.  August 3, 2021* ........................................................................... 4
      *3.  August 6, 2021* ........................................................................... 4
      *4.  August 8, 2021* ........................................................................... 5

  D.  Nakamura Makes False Allegations Against Counterclaimants to the Nevada Securities Division and Other Token Investors ................................................ 6

III.    **LEGAL STANDARD** ................................................................................... 7

IV.    **ARGUMENT** ................................................................................................. 8

  A.  The Defamation/Defamation Per Se Claim is Sufficiently Pled and Timely ...... 8

      *1.  Counterclaimants Have Pled a Plausible Claim for Defamation/Defamation Per Se* .... 8
      *2.  The Defamation Claim is Timely* ................................................. 14

  B.  The Business Disparagement Claim is Sufficiently Pled and Timely ............... 16

  C.  Sunday Group Has Stated a Plausible Claim For Intentional Interference with Contract .. 17

  D.  Sunday Group Has Stated a Plausible Claim Intentional Interference with Prospective Economic Advantage ................................................................... 19

E. Counterclaimants Have Stated a Plausible Claim for Civil Conspiracy ................... 21

V.    **CONCLUSION** ............................................................................................ 23

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Arsenal, Inc. v. Neal,*
   No. 2:11-CV-01628-KJD, 2013 WL 2405289 (D. Nev. May 31, 2013) ............................... 16

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .......................................................................................................... 8

*Balistreri v. Pacifica Police Dep't,*
   901 F.2d 696 (9th Cir.1988)............................................................................................. 14

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................................... 7

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,*
   620 F.2d 1360 (9th Cir.1980)........................................................................................... 22

*Boink Sys., Inc. v. Las Vegas Sands Corp.,*
   2008 WL 11389204 (D. Nev. May 30, 2008) ............................................................. 9, 11

*Brown v. Electronic Arts, Inc.,*
   724 F.3d 1235 (9th Cir. 2013).......................................................................................... 7

*Clark County Sch. Dist. v. Virtual Educ. Software, Inc.,*
   213 P.3d 496 (Nev. 2009) ................................................................................................. 9

*Cohen v. Hansen,*
   2015 WL 3609689 (D. Nev. June 9, 2015) ...................................................... 9, 11, 12, 13

*Consol. Generator-Nevada, Inc. v. Cummins Engine Co.,*
   971 P.2d 1251 (Nev. 1998) .............................................................................................. 22

*Constantino v. McDaniel,*
   2010 WL 1279083 (D. Nev. March 29, 2010) ................................................................. 14

*Cunningham-Dirks v. Nevada,*
   2013 WL 77470 (D. Nev. Jan 3, 2013) ...................................................................... 11, 12

*Diamond Resorts Int'l, Inc. v. Reed Hein & Assocs., LLC,*
   2019 WL 6310717 (D. Nev. Nov. 25, 2019)........................................................ 7, 8, 21, 22

*Donovan v. Flamingo Palms Villas, LLC,*
   2009 WL 10693913 (D. Nev. June 23, 2009) ................................................................. 17

*GES, Inc. v. Corbitt*,
   21 P.3d 11 (Nev. 2001) ........................................................................................ 22

*Grand Canyon Skywalk Dev., LLC v. Cieslak*,
   2014 WL 2123255 (D. Nev. May 21, 2014) ................................................. 9, 14, 15

*In re Amerco Derivative Litig.*,
   252 P.3d 681 (Nev. 2011) ............................................................................... 20, 21

*Levitt v, Leisure Sports*,
   *Inc.*, 734 P.2d 1221 (Nev. 1987) .......................................................................... 21

*Loc. Ad Link, Inc. v. AdzZoo, LLC*,
   2009 WL 10694069 (D. Nev. Dec. 15, 2009) ................................................. passim

*Mattel, Inc. v. MGA Entertainment, Inc.*,
   705 F.3d 1108 (9th Cir. 2013) ............................................................................. 16

*Motogolf.com, LLC v. Top Shelf Golf, LLC*,
   528 F. Supp. 3d 1168 (D. Nev. 2021) .................................................................. 20

*N. Cnty. Commc'ns Corp. v. Sprint Commc'ns Co., L.P.*,
   691 F. App'x 466 (9th Cir. 2017) ......................................................................... 16

*Okeke v. Biomat USA, Inc.*,
   927 F.Supp.2d 1021 (D. Nev. 2013) ................................................................. 9, 11

*Sykes v. Henderson Police Dep't*,
   2023 WL 5561224 (D. Nev. August 29, 2023) ...................................................... 13

*United States ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*,
   720 F.3d 1174 (9th Cir. 2013) ............................................................................. 14

*Universal Ent. Corp. v. Aruze Gaming Am., Inc.*,
   2020 WL 2840153 (D. Nev. May 30, 2020) ................................................... 19, 21

*Wasco Prods., Inc. v. Southwall Techs., Inc.*,
   435 F.3d 989 (9th Cir. 2006) ............................................................................... 22

*Williams v. Univ. Med. Ctr. of S. Nev.*,
   2010 WL 3001707 (D. Nev. July 28, 2010) .......................................................... 15

*Wise v. Schreiber*,
   2017 WL 662981 (D. Nev. Feb. 17, 2017) ............................................................ 14

*WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*,

750 F. Supp. 2d 1180 (D. Nev. 2010) ........................................................................ 18

*Yates v. Washoe Cnty. Sch. Dist.*,
    2007 WL 3256576 (D. Nev. Oct. 31, 2007) ......................................................... 16

**Rules**

Fed. R. Civ. P. 8(a) ............................................................................................... 7, 9, 12

Fed. R. Civ. P. 41(a)(1)(A)(i) ....................................................................................... 8

Rule 8 ...................................................................................................................... 7, 11

Defendants/Counterclaimants Sunday Group Incorporated ("Sunday Group") and Toshiki (Todd) Mitsuishi ("Mitsuishi") (collectively, sometimes, "Counterclaimants") submit this Memorandum in Opposition to Plaintiff/Counterclaim Defendant Tetsuya Nakamura's ("Nakamura") Motion to Dismiss the First Amended Counterclaim ( "FACC" or "Counterclaim").

## I.      INTRODUCTION

This case involves a disgruntled investor who sought to use threats, false accusations and other unlawful tactics to intimidate Counterclaimants into bowing to his extortionist demands. Sunday Group develops and manages cutting edge blockchain related software and systems through a team of scientists, technologists and experienced managers. One of Sunday Group's projects is known as the Mobby Project – a developmental blockchain project that seeks to leverage globally formed beliefs about reputation, in an automated manner through novel AI mechanisms. As the Mobby Project involves creation of a blockchain system and digital asset token ("M-Token") from the ground up, its development has been extremely complex, requiring the devotion of significant time and resources.

Nakamura is a sophisticated businessman who came to regret his investment with Sunday Group and the Mobby Project, and decided to launch an unlawful campaign of harassment and extortion try to pressure Sunday Group to buy him off for far more than he ever invested.  As detailed in the Counterclaim, Nakamura's conduct involved sending threatening emails, including death threats, false and defamatory statements to governmental regulators and to other investors accusing Sunday Group and Mitsuishi of fraud and other criminal conduct.  Notably, the timing of Nakamura's purported dissatisfaction with his investments with Sunday Group and the Mobby Project, and the commencement of his campaign, just so happened to coincide with the surge in the price of Ethereum to all-time highs beginning in March of 2021– which is the digital asset he used to invest in Mobby and was demanding back.[1]  As a result of Nakamura's conduct, Counterclaimants have brought claims for (1) Intentional Interference with Contractual Relations;

---

[1] *See https://www.statista.com/statistics/806453/price-of-ethereum.*

(2) Intentional Interference with Prospective Economic Relations; (3) Intentional Infliction of Emotional Distress; (4) Abuse of Process; (5) Defamation/Defamation Per Se; (6) Business Disparagement; and (7) Civil Conspiracy.

Nakamura moves to dismiss all of these claims except Intentional Infliction of Emotional Distress on the primary basis that they are not sufficiently pled. In moving to dismiss, Nakamura insists upon a level of detail that is simply not required. As set forth herein, Nakamura's Motion should be denied because Counterclaimants have pled facts in sufficient detail to give Nakamura notice of the grounds for the counterclaims to enable him to prepare a defense.  The lone exception is that Counterclaimants stipulate to dismissal, without prejudice, of their Abuse of Process Claim.

## II.   STATEMENT OF FACTS[2]

### A.  Overview of Sunday Group and the Mobby Project

Sunday Group is Nevada corporation that develops and manages cutting edge blockchain related software and systems through a team of scientists, technologists and experienced managers. Defendant James Pack and Defendant/Counterclaimant Mitsuishi are directors and officers of Sunday Group, with Mitsuishi acting as CEO until taking a leave of absence in August 2021 as a result of Nakamura's threats and intimidation. *See* First Amended Answer, ¶¶ 11-12; FACC, ¶ 47. Sunday Group also has a Board of Advisors.  The Chairman of the Board of Advisors is Dr. Leonard Kleinrock of the University of California, Los Angeles.  FACC, ¶ 11.

Part of Sunday Group's operations is to develop the Mobby Project.  FACC, ¶ 8.  The Mobby Project aims to develop a layer-one blockchain system and its representative digital asset token (known as Mobby) based on academic peer-reviewed research by the Mobby Project team

---

[2]   Counterclaimants object to Nakamura's "fact" statement on the basis that it frequently mischaracterizes the actual allegations in the Counterclaim to try to downplay Nakamura's conduct, in violation of the requirements of Rule 12(b)(6). For instance, nearly all of the bullet points on page 4 of the Motion to Dismiss mischaracterize the allegations and contain argument. In describing the death threat (FACC, ¶¶ 42-43), for example, Nakamura argues that it was a "simple admonition that the parties' lives would be better off if the dispute was resolved [that] has been purportedly (and inexplicably) construed by Mr. Mitsuishi as a death threat." Motion to Dismiss, at 4.  Although Plaintiff includes a citation to the FACC after this statement, it is not in the FACC. Moreover, Mitsuishi certainly took it as a death threat, and the jury can decide whether that was warranted in evaluating the statement.

which includes world renowned and award-winning professors and specialists in the fields of computer science, mathematics, artificial intelligence, and cryptography. In general terms, the Mobby Project's mission is to create a better internet experience, one that is more secure, transparent, and trustworthy. FACC, ¶ 9. Sunday Group offered interested investors ("Token Investors") a right to acquire a future interest in its future token, named Mobby or M-Tokens, once the Mobby Project was complete, for a price of $10,000 USD per unit of M-Tokens (i.e., $10,000 USD purchased a right to acquire 1 unit of M-Tokens in the future). FACC, ¶¶ 10, 21-22.

### B. Nakamura and His Investment in the Mobby Project

Nakamura is a sophisticated and very wealthy businessman who resides in Japan. FACC, ¶¶ 4, 17.[3] Among other things, Nakamura, and two Japanese gentlemen named Tsuneyasu Takeda ("Takeda") and Ryu Imachi ("Imachi"), were owners of a Japanese software company named UPUB Co., Ltd. FACC, ¶ 12. Nakamura also made investments in a digital asset project (xcoin/xcoinwallet) owned and/or operated by Takeda. FACC, ¶ 14.

Sunday Group worked with Imachi and his entity Sundale to contact potential investors to raise money for the Mobby Project in Japan in 2017. FACC, ¶ 16. Nakamura was one of these potential investors, as he had previously invested in Sunday Group. FACC, ¶ 18. In discussions with potential Token Investors in the Mobby Project, including Nakamura, Mitsuishi made clear that, *inter alia,* the development of the Project was in its developmental stage, that the development process was enormously complex and that, like any investment, it was risky, with no guarantee of a return on investment. FACC, ¶¶ 19-20. Mitsuishi also made clear to Nakamura and other Token Investors that, by investing in the Mobby Project, they would be purchasing the right to receive a specified number of M-Token Units (1 Unit per $10,000 USD invested) when Sunday Group completed developing the Mobby Project. FACC, ¶¶ 21-22. In late 2017, Nakamura purchased 200 Units of (future) M-Tokens for $10,000 each, for a total price of $2 million. FACC, ¶¶22-23.

Since its inception, Sunday Group has been diligently working on and progressing the

---

[3] For simplicity and readability, Counterclaimants have removed references to allegations made "upon information and belief."

Mobby Project.  However, due to the Covid-19 pandemic and changes in the blockchain industry, development been delayed.  Sunday Group has kept its investors, including Nakamura and other Token Investors, informed of the Mobby Project's status and progress through frequent updates, and has a customer support team to address any questions or concerns from Token Investors. Nakamura has **never** himself contacted Sunday Group's customer support team.  Sunday Group has every intention of completing the Mobby Project and delivering agreed-upon amount of M-Tokens to Nakamura and other Token Investors. FACC, ¶¶ 24-28.

### C.  Nakamura's Campaign of Harassment of Extortion

At some point, Nakamura apparently had second thoughts about his investment in the Mobby Project and, beginning in March of 2021, Nakamura and his friend, Takeda, launched a campaign to harass, intimidate and extort Sunday Group and Mitsuishi to cause them harm and try to force the Sunday Group to return his Mobby Investment and pay additional amounts.  FACC, ¶¶ 29, 37, 39.  The campaign started with a series of emails:

1. **March 4, 2021.**  Nakamura emailed Dr. Kleinrock, making false claims that, *inter alia,* Sunday Group and Mitsuishi had engaged in money laundering, fraud and failed to comply with SEC regulations. Nakamura asked Dr. Kleinrock not to inform Mitsuishi of this email. At the time, Nakamura knew of Dr. Kleinrock's contractual relationship with Sunday Group and his importance to the Mobby Project, and sought to interfere with this essential relationship, causing actual and special damages to Sunday Group. FACC, ¶¶ 31-36.

2. **August 3, 2021.**  Nakamura and Takeda sent an email to Mitsuishi, along with a photo, claiming to represent all of the Token Investors and stating that, if Nakamura does not receive a refund of his Mobby Payment he will contact regulators regarding Sunday Group.  Nakamura also demanded a return of his Series AA investment in Sunday Group (from 2015) in the amount of $1,235,000, despite the fact that his Series AA investment was only for $340,000. FACC, ¶ 37.

3. **August 6, 2021.**  Nakamura and Takeda sent an email to Mitsuishi, together with a

photo and video of themselves, demanding that Sunday Group pay over $10 million in addition to returning Nakamura's actual investment within twenty-four hours, or else he will contact government regulators and Dr. Kleinrock's university employer regarding Sunday Group. On August 6, 2021, Mitsuishi responded that Sunday Group will consider offering, to all Sunday Group shareholders and Token Purchasers, a buy-back opportunity of their right to acquire M-Tokens. FACC, ¶¶ 39-40.

4. **August 8, 2021.** Nakamura and Takeda then took their threats to a disturbing and violent new level. Specifically, in an August 8, 2021 email to Mitsuishi, Nakamura and Takeda refused to accept the buy-back offer and again demand that Sunday Group pay Nakamura the exorbitant $10 million plus sum. They closed the August 8, 2021 email by threatening Mitsuishi's and Dr. Kleinrock's lives: "I expect that you make a prudent decision, not only for us investors, but also for lives to live hereafter of Dr. Kleinrock and your very self." FACC, ¶¶ 41-42.

The impact and damage from this conduct on Sunday Group and Mitsuishi was significant. Mitsuishi took the August 8, 2021 death threat very seriously and began to fear for his and his wife's lives, including because of his understanding that Nakamura and Takeda are extremely wealthy and powerful individuals. Mitsuishi suffered severe emotional trauma and health issues. He believed he was being followed and refused to leave his house for long periods of time. And, in late August 2021, Mitsuishi had to take a leave of absence as Sunday Group's CEO due to issues with his health as a result of the death threat, which Sunday Group had to announce to the Token Investors. FACC, ¶¶ 43-47. The emails and threats to Dr. Kleinrock also damaged Counterclaimants relationships with Dr. Kleinrock, Sunday Group's goodwill and reputation, and forced Sunday Group to incur legal fees and costs with a public relations firm to try to repair the harm and protect the reputations of the Mobby Project and Dr. Kleinrock. FACC, ¶ 36.

Nakamura's and Takeda's continued threats also caused Sunday Group to create and administer a buy-back program, available to all Token Investors, which it would not have done

otherwise.  The buy-back program included the right to sell M-Token back to the company for $10,000 per Unit of M-Token – the precise consideration Token Investors paid for the opportunity to purchase M-Tokens.  While some Token Investors opted to have Sunday Group buy back their M-Token Units, Nakamura declined.  FACC, ¶¶ 48-50. Nakamura instead chose to continue his intimidating and extortive conduct.  FACC, ¶¶ 51-69.

### D. Nakamura Makes False Allegations Against Counterclaimants to the Nevada Securities Division and Other Token Investors.

On August 24, 2021, Nakamura and Takada emailed Mitsuishi and threated that Nakamura would file a complaint with the SEC, unless Sunday Group capitulated to his demands and admitted to engaging in wrongful conduct.  FACC, ¶ 51.  When Sunday Group refused to bend to this threat, Nakamura filed a complaint ("Securities Complaint") with the Nevada Division of Securities at some point between September 2021 and November 2021.  FACC, ¶ 52.

Nakamura did not just file the Securities Complaint for himself, however.  Rather, he sought imbue the Securities Complaint with greater weight and importance, and to cause additional harm to Sunday Group, Mitsuishi, and the Mobby Project, by purporting to also file it on behalf of other Token Investors he claimed to represent.  FACC, ¶¶ 53.  While Nakamura circulated a copy of the Securities Complaint to at least some Token Investors, some, if not all, of them did not know he had filed the Securities Complaint, and did not authorize him to represent them or file the Securities Complaint on their behalf.  FACC, ¶¶ 54, 56, 61-62.  Some of the Token Investors listed by Nakamura in the Complaint are not even acquainted with Nakamura.  FACC, ¶ 57.[4]

In addition to falsely asserting that Nakamura represented and had authority to file the Securities Complaint on behalf of other Token Investors, FACC, ¶¶ 61-62, the Securities Complaint contained other false and defamatory allegations, including that: (1) Sunday Group engaged in fraudulent conduct and/or acted illegally related to the raising of capital for the Mobby Project; (2) Sunday Group and/or its principals mispresented the scope Dr. Kleinrock's

---

[4] It remains unclear how Nakamura obtained a list of Sunday Group's Token Investors, which is confidential, but it is believed that he conspired with Takeda and/or Imachi to obtain it without the knowledge of Sunday Group, its principals, or the Token Investors. FACC, ¶¶ 58-59.

involvement in the Mobby Project; (3) Sunday Group and/or its principals represented to certain Token Investors that the listing of M-Tokens on an exchange was imminent; and (4) Sunday Group and/or its principals represented to certain Token Investors that the value of M-Tokens once listed would increase at least tenfold, and potentially as much as several hundred to several thousand times its value. FACC, ¶ 65.

Nakamura also made the same or similar false allegations about Sunday Group, the Mobby Project and Mitsuishi, both directly to Token Investors and in a 44-page document that he is believed to have authored and provided to Token Investors. FACC, ¶¶ 63-65, 68. Nakamura also tried to coerce the Token Investors into filing their own complaints with governmental regulators containing Nakamura's false allegations of wrongdoing. FACC, ¶ 69. The publication of these false allegations and other misconduct had the improper purpose and effect of damaging Sunday's Group's goodwill and reputation, disrupting Sunday Group's contractual relationships with its existing Token Investors, and interfering with its ability to raise additional capital through new investors, as well as disrupting its business operations. FACC, ¶¶ 66-69. By such actions, it is believed that Nakamura sought rile up the Token Investors against management and destroy Sunday Group's relationships with its investors in order to put pressure on Sunday Group to acquiesce in his demands. FACC, ¶¶67-68.

III.   **LEGAL STANDARD**

A properly pleaded complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegation, the "[f]actual allegations must be enough to rise above the speculative level." *Twombly,* 550 U.S. at 555. In evaluating a motion to dismiss, "the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences from the complaint in the plaintiff's favor." *Diamond Resorts Int'l, Inc. v. Reed Hein & Assocs., LLC*, 2019 WL 6310717, at *2 (D. Nev. Nov. 25, 2019); *accord Brown v. Electronic Arts, Inc.,* 724 F.3d 1235, 1247-48 (9th Cir. 2013). "Legal conclusions, however, are not entitled to the same assumption of truth even if cast in the form of factual

allegations." *Diamond Resorts,* 2019 WL 6310717, at *2. "To survive a motion to dismiss, a complaint must 'contain[ ] enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 696 (2009)). "A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct." *Id.* "'Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the [district] court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal,* 556 U.S. at 679) (alterations in original).

## IV.   **ARGUMENT**

Nakamura seeks dismissal of six of the seven claims brought by Counterclaimants.[5] Nakamura's primary argument for dismissal is that they fail to satisfy pleading standards, insisting upon a level a detail that is akin to proof and is simply not required.  As detailed below, Nakamura is incorrect in his assertion that Counterclaimants must satisfy heightened pleading standards under Rule 9(b) on their claims as none of them is based in fraud, and the Counterclaim provides more than enough facts to state viable claims for relief, under any pleading standard.  Nakamura's additional legal arguments, such as the statute of limitations for the defamation and business disparagement claims, likewise fail, particularly at this stage. That said, Counterclaimants stipulate to dismissal of their claim for abuse of process (Fourth Cause of Action) at the present time, without prejudice to being refiled as a result of additional information gleaned from discovery.[6]

### A.  **The Defamation/Defamation Per Se Claim is Sufficiently Pled and Timely.**

#### 1.  **Counterclaimants Have Pled a Plausible Claim for Defamation/Defamation Per Se.**

Nakamura correctly concedes that a claim for defamation is not subject to the heightened

---

[5] The exception, as indicated, is Mitsuishi's claim for intentional infliction of emotional distress (Third Cause of Action), which Nakamura concedes is facially plausible as pled.

[6]  Nakamura has not filed an Answer to any portion of the Counterclaim, despite not moving to dismiss the claim for Intentional Infliction of Emotional Distress, and the abuse of process claim can thus dismissed, without prejudice, by "notice."  Fed. R. Civ. P. 41(a)(1)(A)(i).

pleading requirements of Rule 9(b).  *See* Motion to Dismiss, at 5, 6.  Nevertheless, Nakamura insists that Counterclaimants were required provide highly particularized factual allegations akin to a Rule 9(b) standard, such as precise allegations regarding who, what, when, where and how the statements were made and specifics regarding falsity.  Motion to Dismiss, at 6.  Nakamura is incorrect because a "defamation claim under Nevada law need only comply with the notice pleading requirements of Fed. R. Civ. P. 8(a)," – i.e., "'a short, plain statement' giving the defendant fair notice of the plaintiff's claim and the ground upon which it rests." *Boink Sys., Inc. v. Las Vegas Sands Corp.*, 2008 WL 11389204, at *4 (D. Nev. May 30, 2008) (citation omitted); *Okeke v. Biomat USA, Inc.,* 927 F.Supp.2d 1021, 1027 (D. Nev. 2013) ("Courts have not looked with favor upon heightened pleading requirements for defamation …."). And, the authorities that Nakamura relies upon are either distinguishable or flat out do not support his assertions.

Counterclaimants' defamation claim easily meets the actual pleading standards.  A claim for defamation requires "'(1) a false and defamatory statement ...; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages.'" *Grand Canyon Skywalk Dev., LLC v. Cieslak,* 2014 WL 2123255, at *3 (D. Nev. May 21, 2014) (quoting *Clark County Sch. Dist. v. Virtual Educ. Software, Inc.,* 213 P.3d 496, 503 (Nev. 2009). "A statement that directly imputes to the plaintiff 'dishonesty, lack of fair dealing, want of fidelity, integrity, or business ability,*' even in general terms and without supporting details*, is considered defamation per se." *Cohen v. Hansen*, 2015 WL 3609689, at *5 (D. Nev. June 9, 2015) (citation omitted) (emphasis added). [7]

Here, Counterclaimants have alleged several false and defamatory statements by Nakamura.  **First**, Plaintiffs allege that Nakamura made the following false and defamatory statements in the Securities Complaint, directly to Token Investors, and through a 44-page document he authored:  (1) Sunday Group engaged in fraudulent conduct and acted illegally related

---

[7] Counterclaimants pled both defamation and defamation per se, *see* FACC, ¶ 107, and it is proper to plead defamation and defamation per se in a single cause of action. *Loc. Ad Link, Inc. v. AdzZoo, LLC*, 2009 WL 10694069, at *10 (D. Nev. Dec. 15, 2009).

to the raising of capital for the Mobby Project; (2) Sunday Group and/or its principals misrepresented the scope Dr. Kleinrock's involvement in  the Mobby Project; (3) Sunday Group and/or its principals represented to certain Token Investors that the listing of M-Tokens on an exchange was imminent; and (4) Sunday Group and/or its principals represented to certain Token Investors that the value of M-Tokens once listed would increase at least tenfold, and potentially as much as several hundred to several thousand times its value.  FACC, ¶ 65.  The Securities Complaint was filed with the Nevada State Securities Division and Counterclaimants also understand that he sent copies of it, in draft and/or final form, to other Token Investors.  FACC, ¶¶ 52-54.  Nakamura also repeated these same allegations outside of the Securities Complaint to other Token Investors in communications and in the 44-page document FACC, ¶ 64.

In addition, Nakamura did not purport to make these statements on behalf of just himself in the Securities Complaint, but rather misrepresented that these false factual statements were also being made by other Token Investors, some of whom he had never even met.  FACC, ¶¶ 54, 56-57, 61-62.  It is a reasonable inference that the purpose of Nakamura adding these other Token Investors as "complainants" to the Securities Complaint, albeit without their permission or knowledge, was to create the false impression that he was not alone in his disgruntlement and assertions that Sunday Group and Mitsuishi were committing fraud, in order to try to gain unwarranted attention and traction with the regulators.  It is a related, yet additional type of defamatory conduct to create a false impression that there are additional investors claiming fraudulent conduct. *See* 53 C.J.S. Libel and Slander; Injurious Falsehood § 78 ("A statement may be provably false [for purposes of defamation] because it falsely represents the state of mind of the person making it, ***because it is falsely attributed to a person who did not make it***, or because it falsely describes an act, condition, or event that comprises its subject matter." (emphasis added)).[8]

---

[8]  For example, a published statement that "the company engaged in fraudulent conduct against me," is similar but distinct from a published statement that "multiple investors are claiming this company engaged in fraud against all of them." Both are defamatory, and defamatory per se, if

Nakamura does not contest, and thus concedes, that Counterclaimants sufficiently alleged that these statements were published to third parties, that they were not privileged, and that they were made at least negligently (fault).[9] Nor does Nakamura purport to fault Counterclaimants' damages allegations, FACC, ¶¶ 106, 108.  And, for Nakamura's statements that are defamatory per se, damages are presumed.  *See, e.g., Local Ad,* 2009 WL 10694069, at *10.

Instead, Nakamura first argues that these statements are too generalized.   Motion to Dismiss at 7.  They are not.  The false statements that Sunday Group "engaged in fraudulent" conduct and acted "illegally" in raising capital for the Mobby Project constitute defamation per se because they "directly impute[]" … dishonesty, lack of fair dealing, want of fidelity, integrity, or business ability," and are thus actionable defamation  even if stated "in general terms and without supporting details." *Cohen,* 2015 WL 3609689, at *5  (quotations and citation omitted). The other statements are quite specific and, in fact, are very similar to the alleged misstatements that Nakamura uses to support his own fraud claims. *See* Complaint, Dkt. No. 1, at ¶ 26.[10]  It is incongruous for Nakamura to assert that such statements are sufficiently particularized for his own fraud-based claims, which are subject to Rule 9(b), but not for a defamation claim under Rule 8.

Plaintiff's reliance on *Cunningham-Dirks v. Nevada,* 2013 WL 77470 (D. Nev. Jan 3, 2013), and *Local Ad Link,* 2009 WL 10694069, in support of its generalities argument and that a pleading must allege the "whom, what, where and how" a statement was made, is misplaced. Other courts have rejected similar arguments.  *See Okeke,* 927 F.Supp.2d at 1027 (rejecting the argument that a plaintiff must "list the precise statements alleged to be false and defamatory, who made them, and when," as imposing an improper heightened pleading standard); *Boink Sys.,* 2008 WL 11389204, at **4-5 (rejecting defendant's argument that a plaintiff "must identify the time, place,

---

false, but in the second statement, the speaker is conveying additional falsehoods, including that fraudulent conduct is a systemic issue or course of business for the company.

[9]  Although Counterclaimants need only show negligence to recover, Counterclaimants intend to show at trial that Nakamura knew these and other defamatory statements were false when made, and that they were made for the purpose of harming Counterclaimants and the Mobby Project and to extort an exorbitant payment from Counterclaimants that far exceeded Nakamura's investment.

[10]  Counterclaimants/Defendants dispute they made any of these statements.

content, speaker and listener of the alleged defamatory comments," as improperly imposing a pleading requirement beyond Rule 8(a), and observing that "[s]pecifics regarding the alleged defamatory comments are not required under Rule 8(a), as more context can be brought out during the discovery process.").

Moreover, in *Cunnigham,* the court was careful to point out that the plaintiff did not even respond to the defendants' "generalities" argument, *see* 2013 WL 77470 at \*9, and thus did not raise the authorities regarding pleading defamation per se, *see, e.g., Cohen, supra.* Both *Cunningham* and *Local Ad* also involved multiple defendants, and *Local Ad* also involved multiple plaintiffs, so determining who said what to whom, when, and how was more important to provide notice for each defendant to prepare a defense. *See Cunningham,* at \*9; *Local Ad,* at \*10. Counterclaimants' allegations are also more specific, detailing who made them (Nakamura), to whom (Nevada State Securities Division and other Token Investors), approximate dates (between September and November 2021), the medium (the Securities Complaint, a 44-page memorandum and in communications directly to Token Investors), and what was said (see above). Nakamura has more than adequate notice.

Nakamura's final argument is that Counterclaimants were required to not only allege the statements at issue were false – which Counterclaimants did, *see* FACC, ¶¶ 60-68, 102 – but also plead facts explaining *how* they were false. Motion to Dismiss, at 6, 8. Nakamura cites no support for this assertion, and it would impose a tremendous and unwarranted burden well beyond the requirements of Rule 8(a) for a party to have to plead facts demonstrating, for example, that he/she did not commit fraud. Indeed, Nakamura did not undertake this burden even with respect to his own fraud-based claims, simply alleging the statements (many of which were the same) were false when made. *See* Complaint, ECF 1, at ¶26, 66, 72-73, 78-79. The *Local Ad* decision is not to the contrary. In that case, the plaintiff literally failed to allege that any of the statements were false; the Court did not require the plaintiff to explain how they were false. 2009 WL 10694069 at \*11.

**Second**, as an additional defamatory statement, Counterclaimants allege that on March 4, 2021, Nakamura emailed Dr. Kleinrock – an important business partner and Chairman of Sunday

Group's Board of Advisors – to make "false claims about Sunday Group, Mr. Mitsuishi and the Mobby Project," including "false claims of money laundering and failing to comply with SEC regulations," and that "Sunday Group has defrauded him." FACC, ¶¶ 31-32.  Each of these statements asserts dishonesty and criminal conduct that is defamatory per se.  *See Cohen,* 2015 WL 3609689, at \*5; *Local Ad,* 2009 WL 10694069 at \*11 ("claims of personal criminality and business misconduct" are "defamatory per se").

In connection with these defamatory statements, Nakamura makes the same arguments addressed above regarding "generalities" and purportedly failing to detail how and why the statements were false, and they fail for all the same reasons. The allegations are quite specific, focused on a specific email and what defamatory statements Nakamura made in that email.  This is certainly enough to put Nakamura on notice as to which statements are at issue.

Nakamura also adds another argument:  that the statements to Dr. Kleinrock would not constitute publication to a third person because Counterclaimants "plead that Dr. Kleinrock was the Chairman of Sunday Group's Board of Advisors." Motion to Dismiss, at 8 (further quotations omitted). This argument should be rejected.  Although Sunday Group has an agreement with Dr. Kleinrock, and he is the Chairman of its Board of Advisors, Counterclaimants have never claimed that Dr. Kleinrock is an employee or officer of Sunday Group.  Nakamura has cited no authority that a person in such a role is the same legal person as an entity.  Frankly, Nakamura has also cited no authority that a false and defamatory statement that is made even to an employee, officer or director of an entity asserting defamation is not publication to a third party.[11] The legal effect of Dr. Kleinrock's position as Charman of the Board of Advisors for Sunday Group in relation to whether he is a "third party" is also a fact-intensive question that is inappropriate to resolve on a motion to dismiss. Furthermore, the March 4, 2021 email also falsely ascribes criminal conduct to Mitsuishi, FACC, ¶¶ 31, who is plainly a distinct person from Dr. Kleinrock. The Motion to

---

[11]  Nakamura's citation to *Sykes v. Henderson Police Dep't,* 2023 WL 5561224, \*5 (D. Nev. August 29, 2023) is inapposite because that case merely recites the element that publication must be to a third party.  *See id.*

1

Dismiss the Defamation claim should thus be denied.[12]

2

    **2.   The Defamation Claim is Timely.**

3

      "The statute of limitations for defamation in Nevada is two years," and "[t]ypically a cause

4

of action does not accrue until a party discovers it." *Grand Canyon*, 2014 WL 2123255, at *2.

5

Nakamura's predicate for asserting the defamation claim is untimely is based on a

6

mischaracterization of the law:  that "Counterclaimants have 'the burden of alleging facts which

7

[render the claim timely or] would give rise to any tolling of the statute.'" Motion to Dismiss, at 9

8

(alteration brackets in original) (citing *Constantino v. McDaniel*, 2010 WL 1279083, at *1 (D.

9

Nev. March 29, 2010). The *Constantino* decision does *not* state that a party must plead facts

10

showing a claim is timely, but rather states ***"[i]f a petition reveals on its face that the statute of***

11

***limitations has run***, the petitioner has the burden of alleging facts which would give rise to any

12

tolling of the statute." *Id.* (emphasis added). This coincides with the well-established rule that

13

"[b]ecause a statute of limitations is an affirmative defense, a court cannot dismiss based thereupon

14

unless the defense appears on the face of the pleadings to be dismissed." *Wise v. Schreiber*, 2017

15

WL 662981, at *1 (D. Nev. Feb. 17, 2017) (citing *United States ex rel. Air Control Techs., Inc. v.*

16

*Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013) (further citations omitted)).

17

      Under the correct standard, the defamation claim is plainly timely as it relates false and

18

defamatory statements in the Securities Complaint and to the Token Investors. Contrary to

19

Nakamura's assertion, Counterclaimants do allege a time period for when the Securities Complaint

20

was filed with the Nevada Division of Securities – between September 2021 to November 2021,

21

FACC, ¶ 52 – which is indisputably within the statute of limitations.  While Counterclaimants did

22

not allege a date when the false and defamatory statements were made to Token Investors in direct

23

communications or through transmission of the Securities Complaint or 44-page document to

24

them, this is not required at this stage.  However, Counterclaimants expect the evidence will show

25

---

[12] Although Counterclaimants believe they have adequately pleaded their defamation claim, to the

26

extent the Court determines more specificity is needed, Counterclaimants request leave to amend.

27

"[L]eave to amend should be granted if it appears at all possible that the plaintiff can correct the
defect." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 701 (9th Cir.1988).

28

that these occurred around the same timeframe as the Securities Complaint.

The analysis on the March 4, 2021 email to Dr. Kleinrock is more involved, but it is also not subject to dismissal under the statute of limitations, particularly at this stage. First, Counterclaimants are not required to, and the FACC does not, allege when Counterclaimants learned about the email. That is a fact issue to be resolved in later proceedings. *See Grand Canyon,* 2014 WL 2123255, at *2 (denying dismissal of defamation claim as time barred because, "[a]lthough the April 8, 2013, complaint alleges the memorandum was 'from' the February or March 'timeframe,' it does not specify when in early 2011 the memorandum was leaked to the public or when the Plaintiffs discovered that publication, thus triggering the statute of limitations.").[13]

Second, this was part of an ongoing course of conduct by Nakamura: making false and defamatory allegations of fraudulent and criminal conduct against Counterclaimants to third parties. "When a tort involves continuing wrongful conduct, the statute of limitations does not begin to run until the conduct ends." *Williams v. Univ. Med. Ctr. of S. Nev*., 2010 WL 3001707, at *2 (D. Nev. July 28, 2010).

Third, a claim based on the email to Dr. Kleinrock is in the nature of a compulsory counterclaim because it arises out of a common core of operative facts and the same transaction as Nakamura's Complaint, filed on August 16, 2022. Nakamura's claims are based, in part, on his investment in the Mobby Project, which he claims was the result of fraudulent inducement, and in connection with which he also claims that Sunday Group and its principals purportedly made subsequent false representations. *See* Complaint, ECF 1, at ¶¶ 26, 28, 66, 72-73, 78-79. Essentially, the Counterclaim alleges that, prior to filing the Complaint, Nakamura published similar false allegations that Sunday Group and Mitsuishi purportedly committed fraud, violated SEC regulations and engaged in other criminal conduct to Dr. Kleinrock (and others). This common core of facts and "logical relationship" makes the counterclaim on this subject

---

[13] This email was also alleged in the original counterclaim, filed on May 8, 2023, Answer and Counterclaim, ¶ 31, ECF No. 47.

compulsory. *See Mattel, Inc. v. MGA Entertainment, Inc.* 705 F.3d 1108, 1110 (9th Cir. 2013).  The general rule is that the filing of a complaint tolls or waives the defense of statute of limitations for a compulsory counterclaim.  *See N. Cnty. Commc'ns Corp. v. Sprint Commc'ns Co., L.P.*, 691 F. App'x 466, 467–68 (9th Cir. 2017) (citing authorities); *Yates v. Washoe Cnty. Sch. Dist.*, 2007 WL 3256576, at *2 (D. Nev. Oct. 31, 2007) (same).  Moreover, given Defendants' motion to dismiss Nakamura's Complaint, it made no sense to file counterclaims until that was resolved.  For all these reasons, Nakamura's statute of limitations defense should be rejected.

**B.  The Business Disparagement Claim is Sufficiently Pled and Timely.**

Sunday Group has also adequately pled a claim against Nakamura for business disparagement (Sixth Cause of Action) based upon the same false and disparaging statements as its claim for defamation. "Under Nevada law, a business disparagement claim requires the Plaintiff to show the following: (1) a false and disparaging statement, (2) the unprivileged publication by the defendant, (3) malice, and (4) special damages." *Arsenal, Inc. v. Neal*, No. 2:11-CV-01628-KJD, 2013 WL 2405289, at *3 (D. Nev. May 31, 2013).

With one exception, Nakamura seeks dismissal of this claim on the same grounds it sought dismissal of Counterclaimants' defamation claim:  for a purported failure to provide specific facts as to the medium, what the false statements were or why they were false, and on the basis that it is time barred. Motion to Dismiss, at 9-10.  Nakamura cites no new authority in support of these arguments, and they should thus be rejected as both inadequately supported and for the same reasons set forth above with respect to defamation.

The lone additional argument that Nakamura raises is that Sunday Group failed to plead special damages.  Here again, though, Nakamura insists upon a level of specificity that is not required under Rule 8(a).  Sunday Group has alleged that Nakamura's false and disparaging statements caused Sunday Group to suffer general and special damages, including the money paid to buy-back Token Investors' M-Tokens, harm to reputation and goodwill, additional expenses incurred to manage the disruptions of the Mobby Project, as well as harm to Sunday Group's ability to attract additional investors or other opportunities to raise capital.  FACC, ¶ 119.  This is

sufficient to put Nakamura on notice of the special damages it seeks on this claim.

Nakamura cites no authority holding that a party asserting a business disparagement claim must plead specific and detailed facts to "corroborate" special damage allegations or to establish a causal nexus between the statements and damages alleged. Motion to Dismiss, at 10. Moreover, it is reasonably inferable that publishing false and disparaging comments that Sunday Group is committing fraud to other Token Investors, for example, would cause harm to Sunday Group's reputation and goodwill, cause certain Token Investors to want get out of the investment, and lead to additional expense, such as legal fees to deal with the false Securities Complaint, or from business disruption while Sunday Group's principals are engaged in damage control with investors from Nakamura's false and disparaging statements. Further, given that the Sunday Group does not advertise for investors, but largely attracts them through word of mouth, it is reasonable to infer and conclude that publishing false allegations that the company is committing fraud harms its ability to attract new investors. Because it is not necessary to plead evidence or particularized allegations on this claim, Nakamura's motion to dismiss this claim should be denied. Discovery is available, and being used by Nakamura to gain additional information on these damages.

**C. Sunday Group Has Stated a Plausible Claim For Intentional Interference with Contract.**

"'To establish intentional interference with contractual relations, the plaintiff must show: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage.'" *Local Ad,* 2009 WL 10694069 at *12 (citation omitted). Sunday Group has stated a claim for intentional interference based on Nakamura's intentional and wrongful acts to disrupt Sunday Group's existing relationships with its Token Investors.

Contrary to Nakamura's assertion, this claim is not subject to heightened pleading under Rule 9(b). The one case he cites for this assertion on Page 11 of his Motion (*Donovan v. Flamingo Palms Villas, LLC,* 2009 WL 10693913 (D. Nev. June 23, 2009)) does not even involve a claim for intentional interference with contract or prospective economic relations. *See id.* at *4.

Furthermore, that Sunday Group alleges that Nakamura intentionally interfered with its relationships with other Token Investors by making false and defamatory statements and threating Mitsuishi (FACC, ¶ 72) does not transform this claim into one grounded in fraud.  In fact, where claims for defamation or intentional infliction of emotional distress are not subject to 9(b), a claim relying on the same factual predicate would not be either. *Cf. WMCV Phase 3, LLC v. Shushok & McCoy, Inc.,* 750 F. Supp. 2d 1180, 1193, 1195 (D. Nev. 2010) (declining to subject the plaintiff's intentional interference claims to Rule 9(b), even though the plaintiff "uses the word 'fraud' often in the [c]omplaint," because "these claims are not all grounded in fraud.").

Regardless, under any pleading standard, Sunday Group has alleged sufficient facts to state a prima facie claim under this tort.  Sunday Group alleged that it had valid and existing contracts with Token Investors whereby they acquired a future interest in a specified number of M-Token Units, once development of the Mobby Project blockchain and M-Token was completed, depending on the amount of investment:  $10,000 per Unit of M-Tokens.  FACC, ¶¶ 10, 22, 71. This is the same contractual arrangement as with Nakamura. FACC, ¶¶ 22-23. Sunday Group has also alleged that Nakamura knew of these contractual relationships; indeed, he must have as he obtained a list of other Token Investors and contacted them repeatedly, including to make false and defamatory statements about Sunday Group and Mitsuishi, and to falsely include the other Token Investors' names on the Securities Complaint as additional purported disgruntled complainants, without their authorization. FACC, ¶¶ 53-54, 56, 58, 61-62, 65, 71.

The same allegations detailing the false statements about Sunday Group, Mitsuishi and the Mobby Project also satisfy the third element of intentional acts intended or designed to disrupt these contractual relationships.  Nakamura not only made these false statements directly to the Token Investors, but also to governmental regulators to try to instigate an investigation and enforcement action based on false assertions of wide-spread fraud being asserted by multiple investors. FACC, ¶¶ 53-54, 56, 58, 61-62, 65, 69, 71-72.  It is at least reasonably inferable that Nakamura's purpose in contacting the other Investors with his false allegations of fraudulent conduct, and involving the other Token Investors (with or without their knowledge and consent),

was to further his own extortionist goals by creating unrest, undermining confidence in Sunday Group and its management, and disrupting Sunday Group's contractual relationships with its investors, including by trying to convince the other investors join forces with him and to also demand to unwind their investments. *See Local Ad,* 2009 WL 10694069, at *13 (finding that allegations that the defendants "intentionally defamed" the plaintiffs to satisfy the intentional disruption element).  Moreover, it is at least reasonably inferable that the threats to Mitsuishi, Sunday Group's then CEO, had a similar purpose and effect, as such outrageous actions would foreseeably cause distress and result in disruption of the management of the Mobby Project. Namakura's assertion that Sunday Group was required to plead more particularized facts establishing his motive for his actions in order to state a claim is baseless. *Cf. Universal Ent. Corp. v. Aruze Gaming Am., Inc.*, 2020 WL 2840153, at *22 (D. Nev. May 30, 2020) ("***At the pleading stage***, [plaintiffs] need not identify specifically which contracts were at issue, so long as they have asserted that [defendants] knew of them and intentionally interfered with them, resulting in disruption and damages, as they have here." (emphasis added)).

Nakamura's actions also led to actual disruption.  Sunday Group has alleged that Nakamura's threats and actions caused them to create the M-Token buy-back program, and that several Token Investors took advantage of this program, which damaged Sunday Group as it no longer has access to this capital to help fund the development of the Mobby Project, among other damages. FACC, ¶¶ 40, 48, 74-77.  Sunday Group believes and alleges that this would not have happened but for Nakamura's conduct detailed above. *Id.*  If Nakamura wishes to test Sunday Group's theory based on the evidence uncovered in discovery on summary judgment or at trial, that is his prerogative, but Sunday Group has provided sufficient allegations to state a claim.

### D. Sunday Group Has Stated a Plausible Claim Intentional Interference with Prospective Economic Advantage.

A claim for intentional interference with prospective economic relations has the following elements: "'(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by

preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct.'" *Local Ad,* 2009 WL 10694069, at *14 (citation omitted).  While similar to Sunday Group's claim for intentional interference with existing contracts, this claim is based on Nakamura's intentional actions in making false and misleading claims in the Securities Complaint and to Token Investors regarding Sunday Group, its principals and the Mobby Project, with the intent of disrupting Sunday Group's relationships with prospective investors and ability to attract new investors. FACC, ¶¶ 66-69, 80, 82-83, 85.

Nakamura primarily raises the same arguments for dismissal of this claim that he did with respect to Sunday Group's claim for intentional interference with contractual relations, and they fail for all of the same reasons.  For the reasons stated above, Nakamura's argument that this claim is subject to Rule 9(b) should be rejected because it is not predicated on fraud.  Moreover, regardless of the pleading standard, Nakamura has provided sufficient detail to state a prima facie claim by identifying the statements at issue and the class of third parties – prospective investors in the Mobby Project – with whom Nakamura interfered.

Contrary to Nakamura's argument, Sunday Group is not required to specifically identify the third parties with whom it has prospective economic relations.  Rather, "[t]he Supreme Court of Nevada has not set out the level of detail a plaintiff must allege about a prospective contractual relationship," and has "allowed a plaintiff to allege generally about unspecified customers." *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168, 1178 (D. Nev. 2021) (citing *In re Amerco Derivative Litig.*, 252 P.3d 681, 702 (Nev. 2011), as holding that "the plaintiff stated a claim by alleging it had 'customers who would have rented self-storage units in [its] U-Haul facilities' but for the defendants' interference.").  Following this authority, *Motogolf* held that "alleging a certain class of prospective customers without identifying them specifically is sufficient," and that the plaintiff's ("Motogolf") allegations that it "has prospective contractual relationships with Motogolf's customers who would click on its ads," was sufficient.  *Id.*  Sunday Group's allegations that it has protective economic relations with prospective investors in the Mobby Project, including with current Token Investors who would have invested more but for

Nakamura's interference, is likewise sufficient.[14]

Additionally, for similar reasons to those detailed above, Sunday Group has sufficiently pled that Nakamura intended to prevent Sunday Group from acquiring new investors through his false assertions in the Securities Complaint to the Nevada Securities Division and to Token Investors directly. It is a near certainty that filing a complaint with a regulator that falsely asserts both that (a) the company and its principals have committed pervasive fraud and (b) that the complaint is on behalf of multiple investors in the company, would have a chilling effect on raising additional capital from investments. This is particularly so when Nakamura also independently made the same allegations directly to multiple other Token Investors and sent them a copy of the Securities Complaint. At that point, an existing Token Investor would be understandably gun shy about investing more in the Mobby Project or recommending it to other potential investors, which Nakamura knew or must have known. Nakamura does not even contest that he knew Sunday Group was looking for additional investors.

Finally, under Nevada law, Sunday Group was not "required to plead harm by alleging that they would have been awarded contracts but for the alleged intentional interference," because it is not an element of the claim. *Universal Ent.,* 2020 WL 2840153, at *23 (citing *Levitt v, Leisure Sports Inc.,* 734 P.2d 1221, 1225 (Nev. 1987) *and In re Amerco,* 252 P.3d at 702). That said, Sunday Group does make such allegations, FACC, ¶¶ 82, 85, and expects that the evidence will support it at trial with respect to specific putative investors.

### E. Counterclaimants Have Stated a Plausible Claim for Civil Conspiracy.

"Under Nevada law, a civil conspiracy 'consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts.'" *Diamond Resorts Int'l, Inc. v. Reed Hein & Assocs., LLC*, 2019 WL 6310717, at *7 (D. Nev. Nov. 25, 2019) (quoting

---

[14] Although Sunday Group believes it is not necessary to state a claim, Sunday Group can provide the identity of the existing Token Investors who were scared-off from investing further by Nakamura's intentionally false allegations, at the direction of the Court.

*Consol. Generator-Nevada, Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998)).

"There must be an agreement between the conspirators, whether explicit or tacit." *Local Ad,* 2009

WL 10694069, at *7 (citing *GES, Inc. v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001)).  "Participation by

each conspirator in every detail in the execution of the conspiracy is unnecessary to establish

liability, for each conspirator may be performing different tasks to bring about the desired result."

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,* 620 F.2d 1360, 1367 (9th Cir.1980).

Nakamura is incorrect in his assertion that this claim is grounded in fraud and fails to meet

the heightened pleading standards of Rule 9(b).  Rule 9(b) only applies to civil conspiracy claims

"where 'the object of the conspiracy is fraudulent.'" *Local Ad,* 2009 WL 10694069, at *7 (quoting

*Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006)).  Here, the object

of the conspiracy alleged is not to commit fraud – Counterclaimants have no fraud claims – but

rather is based on intentional interference with contractual relations (First Cause of Action),

intentional interference with prospective economic relations (Second Cause of Action), and

intentional infliction of emotional distress (Third Cause of Action).  FACC, ¶ 123.  Thus, Rule

9(b) does not apply.  *See id.* (holding that Rule 9(b) is inapplicable to conspiracy claim where

object of conspiracy was to "undermine" the plaintiff's business, and "[f]raud was simply one of

the alleged dirty tricks used to compete, along with misappropriation of trade secrets, defamation,

interference with contractual relations, identify theft, etc."); *Diamond Resorts,* 2019 WL 6310717,

at *7 (holding Rule 9(b) not applicable where the civil conspiracy claim is "predicated on

[plaintiff's] intentional interference [with contract and prospective economic relations] claims").

Not only are the intentional interference claims not grounded in fraud, as detailed above,

Counterclaimants have also alleged a conspiracy between Nakamura and Takeda (and "possibly

Imachi")[15] to cause intentional infliction of emotional distress to Mitsuishi, through their campaign

of harassment and death threats.  FACC, ¶¶ 37-47, 89, 123.  That predicate claim is not fraud-

---

[15]  In his Motion, Nakamura uses ellipses to mischaracterize the allegation in FACC, ¶ 123 by
claiming it says "possibly … conspired." Motion to Dismiss, at 17.   The Court should disregard
this questionable effort by Nakamura to strengthen his poor argument by using ellipses to remove
words to try to make the allegation look speculative.

based and Nakamura concedes it is sufficiently pled.  The conspiracy to commit that tort is also sufficiently pled. The emails that form the basis for the claim, including the death threat, are specifically identified, and are from both Nakamura and Takeda (and at times, even accompanied by pictures and videos of them together).  FACC, ¶¶ 37, 39, 41-42.  Such allegations provide more than enough factual detail to establish an agreement between, and concerted action by, Nakamura and Takeda to establish civil conspiracy.  Nakamura's motion to dismiss the conspiracy claim fails on this basis alone.

The Counterclaim also provides sufficient detail to state a claim for conspiracy to interfere with Sunday Group's existing and prospective economic relations.  As detailed in the Counterclaim, Nakamura and at least Takeda worked together to launch a campaign of intimidation and harassment, to further their own goals of extorting an exorbitant buy-out from Sunday Group, and which included both the direct emails to Mitsuishi and Dr. Kleinrock, as well as making false and defamatory allegations of fraudulent conduct and other misrepresentations in a Securities Complaint to the Nevada Securities Division and directly to Token Investors.  The allegations show, or at least create reasonable inferences, that Nakamura and Takeda knew and/or intended that such actions would disrupt the Mobby Project, impact Sunday Group's contractual relationships with other Token Investors and its ability to attract new investors, and worked together to accomplish that result.  That is sufficient particularity to state a claim for conspiracy to commit the intentional interference torts, under any pleading standard.

## V.   **CONCLUSION**

For the foregoing reasons, Nakamura's Motion to Dismiss should be denied, with the exception that Counterclaimants stipulate to dismissal of their Fourth Cause of Action for Abuse of Process.  In the alternative, to the extent the Court is inclined to grant the Motion to Dismiss for lack of specificity as to any claim or allegation, Counterclaims respectfully request that such dismissal be without prejudice to amend to provide additional details.

DATED: December 1, 2023

**CLYDE SNOW & SESSIONS, P.C.**

By: */s/Timothy R. Pack*
  Timothy R. Pack (UT Bar # 12193)
  Aaron D. Lebenta (UT Bar # 10180)

Attorneys for Defendants/Counterclaimants
SUNDAY GROUP INCORPORATED,
SGI TRUST, TOSHIKI (TODD) MITSUISHI
and JAMES PACK