UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| TETSUYA NAKAMURA,<br><br>　　　　　　Plaintiff,<br>　v.<br><br>SUNDAY GROUP INCORPORATED, *et al.*,<br><br>　　　　　　Defendants. | Case No. 2:22-cv-01324-MMD-EJY<br><br>ORDER |

**I.　SUMMARY**

Plaintiff Tetsuya Nakamura sued Defendants Sunday Group Incorporated, SGI Trust, Toshiki (Todd) Mitsuishi, and James Pack for alleged breach of contract, fraud, and other related claims arising from Plaintiff's investments in Defendants' blockchain industry startup and digital currency "mining" operations. (ECF No. 1.) Sunday Group and Mitsuishi (collectively, "Counterclaimants") then filed counterclaims, alleging intentional interference with contractual relations and prospective economic advantage, defamation, and other related claims against Nakamura. (ECF No. 59 ("First Amended Counterclaim" or "FACC").) Before the Court is Nakamura's motion to dismiss the FACC (ECF No. 68 ("Motion")).[1] As further explained below, the Court grants in part and denies in part the Motion and grants Counterclaimants leave to amend dismissed claims.

**II.　BACKGROUND**

The following allegations are adapted from the FACC. Sunday Group is a Nevada corporation who is developing and completing the Mobby Project, which aims to develop a layer-one blockchain system and its representative digital asset Mobby token (ECF No.

---

[1]Counterclaimants filed a response (ECF No. 71), and Nakamura filed a reply (ECF No. 74).

59 at 13.) Mitsuishi and Pack are managers of Sunday Group. (*Id.* at 1.) The Mobby Project offered the right to acquire a future interest in its future token called "M-Token." (*Id.* at 13.) Individuals who purchased M-Tokens are referred to as "Token Investors." (*Id.*)

Tetsuya Nakamura, Tsuneyasu Takeda, and Ryu Imachi are owners of a software entity. (*Id.* at 14.) Nakamura decided to invest in the Mobby Project in 2017 and purchased 200 units of M-Tokens for $10,000 each for a total price of $2 million USD (the "Mobby Payment"). (*Id.* at 14-15.) Mitsuishi made clear to Nakamura and other Token Investors that there was no guarantee of a return on the investment and that they were purchasing the right to receive M-Tokens when Sunday Group has completed developing the Mobby Project. (*Id.* at 14.) The development of the Mobby Project was delayed due to changes in the blockchain and related industries and the Covid-19 pandemic, but Sunday Group has kept the Token Investors, including Nakamura, reasonably informed of the Mobby Project's status and progress. (*Id.* at 15.) Sunday Group has every intention of completing the Mobby Project and delivering M-Tokens to Nakamura and others at a time judged best by Sunday Group's officers and Board of Advisors. (*Id.*)

Beginning in March 2021, Nakamura and Takeda began a campaign of harassment and extortion against Sunday Group and Mitsuishi for the purpose of harming Sunday Group, Mitsuishi, and the Mobby Project in order to try to force a return of Nakamura's Mobby Payment. (*Id.* at 15.) On March 4, 2021, Nakamura emailed the Chairman of Sunday Group's Board of Advisors, Dr. Leonard Kleinrock, making false claims about Sunday Group, Mitsuishi, and the Mobby Project of money laundering and failure to comply with SEC regulations and suggesting that Sunday Group defrauded him. (*Id.* at 16.)

In early August 2021, Nakamura and Takeda sent a series of emails to Mitsuishi threatening to contact government regulators, such as the SEC, about Sunday Group if Nakamura did not receive a refund of the Mobby Payment and other large sums related to his investment in Sunday Group. (*Id.* at 16-17.) Shortly thereafter, Mitsuishi responded that Sunday Group would consider offering all Token Investors a buy-back of their right

to acquire M-Tokens. (*Id.* at 17.) Nakamura and Takeda replied to Mitsuishi, refusing to accept the buy-back offer, again demanding that Sunday Group pay Nakamura his demanded sums, and allegedly making threats to the lives of Mitsuishi and Kleinrock. (*Id.*)

In late August 2021, Sunday Group administered a buy-back program, available to all Token investors, which included the right to sell their M-Tokens for $10,000 per unit of M-Token. (*Id.* at 18.) Some Token Investors opted to have Sunday Group buy back their M-Tokens, while Nakamura declined. (*Id.*) Nakamura and Takeda sent another email to Mitsuishi, threatening to file a complaint with the SEC against Mitsuishi and/or Sunday Group unless Sunday Group admitted to engaging in wrongful conduct. (*Id.*)

When Sunday Group did not comply, Nakamura filed a complaint with the Securities Division of the Nevada Secretary of State sometime between September 2021 and November 2021 (the "Securities Complaint"). (*Id.*) Nakamura filed the Securities Complaint on behalf of himself and other Token Investors he claimed to represent. (*Id.*) Nakamura conspired with Takeda and/or Imachi to obtain a confidential list of the Token Investors without their knowledge. (*Id.* at 19.)

Nakamura made the following false statements in the Securities Complaint, directly to Token Investors, and through a 44-page document he authored: "(1) Sunday Group engaged in fraudulent conduct and/or acted illegally related to the raising of capital for the Mobby Project; (2) Sunday Group and/or its principals mispresented the scope [of] Dr. Kleinrock's involvement in the Mobby Project; (3) Sunday Group and/or its principals represented to certain Token Investors that the listing of M-Tokens on an exchange was imminent; and (4) Sunday Group and/or its principals represented to certain Token Investors that the value of M-Tokens once listed would increase at least tenfold, and potentially as much as several hundred to several thousand times its value." (*Id.*) The publication of these false statements has caused Sunday Group substantial harm to its goodwill, reputation, ability to attract additional investors or other opportunities to raise capital, and its existing and prospective economic relations. (*Id.* at 20.)

Counterclaimants assert seven counterclaims: (1) intentional interference with contractual relations (Sunday Group against Nakamura); (2) intentional interference with prospective economic advantage (Sunday Group against Nakamura); (3) intentional infliction of emotional distress ("IIED") (Mitsuishi against Nakamura); (4) abuse of process (Sunday Group and Mitsuishi against Nakamura); (5) defamation (Sunday Group and Mitsuishi against Nakamura); (6) business disparagement (Sunday Group against Nakamura); and (7) civil conspiracy (Sunday Group and Mitsuishi against Nakamura). (ECF No. 59.)

### III. DISCUSSION

Nakamura moves to dismiss all the counterclaims except the IIED claim. (ECF No. 68 at 6.) The Court addresses each counterclaim in turn and whether it will grant Counterclaimants leave to amend any dismissed counterclaims.

#### A. Abuse of Process

Nakamura argues that Counterclaimants have not adequately pled an abuse of process claim. (*Id.* at 19.) Counterclaimants stipulate to dismissal without prejudice of their abuse of process claim. (ECF No. 71 at 7.) The Court accordingly grants the Motion as to the abuse of process claim, dismissing it without prejudice.

#### B. Defamation

The Court addresses Nakamura's arguments that the defamation claim is time-barred and insufficiently pled as based on alleged statements made in the Securities Complaint, to Token Investors, and to Kleinrock.

##### 1. Time Bar

Both sides agree that the statute of limitations for defamation in Nevada is two years. (ECF No. 68 at 14; ECF No. 71 at 19.) "A claim may be dismissed as untimely pursuant to a 12(b)(6) motion 'only when the running of the statute [of limitations] is apparent on the face of the complaint.'" *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013) (citations omitted). "In determining whether a statute of limitations has run against an action, the time must be computed

from the day the cause of action accrued." *Clark v. Robison*, 944 P.2d 788, 789 (Nev. 1997) (citation omitted). The general rule is that "a cause of action accrues when the wrong occurs and a party sustains injuries for which relief could be sought." *Petersen v. Bruen*, 792 P.2d 18, 20 (Nev. 1990) (citation omitted). Nevada recognizes an exception to the general rule, the "discovery rule," under which "the statutory period of limitations is tolled until the injured party discovers or reasonably should have discovered facts supporting a cause of action." *Id.* (citations omitted).

Counterclaimants asserted their defamation claim on August 10, 2023 in their FACC. (ECF No. 59 at 23.) As to the allegedly defamatory statements made in the Securities Complaint, Counterclaimants allege the Securities Complaint was filed and thus those statements were made between September 2021 and November 2021. (*Id.* at 18.) Counterclaimants thus timely filed their defamation claim within two years of when the alleged wrongs occurred. As to the allegedly defamatory statements made to Token Investors directly or through transmission of the Securities Complaint or a 44-page document authored by Nakamura, it is not apparent on the face of the FACC that a defamation claim based on those statements would be time-barred. In fact, drawing all reasonable inferences in Counterclaimants' favor as the non-moving parties, *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999), the Court finds that those statements to the Token Investors could have been made around the same time period as or after the filing of the Securities Complaint.

Lastly, as to the allegedly defamatory statements made to Kleinrock, Counterclaimants allege that Nakamura made those statements in a March 4, 2021 email to Kleinrock. (ECF No. 59 at 16.) While that email date falls outside of the statute of limitations, the Court could plausibly infer that Counterclaimants did not discover the email and its contents until after August 10, 2021, tolling the statute of limitations and rendering the claim timely. *See Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) ("When a motion to dismiss is based on the running of the statute of limitations, it can be granted only if the assertions of the complaint, read with the required liberality, would not

permit the plaintiff to prove that the statute was tolled."). Accordingly, because the running of the statute of limitations on the defamation claim is not apparent on the face of the FACC, the Court rejects Nakamura's statute of limitations affirmative defense at this motion to dismiss stage.

### 2. Sufficiency of the Allegations

"An action for defamation requires the plaintiff to prove four elements: '(1) a false and defamatory statement . . . ; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages.'" *Clark Cnty. Sch. Dist. v. Virtual Educ. Software, Inc.*, 213 P.3d 496, 503 (Nev. 2009) (citations omitted). "However, if the defamatory communication imputes a 'person's lack of fitness for trade, business, or profession,' or tends to injure the plaintiff in his or her business, it is deemed defamation per se and damages are presumed." *Id.* (citation omitted). The Court addresses two separate sets of allegedly false and defamatory statements.

### a. Statements in Securities Complaint and to Investors

Counterclaimants allege that Nakamura made the following false and defamatory statements in the Securities Complaint, directly to Token Investors, and through a 44-page document he authored: "(1) Sunday Group engaged in fraudulent conduct and/or acted illegally related to the raising of capital for the Mobby Project; (2) Sunday Group and/or its principals mispresented the scope [of] Dr. Kleinrock's involvement in the Mobby Project; (3) Sunday Group and/or its principals represented to certain Token Investors that the listing of M-Tokens on an exchange was imminent; and (4) Sunday Group and/or its principals represented to certain Token Investors that the value of M-Tokens once listed would increase at least tenfold, and potentially as much as several hundred to several thousand times its value." (ECF No. 59 at 19; ECF No. 71 at 14-15.)

Nakamura argues that Counterclaimants' alleged statements are too general and that Counterclaimants fail to allege specific mediums of communication or explain how the statements were false. (ECF No. 68 at 12-13.) The Court finds Nakamura's arguments unpersuasive. First, Nakamura primarily relies on *Cunningham-Dirks v. Nevada*, Case

No. 2:12-cv-00590-PMP, 2013 WL 77470 (D. Nev. Jan. 3, 2013), and *Loc. Ad Link, Inc. v. AdzZoo, LLC*, Case No. 2:09-cv-01564-RCJ-LRL, 2009 WL 10694069 (D. Nev. Dec. 15, 2009), to support his arguments, but the Court agrees with Counterclaimants that those non-binding cases are distinguishable. In *Cunningham*, 2013 WL 77470 at * 9, only generalities about the alleged statements were pled, whereas Counterclaimants here provide the actual allegedly defamatory statements. And *Loc. Ad Link, Inc.* involved multiple defendants and therefore the court was particularly concerned that the "[p]laintiffs have not specified which [d]efendants published which statements"—a concern not present here. *See* 2009 WL 10694069, at *11.

Second, as to falsity, Nakamura's citation to *Loc. Ad. Link* does not support his argument. The court in *Loc. Ad. Link* merely found that the "[p]laintiffs have not explicitly alleged the falsity of any of the alleged statements" because they only alleged that the statements were "defamatory," which "can encompass both true and false claims."[2] Contrary to Nakamura's assertions, the court did not require that the plaintiffs explain how the statements were false. Regardless, the Court finds that Counterclaimants have sufficiently alleged the falsity of the statements in question, as statements that Sunday Group and/or its principals engaged in fraudulent conduct and made certain representations or misrepresentations are assertions of fact that could be proven false. *See Wynn v. Smith*, 16 P.3d 424, 431 (Nev. 2001) ("As a general rule, only assertions of fact, not opinion, can be defamatory."); *Shafer v. City of Boulder*, 896 F. Supp. 2d 915, 940 (D. Nev. 2012) ("A statement is defamatory only if it contains a factual assertion that can be proven false.").

Third, Counterclaimants do sufficiently allege the mediums through which these statements were made, *i.e.*, in the Securities Complaint, in a 44-page document authored

---

[2]Nakamura proffers a copy of the complaint at issue in *Loc. Ad Link* to assert that the plaintiffs did allege that the statements in question were "false and damaging." (ECF No. 75-1.) However, the court in *Loc. Ad Link* appears to have focused on the allegations listed directly under the defamation claim, which only allege the statements are defamatory. (*Id.* at 13.) In any event, the case is non-binding and nowhere does the court explicitly hold that a claimant must allege facts supporting how and why a statement is false.

7

by Nakamura, and in direct communications to Token Investors. To the extent Nakamura is arguing that even greater detail is required, the Court disagrees. "Defamation actions need only be pled under the requirements of Rule 8(a)," and under those pleading requirements, "a plaintiff's complaint need only provide 'a short, plain statement' giving the defendant fair notice of the plaintiff's claim and the ground upon which it rests." *Boink Sys., Inc. v. Las Vegas Sands Corp.*, Case No. 2:08-cv-00089-RLH-GWF, 2008 WL 11389204, at *4 (D. Nev. May 30, 2008) (citing *Empress LLC v. City & County of San Francisco*, 419 F.3d 1052, 1055 (9th Cir. 2005) and *Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1481 (9th Cir. 1989)). "Specifics regarding the alleged defamatory comments are not required under Rule 8(a), as more context can be brought out during the discovery process." *Id.* at *5. For the purposes of pleading, the Court finds Counterclaimants' allegations sufficient to provide Nakamura fair notice of their defamation claim based on statements made in the Securities Complaint, directly to Token Investors, and in the 44-page document authored by Nakamura.

### b. Statements Made to Dr. Kleinrock

In addition, Counterclaimants allege that Nakamura made defamatory statements to Dr. Kleinrock in a March 4, 2021 email, by "making false claims about Sunday Group, Mr. Mitsuishi, and the Mobby Project, including false claims of money laundering and failing to comply with SEC regulations," and suggesting that "Sunday Group has defrauded him." (ECF No. 59 at 16; ECF No. 71 at 17-18.) Nakamura again argues that the allegations contain only generalities about the defamatory statements that were made and do not detail how or why the statements were false. (ECF No. 68 at 13.) The Court rejects the argument regarding falsity for similar reasons as discussed above.

While these allegations are not framed as specific statements, the Court finds that they are not so general as those rejected in *Cunningham*, 2013 WL 77470, at *9, *i.e.*, defamed "with allegations of criminal intentions," "with allegations of inappropriate intentions and behavior," "with allegations of inability to appropriately care for [someone]," and "with allegations of criminal behavior claiming he was dangerous," a case where the

non-moving party also failed to even respond to the "generalities" argument. Here, the Court may reasonably infer from the allegations that Nakamura allegedly made false assertions of fact that Sunday Group and Mitsuishi engaged in money laundering, failed to comply with SEC regulations, and defrauded Nakamura. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Such assertions constitute defamation *per se* and are sufficiently pled. *See Cohen v. Hansen*, Case No. 2:12-cv-1401-JCM-PAL, 2015 WL 3609689, at *4 (D. Nev. June 9, 2015) (citing *Talbot v. Mack*, 169 P. 25, 30 (Nev. 1917)) ("A statement that directly imputes to the plaintiff 'dishonesty, lack of fair dealing, want of fidelity, integrity, or business ability,' even in general terms and without supporting details, is considered defamation per se.").

Nakamura lastly argues that the statements to Dr. Kleinrock do not constitute publication to a third person because "Counterclaimants plead that Dr. Kleinrock was 'the Chairman of Sunday Group's Board of Advisors.'" (ECF No. 68 at 13.) Counterclaimants counter that they "have never claimed that Dr. Kleinrock is an employee or officer of Sunday Group" and that Nakamura has "cited no authority that a false and defamatory statement that is made even to an employee, officer or director of an entity asserting defamation is not publication to a third party." (ECF No. 71 at 18.) The Court agrees with Counterclaimants and rejects Nakamura's argument as too cursory and not supported by his cited case law.

Accordingly, the Court finds that Counterclaimants have sufficiently pled a defamation claim based on the alleged comments made by Nakamura to Dr. Kleinrock in the March 4, 2021 email.

**C.   Business Disparagement**

"To succeed in a claim for business disparagement, the plaintiff must prove: (1) a false and disparaging statement, (2) the unprivileged publication by the defendant, (3) malice, and (4) special damages." *Clark Cnty. Sch. Dist.*, 213 P.3d at 504. Like

defamation, the statute of limitations for a business disparagement claim in Nevada is two years. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 780-81 (9th Cir. 2002) (citing NRS §§ 11.190(4)(c), (e)). Nakamura makes the same arguments regarding time bar, generalities, specific medium, and falsity as he did for the defamation claim and cites no new authority in support. (ECF No. 68 at 14-15.) Because Sunday Group's business disparagement claim is based on the same statements alleged in the defamation claim, the Court rejects those arguments for the same reasons as discussed above.

Nakamura additionally argues that the business disparagement claim should be dismissed because Sunday Group does not sufficiently plead special damages, specifically the casual nexus between the alleged statements and damages. (*Id.* at 15.) "[A] business-disparagement claim requires the plaintiff to show that the defendants' disparaging comments are the proximate cause of the economic loss, which may be shown through a general decline in business." *SVI, Inc. v. Supreme Corp.*, Case No. 2:16-cv-01098-JAD-NJK, 2016 WL 7190548, at *5 (D. Nev. Dec. 12, 2016) (citing *Clark Cnty. Sch. Dist.*, 213 P.3d at 505).

In the FACC, Sunday Group alleges that "Nakamura's false and disparaging statements caused Sunday Group to suffer general and special damages, including the money paid to buy-back Token Investors' M-Tokens, harm to reputation and good will, expenses incurred to manage with the disruption to the Mobby Project, as well as harm to Sunday Group's ability to attract additional investors or other opportunities to raise capital." (ECF No. 59 at 25.) The Court agrees with Sunday Group that the Court may reasonably infer that publishing false and disparaging comments that Sunday Group is committing fraud and other misconduct would cause a general decline of business in the specific, fact-based examples alleged in the FACC. Nakamura argues that the pleading suggests other reasons for economic damages to Sunday Group, such as "changes in the blockchain and related industries and the Covid 19 pandemic." (ECF No. 68 at 15.) While, to prove a business disparagement claim, "the general decline of business must be the result of the disparaging statements and the plaintiff must eliminate other potential

causes," *Clark Cnty. Sch. Dist.*, 213 P.3d at 505, that is a fact-intensive inquiry not suitable at this stage. For purposes of pleading, the Court may reasonably infer that Sunday Group's alleged decline in business resulted from the alleged false and disparaging statements and not from Nakamura's suggested reasons.

The Court therefore finds that Sunday Group has plausibly alleged a business disparagement claim.

### D. Intentional Interference with Contractual Relations

The Court first addresses Nakamura's argument that the heightened pleading standard under Rule 9(b) applies to Sunday Group's claim for intentional interference with contractual relations, then addresses whether the claim is sufficiently pled under the applicable standard.

#### 1. Rule 9(b) Heightened Pleading

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Nakamura argues that such heightened pleading is required because "the claim asserts deception as its basis," pointing to the allegation in the FACC that Nakamura "intended to disrupt the contracts by making false and misleading claims." (ECF No. 68 at 16.) Sunday Group counters that this claim is not subject to heightened pleading because it is not grounded in fraud. The Court agrees with Sunday Group.

First, Nakamura's cited non-binding cases are distinguishable and do not support his argument. Nakamura's reliance on *Donovan v. Flamingo Palms Villas, LLC*, Case No. 2:08-cv-01675-RCJ-RJJ, 2009 WL 10693913, at *5 (D. Nev. June 23, 2009), does not support his argument, as the case does not even involve a claim for intentional interference with contractual relations and, unlike here, involves explicitly alleged fraud claims, *e.g.*, fraud by intentional misrepresentation, fraud by concealment, and conspiracy to commit fraud, *see id.* at *4. In his reply, Nakamura cites to *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168, 1174 n.3, 1177 (D. Nev. 2021), where the court

analyzed an intentional interference with contractual relations claim under Rule 9(b), but unlike here, the non-moving party in that case did not oppose the application of the heightened standard, *see id.* at 1174 n.3.

Second, the Court is persuaded by Sunday Group's citation to *WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*, 750 F. Supp. 2d 1180, 1193, 1195 (D. Nev. 2010), where the court applied Rule 9(b) to a fraud claim and related RICO claim, but declined to apply the standard to an intentional interference with contractual relations claim and other non-fraud claims because those claims did not "necessarily rely on a theory of fraud" and in fact the fraud claim itself failed under Rule 12(b)(6). Here, not only is there no fraud claim on which the other claims could rely if sufficiently alleged, the intentional interference with contractual relations claim also does not necessarily rely on a theory of fraud. Nakamura argues that *Shushok* is distinguishable because the complaint and intentional interference with contractual relations claim in that case did not rely on a theory of deceit. (ECF No. 74 at 12.) The Court disagrees. The *Shushok* complaint was plainly based on alleged fraud, although the court found that the fraud claim itself was not sufficiently alleged, and even though the other claims did not rely on a theory of fraud, they did rely on allegedly false representations, similar to the claim here. *See* 750 F. Supp. 2d 1180, 1185, 1193-95. Accordingly, like in *Shushok*, the Court will not hold the intentional interference with contractual relations claim to the heightened Rule 9(b) pleading standard.

### 2. Sufficiency of the Allegations

Having found Rule 9(b) heightened pleading does not apply here, the Court analyzes the sufficiency of the allegations of the intentional interference with contractual relations claim under the typical notice pleading standard. "In an action for intentional interference with contractual relations, a plaintiff must establish: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003).

Nakamura argues that Sunday Group fails to sufficiently plead Nakamura's intent to disrupt contractual relationships and a causal nexus between Nakamura's actions and the disruption of any contract. (ECF No. 68 at 16.) The Court finds that intent is sufficiently pled because, based on the FACC allegations, it can reasonably infer that Nakamura intended to interfere with Sunday Group's contracts with other Token Investors by taking intentional steps to, for example, directly contact them and by making false and defamatory statements about Sunday Group and Mitsuishi to them.

The Court however agrees with Nakamura that Sunday Group has not sufficiently pled that Nakamura's intentional acts caused the disruption of the existing contracts between Sunday Group and Token Investors to acquire a future interest in M-Tokens. Sunday Group alleges and argues that Nakamura's actions led to actual disruption in the sense that the actions caused Sunday Group to create the M-Token buy-back program and that several Token Investors took advantage of this program, which damaged Sunday Group. (ECF No. 59 at 20-21; ECF No. 71 at 24.) The Court can reasonably infer that Nakamura's actions led to those actions by Sunday Group and some Token Investors, but Sunday Group's offer to buy back M-Tokens and some Token Investors' election of a buy-back do not constitute an actual disruption of the initial contracts to acquire a future interest in M-Tokens. As alleged, such actions instead constitute the entering of new contracts between Sunday Group and some Token Investors that appear to be legally separate from those initial, existing contracts. *Cf. Operation: £Heroes, Ltd. v. Procter & Gamble Prods., Inc.*, Case No. 2:12-cv-00214-MMD, 2012 WL 5986444, at *3 (D. Nev. Nov. 28, 2012) (finding that termination of an existing agreement constitutes an "actual disruption of the contract"); *FLS Transportation Servs. (USA) Inc. v. Casillas*, Case No. 3:17-cv-00013-MMD-VPC, 2017 WL 4127980, at *7-*8 (D. Nev. Sept. 18, 2017) (finding breach of contract provisions constitutes actual disruption of a contract); *Shushok*, 750 F. Supp. 2d at 1195 (finding that releases of liability from lease agreements constitute disruption of those leases).

Accordingly, the Court finds that Sunday Group has not sufficiently pled actual disruption of an existing contract and thus a claim for intentional interference with contractual relations. The Court therefore grants the Motion as to this claim but will grant Sunday Group leave to amend, as explained further below.

### E.   Intentional Interference with Prospective Economic Advantage

As an initial matter, because Nakamura makes the same argument as above that the intentional interference with prospective economic advantage claim is subject to heightened pleading (ECF No. 68 at 17), the Court rejects the argument for the reasons discussed above and will not apply the Rule 9(b) standard. Nakamura also makes the same arguments regarding the specificity in content, medium, and falsity of the alleged misleading statements on which this claim is based (*id.*), which the Court again rejects for the same reasons discussed above.

To state a claim for intentional interference with prospective economic advantage, a plaintiff must plausibly plead: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct." *In re Amerco Derivative Litig.*, 252 P.3d 681, 702 (Nev. 2011) (quoting *Wichinsky v. Mosa*, 847 P.2d 727, 729-30 (Nev. 1993)).

Nakamura first argues that Sunday Group has not sufficiently alleged and identified the third parties with whom it had prospective contractual relationships or the relationships themselves. (ECF No. 68 at 18.) Sunday Group counters that that level of specificity is not required. (ECF No. 71 at 25.) The Court agrees with Sunday Group. Sunday Group alleges that it "had prospective contractual relationships between itself and one or more third-parties regarding future investments in Sunday Group and/or the Mobby Project." (ECF No. 59 at 21.) As "[t]he Supreme Court of Nevada has seemingly allowed a plaintiff to allege generally about unspecified customers" in intentional interference with prospective economic advantage claims, the Court finds that Sunday Group's allegations

of unspecified potential investors who would have invested in Sunday Group and/or the Mobby Project but for Nakamura's interference are sufficient here. *See Motogolf.com*, 528 F. Supp. 3d at 1178 (finding that Motogolf's allegations that "it has prospective contractual relationships with Motogolf customers who would click on its ads" without "identifying them specifically" is sufficient); *In re Amerco*, 252 P.3d at 702 (determining the plaintiff stated a claim by alleging it had prospective economic relationships with "customers who would have rented self-storage units in [its] U-Haul facilities" and "third parties who owned and sold properties which could be used as self-storage locations" but for the defendants' interference)).

Nakamura next argues that Sunday Group has not sufficiently pled Nakamura's intent to harm Sunday Group by preventing the prospective relationships. (ECF No. 68 at 18.) As with the previous claim, the Court finds that intent is sufficiently pled because, based on the FACC allegations, it can reasonably infer that Nakamura intended to harm Sunday Group by preventing its prospective economic relationships with prospective Token Investors through his intentional actions of, for example, filing the Securities Complaint containing allegations of misconduct committed by Sunday Group and its principals and making the same allegations directly to existing Token Investors who might have invested further or recommended investment to others. Moreover, Nakamura's cited cases are distinguishable. For instance, unlike here, the plaintiff's complaint in *Kraja v. Bellagio, LLC*, 202 F. Supp. 3d 1163, 1174 (D. Nev. 2016), did not plausibly allege that the defendant intended to harm him because the plaintiff alleged specific communications that belied such intent, and the plaintiffs in *Herman v. Venetian Casino Resort LLC*, 498 P.3d 776 (Nev. 2021), were required to prove that the defendant was "substantially certain" that its actions would interfere with prospective relationships at the summary judgment stage, which is not required at the pleading stage here.

Accordingly, the Court finds that Sunday Group has plausibly stated an intentional interference with prospective economic advantage claim.

### F. Civil Conspiracy

"An actionable civil conspiracy 'consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts.'" *Consol. Generator-Nevada, Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998) (citation omitted). "To prevail in a civil conspiracy action, a plaintiff must prove an agreement between the tortfeasors, whether explicit or tacit." *GES, Inc. v. Corbitt*, 21 P.3d 11, 15 (Nev. 2001) (citation omitted).

The Court applies the notice pleading standard, as it rejects Nakamura's argument that Counterclaimants' civil conspiracy claim is subject to heightened pleading under Rule 9(b) for similar reasons discussed above as to the intentional interference claims. The civil conspiracy claim is based on the claims for intentional interference with contractual relations, intentional interference with prospective economic advantage, and IIED—none of which are grounded in fraud. (ECF No. 59 at 26.) Because the Court finds that the intentional interference with contractual relations claim is not sufficiently alleged as discussed above, the Court finds that the civil conspiracy claim is not sufficiently alleged to the extent it is based on the intentional interference with contractual relations claim.

Nakamura argues that Counterclaimants set forth no facts supporting an inference that Nakamura, Takeda, and Imachi formed a conspiratorial agreement. (ECF No. 68 at 22.) Counterclaimants counter that, as to the conspiracy to commit IIED, the alleged threatening emails sent from both Nakamura and Takeda to Mitsuishi that form the basis for the claim sufficiently establish a conspiratorial agreement between them. (ECF No. 71 at 28.) The Court agrees with Counterclaimants, as the emails are specifically identified in the FACC (ECF No. 59 at 16-17) and do raise a reasonable inference that there was a tacit or explicit agreement between Nakamura and Takeda to concertedly engage in the alleged conduct forming the basis of the IIED claim, the plausibility of which is not challenged in this Motion. The Court therefore finds that the civil conspiracy claim to the extent it is based on the IIED claim is plausibly stated.

As to the conspiracy to interfere with Sunday Group's prospective economic relationships, Counterclaimants argue that the FACC sufficiently alleges that Nakamura and at least Takeda worked together to launch a campaign of intimidation and harassment to extort an exorbitant buy-out from Sunday Group, disrupt the Mobby Project, and impact Sunday Group's contractual relationships with other Token Investors and its ability to attract new investors through their threatening emails to Mitsuishi and Kleinrock and the false and defamatory allegations they made in the Securities Complaint and directly to Token Investors. (ECF No. 71 at 28.) But much of that alleged conduct goes towards the insufficiently pled claim for intentional interference with contractual relations. More significantly, the alleged conduct that goes towards the claim for intentional interference with prospective economic advantage—Nakamura's filing of the Securities Complaint containing allegations of misconduct committed by Sunday Group and its principals and communication of the same allegations directly to existing Token Investors, which impaired Sunday Group's ability to attract new investors—does not appear to substantially involve Takeda. (ECF No. 59 at 18-19, 21-22.) The Court therefore finds that the civil conspiracy claim to the extent it is based on the claim for intentional interference with prospective economic advantage is not sufficiently pled.

Accordingly, the Court grants the Motion as to the civil conspiracy claim to the extent it is based on the intentional interference with contractual relations claim and intentional interference with prospective economic advantage claim, but the Court will grant leave to amend as discussed below.

### G. Leave to Amend

In sum, the Court denies the Motion as to the claims for defamation, business disparagement, intentional interference with prospective economic advantage, and civil conspiracy to the extent it is based on the IIED claim. The Court grants the Motion as to the claims for abuse of process, intentional interference with contractual relations, and civil conspiracy to the extent it is based on intentional interference with contractual relations or intentional interference with prospective economic advantage.

The Court has discretion to grant leave to amend and should freely do so "when justice so requires." Fed. R. Civ. P. 15(a); *see also Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990). The Court may deny leave to amend if: (1) it will cause undue delay; (2) it will cause undue prejudice to the opposing party; (3) the request is made in bad faith; (4) the party has repeatedly failed to cure deficiencies; or (5) the amendment would be futile. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

As to the intentional interference with contractual relations claim and civil conspiracy claim to the extent it is based on the former, the Court finds that amendment would not necessarily be futile because additional allegations about the legal and contractual impact, if any, of the buyback offer and acceptance on the initial contract to acquire a future interest in M-Tokens could possibly cure the identified deficiencies. As for the civil conspiracy claim to the extent it is based on the claim for intentional interference with prospective economic advantage, the Court also finds that amendment would not necessarily be futile given that the FACC alleges that "Nakamura conspired with Takeda and/or Imachi to obtain a confidential list of the Token Investors without their knowledge." (ECF No. 59 at 19.) While Takeda and/or Imachi's alleged involvement in that instance is too conclusory and attenuated to establish a conspiracy with Nakamura to interfere with Sunday Group's prospective economic relationships with new investors, that some tangential involvement is alleged suggests that additional factual allegations could possibly cure the identified deficiencies. Accordingly, the Court will grant leave to amend these dismissed claims.

### IV. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motion before the Court.

It is therefore ordered that Plaintiff Tetsuya Nakamura's motion to dismiss the first amended counterclaim (ECF No. 68) is granted in part and denied in part, as specified herein. The Court dismisses but grants Counterclaimants leave to amend their claim for intentional interference with contractual relations and claim for civil conspiracy to the extent it is based on intentional interference with contractual relations and intentional interference with prospective economic advantage.

It is further ordered that Counterclaimants must file their second amended counterclaim containing amended allegations to cure the deficiencies identified herein within 30 days of the date of this order. Failure to do so will result in dismissal of the specified claims without prejudice.

DATED THIS 12th Day of June 2024.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE