EXHIBIT 13b

EXHIBIT 13b



## Date of trial January 20, 2014 Court name Tokyo District Court Judgment
## Case number: Heisei 24 (Wa) No. 15748

Case name: Case for requesting payment refund, etc.

Court result: Claim dismissed Document number: 2014WLJPCA01208006

### Abstract

* In a case where the plaintiff, a doctor who purchased unsecured corporate bonds with a face value of 100 million yen from the defendant, which was issued by a non-party company, sought the return of unjust enrichment or damages on the grounds that the defendant had rescinded the sales contract for the reasons of violation of the principle of suitability, provision of definitive judgment, misrepresentation, and breach of the duty to explain in the solicitation of the bonds, or for fraud, the explanation given by the defendant's representative B was not false or untrue in light of the circumstances at the time, and it could not be said that the explanation was misleading to the plaintiff, so there was no misrepresentation or provision of a definitive judgment. Furthermore, it could not be said that B made a solicitation that significantly deviated from the principle of suitability or explained false or untrue content, so there was no violation of the principle of suitability or breach of the duty to explain, and there was also no fraud or violation of public order and good morals, the claim was dismissed.

### source

westlaw japan

### Reference article

Civil Code Article 90

Article 96, paragraph 1 of the Civil Code

Article 703 of the Civil Code

Article 709 of the Civil Code

Article 715, paragraph 1 of the Civil Code

Consumer Contract Act, Article 4, Paragraph 1

Article 5 of the Financial Instruments and Exchange Act

Article 37-2 of the Financial Instruments and Exchange Act

Article 38 of the Financial Instruments and Exchange Act

Article 40 of the Financial Instruments and Exchange Act

Article 4 of the Law Concerning Sales of Financial Products, etc.

Article 5 of the Law Concerning Sales of Financial Products, etc.

Article 6 of the Law Concerning Sales of Financial Products, etc.

© 2025 Thomson Reuters KK all rights reserved

Trial date: January 20, 2014 Court name: Tokyo District Court     Trial classification Judgment

Case number Hei 24 (Wa) 15748

Case name: Case for requesting payment refund, etc.

Dismissal of request for trial result Document number 2014WLJPCA01208006

| | |
|---|---|
| Asahikawa City, Hokkaido (hereinafter omitted) | |
| plaintiff | X |
| Lawyer representing the lawsuit | Hisashi Takasu |
| same | Shigeru Kikuchi |
| Chiyoda-ku, Tokyo (hereinafter omitted) | |
| defendant | Daiwa Securities Co., Ltd. |
| Representative Director | A |
| Lawyer representing the lawsuit | Jun Hashimoto |

main sentence

1 All claims of the plaintiff are dismissed.

2 Litigation costs shall be borne by the plaintiff.

facts and reasons

### 1st request

The defendant shall pay the plaintiff 82,998,323 yen and the amount calculated at the rate of 5 minutes per year from June 15, 2012 until the payment is completed.

Summary of the second case

1 In this case, the plaintiff, who purchased unsecured bonds with a face value of 100 million yen issued by Elpida Memory Co., Ltd. (hereinafter referred to as "Elpida") from the defendant, violated the principle of suitability, provided conclusive judgments, made false statements, etc. in soliciting the company's bonds to the defendant. Based on the right to claim unjust enrichment by claiming that the sales contract was canceled pursuant to Article 4 of the Consumer Contract Act on the ground of a violation of the duty of explanation, or pursuant to Article 96 of the Civil Code on the ground of fraud, or based on Article 5 of the Financial Instruments and Exchange Act or Articles 709 and 7 of the Civil Code. Based on the right to claim damages pursuant to Article 15, the plaintiff paid the defendant pursuant to the sales contract of 99,998,323 yen, minus the 17,000,000 yen already received in the disposition of the sale, and the remaining amount was 82,998,323 yen, and the day after the date of service of the complaint (after the date of the tort), June 2012.

© 2025 Thomson Reuters KK all rights reserved

This is a case seeking payment of late payment interest at the rate of 5% per annum as stipulated by the Civil Code from the 15th of the month until payment is made.

2 Premise facts (Facts other than those that are not disputed are acknowledged based on the evidence listed in each section.)

(1) The plaintiff is a doctor who runs a urology clinic.

(2) On December 2, 2010, the Plaintiff opened a trading account for financial products at the Sapporo branch of the Defendant, a securities company, and initially began trading with the "planned investment amount" of the "Customer Card" (customer card) set at "5 million to 10 million yen," but changed it to "30 million to 50 million yen" on January 23, 2011. The transaction history between the Plaintiff and the Defendant is as shown in the attached "Transaction History."

(3) At approximately 6:00 p.m. on January 5, 2012, Plaintiff was solicited by B (hereinafter referred to as "B"), an employee of Defendant's Sapporo branch, to purchase the second unsecured corporate bond with a face value of 100 million yen 償還 (hereinafter referred to as "the Bonds in Question"), which was issued by Elpida and had an issue date of March 22, 2005 and a maturity date of March 22, 2012. The purchaser said that by investing just under 100 million yen, Plaintiff could earn a net profit of approximately 800,000 yen in just over two months.

In addition, the corporate bonds in question were unlisted bonds and were traded in the over-the-counter market through private transactions with securities companies.

(4) On January 11 of the same year, the plaintiff paid the defendant 99,998,323 yen as the purchase price for the bonds in question (bond price: 99,500,000 yen (99.5 yen per 100 yen) and accrued interest: 498,323 yen).

In addition, the transaction report prepared by the defendant (Exhibit 20-1) states "January 6, 2012" in the "Agreement Date" column and "January 12" in the "Delivery Date" column.

(5) Elpida was the third largest DRAM manufacturer in the world and Japan's only DRAM manufacturer, with capital of 236.1 billion yen (as of September 30, 2011). It was listed on the First Section of the Tokyo Stock Exchange. However, on February 27 of the same year, it filed for corporate reorganization proceedings with the Tokyo District Court and was delisted on March 28 of the same year.

(6) Elpida's business performance deteriorated significantly due to the effects of the so-called Lehman Shock in the fall of 2008, and in June 2009, the government certified that it was eligible for the Special Measures Law Concerning the Revitalization of Industrial Vitality and Innovation in Industrial Activity (hereinafter referred to as the "Industrial Revitalization Law"), and the company received an investment of 30 billion yen through the Development Bank of Japan Inc., but the application of the Law expired at the end of March 2012. In addition, in September 2009, the company received a syndicated loan of 110 billion yen from a bank syndicate, and the repayment deadline for the remaining debt of 77 billion yen was April 2 of the same year. At the time, the bank syndicate made recertification by the government of the application of the Industrial Revitalization Law a condition for refinancing the above loan.

(7) On March 16, 2012, the plaintiff sold the bonds in question to the defendant for 17 million yen, resulting in a loss of 83 million yen, the difference between the purchase price and the amount sold.

(8) The plaintiff expressed its intention to cancel the purchase and sale contract for the bonds (hereinafter referred to as the "purchase contract") in accordance with Article 4, Paragraph 1 of the Consumer Contract Act by filing the complaint (delivered on June 14, 2012) with the defendant. (Notable in this court)

(9) At the fifth oral argument hearing on January 21, 2013, the plaintiff

© 2025 Thomson Reuters KK all rights reserved

, expressed its intention to cancel the sales contract on the grounds of fraud. (Notable in this court)

### 3. Issues and arguments of the parties:

(1) Date of conclusion of the purchase and sale agreement

**(Plaintiff's claim)**

Generally, in securities transactions with a securities company, if the purchase funds are not deposited in advance, a sales contract is concluded on the terms and conditions at the time of solicitation when the purchase funds are paid.

In this case, the plaintiff paid the defendant the funds to purchase the corporate bonds in question on January 11, 2012, and at that point the purchase and sale agreement was concluded.

(i) As of January 10, 2012, the Plaintiff had not transferred the purchase amount for the bonds in question and was hesitating about whether to purchase the bonds. However, in his second phone call on the same day, B made a definitive judgment and misrepresented the situation. This led the Plaintiff to mistakenly believe that the risk of the bonds in question was low, and he decided to purchase them. On the 11th of the same month, he deposited the amount equivalent to the purchase price into his trading account.

The Plaintiff understood that he was not under any contractual binding until he paid the purchase funds, that it was up to him whether or not to pay the purchase funds, and that once the Plaintiff paid the purchase funds, the purchase agreement would be concluded at that time, and at the same time, the sales agreement B も, would also be concluded. At the time of the solicitation on January 6th of the same year, B had told the Plaintiff that he would "please read it later" regarding the Nikkei newspaper article which contained important information regarding the credit risk of the bond issuer, and B himself understood that the sales agreement had not come into effect on the 6th of that month.

When soliciting the Plaintiff to purchase the Bonds in question, B did not clarify, as stipulated in Article 37-2 of the Financial Instruments and Exchange Act, "whether it would be the counterparty in effecting the sale or transaction, or whether it would act as an intermediary, broker or agent in effecting the sale or transaction." Since the Plaintiff did not know whether a sale contract or a purchase contract would be established, it should not be deemed that a sale contract was established at that stage.

**(Defendant's claim)**

The purchase and sale agreement for the bonds in question was concluded during a telephone conversation between B and the plaintiff at just after 1:02 pm on January 6, 2012. The plaintiff's payment of the purchase price on January 11 was merely performance based on the purchase and sale agreement.

(2) Illegality of solicitation in relation to the purchase and sale contract in question (whether or not there was misrepresentation or the provision of a definitive judgment)

**(Plaintiff's claim)**

A. Misrepresentation

### (A) January 6, 2012

On January 6, 2012, B falsely informed the plaintiff that the focus was on whether or not the recertification would be approved, that the bonds that B was now recommending to purchase were completely irrelevant, and that the concern was regarding the company's cash flow after April.

Furthermore, although the average value of the reference statistical value for over-the-counter trading of the corporate bonds in question on the 5th of the same month was 99.97 (Exhibit 2, 1-1), B falsely stated to the plaintiff that "on the other hand, if there is such a risk, it would never be 99.5...please rest assured," thus conveying a false statement of fact.

### (a) January 10, 2012

© 2025 Thomson Reuters KK all rights reserved

On the 10th of the same month, B falsely told the plaintiff over the phone, "In the end, what we are concerned about is what happens after April, around April and May."

(c) January 10, 2012 (second phone call)

On the 10th of the same month, B made the second phone call that day and told the plaintiff the following false information:

① If you want, you can even sell this 29 billion yen.

② For example, if the price of Deeram, or the cost price of the product, falls below 200 billion yen in six months, and the company ends up in the red, it will still have about 100 billion yen in cash remaining.

③ Even if, for example, you are not successful, you cannot give up because you cannot pay next month. Of course, you should pay back the amount you have cash on hand, and once you have paid back the amount, if you are not successful, you would normally and normally negotiate again with the financial institution.

④ The possibility of this being rejected is also close to zero. The decision will be made not by politicians but by METI officials, and it is realistically impossible for the officials who gave the OK to make a choice that would prevent them from recovering the funds they had invested.

Providing definitive judgment

On January 6, 2012, B falsely asserted to Plaintiff that the current issue regarding Elpida was whether or not it would be granted recertification under the Industrial Revitalization Act, and that the redemption of the bonds in question, which matured on March 22, 2012, was unrelated to this issue, and Plaintiff trusted this and agreed to purchase the bonds in question, setting the delivery date for January 12, 2012. The specific explanation given by B is as follows:

(a) B repeatedly asserted to the Plaintiff that "the problems with the redemption and repayment of bonds and loans lie with those maturing after April 2012, and 99.9% of those due by the end of March will be paid," and explained that the reasons for this were that "with the approximately 100 billion yen in cash and deposits held as of the end of September 2011, it is possible to pay the 30 billion yen in bonds maturing on January 24, 2012 and the 15 billion yen maturing on March 22," and that "even if re-certification for application of the asset utilization scheme is rejected, we cannot give up because we cannot pay next month's debt. Naturally we should repay the amount we have cash on hand, and it is normal and the normal schedule to renegotiate after repayment."

The above statements provided a definitive judgment on the uncertain matter of whether the bonds in question would be redeemed on the redemption date of March 22, and as a result, the plaintiff mistakenly believed that the bonds in question would certainly be redeemed.

(i) B provided a definitive judgment to the plaintiff regarding whether recertification of the application of the Industrial Revitalization Act would be granted, stating that "the possibility of this being a failure is also close to zero" and that "it is not politicians but METI officials who make the decision, and it is realistically impossible for the officials who gave the OK to make a choice that would prevent them from recovering the funds they had invested."

Based on the above statements, the plaintiff mistakenly believed that recertification of the application of the Industrial Revitalization Act was certain.

ウ    The defendant's solicitation to purchase the bonds in question violates the Consumer Contract Act Article 4, Paragraph 1, Item 1, prohibition on false representations, and the prohibition on the provision of definitive judgments, Paragraph 2 of the same Article. Therefore, based on Paragraph 1 of the same Article,

The plaintiff cancels the contract and demands the defendant to return the damages suffered by the plaintiff for unjust enrichment.

In addition, the defendant's above-mentioned solicitation violates the prohibition on providing definitive judgments under Article 4 of the Act on Sales, etc. of Financial Products (Financial Products Sales Act), and therefore the plaintiff seeks damages under Article 5 (Article 6) of the same Act.

(Defendant's claim)

The misrepresentations and definitive judgments asserted by the Plaintiff that occurred after the conclusion of the Purchase and Sale Agreement at around 1:02 p.m. on January 6, 2012 do not constitute illegal solicitations by B to purchase the Bonds.

In a series of conversations between January 5 and 6, 2012, B spoke under the assumption that there was a credit risk in the corporate bonds in question and that there was a risk that the investment amount would not be repaid, and the Plaintiff was aware of this.

The explanation given by B to the plaintiff is as follows:

(A) The maturity date is March 22nd, and it will mature in approximately two months.

(a) The effective yield is 4.623%.

(c) The brand name is Elpida.

(D) The rating is BBB.

(E) The gross yield is 2.03%.

(F) The unit price is 99 yen and 50 sen.

The interest received before tax is about 1 million yen, and the interest received after tax is about 800,000 yen.

(K)

(h) The real yield is 4.623%, so after tax it is about 4.215%.

On the same day, B stated his opinion to the Plaintiff that "Well, even in terms of substance, it is not the type of company that will go bankrupt in two months," taking into account circumstances such as the fact that Elpida was a company that had received public funds and was understood to be a company that had been successfully supported, and that it had also received support from the government. This does not constitute a categorical judgment or a false or misleading statement.

Furthermore, on the same day, B told Plaintiff, "Well, it is a rare case, but basically, we cannot guarantee it 100%. For example, if the situation were to change and the company were to go bankrupt tomorrow, things would change a little and, excluding rare cases, the bonds could be sold for almost 100%." He was explaining the possibility that the bonds would not be repaid if Elpida went bankrupt, and Plaintiff understood this.

Regarding B's statement to the plaintiff on the 6th of the same month that "The focus is on whether or not the recertification will be approved, and the bonds we are recommending to buy now are completely unrelated. What is scary is the cash flow after April," B's statement that since the deadline for Elpida's application of the Industrial Revitalization Law is the end of March, the issue of whether Elpida will be recertified under the law will come up at the end of March, and that the redemption deadline for the bonds in question is March 22, are both correct, and based on this premise, B's statement that this has nothing to do with the bonds in question does not constitute a misrepresentation. The plaintiff also understands that the above statement represents the view of B and others.

The above opinion was issued by the defendant (Daiwa Securities Capital Markets Co., Ltd. Financial Securities Research Institute)

© 2025 Thomson Reuters KK all rights reserved

The report entitled "Elpida Memory Continues to Have Negative Cash Flows" (Exhibit 3) 7. Hereinafter referred to as "this report."

(3) Illegality of solicitation in relation to the purchase and sale contract (whether or not there was a violation of the principle of suitability, the duty to provide explanations, etc.)

(Plaintiff's claim)

Violation of suitability principle

The corporate bonds in question are bought and sold in private transactions with securities companies in the over-the-counter market, and because their face value is over 100 million yen, they are exempt from the requirement to appoint a corporate bond administrator pursuant to the proviso to Article 702 of the Companies Act. Therefore, they are intended primarily for qualified institutional investors, and the very act of soliciting them from the plaintiff, who is an ordinary individual investor, is illegal.

In addition, the corporate bonds in question are unlisted bonds with a face value of 100 million yen, far exceeding the "planned investment amount" stated in the Plaintiff's "Customer Card." In light of the Plaintiff's past investment history, which has always considered holding public bonds to maturity, as well as the Plaintiff's knowledge and experience, the solicitation of the Plaintiff, an ordinary individual investor with little experience in transactions that involve specific credit risks and the difficulties of responding to emergencies, to purchase the corporate bonds in question violates the principle of suitability.

B Violation of duty of explanation

B only provided Plaintiff with an article in the Nihon Keizai Shimbun (Nikkei) dated January 6, 2012 and a summary of the consolidated financial statements for the second quarter of the fiscal year ending March of that year (Exhibit Ko 18). In a phone call on the same day, B stated, "It was in the Nikkei article today, so...the bonds you will be holding this time mature on March 22nd...the focus is on whether or not the recertification of the government assistance we are receiving will be approved, which is coming up at the end of March, so the bonds you will be holding this time are completely unrelated." Furthermore, although the summary of the consolidated financial statements for the second quarter did not state anything about Elpida's assets, such as investment securities worth 100 billion yen, in a phone call on the 10th of the same month (the first time), B falsely stated that in addition to the 100 billion yen in cash and deposits, there was also 100 billion yen in investment securities, and provided almost no explanation regarding the specific credit risks of the bonds in question.

The Defendant's solicitation of the purchase of the Corporate Bonds in question, including the act described in (2) above, violates the prohibition on providing definitive judgments under Article 38, Paragraph 1, Item 2 of the Financial Instruments and Exchange Act, the prohibition on making false representations under Paragraph 1 of the same Act, and the principle of suitability under Article 40 of the same Act, and also violates the duty to provide explanations (Civil Code Articles 709 and 715).

(a) The above solicitation was made by B, an employee of the defendant, in the course of "business," and therefore the plaintiff seeks compensation for the damages suffered by the defendant based on Article 715 of the Civil Code (employer liability).

(i) Furthermore, in early November 2011, the Defendants predicted the likelihood of Elpida going bankrupt by the end of March 2012, and attempted to pass on the losses that should have been suffered by their large corporate customers to the Plaintiffs, among other general investor customers, by selling the Elpida bonds held by the Defendants to the Plaintiffs, among other general investor customers, while making illegal profits for themselves. These acts constitute illegal acts under Article 4 of the Consumer Contract Act, Article 4 of the Financial Instruments Sales Act, and Article 38, item 1 of the Financial Instruments and Exchange Act, including "provision of a definitive judgment," "misrepresentation," and "false representation," as well as the company-wide act of "double-dealing" as described below. Therefore, the Plaintiffs seek compensation for the damages suffered by the Defendants under Articles 709 and 715 of the Civil Code.

(Defendant's claim)

Principle of suitability

The bond in question was rated BBB at the time of the conclusion of the purchase and sale agreement and was an investment grade ordinary bond. The plaintiff was a doctor, had a high level of understanding and judgment, owned a large amount of assets, and had experience in investing in financial products, so it can be said that the solicitation was suitable.

A duty of explanation

Regarding the bond purchase and sale contract, B's explanation to the plaintiff was not untrue and was sufficient.

(4) Grounds for invalidity and fraudulent rescission of the bond purchase agreement

(Plaintiff's claim)

A two-way transaction

The defendant did not state to the plaintiff when the purchase and sale contract for the bonds in question would be concluded, and when the price of the bonds in question fell, the purchase and sale contract was concluded on January 6, 2012, the time of the solicitation. When the price rose, however, the defendant chose the "advance deposit method," and, citing a "provisional statement of accounts" (Exhibit 45) that it had mailed to the plaintiff in advance, claimed that the transaction in question was from the start a transaction to acquire already issued bonds, and intended to conclude a purchase and sale contract with the plaintiff under the terms and conditions at the "time of transaction" after the time of the deposit. This kind of "two-pronged transaction" was decided based on the transaction method (

This was a fraudulent transaction carried out by the defendant on a company-wide basis, in which the defendant was forced to choose the time when the sales contract would be concluded.

B. Absence of sales contract

In the above transaction, there is no contract for the purchase of the bonds, so there is no contract for the purchase of the bonds.

C) Sales contract is invalid (violation of public order and morals)

Even if a purchase and sale agreement for the corporate bonds in question was concluded on January 6, 2012, the agreement is invalid because it violates public order and morals.

E-fraud

(a) If the Plaintiff had known about the above-mentioned "double-dealing" by the Defendant (B), it would not have entered into the purchase and sale agreement for the Bonds in question.

(a) The credit risk fraud of January 6, 2012

a B falsely stated to the plaintiff that "The focus is on whether or not the recertification will be approved, and it has nothing to do with the bonds that we are now recommending you to purchase. What is scary is the cash flow after April. This is very clear when you look at page 13."

b B falsely told the plaintiff, "On the other hand, if there was such a risk, it would never be 99.5...please rest assured."

(c) Credit risk fraud on the 10th of the same month

B told the plaintiff, "The cash of 112.8 billion yen has been reduced to 100 billion yen. In terms of Shuflow, cash has decreased by about 13 billion yen in six months. For example, if the price of Deeram, the cost price of the product, falls, and you end up with twice as much in six months, say 23 billion yen, even if you end up in the red, the theory is that you will still have about 100 billion yen in cash left," he said, lying.

b B told the plaintiff, "The next level of intangible investment and other securities...29 billion yen.

© 2025 Thomson Reuters KK all rights reserved

"Yes, I have 100 billion yen in cash on hand, plus this 29 billion yen, and if necessary, I can sell it. It's securities, so I have about 130 billion yen," he said, lying about the fact.

(Defendant's claim)

The purchase and sale contract for the bonds in question is a consensual purchase agreement, and there is no room for choosing the "method" as asserted by the plaintiff. It does not constitute fraud, nor does it violate public order and morals. The purchase and sale contract in question was concluded at 1:02 p.m. on January 6, 2012.

B denies that he conveyed false information to the plaintiff.

(5) Plaintiff's damages

(Plaintiff's claim)

Although the Plaintiff had not yet decided to purchase the bonds in question as of January 10, 2012, B provided the Plaintiff with a definitive judgment and made false representations to the Plaintiff in the second telephone call on the same day, which caused the Plaintiff to decide to purchase the bonds in question and pay 99,998,323 yen for them. As a result, the Plaintiff suffered losses of 82,998,323 yen, after deducting the 17 million yen paid from the sale of the bonds in question.

Regarding compensation for damages based on Article 5 of the Financial Instruments Sales Act, the amount of damages is presumed to be the above amount "the amount of damages suffered by the customer" pursuant to Article 6 of the same Act.

Third, the Court's decision

1 Based on the above premise facts and evidence (Exhibits A15, 17-1-4, A37, 40-1-5, Otsu 1-9-20, Otsu 13-1-4, Otsu 17, 19, 20) and the overall gist of argument, the following facts are established.

(1) Plaintiff's investment experience, etc.

The plaintiff is a doctor who runs a hospital and has considerable assets. In his transactions with the defendant, since December 2010, he has traded financial instruments such as listed stocks, corporate bonds, foreign currency-denominated bonds, Euroyen bonds, and subordinated corporate bonds over a period of approximately one year, and has traded not only in his personal account but also in an account under the name of "A Clinic," giving him considerable experience. He has also traded various financial instruments with securities companies other than the defendant, and has considerable knowledge of the taxation of financial instruments. Furthermore, he has some knowledge of Elpida's business situation, etc., and is therefore recognized to have a considerable amount of knowledge of financial instruments (the plaintiff has not made any attempt to prove his own lack of trading experience or knowledge, etc.).

(2) Transaction History of the Bonds

At around 6:07 pm on January 5, 2012, B called the plaintiff to solicit the purchase of the bond, informing him that the bond had a face value of 100 million yen, was due on March 22, 2012, had a nominal yield of 2.03, a real yield of 4.623, was rated BBB, and had accrued interest of approximately 460,000 yen, which was approximately 100 million yen, and would earn a profit of 800,000 yen in two months. The plaintiff expressed interest in the transaction and asked about taxation, to which B replied that he would contact him again after confirming the details.

On January 5, 2016, at around 6:14 p.m., B called the plaintiff and stated that he was a party to the transaction.

© 2025 Thomson Reuters KK all rights reserved

In that case, the profit on the sale would be tax-free and there would be a profit of 500,000 yen at maturity, and because 20% tax is applied to interest and the nominal interest rate is about 2%, at maturity it would be half that, or 1%, or 1 million yen, which would be 800,000 yen even after deducting the tax amount, and because the accrued interest was about 460,000 yen, the profit would be about 900,000 yen in the end. However, we decided to call the plaintiff after confirming the exact figures. In this conversation, the plaintiff was the one who took the lead in calculating the figures.

At 6:23 p.m. on the same day, B called the plaintiff and informed him that if he sold the corporate bonds just before they matured, he would make a profit of approximately 810,000 yen, and that if he held the bonds until maturity, he would have a redemption gain that would be taxed. At that time, B said, "For example, in the first rare case, we cannot guarantee it 100%. For example, if the company were to go bankrupt tomorrow, then things would be a little different."

The main points of the subsequent phone conversation between the two are as follows:

Plaintiff: "When I say Elpida, I mean, they received some kind of support from the Industrial Revitalization Corporation of Japan or something."

B: "In Japan, semiconductor manufacturing and sales are almost an oligopoly. Because of this, financial institutions quickly provided financial assistance. And we were the only company to receive support from the government."

Plaintiff: "Okay, okay, so what's the stock price now?"

B: "The current stock price is, er, 350 yen."

Plaintiff: "Oh, that's okay, then."

B: "Oh, it doesn't mean it's under 100 yen like the teacher said."

Plaintiff: "Well, the stock price isn't even below 100, and there are no rumors that the company will go bankrupt in the next two months."

B "I don't think so."

Plaintiff: "Rumors are…"

B: For example, the recent news about the debt of the restructuring company was that there was a rumor that they were asking each of their business partners for financial assistance of about 40 billion yen. "

B: Basically, the rumors are that the company is still struggling financially. And so, it seems that this time, a deal just happened to come up. In reality, they've already been talking about postponing repayment of the funds, and there are also rumors that the government is working on matching it with Toshiba. In short, in the current economic situation, the government can't afford to let such a well-known company go under.

・ ・ 」

Plaintiff: "So this won't go bankrupt in two months."

B: "Of course. I can't guarantee it though…"

At 1:02 p.m. on the 6th of the same month, B called the Plaintiff to confirm the Plaintiff's intention to purchase the Bonds in question, and explained that since the deadline for application of the Industrial Revitalization Act to Elpida was the end of March of the same year,

The issue of whether Elpida will receive recertification under the Industrial Revitalization Act will come up at the end of March, but since the redemption deadline for the bonds in question is March 22nd of the same year, he said that this is not related to the bonds in question.

B: "Oh, sorry, I was actually just placing an order, but is it okay to take it here and now?"

Plaintiff: "It's okay."

B: Before I continue, the easiest thing to understand was an article in the Nikkei newspaper today, so I'd like you to read it later. Basically, on page 13, there was a detailed feature on whether the funds would be repaid, but the bond you're bringing with you today matures on March 22nd. Ultimately, the focus is on the government assistance that expires at the end of March, and whether it will be recertified, and whether it will be approved again, so the bonds you just held this time have absolutely no effect, in short.

Plaintiff: "So it has nothing to do with it."

B: "That's irrelevant. Basically, I'm worried about the cash flow from April onwards. If you just look at page 13, I think it will be very easy to understand. I will also send you the financial report later, so please just look at that."

Plaintiff: Well, that's it. So, as far as you guys can see, it's fine that way. So...

B: "Yes, on the contrary, if there is such a risk, the unit price can never be 99.5, so taking that into consideration, if it is the end of March and the maturity date is March 22nd, then this value will be the one we are offering."

Plaintiff: "I see."

B: "I hope you can rest assured."

Plaintiff: "The 11th?"

B: "Well, if you order today, it will be delivered in four business days, so by the 12th."

Plaintiff: Oh, right.

B: "Yes, until the 12th."

Plaintiff: "Yes, I understand."

B: "Oh, so it's Mr. X's personal account."

Plaintiff: "Yes"

B: "Well, I would like to place an order for the second Elpida Memory corporate bond, with a face value of 100 million yen. The interest rate is 2.03%, and the maturity date is March 22nd. This time, the unit price is 99.50 yen per 100 yen face value, so the total amount including accrued interest is 99,998,323 yen. I will place the purchase order here."

Plaintiff: "99,998,323 yen."

B: "It's 998,323 yen (in unison with the plaintiff). We will place the order for you."

© 2025 Thomson Reuters KK all rights reserved

Plaintiff: "I just need to transfer this amount, right?" "Okay, yes."

In addition, the article on page 13 of the Nikkei newspaper of January 6th, 2012, pointed out by B, reported that the formulation of Elpida's reconstruction plan was reaching a critical point, and that "In addition to its business strategy, Elpida will also reach a critical point in terms of its finances. It needs to repay 45 billion yen in corporate bonds by the end of March. It also has loans of 50 billion yen that must be repaid in the second half of fiscal 2011. The company plans to cover this with cash on hand and financial support that it has sought from product suppliers, etc." and "Furthermore, of the total 110 billion yen borrowed from the DBJ and its main banks at the time of its certification under the Industrial Revitalization Law, the deadline for repayment of 77 billion yen is approaching on April 2nd. The bank group has set Elpida's re-certification at the end of March, the deadline for the application of the Industrial Revitalization Law, as a condition for agreeing to refinancing."

(3) About this report

The report on this matter (Exhibit 37), prepared by the Financial Research Institute of Daiwa Securities Capital Markets Co., Ltd. on November 7, 2011, states, "There is no need to change our view that the credit risk of the 2nd and 5th bonds, which will mature during the business revitalization construction period based on the revised Industrial Revitalization Law (July 2009 to March 2012), remains extremely limited. The reasons are as follows.", "(2) The maturity of the bonds in question is roughly earlier than the borrowings that will mature near the end of the fiscal year, and it is considered possible to cover the maturity with existing cash, etc. (3) With the 30 billion yen in preferred stock (DBJ) injected into Elpida based on the business restructuring plan and the aforementioned loan still remaining, it is not very realistic for these parties to make choices that would induce a deterioration in Elpida's creditworthiness."

(4) Reports regarding Elpida

It has been reported that Aelpida has been in capital alliance negotiations with Taiwanese companies and others since late December 2011, and that the company has been experiencing poor performance.

(i) An article in the Nikkei newspaper dated February 2, 2012 (Otsu 9-2) reported that the Industrial Revitalization Act would expire at the end of March, and that from April of that year, the Development Bank of Japan would have the right to demand that Elpida purchase the 30 billion yen worth of preferred shares. In preparation for the possibility of the bank making a demand for purchase, Elpida would use its capital reserves to secure funds for the repurchase.

An article in the Nikkei newspaper dated February 3rd of the same year (Otsu 9-3) reported that Elpida's President C stated at a press conference that in order to secure the funds for the above-mentioned repurchase, "announced that an extraordinary general meeting of shareholders would be held in late March of the same year to draw down capital," and that "he said, 'We have no problems with cash flow until March. We are in discussions with a group of banks, including about refinancing.'"

Elpida's share price fluctuated in the 300 yen range from December 16, 2011, to 350 yen on January 5, 2012, 331 yen on the 6th, 309 yen on the 10th, 313 yen on the 11th, and 308 yen on the 12th. It reached 377 yen on February 9 of the same year, but suddenly fell (down 54 yen) to 320 yen on the 15th of the same month. Thereafter, it fluctuated between 307 yen and 349 yen (all closing prices) until February 27, 2012, when a petition for the commencement of corporate reorganization proceedings was filed.

2. Point of contention (1) (the time of the conclusion of the purchase and sale agreement)

(1) As stated in the above premise facts and the above-mentioned facts, the transaction report prepared by the defendant (Exhibit 20-1)

In addition, in a telephone conversation between Plaintiff and B at 1:02 p.m. on January 6, 2012, B states "We were talking about placing an order. Is it okay to take it now?", "For today's order, (omitted)", "We will place the purchase order", and "We will place the order here", to which Plaintiff responded with "So I just need to transfer this money, right?" and "Okay, okay." It has also been confirmed that the purchase price for the Bonds in question would be paid by January 12, 2012. According to the evidence (Ko 17-5), in a telephone conversation between Plaintiff and B at 3:03 p.m. on January 10, 2012, B states with regard to the Bonds in question, "Well, you already have them.

" and you can see that he responds "Yes."

Furthermore, taking into consideration the above-mentioned determination that the Plaintiff had a certain amount of experience in his occupation and in trading financial instruments, as well as a fair amount of knowledge of financial instruments, and in light of the above-mentioned details of the transaction regarding the corporate bonds in question, it can be said that the Plaintiff had a full understanding of the purchase of the corporate bonds in question before agreeing to the purchase (purchase).Therefore, it is reasonable to find that the purchase agreement in question was concluded in the above-mentioned telephone exchange at a little after 1:02 p.m. on January 6th.

(2) In response, the plaintiff presents extensive evidence, but none of it is sufficient to affect the above findings.

Furthermore, the document entitled "Provisional Bond Calculation" (Exhibit 45) is one of the documents that employees of the defendant are permitted to provide to customers, and since B is a document which lists the terms of the transaction in an easy-to-understand manner, it can be said that it was provided to the plaintiff as a retrospective reference for the terms of the transaction which had already been finalized, and this is not enough to affect the above finding.

3. Point of issue (2) (Illegality of solicitation in relation to the purchase and sale contract in question (whether or not false representations were made and whether or not a definitive judgment was offered))

(1) According to the facts established above, in the series of conversations held from January 5 to 6, 2012, B proceeded under the assumption that the corporate bonds in question had a credit risk and that there was a risk that the investment amount would not be repaid, and it is acknowledged that the plaintiff was fully aware of this.

(2) Furthermore, as stated in the facts found above, the report separates the 30 billion yen bonds (5th bond) due on January 24, 2012 and the 15 billion yen bonds (2nd bond) due on March 22 from the repayments made after the end of March of that year, states that the bonds are "roughly nearing the end of the process," and concludes that the 15 billion yen bonds due on March 22 will be paid.The report also states that if the government does not recertify Elpida when the 30 billion yen capital investment and 10 billion yen loan have not yet been repaid, it would induce a deterioration in Elpida's creditworthiness, making it difficult to recover the previous capital investment, and therefore it is unrealistic to assume that the company will not be recertified.

As stated in the facts found above, although it had been reported that Elpida's business performance had been sluggish since around the end of December 2011, there were no specific articles predicting bankruptcy. In addition, newspaper articles published after the conclusion of the Purchase Agreement, including an article in the Nikkei newspaper dated January 6, 2012, reported that concrete cash flow arrangements were still expected to be made. Furthermore, the company's stock price remained in the 300 yen range until February 27, 2012, when the petition for commencement of corporate reorganization proceedings was filed. In light of these facts, the opinion in the Report and the opinion in January of the same year

The Nikkei article of the 6th mentioned above was based on a well-founded opinion at the time it was reported, and it cannot be said to have been false or an artificial attempt to dispose of the corporate bonds.

Then, in response to the contents of this report and the Nikkei newspaper article, B called the plaintiff on January 6, 2012 and stated his opinion that "the focus is on whether or not the recertification will be approved, and the bonds that I am now recommending to purchase are completely unrelated, and the scary thing is the cash flow after April." As mentioned above, the application deadline for Elpida under the Industrial Revitalization Act is the end of March, so the issue of whether Elpida will be recertified under the Act will come up at the end of March, but the fact that the redemption deadline for the bonds in question is March 22 is itself not a false fact, and B can be said to have expressed the opinion that it had nothing to do with the bonds in question, based on this fact. And it can be recognized that the plaintiff also understood the above statement to represent the view of B and others.

(3) Furthermore, B's statement to Plaintiff on January 6, 2012, "On the other hand, if there was such a risk, it would never be 99.5...please rest assured," can be deemed to have been a statement to the effect that if there had been a greater risk of Elpida's credit risk becoming a reality, the unit price would have fallen more significantly, and cannot be deemed to have been false or untrue (Note: As of January 6, 2012, the rating of the Corporate Bonds in question was 1 (investment grade).). 3 B B であり,

(4) In summary, taking into account the above points, B's explanation to the Plaintiff, based on the circumstances at the time, cannot be deemed to be false or untrue. In addition, considering that the Plaintiff, who had considerable knowledge and experience in financial product transactions, responded to B's explanation by saying, "So that's fine from your point of view," and listened to it as the opinion of the Defendant, it cannot be said that B's explanation was misleading to the Plaintiff. Therefore, B's explanation cannot be deemed to be illegal as a misrepresentation or the provision of a definitive judgment, etc. (The Plaintiff alleges that the sales contract in this case was concluded on January 12, 2012, and that the explanations given by B from January 6 onwards were illegal. However, the time of the conclusion of the sales contract in this case is as described in 2 above, and the circumstances after the conclusion of the sales contract cannot be taken into consideration.)

4. Point of issue (3) (Illegality of solicitation in relation to the purchase and sale agreement (violation of the principle of suitability, breach of duty to explain, etc.) About presence))

(1) Principle of conformity

In general, when a securities company employee actively solicits a customer to make a transaction that clearly involves excessive risk, contrary to the customer's wishes and circumstances, and solicits the customer to make a securities transaction that significantly deviates from the principle of suitability, it is reasonable to consider that such an act is illegal under tort law. In determining a customer's suitability, the characteristics of the product in question should be taken into account, and in correlation with these, various factors such as the customer's investment experience, knowledge of securities transactions, investment intentions, and financial situation should be taken into consideration comprehensively. It is possible.

In the present case, as found above, the bonds in question were ordinary bonds with a simple structure, and at the time of the conclusion of the purchase and sale agreement, they were ordinary bonds with an investment grade rating of BBB. In addition, the plaintiff was a doctor with a high level of understanding and judgment, and possessed a large amount of assets.

The plaintiff has experience in investing in appropriate financial products. Furthermore, based on the facts established above, it can be seen that the plaintiff fully understood the risks associated with the bonds in question, including the bankruptcy of Elpida.

Therefore, it can be said that the Plaintiff, based on his investment experience and knowledge, fully understood the content and risks of the Bonds in question, and since the Bonds in question cannot be deemed inappropriate in light of the Plaintiff's financial situation, it cannot be said that the Defendant's (B) solicitation of the Bonds in question violated the principle of suitability.

In addition, the plaintiff claims that soliciting general investors to sell "bonds without a bond manager" (proviso to Article 702 of the Companies Act), such as corporate bonds with a face value of 100 million yen or more, violates the principle of suitability and constitutes a tort. However, there is no law prohibiting the sale to general investors of corporate bonds that are exempt from the mandatory appointment of a bond manager pursuant to the proviso to Article 702 of the Companies Act, and it cannot be said that selling the above-mentioned bonds to general investors immediately violates the principle of suitability. As stated above, in light of the product characteristics of the corporate bonds in question, the customer's investment experience, knowledge of securities trading, investment B が, intentions, financial status, and other factors, it cannot be said that the solicitation to the plaintiff to purchase the corporate bonds in question made a significant deviation from the principle of suitability.

(2) Violation of the obligation to provide explanations, prohibition on providing definitive judgments under Article 38, Paragraph 1, Item 2 of the Financial Instruments and Exchange Act, prohibition on making false statements under Item 1 of the same Paragraph, and violation of the principle of suitability under Article 40 of the same Act

As explained above, B can be said to have provided sufficient information to the Plaintiff when soliciting the purchase of the Bonds in question, and it cannot be said that B provided false or untrue information. Therefore, the Defendant's (Editor's note: original text) claims of breach of the duty to provide explanations and breach of the Financial Instruments and Exchange Act cannot be accepted.

5. Regarding Issue (4) (Invalidity of the Bond Purchase Agreement and Grounds for Fraudulent Cancellation)

(1) Plaintiff alleges that Defendant intended to conclude the purchase and sale contract at the price at the time of the transaction after the time of payment of the purchase money after January 6, 2012, if the price of the bonds in question fell, the purchase and sale contract would be concluded on that day, and if the price rose, the purchase and sale contract would be concluded at the price at the time of the transaction after the time of payment of the purchase money. However, there is no evidence sufficient to prove that Plaintiff had the intention to select the transaction method (the time of the purchase and sale contract) after observing the price movement of the bonds after the payment of the purchase money in B, and it cannot be found that Defendant intentionally did so on a company-wide basis.

In addition, the purchase price for this sales contract was agreed upon as 99.5 million yen (excluding accrued interest) as of January 6, 2012, and there are no objective circumstances from which it can be inferred that if the price subsequently rose, a new sales contract would be concluded at the increased price.

Furthermore, the Plaintiff cites the contents of a document entitled "Provisional Bond Calculation" (Exhibit 45) as the basis for its argument. However, as explained above, since the document lists the terms of the transaction in an easy-to-understand format, it can be said that B provided the Plaintiff with this document as a retrospective reference for the terms of the transaction that had already been finalized. Therefore, this is not enough to affect the above finding.

(2) As stated above, it is clear that the defendant's argument of fraud cannot be accepted (the argument itself is invalid with respect to the circumstances after the conclusion of the sales contract in this case). In addition, taking into consideration the circumstances explained in 1 to 4 above, it is not clear that the sales contract did not exist or that the public order

Nor can it be said to be invalid because it violates good morals.

6 Although the Plaintiff withdraws its claim that the Defendant violated its obligation to provide information and guidance, it also alleges that after purchasing the Bonds in question, B only provided the Plaintiff with "good information" without conveying to the Plaintiff any information that would have cast significant doubt on Elpida's going concern status, and that the Plaintiff suffered damages as a result of B's omission to provide appropriate advice and guidance regarding the Bonds in question. We will consider this claim just to be sure.

Generally, once a securities company has sold corporate bonds to general investors through solicitation, it cannot be said to be obligated to provide guidance or advice to the buyer regarding the timing of the sale of the purchased corporate bonds, unless there are special circumstances.

Looking at this case, the reports regarding Elpida's cash flow after the conclusion of the Purchase and Sale Agreement and the trends in the company's stock price are in line with the facts established above, and a considerable amount of information about Elpida's general risk of bankruptcy was circulating before the purchase of the Bonds in question. Plaintiff has a considerable history of trading in bonds and information about Elpida's stock price and the trends in the prices of the Bonds in question were available to Plaintiff on a daily basis. Accordingly, Plaintiff was in a position to fully consider the timing of the sale of the Bonds in question. In light of these facts, it cannot be found that B provided Plaintiff with any information that would have deprived him of the opportunity to avoid further damage by selling the Bonds in a timely manner. Therefore, it cannot be found that the above-mentioned special circumstances existed.

The plaintiff also alleges that Elpida had an obligation to inform shareholders of the likelihood of bankruptcy when it published the "Notice regarding notes on matters related to the going concern assumption" (Exhibit 22-1) on February 14, 2012. However, as explained above, it cannot be said that the defendants had any special circumstances that would give rise to such an obligation.

7 Based on the above, all of the plaintiff's claims are without merit.

Therefore, the judgment is as set forth in the main text.

(Judge Hisashi Tateuchi)

<Omitted below>

*******

© 2025 Thomson Reuters KK all rights reserved