EXHIBIT 14b

EXHIBIT 14b



Trial date: April 13, 2020    court name    Tokyo District Court    Trial classification Judgment
Case number: Rei 2 (Wa) No. 7287
Case name Damages claim case
Document number 2022WLJPCA04138005

source
westlaw japan

| | |
|---|---|
| Saitama City (omitted) | |
| plaintiff | X 1 |
| Saitama City (omitted) | |
| plaintiff | X 2 |
| Lawyers representing the plaintiffs | Akiyoshi Motosugi |
| same | Yuki Tegawa |
| Lawyer representing the same lawsuit | Shunsuke Chino |
| Chuo-ku, Tokyo (hereinafter omitted) | |
| defendant | Nomura Securities Co., Ltd. |
| Representative Director | A |
| Lawyer representing the lawsuit | Yasunori Kimura |
| same | Yuko Mori |
| same | Takashi Kimura |
| Lawyer representing the same lawsuit | Koichiro Kimura |

main sentence

1 All of the plaintiffs' claims are dismissed.

2 The plaintiffs shall bear the costs of the proceedings.

© 2025 Thomson Reuters KK all rights reserved

facts and reasons

### 1st request

(Dominant claim)

1. The defendant shall pay Plaintiff X1 5,307,264 yen plus interest thereon at the rate of 3% per annum from June 30, 2020 until payment is made.

2 The defendant shall pay the plaintiffs x2 4,632,776 yen plus interest at the rate of 3% per annum from June 30, 2020 until payment is made.

(Preliminary request)

1 The defendant shall pay Plaintiff X1 5,837,990 yen plus interest at the rate of 5% per annum from February 26, 2016 until payment is made.

2 The defendant shall pay the plaintiffs x2 5,096,053 yen plus interest at the rate of 5% per annum from July 17, 2015 until payment is made.

Summary of the second case

In this case, the plaintiffs, who had opened trading accounts at the defendant's branch office, were solicited by the defendant's employees to purchase shares in UMN Pharma Inc. (hereinafter referred to as the "non-party company"), and (i) primarily sought to have the contract rescinded pursuant to Article 4, Paragraph 1, Items 1 and 2, and Paragraph 2 of the Consumer Contract Act, on the grounds that they had been informed of false important facts, had been provided with definitive judgments, and had not been informed of unfavorable facts, and sought to have the defendant rescind the contract, as well as to recover the losses incurred in the transaction (5,307,264 yen for Plaintiff X1 and 4,632,776 yen for Plaintiff X2) as compensation for their unjust enrichment, as well as to pay late payment damages at the rate of 3% per annum as prescribed by the Civil Code from the day after the date of service of the complaint until the date of payment; and (ii) primarily sought to recover the losses incurred in the transaction (the same amount as the above losses) from the defendant, as its employer, on the grounds that the defendant employees had violated their duty to provide definitive judgments and explanations to the plaintiffs, and had subsequently violated their duty to provide guidance and advice, their duty to prevent losses from expanding, and their duty to close out their positions, on the grounds that the defendant's employees had violated their duty to provide definitive judgments and explanations to the plaintiffs, as well as their duty to provide guidance and advice, their duty to prevent losses from expanding, and their duty to close out their positions, on the grounds that they had violated their duty to provide guidance and advice, their duty to prevent losses from expanding, and their duty to close out their positions, as well as to recover the losses incurred in the transaction (the same amount as the above losses) from the defendant, as their employer, based on the tort of Article 715 of the Civil Code. The plaintiffs are seeking payment of attorney's fees (530,726 yen for Plaintiff X1 and 463,277 yen for Plaintiff X2) and late payment damages at the rate of 5% per annum as prescribed by the Civil Code prior to the amendment by Law No. 44 of 2017 from the date of the tort (last purchase date) to the date of payment.

### 1 Prerequisite fact

The following facts are either not disputed by the parties or are readily established from the evidence and overall substance of argument presented below.

(1) The defendant is a corporation engaged in financial instruments trading business as defined by the Financial Instruments and Exchange Act.

(2) Plaintiff X1 (hereinafter referred to as "Plaintiff X1") opened an account at Defendant's Omiya Branch in May 1988 (Otsu 4) and began transactions with Defendant. Plaintiff X1's branch was changed to Omiya Nishiguchi Branch (merged with Saitama Branch in April 2018) in January 2014 (Otsu 7).

(3) Plaintiff X2 (hereinafter referred to as "Plaintiff X2") is the wife of Plaintiff X1, and opened an account at Defendant's Omiya branch in October 2001 (Otsu 23) and began transactions with Defendant. Plaintiff X2's branch was changed to Omiya Nishiguchi branch (currently Saitama branch) in March 2014 (no dispute).

© 2025 Thomson Reuters KK all rights reserved

(4) The non-party company was established on April 20, 2004, with its head office in Akita City, as a pharmaceutical research and development venture, and was listed on the Tokyo Stock Exchange's Mothers market in December 2012 (Exhibit 29).

(5) Plaintiff X1 purchased 1,000 shares of the non-party company for 2,831,988 yen on July 15, 2015, 1,000 shares for 2,864,856 yen on July 17, 2015, and 500 shares for 960,420 yen on February 26, 2016, and Plaintiff X2 purchased 1,000 shares of the non-party company for 2,846,306 yen on July 15, 2015, and 1,000 shares for 2,866,470 yen on July 17, 2016 (these transactions are referred to as "the Transactions in Question").

(6) At the time of July 2015, the person in charge of the Plaintiffs' accounts at the Omiya West Exit Branch was B (hereinafter referred to as "B"), and it was B who provided the Plaintiffs with explanations regarding the purchase of the shares of the non-party company on the 15th and 17th of that month.

As of February 2016, the person in charge of the plaintiffs' accounts at the Omiya West Exit Branch was C (hereinafter referred to as "C"), and it was C who provided the explanation to plaintiff X1 regarding the purchase of shares of a non-party company on the 26th of that month.

(7) On December 12, 2019, the plaintiffs responded to a tender offer made by Shionogi & Co., Ltd. to purchase the shares of the non-party companies at 540 yen per share. Plaintiff X1 sold 2,500 shares of the non-party companies for 1.35 million yen, and Plaintiff X2 sold 2,000 shares for 1.08 million yen to Shionogi & Co., Ltd. (Exhibits 8 and 9, Exhibits 1 and 3).

(8) The plaintiffs have expressed their intention to cancel the transaction by filing the complaint in this lawsuit, on the grounds that the transaction is subject to grounds for cancellation as provided for in Article 4, Paragraph 1, Items 1 and 2 of the Consumer Contract Act (as is evident from this Court).

## 2. Issues and arguments of the parties

(1) Regarding this transaction, the cancellation provisions of Article 4, Paragraph 1, Items 1, 2, and 2 of the Consumer Contract Act Was there a reason?

(Plaintiffs' arguments)

B and C, despite the fact that it was uncertain that the influenza vaccine (hereinafter referred to as the "vaccine") developed by the non-suit company would be approved in Japan and the stock price of the non-suit company would rise in a short period of time, falsely represented to the plaintiffs that this was certain, provided definitive judgments about facts whose future fluctuations were uncertain, and did not disclose the disadvantageous fact that the non-suit company's vaccine would not be approved in Japan and the stock price would fall. As a result, the plaintiffs mistakenly believed that the non-suit company's vaccine would be approved in Japan and the stock price of the non-suit company would rise in a short period of time, and entered into the transaction in question.

These fall under the grounds for cancellation stipulated in Article 4, Paragraph 1, Items 1, 2, and 2 of the Consumer Contract Act.

(Defendant's claim)

B and C never told the plaintiffs facts that were different from the objective facts, never provided them with definitive judgments, or never failed to inform them of unfavorable facts.

The plaintiffs were of sufficient age, social experience, investment experience, investment knowledge, etc. to understand the content and risks of the products in the transactions in question, and therefore they were not mistaken about them.

© 2025 Thomson Reuters KK all rights reserved

(2) Whether the defendant employees breached their duty to provide a definitive judgment or explanation to the plaintiffs in soliciting the transactions in question, which would constitute tort.

(Plaintiffs' arguments)

The shares of the non-party company were listed on the Tokyo Stock Exchange Mothers, a market where prices are likely to fluctuate, and in light of the non-party company's performance and financial situation, they were speculative stocks with a high risk of a decline in stock price. However, B persuaded the plaintiffs to purchase the non-party company's shares, telling them that the vaccine developed by the non-party company would soon be approved in Japan and that the non-party company's stock price would certainly rise in the short term.

Such solicitation by B constitutes the provision of a definitive judgment to the plaintiffs and, as a breach of its duty to provide explanations, constitutes a tort by B against the plaintiffs.

(Defendant's claim)

The selection of target stocks in stock transactions, the timing of buying and selling, the type of buying and selling, the unit price, the quantity, etc. are matters that an investor should decide at his or her own judgment and responsibility, and therefore even if the defendant employees provided the plaintiffs with a definitive judgment, this does not immediately provide a basis for illegality under private law. Even if it did provide a basis for illegality, the investment experience, investment knowledge, investment objectives, financial situation, etc. of the investor conducting the securities transaction in question should be taken into consideration when determining whether or not there was illegality.

Considering the plaintiffs' age, social experience, investment experience, investment knowledge, investment intentions, assets, etc., it cannot be said that the defendant employees' solicitation into the transactions in question involved a breach of the duty to provide definitive judgments or explanations that would be deemed illegal in a tort. Therefore, the defendant employees' solicitation of the plaintiffs does not constitute a tort.

(3) Did the defendant employees breach their duty to provide guidance and advice, to prevent losses from expanding, or to liquidate their positions in relation to the transactions in question, which would constitute torts against the plaintiffs?

(Plaintiffs' arguments)

B and C misled the plaintiffs into believing that the vaccine developed by the non-party company would soon be approved in Japan and that the non-party company's stock price was sure to rise in a short period of time. However, they continued to give them this erroneous impression and encouraged them to continue holding the non-party company's shares, thereby depriving the plaintiffs of the opportunity to sell the non-party company's shares.

Such provision of erroneous information by B and C constitutes tort as a breach of the duty to provide guidance and advice to the plaintiffs, a breach of the duty to prevent losses from increasing, and a breach of the duty to close positions.

(Defendant's claim)

The selection of target stocks in stock transactions, the timing of buying and selling, the type of buying and selling, the unit price, the quantity, etc. are matters that investors should decide at their own discretion and responsibility, and the defendant employees have no obligation to provide guidance or advice to the plaintiffs, and the plaintiffs have not asserted any specific facts regarding the breach of these obligations. Therefore, the defendant employees' actions do not constitute any kind of tort against the plaintiffs. Never.

(4) Amount of unjust enrichment or damages

(Plaintiffs' arguments)

The defendant has informed the plaintiffs that if the transaction is cancelled, the amount of unjust enrichment will be the amount listed in A below.

© 2025 Thomson Reuters KK all rights reserved

4

If a tort is found to exist with respect to this transaction, the amount of damages to be compensated will be the sum of items A and B below.

The difference between the purchase price and the sale price of the shares of the non-suit company

The amount is 5,307,264 yen for Plaintiff X1 and 4,632,776 yen for Plaintiff X2.

b. Attorney fees

The amount is 530,726 yen for Plaintiff X1 and 463,277 yen for Plaintiff X2.

(Defendant's claim)

Both fight.

(5) Contributory negligence

(Defendant's claim)

Even if the actions of the defendant employees constitute a tort against the plaintiffs, in light of the plaintiffs' investment experience, etc., the plaintiffs were grossly negligent in entering into the transactions in question, and therefore the plaintiffs' negligence should be taken into consideration when calculating the amount of compensation.

(Plaintiffs' arguments)

The plaintiffs believed the explanations given by B and C and continued to believe that the vaccine of the non-party company would be approved in Japan and that the share price of the non-party company would rise, and therefore the plaintiffs are not negligent.

Third, the Court's decision

1 Found facts

(1) Plaintiff X1's investment experience, etc.

Plaintiff X1 was born on a certain date in 1951. After graduating from high school, he worked for the A Prefectural Police. After retiring in 2011, he worked for the B Association, a general incorporated association, and a C Bank and a credit union (Exhibit 11, Exhibits 6, 7, 13, 14).

B. After opening a trading account with the defendant in May 1988, the plaintiff X1 applied to use the home trade service by submitting a comprehensive securities service application form to the defendant on July 14, 2004. In this application, the plaintiff declared that, as his investment policy, he wanted to place more importance on profitability while taking into consideration the balance between safety and profitability, that his investment objectives were to form assets for the future, to manage excess funds, that he had experience in stock investment, that he had an annual income of 10 to 20 million yen, that he wanted to use the information and advice from the defendant as a reference, and that he did not need any further explanation regarding important matters related to the Law on the Sales, etc. of Financial Products for Domestic Stocks (hereinafter referred to as the "Financial Products Sales Law") (Exhibits Otsu 4, 5, 6).

On January 10, 2014, Plaintiff X1 informed the Defendant that, as his investment policy, he would not limit the investment targets or investment methods, but would consider active management, that he had investment experience in MMFs, public bond investment trusts, investment trusts other than those mentioned above, foreign bonds (including foreign exchange transactions), and stocks, that he had an annual income of 5 to 10 million yen, and financial assets of 50 to 100 million yen, and that he did not need an explanation of important matters related to the Financial Instruments Sales Act for all seven products: domestic and foreign stocks, bonds, CBs (convertible bonds or convertible bond-type bonds with stock acquisition rights), and government bonds for individuals. Around May 2 of the same year, he submitted a confirmation letter to the Defendant stating that he understood that there were price fluctuation risks and exchange rate fluctuation risks for transactions of currency-selectable investment trusts.

(Otsu 8, 12).

On or around October 6, 2016, Plaintiff X1 applied to the Defendant to open a foreign securities trading account.

© 2025 Thomson Reuters KK all rights reserved

(Otsu 15).

From the time Plaintiff X1 opened his trading account with Defendant until December 12, 2019, he made 46 purchases and 36 sales of domestic stocks traded on at least the First Section, Second Section, and First Section of the Tokyo Stock Exchange, as well as trading in exchange-traded funds (ETFs), REITs (real estate investment trusts), bonds with stock acquisition rights (convertible bonds), and foreign bonds. As of around March 2015, the amount of his investments was approximately 20 million yen (Exhibits 1 and 2).

In addition, since December 1, 2011, Plaintiff X1 invested a total of 42.3 million yen over 13 installments at Musashino Bank's Omiya Kita branch in investment trusts that invest in foreign bonds, domestic and foreign REITs, and domestic and foreign stocks (Exhibit 10-1).

(2) Regarding the investment experience of Plaintiff x2

Plaintiff X2 was born on XX/XX/1952. After graduating from high school, she helped out at her parents' home and did clerical work. After marrying Plaintiff X1, she worked part-time while also taking care of the housework and raising the children, and is currently a full-time housewife (Exhibit 13).

B. When Plaintiff 2 opened a trading account with Defendant in October 2001, he submitted a Customer Card Registration/Change Notification Form to Defendant and declared that, as his investment policy, he would like to place greater emphasis on profitability while taking into consideration the balance between safety and profitability, that his investment objectives were to manage excess funds, that he had investment experience in MMFs, medium-term government bond funds, and public bond investment trusts, and that he had financial assets of 5 million to 10 million yen, and that he would also like to receive information and advice from Defendant. He also stated that, with regard to important matters related to the Financial Instruments Sales Act, he did not require an explanation of six products, namely domestic and foreign stocks, bonds, and convertible bonds (CBs) (Exhibits 24 and 25).

or around April 4, 2012, the plaintiff submitted a written confirmation to the defendant stating that he understood that there were price fluctuation risks and exchange rate fluctuation risks associated with currency-selection investment trust transactions (Otsu 26).

On

From the time Plaintiff 2 opened a trading account with Defendant until December 12, 2019, he made 33 purchases and 34 sales of domestic stocks, including stocks traded on the First and Second Sections of the Tokyo Stock Exchange, as well as initial public offerings on the Tokyo Stock Exchange Mothers, in addition to trading in exchange-traded funds (ETFs), REITs (real estate investment trusts), domestic stock investment trusts, and foreign stock investment trusts. By around April 2015, his investment amount had exceeded 10 million yen (Exhibit 3).

In addition, since February 2015, Plaintiff No. 2 invested a total of 40 million yen in 12 installments at Musashino Bank's Omiya Kita branch in investment trusts that invest in foreign bonds, foreign REITs, and domestic and foreign stocks (Exhibit 10-2).

(3) In August 2006, the non-party company concluded an exclusive license agreement in Japan for influenza vaccines using BEVS (a technology in which target gene information is incorporated into a virus that is believed to have no effect on the human body, and then the virus is infected into insect cells to mass-produce the target protein) with Protein Sciences Corporation (hereinafter referred to as "PSC"), a U.S. company that developed BEVS. On August 16, 2010, the non-party company concluded an exclusive license agreement in Japan for influenza vaccines using BEVS technology with Astellas Pharma Inc. (hereinafter referred to as "Astellas Pharma") ") to jointly develop a vaccine in Japan using cell cultures produced by BEVS. , and agreed on the basic terms regarding exclusive sales (Exhibit 29).

© 2025 Thomson Reuters KK all rights reserved

In December 2011, Astellas Pharma and the non-party company issued a press release stating that as a result of Phase I/II clinical trials of the vaccine they were jointly developing, they had confirmed immunogenicity (the ability to produce antibodies that react to pathogens or toxins and eliminate their pathogenicity) and good tolerability (the degree to which side effects are tolerable to the subjects) (Otsu 30).

The non-party company was listed on the Tokyo Stock Exchange Mothers in December 2012 (Exhibit 31).

On January 16, 2013, PSC received approval from the U.S. Food and Drug Administration (FDA) for the world's first seasonal recombinant influenza HA vaccine manufactured using BEVS (Exhibit 32).

On March 11 of the same year, Astellas Pharma and the non-party company issued a press release stating that the non-inferiority criteria for the primary endpoint were met in a Phase III clinical trial targeting people aged 65 and over. On January 15, 2014, they issued a press release stating that the criteria were also met in two further trials and that no major safety issues were confirmed. On May 30 of the same year, they issued a press release stating that they had applied to the Ministry of Health, Labour and Welfare for manufacturing and marketing approval for the efficacy and effectiveness of preventing influenza (Exhibits 33 to 3-5).

(4) C was transferred from the Defendant Akita Branch to the Defendant Omiya Nishiguchi Branch around July 2015. On the 15th of the same month, at the morning meeting at the Omiya West Exit Branch, he introduced a non-party company that he had been paying attention to since working at the Akita Branch as a promising stock for the future.

After the morning meeting, B asked C to tell him about the non-suit company again, because he wanted to propose the company's shares to a client. C explained to B using stock reports prepared by the defendant company about the non-suit company, and said that a factory had been built in Gifu, that if the vaccine was approved, the stock price of the non-suit company could rise, and that while it was unlikely that a product would be approved in the US but not in Japan, approval in Japan was not necessarily guaranteed. (Otsu 55, 70, Witness C)

(5) On the morning of July 15, 2015, B called Plaintiff X1 and solicited him to purchase shares in a non-party company.

At that time, B explained that the non-party company was a pharmaceutical manufacturer that had been listed in 2012, that it was developing a vaccine using a technology that could produce influenza vaccines in a shorter time than the conventional manufacturing method, that "so it has not yet been approved in Japan, but in the United States, influenza vaccines have already been reviewed. So, it is not the case that something is approved in the United States and not approved by the Ministry of Health, Labor and Welfare in Japan, so it will be approved in the future," "I think it will be approved soon," "When it was listed in 2012, it clearly stated that it aimed to turn a profit in 2016, and I think it is a stock that will achieve that goal," that the stock price had been fluctuating over 3,000 yen but is currently in the 2,800 yen range, that it is not a stock with a high trading volume, so it would be better to hold up to 1,000 or 2,000 shares, and that he would like to introduce the purchase to Plaintiff X2 as well. Plaintiff X1 expressed his intention to purchase 2,000 shares. In response, B said, "I will contact you again when the price drops another level," and recommended that I limit my purchase to 1,000 shares this time and then buy another 1,000 shares depending on the situation. He also said, "This is a relatively short-term purchase, so I would like you to hold it for three or four months."

"It is not a sale, so we will contact you again when it is time to sell." (Exhibit 6-1, 6-2)

(6) On July 15, 2015, after Plaintiff X1 purchased 1,000 shares of the non-suit company, B called Plaintiff X2 and explained the non-suit company's vaccine, just as he had done to Plaintiff X1, saying, "It is highly unlikely that something approved in the United States will not be approved by the Ministry of Health, Labor and Welfare in Japan, so this will also be approved in Japan later. When I say later, it's probably quite soon." Plaintiff X2 asked B if the vaccine would be approved in about six months, and B replied, "Not even six months away. Probably already," and "I think it will be a little sooner." He stated that the company had publicly declared that it would aim to turn a profit in 2016, and that this was likely to happen. Plaintiff X2 decided to purchase 1,000 shares at the limit price as recommended by B. (Exhibit 6-3)

(7) On July 15, 2015, Plaintiff No. 1 purchased 300 shares at 2,805 yen per share and On the same day, Plaintiff X purchased 600 shares at 2,806 yen per share and 100 shares at 2,807 yen per share, and Plaintiff X2 purchased 1,000 shares at 2,820 yen per share (Exhibits 1 and 3).

On the same day, B informed C that Plaintiffs X1 and 2 had each purchased 1,000 shares of UMN Pharma (Exhibit 70, Witness C).

(8) On July 17, 2015, B called the Plaintiffs and inquired about the purchase of shares of a non-party company. They advised the plaintiffs to purchase more shares and received limit orders from them.

On the same day, Plaintiff X1 purchased 200 shares at 2,836 yen per share and 200 shares at 2,837 yen per share. , purchased 200 shares at 2,839 yen per share and 400 shares at 2,840 yen per share, and on the same day, plaintiff X 2 purchased 1,000 shares at 2,840 yen per share.

B called the plaintiffs in the evening of the same day to inform them that the contract to purchase the additional shares had been concluded, and also to inform them of the timing of the sale, saying, "I will contact you again next week or when the time to sell comes." (Exhibit A 6004, 11, 13, Exhibit B 1, 3)

(9) While C felt that the stock market was becoming cloudy due to the economic situation in China and other factors, on August 18, 2015, the share price of the non-party company rose to around 3,000 yen. On the same day, C advised B to sell the non-party company's shares to the plaintiffs and asked B to confirm their intentions before taking any action.

In response to this, B called Plaintiff X1 on the same day and said, "I contacted you because I thought it might be a good idea since I've already made about 350,000 yen and my profit is now about 350,000 yen, but even if you sell it now, if you want to lock in your profits, you've already made this much profit." He explained the sale of the non-party company, to which Plaintiff X1 replied, "It's still good." Furthermore, B told Plaintiff X1 that there would be a discussion about approval on September 4 of the same year, that approval would be granted sooner or later, so he thought he would probably be able to make a little more profit if he waited for that, and that if approval was not granted, the stock price would fall to about 2,800 yen again, and that he would contact him so that he could sell at the highest price. (Exhibit 6-5, Exhibit 1-1, Exhibit 70)

In addition, the share price of the non-suit company reached a peak of 3,035 yen during trading hours on August 18 of the same year during the period between when the plaintiffs purchased and sold the non-suit company's shares (Exhibit 7-2).

© 2025 Thomson Reuters KK all rights reserved

(10) On September 7, 2015, B called Plaintiff X1 and stated that he would contact him when information became available regarding the meeting held on September 4 of the same year, and on October 14, 2015, B called Plaintiff X2 and informed him that there was no movement regarding the vaccine of a non-party company, that the Nikkei average was sluggish, and that he would contact him when it looked like he could make a profit including the commission. (Exhibits 6-6 and 6-7)

Furthermore, B began to feel unwell towards the end of the same month, and C then took over the plaintiffs' care (Witness C, Plaintiff X2).

(11) On November 2, 2015, C called Plaintiff X1 and told him that the financial statements of the non-party company had been revised downwards, that the prospects for approval of the vaccine within this fiscal year were bleak, that he thought it would be better to hold the shares in the medium to long term, and that although the schedule was about three months behind schedule, there was a high possibility that the share price would rise once approval was granted (Exhibit 6-8).

On February 26, 2016, C told Plaintiff X1 by phone that although the vaccine of the non-party company would not be approved in March of that year, the US approved portion would be officially confirmed and exports would begin, so 1,900 yen might be the bottom price, and if the stock price rose to around 2,700 yen as expectations of approval increased, there would be no loss. C recommended that Plaintiff X1 reduce the acquisition cost by averaging down (buying more shares when the price of the securities initially purchased falls in order to reduce the average purchase cost). Plaintiff X1 purchased 500 shares of the non-party company at 1,899 yen per share (Exhibit 6-9, Exhibit 1).

(12) On March 17, 2016, C spoke with Plaintiff X1 by phone about the status of approval of UMN Pharma's influenza vaccine. At that time, Plaintiff X1 said to C, "But UMN Pharma's stock price has gone up quite a bit, hasn't it?" (Exhibit 6-10) The stock price of one share of the non-party company reached a high of 2,375 yen and a low of 1,918 yen in March of that year, and a high of 2,755 yen and a low of 2,058 yen in April of that year. However, after May of that year, the price gradually fell, and in November of that year, the lowest price fell below 1,000 yen to 881 yen (Exhibit 7-2).

(13) C continued to provide the Plaintiffs with information about the approval status of the vaccine of the non-party company by telephone, etc. Plaintiff X1 told C that he was watching the situation and that he had read in the newspaper that the non-party company was looking for business partners overseas. Plaintiff X2 also told C that he wanted to wait for approval without selling the vaccine, that he had read on the Internet that the vaccine would not be approved because Astellas Pharma did not accept transfers from the Ministry of Health, Labor and Welfare, and that he and his wife had gone to the general meeting of shareholders of the non-party company (Otsu 70, Witness C).

(14) In January 2017, Astellas Pharma withdrew its application for marketing approval for the vaccine. An analyst's research report on the non-party company also noted that since a vaccine with the same ingredients developed by PSC had been approved in the United States, it was thought that there was a high possibility that the vaccine would also be approved in Japan, so the announcement of the withdrawal of the application came as a surprise to the stock market, and that the clinical trial data showed high efficacy compared to existing products, leaving the results questionable. (Otsu 41, 63)

Regarding point (1) (whether there were grounds for cancellation of the transaction under Article 4, Paragraph 1, Items 1, 2, and 2 of the Consumer Contract Act)

© 2025 Thomson Reuters KK all rights reserved

The Plaintiffs allege that, although it is an uncertain fact that the vaccine being developed by the Non-Party Company will be approved in Japan and that the Non-Party Company's stock price will rise in a short period of time, B and C (i) conveyed to the Plaintiffs facts that were not true, that this was certain, (ii) provided definitive judgments about facts that are uncertain as to future fluctuations, and (iii) failed to inform the Plaintiffs of the unfavorable fact that the Non-Party Company's vaccine will not be approved in Japan and there is a risk that the stock price will fall.

It is true that, as stated in the found facts (5) and (6), when B recommended the Plaintiffs to acquire the shares of the Non-party Company on July 15, 2015, he stated, with regard to the possibility that the Non-party Company's vaccine would be approved, "There is no such thing as something that is approved in the United States and not approved by the Ministry of Health, Labor and Welfare of Japan," and did not point out the possibility that the Non-party Company's vaccine would not be approved in Japan. (As for C, as stated in the found facts (11), it is true that C recommended Plaintiff X1 to average down the shares of the Non-party Company's stock because the price was at the bottom when Plaintiff X1 purchased 500 shares on February 26, 2016. However, C did not advise Plaintiff X1 that the Non-party Company's vaccine would be approved in a short period of time. Therefore, it is not true that C recommended the purchase of the Non-party Company's stock by stating that the vaccine being developed by the Non-party Company would be approved in Japan and that the Non-party Company's stock price would rise in a short period of time.)

Regarding the obligation of financial product sellers to provide explanations to their customers, the Financial Products Sales Act (before the amendment by Law No. 50 of June 12, 2020) as of July 2015 stipulated that, when financial product sellers intend to sell financial products as a business, they must explain to customers that there is a risk of initial losses directly caused by fluctuations in market prices and other indicators in the financial products market, as well as important parts of the indicators and trading mechanisms, before the sale of the financial products related to the sale of the financial products. This explanation must be given in a manner and to an extent necessary for the customer to understand, in light of the customer's knowledge, experience, financial situation, and the purpose of entering into a contract for the sale of the financial products (Article 3 of the same Act), and they must not provide definitive judgments on uncertain matters or make statements that may lead customers to mistakenly believe that they are certain with regard to matters related to the sale of the financial products (Article 4 of the same Act). In the case of failure to explain important matters or providing definitive judgments, the said business operator would be liable for damages based on tort (Article 7 of the same law). If B's solicitation of the plaintiffs to purchase the shares of a non-party company was not done in a manner and to an extent necessary for the plaintiffs to understand it in light of the plaintiffs' knowledge, experience, financial situation and the purpose of concluding a contract for the sale of the financial product, then it is possible that B's solicitation may constitute a tort against the plaintiffs.

As stated in the established facts (1) and (2), the Plaintiffs had been investing for many years with excess funds with an emphasis on profitability even before the commencement of the transactions in question, and had ample investment experience, having traded not only domestic stocks but also investment trusts targeting foreign stocks and real estate, as well as foreign bonds, on numerous occasions. Therefore, it is recognized that they fully understood that even if a financial product was predicted to produce a profit at the time of purchase, there was a possibility that a loss would occur contrary to the prediction, and that the price movements of financial products are influenced by various factors depending on the type of product. In fact, Plaintiff No. 2 stated in his personal examination that he fully understood that when trading stocks, the price movements could differ from predictions and losses could occur.

It can be inferred that the Plaintiffs, understanding that stock prices fluctuate due to various factors, believed they could make investment decisions at their own risk, which is why they declared to the Defendant that they did not need an explanation of important matters related to the Financial Instruments Sales Act regarding domestic stocks, and they were fully aware that the information and advice provided by the Defendant was merely reference information for them to use in deciding whether or not to invest.

Based on the Plaintiffs' investment knowledge and experience, even if B did not explicitly inform the Plaintiffs that the Non-Personnel Company's vaccine might not be approved in Japan and that the share price would fall if it was not approved when he introduced the Non-Personnel Company's shares to the Plaintiffs as a stock that he could recommend to them for purchase, the Plaintiffs knew that B was merely a sales employee of the Defendant and was not actually involved in the approval of the vaccine. Therefore, it is reasonable to recognize that the Plaintiffs understood that the information provided by B to the Plaintiffs was merely his outlook as a sales employee that there was a very high possibility that the vaccine would be approved in Japan as well, based on the already publicly known fact that a vaccine using similar technology to the Non-Personnel Company's vaccine had been approved in the United States (Found Fact (3)). However, after listening to B's explanation, the Plaintiffs made their own investment decision that the Non-Personnel Company's vaccine, which uses technology approved in the United States, was superior and had a very high possibility of being approved in Japan, and purchased the Non-Personnel Company's shares.

Therefore, even if it is acknowledged that the plaintiffs entered into the transaction in the expectation that, based on B's explanation, the vaccine developed by the non-party company would be approved in Japan early on, which would lead to an increase in the non-party company's share price in a short period of time, it cannot be acknowledged that the plaintiffs entered into the transaction in the mistaken belief that the vaccine would definitely be approved in Japan as a result of B's definitive judgment that this was certain. Therefore, it cannot be acknowledged that there were grounds for rescission of the transaction in accordance with Article 4, Paragraph 1, Items 1, 2, and 2 of the Consumer Contract Act.

Regarding the third issue (2) (whether the defendant employees breached their duty to provide definitive judgments or explanations to the plaintiffs in soliciting the transactions in question, which would constitute a tort).

(1) As explained in the two points above, B's explanation to the Plaintiffs regarding the prospects for approval in Japan of the non-party company's vaccine cannot be recognized as providing the Plaintiffs with a definitive judgment in light of the Plaintiffs' investment knowledge and experience, etc., nor can it be recognized that there was a breach of the duty to provide explanations regarding important matters.

Furthermore, as stated in facts (3) and (14), PSC has obtained approval from the U.S. FDA (Food and Drug Administration) for the vaccine it manufactures using BEVS, and the clinical trials in Japan conducted jointly by the non-party company and Astellas Pharma cleared the standards and the application for manufacturing and marketing approval was submitted, and it was thought that there was a high possibility that the application would be approved on the stock market. Therefore, it cannot be said that there was any problem with the explanations given by B to the plaintiffs regarding the non-party company's vaccine being unfounded.

(2) The plaintiffs also argue that the shares of the non-party companies were listed on the Tokyo Stock Exchange Mothers, which is subject to significant price fluctuations, and that, given the non-party companies' performance and financial situation, they were speculative stocks with a high risk of a decline in stock prices.

However, as shown in the facts (2) and (3), the plaintiff X1 did not limit the investment method to the defendant,

Considering the investment policy, Plaintiffs x2 declared to Defendant that they wanted to place greater emphasis on profitability while taking into consideration the balance between safety and profitability, and had acquired stocks other than those listed on the First Section of the Tokyo Stock Exchange. Therefore, B's introduction of stocks listed on the Tokyo Stock Exchange Mothers cannot be found to be contrary to the investment policy declared by the Plaintiffs to Defendant, and there is no evidence that stocks listed on the Tokyo Stock Exchange Mothers are speculative stocks.

In addition, since B stated that the non-party company was aiming to turn a profit in 2016, it can be said that the plaintiffs were fully aware that the non-party company was in the red as of July 2015, and it cannot be said that B breached any obligation to provide explanations to the plaintiffs.

(3) Based on the above, it cannot be found that B violated the duty to provide a definitive judgment or explanation to the plaintiffs in soliciting the transaction in question, which would have constituted a tort, and the plaintiffs' claims cannot be accepted.

Regarding the 4th issue (3) (whether the defendant employees committed acts of tort against the plaintiffs, such as breaching their duty to provide guidance and advice, breaching their duty to prevent losses from increasing, and breaching their duty to liquidate their positions)

(1) The Plaintiffs abstractly allege that B and C misled the Plaintiffs into believing that the vaccine developed by the Non-Party Company would soon be approved in Japan and that the Non-Party Company's stock price would inevitably rise in a short period of time, and continued to provide them with erroneous judgments and encouraged them to continue holding the Non-Party Company's shares, thereby depriving the Plaintiffs of the opportunity to sell the Non-Party Company's shares that they had acquired through the Transaction. However, the Plaintiffs have not made any specific factual allegations as to what guidance, advice or information B and C should have provided and at what point in time.

(2) Even if we ignore this point, as stated in the two explanations above, it is not found that B misled the Plaintiffs into believing that the vaccine developed by the Non-party Company would soon be approved in Japan and that the Non-party Company's stock price was sure to rise in a short period of time. As stated in the established fact (14), until Astellas Pharma withdrew its application for marketing approval in January 2017, the stock market also perceived that the Non-party Company's vaccine was highly likely to be approved. Given this, it cannot be said that the Plaintiffs' continued holding of the Non-party Company's shares after July 2015 was particularly unreasonable in light of the objective situation in which the Non-party Company found itself. It is unclear what guidance and advice B and C failed to provide to the Plaintiffs constitutes a tort.

In addition, on August 18, 2015, B advised Plaintiff X1 that he could expect a profit of about 350,000 yen if he sold the shares of the non-party company, and that the share price could rise or fall depending on the outcome of the vaccine approval negotiations on September 4 of the same year (Found Fact (9)). On November 2 of the same year, C told Plaintiff X1 that it was unlikely that the vaccine would be approved within the current fiscal year, and that although it was about three months later than expected, there was a high possibility that the approval would be granted and the share price would rise. On February 26, 2016, C recommended that he reduce the acquisition cost by averaging down the shares of the non-party company (Found Fact (11)). As such, B contacted Plaintiff X1 in a timely manner when the share price rose or when it seemed to have fallen to the bottom, and gave advice that was reasonable at the time. The Plaintiffs, while taking into consideration the advice from B and C, did not themselves make any investments in the non-party company.

In light of the course of events, including the fact that B and C checked the company's stock prices and collected information about non-party companies (established facts (12) and (13)), and also decided on the timing of the sale (established fact (9)), it cannot be said that there was anything particularly problematic about the way B and C handled the case.

(3) Based on the above, it cannot be found that B and C violated the duty to provide guidance and advice, the duty to prevent losses from increasing, or the duty to close the position in relation to the transactions in question, which would constitute torts against the plaintiffs, and the plaintiffs' claims cannot be accepted.

5 Summary

As explained in points 2 through 4 above, there are no grounds for cancelling the transaction between the plaintiffs and the defendant, and the defendant has not committed any tort against the plaintiffs. Therefore, there is no need to determine the remaining issues, and the plaintiffs' claims are without merit.

6 Therefore, the judgment is as set forth in the main judgment.

Tokyo District Court, Civil Division 7

(Judge Ritsuko Ogawa)

*******

© 2025 Thomson Reuters KK all rights reserved