EXHIBIT 16b

EXHIBIT 16b



Date of trial: September 16, 2011  Name of court  Tokyo District Court  Trial classification Judgment

## Case number: Heisei 21 (7) 37969

Case name: Claim for return of unjust enrichment

Court result: Claim dismissed  Document number: 2011WLJPCA09168012

### Abstract

* The plaintiff was falsely informed by a non-party employee of the defendant that a non-party company would be listed on the stock market in the near future, and that if he purchased the company's unlisted shares he would be able to resell them to other companies for 330 million yen. He believed this, entered into a purchase and sale contract with the defendant for the shares in question, and paid the purchase price of 300 million yen. The plaintiff then selectively asserted against the defendant that the purchase and sale contract was rescinded due to fraud, was invalid due to mistake, and was terminated for default, and sought the return of the purchase price based on a right to claim for the return of unjust enrichment. However, the court denied the plaintiff's claim of fraud on the grounds that it could be inferred that the plaintiff was quite knowledgeable about stock trading, and there was no evidence that the non-party employee had given false explanations regarding the resale. The court also found that the claim of mistake was without merit, and furthermore dismissed the claim on the grounds that the defendant had not violated its obligations under the purchase and sale contract.

### source

westlaw japan

### Reference article

Civil Code Article 95

Civil Code Article 96

Civil Code Article 415

Article 545 of the Civil Code

Article 703 of the Civil Code

Article 704, first part of the Civil Code

Consumer Contract Act Article 10

# Date of trial September 16, 2011 Court name Tokyo District Court Judgment
# Case number: Heisei 21 (Wa) 37969

Case name: Claim for return of unjust enrichment

Court result: Claim dismissed Document number: 2011WLJPCA09168012

| | |
|---|---|
| Setagaya Ward, Tokyo (omitted below) | |
| plaintiff | X |
| Lawyer representing the lawsuit | Masaki Hayashi |
| Chuo-ku, Tokyo (hereinafter omitted) | |
| defendant | Y Securities Co., Ltd. |
| Representative Director | A |
| Lawyer representing the lawsuit | Second son Yada |
| same | Makoto Watanabe |
| same | Yutaka Nomura |
| same | Fumio Koma |
| Lawyer representing the same lawsuit | Masamichi Komatsu |

main sentence

### 1. Plaintiff's claim is dismissed.

2 The plaintiff shall bear the costs of the proceeding.

### facts and reasons

### 1st request

The defendant shall pay the plaintiff 300 million yen plus interest at the rate of 6% per annum from October 26, 2004 until payment is made.

Summary of the second case

In this case, the plaintiff received false representations from the defendant's employee B (hereinafter referred to as "B") that the unlisted company Kotoveil Co., Ltd. (hereinafter referred to as "Kotoveil") would soon be listed on the stock exchange, and that if he purchased the unlisted shares of Kotoveil he would be able to resell them to other companies for 330 million yen. The plaintiff believed this to be the case, entered into a purchase and sale agreement with the defendant for Kotoveil shares, and paid the purchase price of 300 million yen to the defendant. As a result, the plaintiff selectively sought to fraudulently terminate the said purchase and sale agreement,

© 2025 Thomson Reuters KK all rights reserved

The plaintiff alleges that the contract was invalid due to mistake and that it was terminated for default, and that the defendant is a beneficiary in bad faith. The plaintiff seeks the return of the purchase price of 300 million yen, as well as interest and late payment charges based on the right to return unjust enrichment (Civil Code Articles 703 and 704, first paragraph) or the right to return the contract to the original state upon termination (Civil Code Article 545, paragraphs 1 and 2).

### 1. Undisputed facts, etc.

The facts not disputed by the parties and which can be established from the overall substance of the evidence and argument set out above are as follows:

#### (1) Parties, etc.

Defendant A is a member of the Japan Securities Dealers Association and is a financial instruments business operator and a joint stock company. B joined Defendant on October 20, 2003 in response to a newspaper advertisement, was fired in April 2004 due to poor sales performance, became a commission-based sales contract employee, improved sales performance and was rehired on July 29 of the same year, and became Deputy General Manager of the Defendant's Stock Division on August 1 of the same year, but was dismissed by Defendant around November of the same year (Otsu 7-1, 25, Witness B, Defendant's representative, entire gist of oral argument).

(2) The share purchase agreement between the plaintiff and the defendant and payment of the purchase price

On October 21, 2004, Plaintiff purchased 200 registered common shares of Cotoveil (hereinafter referred to as "the Shares") from Defendant for 300 million yen (1.5 million yen per share) (hereinafter referred to as "the Purchase and Sale Agreement").

The shares in question are restricted stocks.

Cotovel has not been listed on the stock exchange since October 2004, and at that time its articles of incorporation stipulated that it would issue stock certificates.

On the 25th of that month, the plaintiff transferred 300 million yen, the purchase price for the sales contract, to the defendant's account at the Ningyocho branch of Sumitomo Mitsui Banking Corporation, and the branch sent the money to the account on the following business day, the 26th of that month (Exhibit 2).

(3) The plaintiff, by registered mail delivered on November 30, 2004 (hereinafter referred to as "the registered mail"), expressed its intention to cancel the sales contract on the grounds of the defendant's fraud and demanded payment of the purchase price of 300 million yen plus late payment interest at the rate of 6% per annum from the date of delivery of the registered mail until payment is made (Exhibit 3, 5-1).

(4) At its regular shareholders' meeting on March 22, 2007, Kotoveil decided to abolish the provision in its articles of incorporation to issue stock certificates on April 13, 2007, and on the same day, Kotoveil's stock certificates became invalid (Exhibit 6, entire gist of argument).

(5) On October 23, 2009, the Plaintiff expressed its intention to terminate the contract to the Defendant, claiming that the Defendant had breached its obligations under the contract.

2 Points of contention

(1) (Regarding the success or failure of the claim for return of unjust enrichment) Did the plaintiff enter into the sales contract in question as a result of the defendant's fraud?

(2) (Regarding the success or failure of the claim for return of unjust enrichment) Did the plaintiff make a mistake as to the elements in concluding the sales contract in this case?

© 2025 Thomson Reuters KK all rights reserved

(3) (Regarding the success or failure of the claim for restitution based on termination of contract due to default) Did the defendant breach its obligations under the sales contract?

(4) (Based on point of issue (2)) Was the Plaintiff grossly negligent in concluding the sales contract in this case based on mistake?

(5) The timing and rate of interest or late fees

3. Arguments of the parties on the issues at issue

(1) Did the plaintiff enter into the sales contract in question as a result of the defendant's fraud?

(Plaintiff's claim)

B, who was an employee of the defendant, stated to the plaintiff,

(a) In truth, Kotoveil had no plans to go public and had no plans to resell the shares in question for 330 million yen. However, falsely representing that Kotoveil was scheduled to go public in the near future and that the shares in question were scheduled to be resold to GC Holdings Co., Ltd. (hereinafter referred to as "GC") for 330 million yen,

(a) The stocks in question are not unlisted stocks (hereinafter referred to as "Green Sheet stocks") for which the self-regulation of the Japan Securities Dealers Association permits securities firms to solicit purchases and sales from their customers, and self-dealing is also prohibited. However, the stocks in question were falsely represented as Green Sheet stocks,

(c) The price of 300 million yen for the shares in question was falsely represented as a fair price, even though in reality it was not a fair price with any basis.

The plaintiff was misled into believing this, which led to him entering into the sales contract in question.

At the time the purchase and sale agreement was concluded, B was an employee of the defendant and in charge of unlisted stock transactions. Therefore, B's actions above constitute fraud by the defendant against the plaintiff.

(Defendant's claim)

The plaintiff denies and disputes the allegations.

AB did not explain to the plaintiff that Kotoveal was scheduled to go public in the near future, or that the shares in question could be resold to GC for 330 million yen. The price of 300 million yen for the shares in question was the amount that the plaintiff offered to the defendant, and the defendant's representative had also conducted some verification and determined that it was a fair price.

Generally, when preparing for an IPO, unlisted companies implement thorough information management to prevent information from leaking to third parties, so there is no way that B could have explained to the plaintiff that Kotovel was planning to go public.

Furthermore, if the shares in question could be resold to GC for 330 million yen, the defendant would not have sold them to the plaintiff, but would have sold them directly to GC, and therefore B would not have explained to the plaintiff that the shares could be resold for 330 million yen. In any case, it is presumed that GC had the intention to purchase the shares in question for 330 million yen at the time of the purchase and sale agreement, and even if GC was later unable to purchase the shares in question for 330 million yen for some reason, it cannot be said that B defrauded the plaintiff.

Therefore, the plaintiff did not enter into the sales contract in this case due to B's fraudulent acts.

If B persuades the plaintiff that the shares in question can be resold to GC for 330 million yen,

© 2025 Thomson Reuters KK all rights reserved

Even if it had been made clear, B did not act as an employee of the defendant and acted as an intermediary or brokerage of the shares in question as part of the defendant's business, but rather acted as an individual in a personal transaction between the plaintiff and B, and the plaintiff was aware of this.

In other words, the Plaintiff had a close personal relationship with B, having engaged in multiple private transactions of unlisted shares through the intermediation or mediation of B, distributing the profits between them, and acting as a joint guarantor for the 330 million yen that B borrowed from others to buy and sell unlisted shares. In order to repay the debt of 330 million yen, the Plaintiff had a strong motive to scheme to make a profit by buying and selling unlisted shares, even if it meant compromising the profit that the Defendant would make by selling the shares in question directly to GC at a higher price.

Therefore, B's explanation above does not affect the legality of the sales contract.

It cannot be assessed that the defendant has committed fraud against the plaintiff.

(2) Did the plaintiff make a mistake regarding the elements of the sales contract in question?

**(Plaintiff's claim)**

When the Plaintiff entered into the sales contract,

(A) With regard to Cotoveil, the company mistakenly believed that it was scheduled to be listed soon, when in fact it was not.

(a) The price of the shares in question, 300 million yen, was in fact not a fair price with any basis. Regardless, they mistakenly believed that the price was fair,

(c) In reality, the stocks in question were not Green Sheet stocks that members of the Japan Securities Dealers Association could solicit to customers. However, because the defendant was a member of the same association, I mistakenly believed it to be a lean sheet stock.

(d) With regard to the shares in question, which were subject to transfer restrictions, the defendant mistakenly believed that, although in reality the defendant was not the registered shareholder on the shareholder register, the defendant was willing and able to cooperate with the plaintiff in the transfer procedures for the shares in question, and that it would be easy to obtain approval for the transfer from the board of directors of Kotoveil.

There was a mistake.

The plaintiff entered into the sale and purchase agreement and expressed its motive for entering into the agreement to the defendant on the assumption that Kotoveal was scheduled to be listed on the stock exchange and that it would be able to recover its invested capital by reselling the shares in question. Therefore, the sale and purchase agreement in question is invalid due to the plaintiff's mistake in the elements.

**(Defendant's claim)**

The plaintiff denies and disputes the allegations.

The Defendant provided the Plaintiff with the Purchase Agreement (Exhibit A1) and a document entitled "Points to Note When Submitting an Application for the Purchase of Unlisted Shares" (Exhibit B5; hereinafter referred to as "The Note") at the time of the Purchase Agreement, and warned the Plaintiff that there was a risk that the full investment amount would not be recovered, that the company issuing the unlisted shares was usually a company that restricted the transfer of shares, and that if there were restrictions on the transfer of shares, it would be necessary to follow the prescribed procedures for their transfer. The plaintiff explained the risks of unlisted stock transactions, including the fact that the company was not listed on the market at the time of the sale. The plaintiff entered into the purchase agreement with a full understanding of these risks.

In addition, it is difficult to imagine that the existence or absence of regulations in the securities industry had any particular impact on the plaintiff's expression of intent, and since securities firms are not prohibited from trading unlisted stocks on their own, the stocks in question are not green

© 2025 Thomson Reuters KK all rights reserved

It doesn't matter if it's not a sheet brand.

(i) The mistakes asserted by the plaintiff are all mistakes of motive, but the plaintiff did not express these motives to the defendant as part of its expression of intention when concluding the sales contract in question, and therefore there is no mistake of any element on the part of the plaintiff.

(3) Whether the defendant failed to fulfill its obligations (debts) under the sales contract in this case.

**(Plaintiff's claim)**

The defendant owed the plaintiff the following obligations under the sales contract:

(A) As a member of the Japan Securities Dealers Association, in accordance with the regulations of the Association, the Company is obligated to not sell the Shares in question, which are unlisted shares other than Green Sheet stocks, to customers and to explain this obligation.

(a) The obligation not to sell the shares in question, which do not have a fair market price, at a high price by pretending that they do have a fair market price, and the obligation to explain this.

(c) The obligation to obtain approval from the board of directors of the issuing company, Cotvale, to transfer the shares in question to the plaintiff, which are subject to transfer restrictions.

(d) After the conclusion of the purchase and sale agreement, Cotveld abolished the provision in its articles of incorporation to issue stock certificates before the plaintiff received the transfer of the stock certificates for the shares in question. In response to this, Cotveld had an obligation to explain the method of transfer of the stock certificates for the shares in question.

However, the defendant failed to fulfill these obligations (debts). Even if the plaintiff and the defendant had agreed in the sales contract that the defendant, as the seller, would not be obligated to cooperate in the transfer of the restricted stock, this agreement would be invalid as it violates Article 10 of the Consumer Contract Act.

The plaintiff demanded the defendant to fulfill its obligations under the sales contract by registered mail dated May 28, 2009, June 17 and June 30, 2009, but the defendant refused to fulfill its obligations, claiming that the matter had been resolved. The sales contract was subsequently terminated when the plaintiff expressed its intention to terminate.

(Defendant's claim)

The plaintiff denies and disputes the allegations.

There is no regulation on securities companies' self-dealing of the shares in question, and the defendant is not obligated under A(a) above (Plaintiff's claim). The defendant also explained to the plaintiff that the shares in question are unlisted shares, and their value fluctuates greatly depending on the financial situation and business performance of the issuing company, and that since there is no fixed trading market, the price of the same shares may vary depending on the valuation of the parties to the transaction, and there is no breach of the obligation under A(b) above (Plaintiff's claim). The purchase and sale agreement in question is a transaction that assumes the risk of not being able to transfer the name, and the defendant is not obligated under A(c) and A(d) above (Plaintiff's claim).

Therefore, the defendant has not breached any obligations or defaulted on any obligations under the sales contract in this case.

(4) Was the plaintiff grossly negligent in entering into the sales contract based on mistake?

(Defendant's claim)

The defendant delivered the purchase agreement and the cautionary statement to the plaintiff and warned them of the risks of unlisted stock transactions.

It is difficult to imagine that the Plaintiff would have concluded the Purchase and Sale Agreement without understanding the contents of the Purchase and Sale Agreement and without reading the Notice cited in Article 3, Paragraph 1 of the Purchase and Sale Agreement. Therefore, even if the Plaintiff was mistaken about the risks of unlisted stock transactions, the Plaintiff must be found to have been grossly negligent in concluding the Purchase and Sale Agreement through mistake.

Therefore, the plaintiff cannot claim against the defendant that the sales contract in this case was invalid due to mistake.

### (Plaintiff's claim)

The defendant's argument is disputed.

### (5) The timing and rate of interest or late fees

### (Plaintiff's claim)

In the case of a claim for return of unjust enrichment due to fraudulent rescission or invalidity due to mistake

At the time of concluding the Purchase and Sale Agreement in question, the Defendant knew that 1) B's explanation that Kotoveil was planning to go public in the near future was false, 2) the 300 million yen price for the shares in question was baseless, 3) the shares in question were not green sheet stocks, and 4) the shares in question were subject to transfer restrictions and could not be resold without the approval of Kotoveil's board of directors. Therefore, it can be said that the Defendant received 300 million yen for the shares in question from the Plaintiff, knowing that the Purchase and Sale Agreement in question was subject to fraud and was invalid due to the Plaintiff's mistake.

Therefore, as the defendant is a bad faith beneficiary (first paragraph of Article 704 of the Civil Code), it is obligated to repay the 300 million yen purchase price of the shares in question, together with interest at the statutory commercial interest rate of 6% per annum, from the date of receipt, October 26, 2004, until payment is made.

Even if the defendant is not a bad faith beneficiary, the plaintiff expressed its intention to cancel the sales contract due to the defendant's fraud by sending the registered mail in question on November 30, 2004, and demanded the return of the purchase price of 300 million yen and payment of late payment interest at the rate of 6% per annum from the date of arrival of the registered mail in question until payment is made, and therefore the plaintiff is obligated to pay late payment interest at the statutory commercial interest rate of 6% per annum from the same date until payment is made at the latest.

In the case of a right to claim restitution based on termination

Pursuant to Article 545, paragraph 2 of the Civil Code, the defendant is obligated to return the 300 million yen it received from the plaintiff under the sales contract in this case, together with interest at the statutory commercial interest rate of 6% per annum, from the date of receipt, October 26, 2004, until the date of payment.

### Summary

Therefore, based on the plaintiff's right to claim restitution based on the termination or the right to claim return of unjust enrichment, the plaintiff seeks from the defendant payment of the 300 million yen already paid, plus interest or late payment damages at the statutory commercial interest rate of 6% per annum from the date of receipt, October 26, 2004, until the date of payment.

(Defendant's claim)

The plaintiff's claims are disputed.

### Third, the Court's decision

1 Considering the evidence (including those described below, as well as Witness B, the Plaintiff, and the Defendant's representative) and the overall substance of argument, the following facts are established.

(1) The defendants' main business was to process customer orders for securities held by the stock exchanges.

The defendant was a company which operated as a sole proprietorship, and A (hereinafter referred to as "A") and C (hereinafter referred to as "C") both became representative directors of the defendant on May 5, 2003.

(2) The defendant had handled unlisted shares of Japan Land Development Co., Ltd. and other companies through small-scale public offering procedures, and around February 2004, through the introduction of B, acted as an intermediary in the trading of unlisted shares of Otsuka Pharmaceutical Co., Ltd. Thereafter, at the instruction of A, the defendant established guidelines for the trading of unlisted shares and made it a condition that the seller be the holder of the stock certificates (Exhibits 17 and 25, Exhibit 21).

(3) From around March 2004 to around April of the same year, B received 50 million yen from C as payment for the purchase of Recruit shares. However, B was unable to return the money, which caused trouble between B and C. Subsequently, B signed a certificate of indebtedness to C stating that he would return 156 million yen, the price of Baltimore shares that B had purchased with the proceeds from the sale of Recruit shares (Exhibit 17).

(4) Around August 2004, GC entrusted the defendant with the services of providing information regarding certain holders of unlisted shares and facilitating the acquisition of unlisted shares designated by GC for GC (Exhibit 20).

(5) On October 6, 2004, the defendant established guidelines regarding its own trading of shares and began its own trading of unlisted shares. However, the final decision on individual transactions was to be made through interviews with the representative directors, A and C (Exhibits 25 and 28, Exhibit 22).

(6) On October 8, 2004, the Plaintiff signed and sealed an application form for purchasing unlisted shares (Exhibit 4) and delivered it to the Defendant. In the application form, the Plaintiff stated that he had carefully read and fully understood the "Notes for Applying to Purchase Unlisted Shares" (Exhibit 5), which describes the risks of unlisted stock transactions, before applying to purchase the shares in question. The Plaintiff also stated that he would purchase 200 shares of Kotoveil in actual value for less than 1.5 million yen. On the 21st of the same month, the Plaintiff and the Defendant concluded the purchase agreement in question (Exhibits 1 and 15), and around the 25th of the same month, the Plaintiff transferred 300 million yen to the Defendant by bank transfer (Exhibit 2). Article 3 of the purchase and sale agreement in question states in firm terms that the transferee has carefully read the Notice and fully understood its contents, has also received an oral explanation of it, that the value of the shares may fluctuate significantly depending on the issuing company's financial situation and business performance, and that resale of the shares after purchase may be difficult.

(7) Around October 14, 2004, the defendant transferred to GC 100 unlisted shares of Mirai Securities Co., Ltd. on the 19th of that month for a total of 70 million yen, at 700,000 yen per share (Exhibit 21). In addition, around the 29th of that month, the defendant transferred to GC 10,000 unlisted shares of Trinity Security Systems Co., Ltd. (hereinafter referred to as "Trinity") on November 4 of the same year for a total of 405,000 yen, at 40,500 yen per share (Exhibit 32).

(8) On or around October 19, 2004, the plaintiff entered into an agreement with the defendant to transfer to the defendant 10,000 unlisted shares of Recruit Co., Ltd. at 16,700 yen per share for a total of 167 million yen (Otsu 23). In addition, on or around October 21, the plaintiff entered into an agreement with the defendant to transfer to the defendant 10,000 unlisted shares of Trinity Co., Ltd. at 40,000 yen per share for a total of 400 million yen (Otsu 24).

(9) On October 26, 2004, B agreed to transfer 3,200 unlisted shares of Incubator Bank of Japan Ltd. (hereinafter referred to as "Incubator Bank of Japan") to the defendant for a total of 288 million yen, at 90,000 yen per share.

He forged a securities transfer agreement and showed it to the plaintiff, inviting him to become involved in the Incubator Bank of Japan stock (Exhibit 29, Witness B).

(10) Around November 1, 2004, B sought police protection and began to absent himself from the defendant without permission (Exhibits 14 and 15).

(11) The representatives of GC and their husband visited the defendant from November 1 to 4, 2004, and told the defendant that they had paid the purchase price for the Kotoveal shares into B's personal account but had not received the shares and that they wanted the defendant to do something about it, that they could not settle the settlement without the shares, that they did not have the money right away but would pay once the shares were sold, etc. The plaintiff, who accompanied them, asked the defendant to buy the shares in question for 300 million yen on the same day, and for 200 million yen on the 3rd of the same month. However, the defendant did not comply with this, repeatedly explaining that the amount exceeded the purchase limit for self-dealing and that the full picture was unclear (Otsu 9).

(12) B was dismissed by the defendant after his whereabouts became unknown around November 2004. C was asked by A to take responsibility for the troubles caused by B on the 30th of the same month, and resigned from his position as an officer of the defendant (Exhibit 24).

2. Regarding point (1) (whether or not the defendant committed fraud)

(1) B's explanation to the plaintiff

There are parts in the Plaintiff's statement (Exhibit 27), Witness B and the Plaintiff himself that B explained to the Plaintiff at the time of concluding the Purchase and Sale Agreement on October 21, 2004 that Cotovel was scheduled to be listed on the stock exchange in the near future and that the shares in question could be resold to GC for 330 million yen, and encouraged the Plaintiff to purchase the shares in question, and that the Plaintiff concluded the Purchase and Sale Agreement in accordance with this explanation, and therefore the credibility of these parts will be examined.

A. Explanation of the listing plan

Witness B stated that, regarding the customers who traded unlisted stocks, there was not a single person who thought about holding on to the unlisted stocks and waiting until they were listed to make a profit from the listing. In other words, they only participated with the idea of reselling them to make a profit, so they had almost no thought of approving the transfer (Witness B, p. 16). In addition, according to the evidence (Ko 27, Otsu 25, 33, Witness B, Defendant's Representative), the Plaintiff had held the positions of Director of the President's Office at Joyo Sangyo Co., Ltd., Director of a subsidiary company, and President of an affiliated company, and when applying for comprehensive securities services from the Defendant, he stated that he had 20 years of stock investment experience, annual income, and financial assets of over 100 million yen each. It is acknowledged that the Plaintiff got in touch with the Defendant after receiving information from a securities broker that the Defendant had started dealing in unlisted stocks, and that he was involved in the financing of B's personal unlisted stock transactions, exchanged cash, and received the cash when profits were made. The purchase price for the shares in question (200 shares) was 300 million yen, and in transactions conducted around the same time as the conclusion of the Purchase and Sale Agreement, the defendant admitted to selling Recruit shares (10,000 shares) to the Plaintiff for 167 million yen and Trinity shares (10,000 shares) for 400 million yen (see 1 (8) above). In addition to this, the Plaintiff also stated that he purchased ELS shares (500 shares) from B for 175 million yen and paid 160 million yen to B for the purchase of Incubator Bank of Japan shares (3,200 shares). In light of the number of shares and amounts in these transactions, it can be inferred that the Plaintiff was quite familiar with stock or unlisted stock trading even before the conclusion of the Purchase and Sale Agreement. The Plaintiff had only traded stocks once after graduating from university.

The plaintiff's own testimony, which contradicts the above findings, cannot be accepted in light of the above evidence. Given the plaintiff's attributes, it cannot be found that the plaintiff accepted at face value the explanation given by B that the shares in question were to be listed on the stock exchange and used it as a motive for purchasing the shares in question.

B. Explanation of resale destination

Regarding the resale of the 330 million yen to GC, Witness B testified that at the time of concluding the sales agreement, GC showed Plaintiff a postdated contract bearing GC's company seal which contained the details of GC's purchase of the shares in question, and Plaintiff himself also stated that B showed him something that resembled a purchase application form. However, the above-mentioned contract was not submitted as evidence, and its existence and the contents thereof are unknown.

B also submitted a statement (Exhibits 18 and 19) that the story of GC reselling the shares in question for 330 million yen was merely fabricated by B to induce the plaintiff to purchase the shares in question held by the defendant, and made a similar statement during witness examination (Witness B, p. 11). However, as found in 1 (11) above, from November 1 to 4, 2004, the GC representative and his wife and the plaintiff visited the defendant, and GC asked the defendant to do something about it, saying that it had paid the Kotveal money to B's personal account but had not received the shares. The plaintiff was also present at the meeting, and the plaintiff asked the defendant to buy the shares in question for 300 million yen, and on the 3rd of the same month to buy them for 200 million yen, but the plaintiff did not mention that during the negotiations with the defendant, B had falsely explained to GC that the shares in question could be resold to GC for 330 million yen.

Furthermore, B testifies that the contract for GC to purchase the shares in question for 330 million yen was prepared by D, who was GC's representative at the time (Witness B, p. 42). Assuming that the story of resale to GC was a false explanation by B in the above statement (Exhibits 18 and 19), GC was complicit in B's false explanation. If this is the case, it would be natural for the Plaintiff to pursue some kind of responsibility against GC, but the Plaintiff and GC visited the Defendant together on November 1, 2004, and it would be unreasonable for them to take such action.

In this case, the statements in the above statement that B falsely represented to Plaintiff that the shares in question could be resold to GC for 330 million yen while showing him a contract bearing GC's company seal, the testimony of Witness B, and the results of Plaintiff's personal examination cannot be immediately accepted, and there is no other evidence sufficient to establish the fact that B falsely represented to Plaintiff that the shares in question could be resold to GC for 330 million yen.

(2) As explained above, even if B had explained to the Plaintiff that Kotoveal was scheduled to be listed in the near future when concluding the Purchase and Sale Agreement, it cannot be found that the Plaintiff purchased the Shares in question on the basis of this explanation, and there is no evidence sufficient to prove that B falsely represented to the Plaintiff that the Shares in question could be resold to GC for 330 million yen. Even if B falsely represented to GC that the Shares in question could be resold for 330 million yen, the Purchase and Sale Agreement contains a clause stating that the Plaintiff acknowledges and confirms that the Shares in question do not have an organized secondary market and therefore may be difficult to resell after purchase, and the Notice in question also contains a clause stating that, in the case of unlisted shares, it is difficult to recover investment by selling the publicly held shares unless a buyer is found.

Therefore, there is a risk that resale may be difficult when purchasing unlisted shares.

It can be said that the Plaintiff was fully capable of predicting this, and it can be acknowledged that the Plaintiff, as a buyer of unlisted shares, was aware of the risk that the false explanation given by B that the shares could be resold would not come true. In addition, the Plaintiff also stated that he bought the shares in question not only through GC, but also in the hope that they would sell at a higher price (Plaintiff himself, p. 33). Given this, it cannot be said that the Plaintiff was deceived by the Defendant through B's explanation.

Based on the above, the plaintiff's argument that B's explanation that Kotovel was scheduled to go public in the near future and that the shares in question could be resold to GC for 330 million yen and his recommendation to purchase the shares in question constituted a deceptive act by B against the plaintiff cannot be accepted.

(3) Plaintiff also alleges that B falsely represented the shares in question as Green Sheet stocks, but there is no evidence sufficient to support this claim.

(4) Furthermore, the plaintiff alleges that the price of 300 million yen for the shares in question was falsely represented as a fair price, when in fact it was not a fair price with any basis, and we will consider this point.

Regarding the price of the shares in question, B stated in his witness examination that there was no basis for the price (Witness B, p. 9), and the Defendant's Representative stated that it was the result of an investigation and analysis of the price of Kotoveil's subscription rights (1.4 million yen per share in July 2002) and the company's value (Defendant's Representative, p. 16). In addition, according to evidence (Ko 1, Otsu 5), unlisted shares are not traded in the secondary market, but are traded over the counter or through private transactions with securities companies, so the transaction prices vary, and according to evidence (Otsu 4), the purchase price of the shares in question is in line with the price conditions proposed by the Plaintiff. In light of the above, it cannot be found that the price of 300 million yen for the shares in question was not a fair price with a basis.

Therefore, the plaintiff's above argument cannot be accepted.

(5) In view of the above, the plaintiff's claim regarding issue (1) is without merit.

3. Regarding point of dispute (2) (whether there was an element of error)

(1) Misconceptions about planned listing

As explained in paragraphs 2(1) and (2) above, it cannot be found that the Plaintiff mistakenly believed, at the time of entering into the Sales Agreement, that Cotovel was scheduled to be listed in the near future, when in fact it was not.

(2) Misconception that the price of 300 million yen was a fair price

It cannot be recognized that the price of 300 million yen for the shares in question was not a fair and reasonable price. is as explained in 2(4) above.

(3) Misconception that it is a Green Sheet stock

There is insufficient evidence to prove that the plaintiff mistakenly believed that the stocks in question were Green Sheet stocks.

(4) Misconception that there are restrictions on transfer

The shares in question are shares with transfer restrictions, but Witness B testified that the unlisted stock customers knew that transfer approval was required for the shares and had never been informed of this (Witness B, p. 16), and the Plaintiff knew that the shares in the company he managed were subject to transfer restrictions (Plaintiff's

Therefore, it can be said that the plaintiff had knowledge of the situation in which the shares were subject to transfer restrictions. There is no evidence sufficient to prove that the plaintiff had a mistaken belief that it would be easy to obtain approval for the transfer of the shares from the board of directors of Kotveal.

(5) Therefore, all of the plaintiffs' claims of error are without merit.

4. Point of contention (5) (whether or not there was default on the debt)

Plaintiff alleges that the defendant is in default, but of the defendant's obligations and liabilities in the Purchase and Sale Agreement that Plaintiff alleges (items II.3.(3)A(A) through (D) above), there is no legal basis for Plaintiff to assume an obligation under item (A) (the obligation not to sell unlisted stocks other than Green Sheet stocks to customers and the obligation to explain this), and in any case, this is a matter of contractual conclusion, and there is no room for breach of contractual obligations. Furthermore, there is no evidence sufficient to recognize that Plaintiff assumes such obligations under item (C) (the obligation to transfer the name of the stock certificates with the approval of the issuing company's board of directors) and item (D) (the obligation to explain the method of transferring the name of the shares in question).

Furthermore, with regard to (i) above (the obligation not to sell under the pretense of a fair price and the obligation to explain this), there is insufficient evidence to prove that the defendant sold to the plaintiff at a high price under the pretense of a fair market price.

5 Conclusion

In view of the above, all of the plaintiff's claims are without merit and are therefore dismissed. Judgment is entered as set forth in the judgment.

(Chief Judge Yoichi Ono, Judge Jun Oshino, and Judge Makiko Shiomi)

*******