1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF NEVADA

2     BEFORE THE HONORABLE ELAYNA J. YOUCHAH, MAGISTRATE JUDGE
                      ---o0o---

3

4  TETSUYA NAKAMURA,           :  No. 2:22-cv-1324-MMD-EJY
                        :

5           Plaintiff,    :  May 23, 2025
                        :

6       -vs-              :
                        :

7  SUNDAY GROUP INCORPORATED,  :  United States District Court
  SGI TRUST, TOSHIKI (TODD)    :  333 Las Vegas Boulevard

8  MITSUISHI, JAMES PACK, and  :  Las Vegas, Nevada
  JOHN DOES 1-10,          :

9

           Defendants.
10  _____:

11

12               **TRANSCRIPT OF MOTIONS HEARING**

13

14  A P P E A R A N C E S:

15  FOR THE PLAINTIFF:        Felix Lee
                        Claire Mena
16                      Attorneys at Law

17

    FOR DEFENDANTS:          James E. Magleby
18                      Mark Smith
                      Attorneys at Law
19

20  **EJY LIBERTY RECORDING: 052325@11:00am**

21

22  Proceedings recorded by digital recording produced by
    computer-aided transcript
23

24  Transcribed by:         KATHRYN M. FRENCH, RPR, CCR
                      NEVADA LICENSE NO. 392
25                    CALIFORNIA LICENSE NO. 8536

1          Las Vegas, Nevada, Friday, May 23, 2025, 11:00 a.m.

2                          ---oOo---

3

4               THE CLERK:  Your Honor, good morning.

5          This is the time set for Tetsuya Nakamura versus

6   Sunday Group, Incorporated.  The case number is

7   2:22-cv-1324-MMD-EJY.

8          Beginning with plaintiff's counsel, will all counsel

9   please state your names for the record

10              MR. LEE:  Felix Lee, of Fenwick & West behalf of

11  plaintiff.

12              THE COURT:  Thank you.

13              MS. MENA:  Claire Mena -- oh.  Apologies.

14          Claire Mena from Fenwick & West on behalf of

15  (inaudible) --

16              THE COURT:  On behalf of?

17              MS. MENA:  Plaintiff.

18              THE COURT:  Thank you.

19              MR. SMITH:  Your Honor, Mark Smith on behalf of

20  defendants.

21              MR. MAGLEBY:  And, Your Honor, Jim Magleby.

22  I've been pro hac vice'd in, and I am here on behalf of

23  defendants and will be presenting argument on their behalf

24  today.

25              THE COURT:  All right.

3

1          And for the plaintiff, is it Ms. Mena or Mr. Lee who

2    will be arguing?

3          MR. LEE:  That will be me.

4          THE COURT:  All right.  Great.  I love having

5    you in the office -- in the chambers -- ah, in the courtroom

6    for purposes of arguments, then I don't have to worry about

7    people fading in and out or other frustrating technological

8    issues that come up all the time because, of course, this is

9    the federal government and I cannot promise you that I have

10   the most recent equipment available to me.

11          I am just briefly signing onto the computer here so

12   that if there is something that I need to look at that is in

13   the record that I do not have in front of me, I don't first

14   have to pull up the documents, pull up the case on our CM/ECF

15   system.

16          All right.  So, with that, I have some preliminary

17   remarks.  I always make preliminary remarks in these cases so

18   you have a bit of the lay of the land.  And then I will --

19   we'll go through things as I describe, allowing everybody to

20   make their record and make whatever arguments they wish to

21   make.

22          So, what I have before me are three motions:  The

23   Plaintiff's Motion to Compel, which is ECF number 99 and 100,

24   that is sealed and unsealed; Defendant's Motion to Compel,

25   ECF number 110 and 112, sealed and unsealed; and ECF number

1    114, which is a Motion to Extend Discovery.

2           The Motion to Extend Discovery, which is 114, is

3    granted.  What we will do specifically will depend on the

4    outcome of the remainder of what we discuss today.  I suspect

5    that we'll not follow the suggestion in the joint motion, but

6    that is for us to figure out as we determine what portions of

7    the Motions to Compel may or may not be granted, and how long

8    it will take to supplement anything that is ordered.

9           All right.  First, because I am not familiar with

10   any of the counsel either on the video or present, let me

11   just tell you that I spent 26 years as a civil litigator in

12   California and here.  I don't think there's anything about

13   civil litigation, especially discovery, that I don't know with

14   respect to the rules, or the application of the rules.  It is

15   not specific to this case, but I do not need an education on

16   proportionality or relevance or what's discoverable, anything

17   of that nature.

18          With respect to Dr. Nakamura's Motion to Compel, I

19   must note that he did not identify the request for production

20   or, if there was an interrogatory -- my sense is there was

21   not -- any interrogatory to which defendant failed to provide

22   an adequate response -- defendants, I should say, failed to

23   provide an adequate response.  And that is a fatal flaw to the

24   motion.  It makes it very difficult for the Court to know

25   exactly what it might order to compel; in other words, a

1  supplemental response to RFP number -- fill in the blank --

2  and under our Local Rules, it's a basis to deny the motion

3  itself.

4          Second, Dr. Nakamura never discusses

5  proportionality.  And my read of his Motion to Compel

6  makes general conclusory statements regarding relevance.

7  This, too, could be fatal to his motion.

8          Third, according to defendants, even if I look --

9  overlook the first two issues, Dr. Nakamura did not propound

10  a discovery request, as far as I can tell, for the production

11  of Mr. Hashimoto's Sunday Group domain e-mails.  I noted

12  that Mr. Hashimoto and Stephanie Vaughan -- spelled

13  V-a-u-g-h-a-n -- were not listed on the defendant's initial

14  disclosures as individuals with knowledge.

15          While the first two issues that I identified are a

16  basis to deny Dr. Nakamura's Motion to Compel, I'm not going

17  to do so on that basis.  I exercise my discretion and employ

18  Rule 1 of the Federal Rules of Civil Procedure to proceed

19  because I do not want this delayed further.  I, certainly,

20  don't want further briefing.  And, this is something that is

21  curable, although I will say there are judges in this district

22  who would not overlook the failure, especially to identify the

23  request for production at issue and interrogatories, if any,

24  and they would deny the motion on that basis.  So, in the

25  future, if there is such a motion, I highly recommend you

1    comply with our Local Rule.

2              Further, I note both parties offered general -- or I

3    should say all parties because there is more than one

4    defendant -- offered general boilerplate objections.  It is

5    virtually black letter law that those are ineffective,

6    gentlemen, and you know it.  So, don't do that.

7              I don't know if you practice in our state court,

8    where you may be able to get away with that, but this is

9    federal court.  We take the rules seriously.  We know what

10   they are.  And we follow them.  So, don't do that.

11             I'm not going to grant or deny anything based on a

12   general objection.  Those are, for all intents and purposes,

13   ineffective; with the one exception that I take to that --

14   because I treat this very carefully -- is both parties, all

15   parties also asserted in their general objections these

16   blanket statements of "attorney-client privilege and/or work

17   product."  Of course, general assertions of privilege and work

18   product are ineffective.  However, if there are -- if there is

19   anything that has been withheld -- and this is also so well

20   settled, I call it, black letter -- if there is anything that

21   was withheld based on privilege or work product, there has to

22   be a privilege log produced, and there has been none here.  So

23   you can either clarify that there's nothing been withheld on

24   that basis.  But, if something has been withheld on that basis

25   by anybody who is participating as a party, within 21 days

7

1    of today's date, a privilege log must be produced.  And that

2    privilege log had best comply with the Ninth Circuit law.  It

3    doesn't just say date, assertion, privileged.  Right?  You

4    have to provide the "to and from."  You have to provide the

5    identities, their roles.  And you have to provide enough

6    information so that the nonproducing party who are receiving

7    the privilege log, has enough information so that he, she,

8    it, they, can assess whether there's a basis to challenge

9    the assertion.  It is always a difficult process.  It's that

10   fine line.  You don't want to disclose the work product or the

11   privilege, but you have to give the other side enough so that

12   they understand.

13          By way of example:  Discussion of terms of

14   settlement.  Right?  Not something at issue here, but an

15   example.  So, you know the subject matter of whatever document

16   is being withheld discussed settlement terms.  And the to and

17   the from are between or among counsel and client.  Clearly a

18   privileged communication, right?  You have to give enough

19   information.  You wouldn't say "discussing paragraph 6A

20   and whether we should object."  That would be too much

21   information, right?

22          All right.  Okay.  Twenty-one days, if anything has

23   been with held; so 21 days from today's date for production of

24   privilege log would be June 13th, 2025.

25          Plaintiff's Motion to Compel.  First issue, I took

1    to heart the Status Report and focused on the things in the

2    Status Report, not that it doesn't give me enough to talk

3    about.  The production of Signal messages.  Before this case,

4    and recent newsworthy items, I didn't know "Signal" existed.

5    But, I do understand what it is.  I understand there is

6    dispute about what has and has not been produced when

7    plaintiff filed their -- I think it's in their reply -- but

8    in any event, either in their motion or reply -- in his motion

9    or reply, documents had recently been received.  They had not

10   been thoroughly reviewed yet.  The feeling was that the only

11   messages that had been produced were from Todd Mitsuishi,

12   I think is how you would say it.  If I said it wrong, I

13   apologize.  And that there was concern that nothing from

14   James Pack had been produced.

15        So, before we go further, from plaintiff, first,

16   what production of documents are Signal messages -- were the

17   production of Signal messages anticipated to produced in

18   response, so that I know what RFP we're talking about, and

19   what is the status?

20        And I really want you -- because I have lots of

21   questions, which is why I had the hearing, please try to

22   answer my questions discretely, so that we're not getting

23   off track and repeating things.

24        So, what's the RFP and what is the status now?

25             MR. LEE:  So, Your Honor, the -- let me answer

1    your second question first because I think that might help

2    frame, I think, what's coming up.  With respect to the

3    status, we did receive, yet, another production of what was

4    represented to us as being Signal messages.  That was on

5    May 13th.  It's -- it looks like they were documents from a

6    couple of additional custodians, and ones that we didn't even

7    know had Signal messages.  But kind of conspicuously, we did

8    not see anything from Mr. Pack, who was the other individual

9    defendant in the litigation.

10            Now, with respect to the status of his messages, we

11   should note that we actually had a subsequent meet and confer

12   with opposing counsel, after all the briefing had been done

13   because we were trying to work this out and we said, did you

14   collect Signal messages off of Mr. Pack's device?   During

15   that meet and confer, the answer we initially got was, well,

16   we think so.  But then as we pressed and said, well, we don't

17   think we've seen these.  They said, okay, we will go back and

18   we will check.

19            And so after that meet and confer took place, we

20   have sent multiple messages to them saying can you just

21   confirm for us?  Did you find -- you know, did you collect

22   Signal messages off of Mr. Pack's device?  And we got no

23   response from them.

24            Finally, you've seen the Status Report.  You may

25   note that they put into there that Signal messages to and from

—10—

 1    Mr. Pack had been produced on January 15th.

 2            Now, that, conspicuously, does not say they

 3    collected off of his device.  That is what we are trying to

 4    figure out.  Obviously, Mr. Mitsuishi had been talking to

 5    Mr. Pack on Signal back and forth, so we've gotten that.  But,

 6    we didn't get anything off of Mr. Pack's device, and that is

 7    one of the things that we've been trying to clarify, and

 8    one of the things that we are seeking with respect to this

 9    production, which is, you know, since he is one of the two

10    individual defendants, and a key custodian, we are entitled to

11    know were messages taken off of his device; or, have they, in

12    some sense, been lost or spoliated?  We've never gotten an

13    answer to that question.

14            Now, that brings me back to -- and this is where my

15    colleague, Ms. Mena, I think can, you know, address this.

16    With respect to the document requests, keep in mind, since

17    they are both individual defendants, we believe that this is

18    responsive to, you know, a very large number of requests that

19    go to the business of Sunday Group.  Right?  And Ms. Mena, I

20    think, can rattle some of them off to you.  But this was, in

21    some sense, an inquiry into custodians, and also document

22    sources.  This was not something that was geared toward any

23    particular document request.  But the way that, you know,

24    certainly, we see this, is that when they agreed that we will

25    produce documents regarding, say, request number 11, which is

1  documents regarding financial statements, the president and

2  the CEO of the company are people that should have documents

3  like that.  Right?  And so we were simply saying that we

4  believe Mr. Pack should be a custodian.  They've never

5  disputed that.  And if he is a custodian, then you should

6  collect from all custodial sources, including Signal messages,

7  and they committed to doing that.  But then when we tried to

8  drill down for additional detail on, well, did that happen?

9  We just have never received an answer.  And so this is why we

10  thought it made sense for us to come and move to compel, not

11  on any specific document request, but with respect to

12  custodial sources.

13          So, hopefully that --

14              THE COURT:  Mr. Lee, let me just stop you.

15              MR. LEE:  Yeah.

16              THE COURT:  But even if you -- I understand that

17  documents could be responsive to more than one request for

18  production.

19              MR. LEE:  Sure.

20              THE COURT:  This is not a simple slip and fall

21  or some, you know, case where there -- where the discovery

22  would be far more -- far less complex.

23              MR. LEE:  Sure.

24              THE COURT:  But you still have to tell me what

25  RFPs because, otherwise, I don't know what I'm compelling.

```
 1                      MR. LEE:  Yeah.

 2                      THE COURT:  And I don't know if I think they're

 3    responsive.

 4                      MR. LEE:  Yeah.  Exactly.

 5                      THE COURT:  Now, I understand that the defense

 6    has not, obviously, objected to this production, which is one

 7    of the reasons why I wouldn't deny the motion for the failure

 8    to identify an RFP.

 9                      MR. LEE:  Sure.

10                      THE COURT:  I, intuitively, understood that.

11                      MR. LEE:  Yeah.

12                      THE COURT:  But I still need to know whichever

13    ones we're talking about.

14                      MR. LEE:  Exactly.

15                      THE COURT:  Or if the parties simply want to

16    stipulate that there doesn't need to be that, I can consider

17    that as well.

18                      MR. LEE:  Sure.  And as I noted -- yeah, my

19    colleague -- I actually asked my colleague, Ms. Mena, to kind

20    of collate all of those in advance because I knew you were

21    going to ask that question.

22                      THE COURT:  All right.

23                      MR. LEE:  So, I'll turn it over to her.

24                      THE COURT:  All right.

25                Can you just tell me, Ms. Mena, which RFPs the
```

1    Signal documents would be, from your perspective, responsive

2    to?

3                    MS. MENA:  Yes.  I believe they would be

4    responsive to RFP number 3, related to Dr. Nakamura's

5    investment, RFP number 4 is his record regarding

6    representations made to Dr. Nakamura regarding the description

7    (unintelligible).  It could be RFP 5 related to

8    (unintelligible) financial status --

9                    THE COURT:  You're cutting in and out, Ms. Mena,

10   so I don't hear everything you're saying.

11            Go ahead, I heard number 5.  That's fine.

12                    MS. MENA:  I'll try to speak louder.

13            RFP number -- this could be anything related to --

14                    THE COURT:  Well, let me stop you with the

15   "could be."

16            What is plaintiff contending was not fully responded

17   to?  It's your Motion to Compel.  Not what could be.  What are

18   you moving to compel?  Responses -- further responses to RFP

19   3, 4, and 5?

20                    MS. MENA:  Yes, in terms of Signal messages.

21                    THE COURT:  Okay.

22                    MS. MENA:  Because -- because.

23                    THE COURT:  What other -- just because you keep

24   using qualitative language, "it could be."  I'm just asking

25   you what RFPs are you contending need to be supplemented?

1          So, 3, 4, 5.  What else?

2                    MS. MENA:  Six, 7, 8, 9, 10, 11, 12, 13, 14 --

3                    THE COURT:  Is it, essentially, all of them?

4    Because there are 40 some odd, and I don't want you to list

5    all the numbers, if it is.

6                    MS. MENA:  I didn't list, I believe, 1 and 2.  I

7    believe the vast majority of them would be relevant.

8                    THE COURT:  In other words, what you're saying

9    is that all of the document requests made may have responsive

10   documents, with the exception of 1 and 2, information that

11   would have been communicated through Signal messages?

12                   MS. MENA:  I believe so.  Uh, I'm conforming as

13   I go through, but I believe Signal to potentially have

14   communications that we requested in our requests for

15   production.

16                   MR. LEE:  Yeah, if I may interject, Your Honor,

17   the documents requests went to both these individuals, but --

18                   THE COURT:  Which you didn't give me, so I

19   couldn't read.

20                   MR. LEE:  Understood, Your Honor.  Yeah.  And,

21   you know, certainly, we take Your Honor's admonishments very

22   seriously.

23                   THE COURT:  Okay.

24                   MR. LEE:  But, you know, in some respects,

25   remember, they're propounded on both them individually, but

1    also on the company as well.  Right?

2              THE COURT:  Uh-huh.

3              MR. LEE:  So this was -- this was aimed at

4    company-related business.  And because of the positions that

5    they hold, it shouldn't be surprising at all that, in fact --

6    this is why we characterize this as something aimed at

7    custodial sources as opposed to any specific document request.

8    Because if they are going to say, hey, we agree that we will

9    collect documents related to this document request on behalf

10   of the company, you would naturally go to Todd Mitsuishi

11   and James Pack, and all of their respective sources of

12   information.

13             And I know that Your Honor noted that all of us have

14   recently gotten a deep education into what Signal messages

15   are, what they are used for, and how sensitive they can be.

16   And so, you know, we believe that with respect to any of the

17   requests where the defendant said we're going to produce that

18   for you, one of sources that you search for them is going to

19   be the Signal messages.

20             THE COURT:  Okay.  I appreciate that.

21             All right.  So is what you are seeking at this point

22   confirmation that Mr. Pack's devices, whatever they might be,

23   on which Signal communications would have occurred, were

24   searched for purposes of responsive documents?

25             MR. LEE:  It's both that and all other

1    custodians because the interest --

2                    THE COURT:  Who are "all other custodians?"

3                    MR. LEE:  So --

4                    THE COURT:  Because you don't identify that

5    either.

6                    MR. LEE:  Your Honor -- and this, actually, I

7    think, addresses one of the -- one of the preliminary

8    observations that you made.  Their initial disclosures, which

9    they updated in November of 2024, has a list of people.  We

10   think that that would, at a minimum --

11                   THE COURT:  How many?

12                   MR. LEE:  Uh --

13                   THE COURT:  I'm not going to identify 50

14   custodians.  That's not how it works.  And, you would have to

15   justify that, and you haven't, so you're not going to prevail

16   on that today, Mr. Lee.

17                   MR. LEE:  There's 17 custodians that are listed

18   on their initial disclosures.

19                   THE COURT:  And those 17 are all officers,

20   directors, or higher level employees of Sunday Group; or,

21   advisors, like the guy that's associated with UCLA?

22                   MR. LEE:  Yes.  I mean I -- that's why they put

23   them on here, Your Honor.

24                   THE COURT:  Well, I'm asking you what -- how you

25   perceive them, not --

1              MR. LEE:  That is how we perceive them, yes.

2              THE COURT:  All right.

3              MR. LEE:  So, at a minimum, I think it should be

4    them and also --

5              THE COURT:  And I have to tell you this is so

6    frustrating for me because I don't know who those 17 are,

7    and I'm not a pig in the forest searching for truffles in

8    thousands of pages of documents to figure out who you think

9    the custodians are.  This is just -- I would -- I do my

10   homework.  I take what you ask me to do very seriously.  I

11   understand not every judge does.

12             MR. LEE:  Uh-huh.

13             THE COURT:  I don't know who those judges are

14   in this district.  We do.

15             MR. LEE:  Yeah.

16             THE COURT:  So I -- so I don't know who they

17   are.

18             MR. LEE:  Sure.  Well, this is how I would

19   explain it.  I've been in defense counsel's position many

20   times, representing a company, saying, okay, I received a

21   document request from -- I received a document request from

22   the plaintiff asking to produce all documents regarding, you

23   know, fill-in-the-blank topic.  I take it as my responsibility

24   as an officer of the court in responding to that, to say,

25   well, if I'm going to do a reasonable search, I need to

```
 1    identify the custodians that I believe would have that
 2    information.  And anytime I try to put it off on the
 3    plaintiffs, they say, well, we're not the ones representing
 4    the company.  We don't know who those custodians all are.  You
 5    tell us who those are and --
 6                    THE COURT:  So they do.  And they do their
 7    search.  And then you say that's not good enough.  And then
 8    they say, well, who do you want?
 9                    MR. LEE:  You meet and confer over that, yeah.
10                    THE COURT:  Right.
11                    MR. LEE:  And that's what's been happening.
12    We've been doing that.
13                    THE COURT:  So do they agree that all 17 are
14    custodians?
15                    MR. LEE:  There have -- we told them that this
16    is who we want, and there have been -- you know, they have
17    told us -- and this will lead into, I think, part of the other
18    dispute -- that for some of these, there are certain types of
19    information that they can't gather because, like, they don't
20    have Sunday Group e-mail addresses.
21                    THE COURT:  Uh-huh.
22                    MR. LEE:  But, we have had this discussion about
23    who the custodian should be, yes.
24                    THE COURT:  And as far as you understand, they
25    don't object to the 17 being identified as custodians?
```

1              MR. LEE:  That was my understanding.

2              Now, again, this has gotten muddled, I think because

3   of the -- all the different discussions regarding sources.

4              THE COURT:  Well, I'm not getting into, right

5   now, current and former employees.  That's a different

6   question.

7              MR. LEE:  Right.

8              THE COURT:  And I am prepared to deal with that

9   separately.

10             MR. LEE:  Yeah.

11             THE COURT:  So I'm not suggesting that there

12  would be responsive documents from all 17.  I'm just asking if

13  it's your understanding that there's any objection to them,

14  generally, being considered custodians?

15             MR. LEE:  Yeah, well, my -- you know, my

16  counterpart can clarify if that's not his understanding.

17             I will note -- I mean I think this is what I

18  was driving towards when I was talking about the initial

19  disclosures -- this most recent production that we got just

20  last week included two more people that were on that list,

21  and we had been told, repeatedly, that Mr. Mitsuishi was the

22  only one who had this.  The reason why we were pressing on

23  this issue was we were, like, well, that doesn't sound

24  credible, but we'll see what happens.  And then when we got

25  Mr. Mitsuishi's communications, he's talking to other people

-20-

1    at Sunday Group on Signal, which, definitionally, means that

2    other people at Sunday Group were using Signal.

3            And so this goes back to your initial question of

4    are we just looking for Mr. Pack?  Well --

5                    THE COURT:  No.

6                    MR. LEE:  -- it includes him, but we believe

7    that anyone -- any custodian who was using Signal, that you

8    should collect those Signal messages from them.

9                    THE COURT:  To the extent they have possession,

10   custody or control?

11                   MR. LEE:  Correct.

12                   THE COURT:  All right.

13           Sorry.  Counsel, I've lost my piece of paper, so I

14   don't have your name in front of me.  I apologize.

15                   MR. MAGLEBY:  Your Honor, not a problem.  It's

16   James Magleby.

17                   THE COURT:  Magleby.

18                   MR. MAGLEBY:  Or Jim Magleby.

19                   THE COURT:  Okay.

20                   MR. MAGLEBY:  Call me -- whatever you call me,

21   I've been called worse.

22                   THE COURT:  Okay.  I have your name now,

23   Mr. Magleby.  Thank you.

24                   MR. MAGLEBY:  Sure.

25                   THE COURT:  So let me just start with a simple

1    question, just one simple question:  Was Mr. Pack's device or

2    devices, whatever they may be, on which Signal communications

3    could have been exchanged, searched for responsive documents?

4                 MR. MAGLEBY:  Yes, Your Honor.  The direct

5    answer is, yes, they were produced on May 13th, 2025, and I

6    have a list that I could actually pass out, if the Court is

7    interested, of the persons that Mr. Pack communicated with.

8                 THE COURT:  All right.  Well, I don't need it,

9    but if you have that -- you have -- let me take back those

10   partial sentences.

11              So, as of today, and for Mr. Lee's purposes, you are

12   representing that all of Mr. Pack's devices on which Signal

13   communications could have been stored, were searched, and the

14   responsive documents that are available have been produced.

15                 MR. MAGLEBY:  That is correct.  Yes.

16                 THE COURT:  Now, with respect to other

17   custodians --

18                 MR. MAGLEBY:  Yes.

19                 THE COURT:  -- and I don't -- and I understand

20   and have concerns about former employees, former independent

21   contractors, former consultants.  We'll get there.  But with

22   respect to former -- not former -- with respect to additional

23   custodians, have additional custodians' devices, to which you

24   have access, been searched?

25                 MR. MAGLEBY:  This is a answer yes and no.

1              THE COURT:  Okay.

2              MR. MAGLEBY:  Let me back that up.

3         To which we have access --

4              THE COURT:  Right.  Possession, custody,

5    control.

6              MR. MAGLEBY:  Possession, custody or control?

7              THE COURT:  Right.

8              MR. MAGLEBY:  I would say I don't think there

9    are any, where we have possession, where we have actual

10   control.  There are none.

11             THE COURT:  There are no current officers,

12   directors, or advisors who -- whose devices you have actual

13   custody and control of, correct?

14             MR. MAGLEBY:  That is correct.

15             THE COURT:  Okay.

16             MR. MAGLEBY:  There are no company-issued phones

17   or devices.

18        I'm sorry.  I misunderstood your question.

19             THE COURT:  No.  I think I might have changed it

20   slightly.

21        Okay.

22             MR. MAGLEBY:  And --

23             THE COURT:  So with respect to current -- let's

24   leave off advisors, like the gentleman's name who escapes me,

25   and who is associated with UCLA, and whether you could

1  possibly get him to give you his phone for this purpose, let's

2  set that aside for a second.

3              MR. MAGLEBY:  Yes.

4              THE COURT:  But with respect to officers of

5  Sunday Group, even if they don't have company-issued devices,

6  I think the case law appears to be that those individuals

7  would be individuals who, as a company, you would have

8  constructive control, sufficient control over to -- I don't

9  want to use -- to acquire --

10             MR. MAGLEBY:  Right.

11             THE COURT:  -- the access to the phone for

12  purposes of searching for responsive documents, whether

13  they're Signal or something else.  So, if that hasn't

14  happened, I think that has to happen.  And I say "think"

15  because I will let you argue why it shouldn't.

16             So I'm limiting, right now -- we're going through

17  different levels of people -- current officers of the company.

18  Officers is defined -- this is a California corporation, so

19  it's as defined under California law.  Typically it's

20  president, sometimes there are vice-presidents.  There are

21  secretaries.  There are treasurers.  There are different

22  names.  But however they are defined under California law,

23  those current officers must make their devices available so

24  that you can search for Signal or other -- let's just make it

25  broad -- responsive documents.

1          MR. MAGLEBY:  And I understand the Court's

2     ruling.  The only officers, at least to my understanding, are

3     Mr. Mitsuishi and Mr. Pack.  They are the decision-makers.

4     They are the founders.  Everybody else is either what I call

5     a "worker bee," which is a coder, a programmer, a technical

6     person, or maybe kind of a supervisor of a worker bee.

7     There's a number of Ph.Ds in different countries that manage

8     those technical aspects.

9          And I don't want to go too far afield, Your Honor,

10    but just for clarity, Signal was not -- did not begin to be

11    used until August of 2021.  Mr. Nakamura's fraud, and flavor

12    of fraud allegations, which is how I interpret the Complaint,

13    were from April of 2015 through about March of 2018.

14          THE COURT:  Right.

15          MR. MAGLEBY:  Nonetheless, we produced documents

16    all the way up through the very present.  But I -- the

17    implications that somehow Signal was used to conceal or hide

18    information, I need to rebut that on behalf of our clients.

19    It's a serious accusation.  And so that's the relevant time

20    period.

21          In addition, Mr. Nakamura alleges communications or

22    false statements with one person and one person only, and

23    that's Mr. Mitsuishi.

24          THE COURT:  Okay.

25          MR. MAGLEBY:  So, I just want to say that.

1           THE COURT:  So that's why I was saying documents

2   generally, not just Signal and --

3           MR. MAGLEBY:  Understood.

4           THE COURT:  Right?

5       And I'm not -- there is no finding today, now, or at

6   any point during this conversation, this hearing, where I am

7   finding that there is any wrongdoing by either side, and there

8   are accusations that have gone both ways.  So, there's not

9   enough before me to reach that conclusion, and it's a serious

10  conclusion.  So before I would get there, I would need much

11  more information.  So, there is no such finding today.

12       All right.  So with respect to current officers,

13  Mr. Mitsui -- I keep wanting to add --

14           MR. MAGLEBY:  Mitsuishi.

15           THE COURT:  I want to add that, the car

16  consonant, right, the B.

17       Mitsuishi, right, and Mr. Pack, all of their Signal

18  documents have been produced.

19           MR. MAGLEBY:  Yes.

20           THE COURT:  Searched for and produced.

21       Other responsive documents searched for and

22  produced?

23           MR. MAGLEBY:  Yes.

24           THE COURT:  All right.  So we can leave -- no

25  more need to discuss current officers.

1          With respect to others who are current employees,

2   has there been -- well, first, let me ask you.  Do you know

3   whether there are any Signal -- now I'm limiting this to

4   Signal.

5               MR. MAGLEBY:  Uh-huh.

6               THE COURT:  So talking current employees and

7   Signal communications, do any of those other employees,

8   current employees, use Signal for purposes of communicating

9   business-related information?

10              MR. MAGLEBY:  The short answer to that is yes,

11  with the caveat that there is a distinction between an

12  employee and a contractor.  Different agreements.

13              THE COURT:  Yes.  I'm talking employee right

14  now.

15              MR. MAGLEBY:  Ah.

16              THE COURT:  I'm saying employee.  Right.  I

17  understand the difference between an employee and a

18  contractor.  I also understand the difference between

19  current and former employees and contractors.

20              MR. MAGLEBY:  Thank you.

21              THE COURT:  So -- I was a wage hour, class

22  action lawyer for years.  Believe me, I got this.  So, I'm

23  talking current employees.

24              MR. MAGLEBY:  The answer is there are only three

25  employees of the defendant that is DAG.  And looking at my

1    list, they have not communicated on Signal.

2            THE COURT:  Okay.

3        All right.  So -- and then let's talk about current

4    advisors.  And I use that word because the word consultant was

5    used, and the word contractor was used.  And I don't know if

6    they are intended to be used interchangeably because certainly

7    a consultant can be a contractor, but I often see a difference

8    between the two as well.  So, are there -- are all of the

9    consultants contracted through the document that plaintiff

10   identified that has the language in it about all the document,

11   all the work -- let me get the --

12           MR. MAGLEBY:  All works, yes.

13           THE COURT:  All works belong to the company.

14   So, all of the consultants would be subject to that phrase in

15   a written document they signed?

16           MR. MAGLEBY:  The short answer to that is no.

17   There were a number of different agreements.

18           THE COURT:  Okay.

19           MR. MAGLEBY:  They have provided only a single

20   agreement for, I believe his name is Vassilis Zikas.

21           THE COURT:  Okay.

22           MR. MAGLEBY:  And, of course, they have the

23   burden of showing custody and control under the Citric Acid

24   and Mathew Enterprises case, which you clearly have read and

25   understand.

1          THE COURT:  Okay.

2          MR. MAGLEBY:  So what I would say is they

3  have -- they have a document for one employee.  I don't think

4  it gives that control --

5          THE COURT:  One consultant.

6          MR. MAGLEBY:  Excuse me.  Yes.  I'll use your

7  word advisors for the broader purpose.

8          THE COURT:  Right.  Okay.

9          MR. MAGLEBY:  And there are different forms of

10  that agreement, and I started looking last night and was not

11  able to complete a list of who has which.

12          And so I think I've forgotten what your question

13  was.

14          THE COURT:  Well, that language that is quoted

15  by plaintiff would provide some argument to be made, basis for

16  concluding the company would have sufficient control -- legal

17  right to gather the document, gather documents.  So, John Doe

18  is a consultant.  He signs an agreement that says everything I

19  do for you belongs to you.

20          MR. MAGLEBY:  Uh-huh.

21          THE COURT:  And if that's true, then there is an

22  argument to say if it belongs to me, I have a legal right to

23  get it and, therefore, I could say, Mr. Doe, you need to give

24  me your phone so I can look for X and Y and Z, or your

25  computer or whatever; or, you must do that and do it

1    sufficiently to be able to describe to me what you did so I

2    can be assured you've looked for everything and you've given

3    me everything, whatever it is you do.  But, given that

4    language, there would seem to be a basis to argue -- a strong

5    basis to argue -- you have sufficient control, possession and

6    control.  But if only one person so far identified has that

7    language, then my question is with respect to that individual,

8    has there -- do we know if he ever used Signal?  Do we know if

9    there was ever a search done for a Signal information?

10                   MR. MAGLEBY:  Mr. Zikas did use Signal, and we

11    have not searched his device.

12                   THE COURT:  Okay.

13                   MR. MAGLEBY:  However, we believe that all

14    of his communications would have been captured in the

15    communications with Mr. Mitsuishi and Mr. Pack.  And I'm

16    sure you saw our reference to the 2015 advisory note about

17    electronic information.  You know, you can get it from

18    multiple sources.  And I'm setting aside my other arguments

19    and trying to be directly responsive to Your Honor.

20                   THE COURT:  I appreciate that.

21              So he used Signal, and you believe that you have --

22    so you believe you have produced everything because the only

23    communications that would have occurred would have been with

24    the two officers, and their communications have been produced.

25                   MR. MAGLEBY:  That is correct.

-30-

```
 1                    THE COURT:  Okay.  But we don't know if any
 2    other current employee uses Signal?
 3                    MR. MAGLEBY:  Current employee?  I do know that
 4    none.
 5              In terms of advisors, um, there are other --
 6                    THE COURT:  So no current employee uses Signal.
 7    Sorry.  You did tell me that.
 8                    MR. MAGLEBY:  But advisors, there are others.
 9                    THE COURT:  Okay.  And so how could you be
10    certain, without searching, that he did not communicate with
11    respect to relevant information -- he being Mr. Zikas or
12    Dr. Zikas -- I'm sorry -- whichever it is --
13                    MR. MAGLEBY:  Right.
14                    THE COURT:  -- with others?  Not with pack or
15    Mitsuishi, about relevant information?
16                    MR. MAGLEBY:  Sure.  The short answer is we
17    cannot be unless we get the information.  Fair point.
18              Slightly longer answer is anything -- so these are
19    technical people.  Anything important about the Mobby Project
20    is communicated to Mr. Mitsuishi, who is the technical person.
21    And to the extent -- and this applies to e-mails as well --
22    anytime one of these persons sends an e-mail that answers a
23    technical question to a person with a Sunday Group domain
24    name, even if they send it from their gmail, it then ends up
25    on the Sunday Group server.
```

1           THE COURT:  Uh-huh.

2           MR. MAGLEBY:  So the only possibility -- and I

3  do think in the papers they acknowledge that it is a "may" or

4  a "possible" -- maybe they say likely.  I think it's

5  unlikely -- the only possibility of information that might

6  not be caught is if the worker bees are communicating directly

7  to each other, without communicating with Mr. Mitsuishi or

8  anybody else with a Sunday Group e-mail, and we think that's

9  highly unlikely --

10          THE COURT:  But I'm --

11          MR. MAGLEBY:  -- but it is possible.

12          THE COURT:  I'm talking Signal as opposed to

13 e-mail.

14          MR. MAGLEBY:  Sorry.

15          THE COURT:  Right?  So my concern is if Mr.

16 Zikas communicates with another advisor on Signal, you might

17 not know that.  You wouldn't even know what the subject matter

18 was.  So I --

19          MR. MAGLEBY:  Correct.

20          THE COURT:  So tell me why you shouldn't have

21 to search Mr. Zikas's device for relevant, responsive,

22 proportionate Signal communications?

23          MR. MAGLEBY:  Four reasons.  Let's see if I can

24 actually do it.

25          Reason number one, relevant timeframe for

1  Mr. Nakamura's claim, 2015 through 2018.  I think Mr. Zikas,

2  I think he's the one that came onboard in 2019.  But this

3  would apply to any of these persons.  They're not around when

4  the allegedly false statements were made.

5              THE COURT:  For the original purchases, or any

6  of the relevant events.

7              MR. MAGLEBY:  Right.

8              THE COURT:  Not just the comments, alleged

9  misrepresentations.

10              MR. MAGLEBY:  Correct.

11              THE COURT:  Okay.

12              MR. MAGLEBY:  Second, Mr. Mitsuishi is the only

13  one who, allegedly, made a false statement.  It's not like

14  they have alleged that there was some unnamed or some unknown

15  persons that made a false statement to Mr. Nakamura.  And, of

16  course, that's an important thing in a fraud case.  Tell us

17  who said it?  What?  When?  Where?

18              THE COURT:  Right.  You need to be specific.

19              MR. MAGLEBY:  Third reason is the subject

20  matter.  And that is -- it's all technical with these persons.

21  They're not involved in making management decisions.  They

22  certainly weren't involved in negotiating with Mr. Nakamura or

23  these other events.

24              So we've produced 68,000 pages of documents, and I

25  am certain that tens of thousands of them are technical

1    documents.  Is it possible that there is a communication

2    between two worker bees or the consultants -- sorry -- the

3    advisors about something, like, do you want to go to lunch?

4            For sure.

5                   THE COURT:  Not relevant.

6                   MR. MAGLEBY:  Right.  There would not be any

7    communication that says, gee, Dr. Nakamura said this, or

8    didn't say that, or --

9                   THE COURT:  It doesn't have to be that specific,

10   of course.

11                  MR. MAGLEBY:  Sure.

12           And so what we get to is --

13                  THE COURT:  What's the fourth?

14                  MR. MAGLEBY:  What was the fourth?

15           Oh, that the management is -- we call him Todd

16   because sometimes his last name challenges us as well.

17                  THE COURT:  Okay.

18                  MR. MAGLEBY:  Todd and Jim are management.  And

19   so if there's anything relevant about Nakamura or the case or

20   anything like that, it stays between them.

21                  THE COURT:  So here's the example -- and I'm

22   going to give the plaintiff a chance to respond to these four

23   things.  First, I have concerns about the time period as well.

24   And when we get to the requests that have specific time

25   periods, we'll talk about that because I have some thoughts on

1    that.

2           But Mr. Mitsuishi is the only person that made the

3    fraud -- allegedly, made a statement that would qualify as

4    fraud, I understand, as well.  What is possible to me is that

5    you get two advisors, just like you might get a Secretary of

6    State, that says something dumb on a Signal chat, like I can't

7    believe Mitsuishi said blah, blah, blah, blah, blah; or, I

8    can't believe Nakamura said; or did you hear...

9           Right?  I have no idea -- nor do you -- and I

10   understand that.  So that is really my concern.  But, what

11   I -- that is really my concern.  But what trumps all that is

12   if he wasn't there until '19, then my question for Mr. Lee is

13   how could what he said be proportional to the needs of this

14   case, requiring you to do this investigation?

15          So unless there's something else you want to tell

16   me, that's what I'm going to turn to Mr. Lee and ask him.

17             MR. MAGLEBY:  Just the caveat that I need to

18   make sure that I was clear before.  Signal use started in

19   August of 2021 between Mr. Pack and Mr. Mitsuishi.  So one of

20   my arguments was, well, there's nothing that relates to that

21   timeframe.  I want to qualify that.  I don't know -- like you

22   said -- what the worker bees would have done among themselves.

23   It's possible it predates 2021.  I just want to make sure that

24   that's clear in the record.  There is that possibility.  But

25   what I know is about the two officers.

1          THE COURT:  All right.

2          MR. MAGLEBY:  Thank you.

3          THE COURT:  And Mr. Zikas did not join until

4    '19?

5          MR. MAGLEBY:  My understanding -- and this is

6    from memory, walking through all of the advisors with the

7    clients on a call, he did not start until 2019.

8          THE COURT:  All right.  And --

9          MR. MAGLEBY:  However, if I'm wrong, and it's a

10   different time period --

11         THE COURT:  That's what I'm saying.  We can deal

12   with the time period.  Any order could say if he didn't start

13   until '19, no need.  If it started before that --

14         But, first, Mr. Lee, really focus for me on why

15   something subsequent to the time period when Mr. -- sorry --

16   Dr. Nakamura's first interaction is April of '15 and last is

17   March of '18, if I have my dates right -- now I'm not saying

18   that for all purposes those are the dates that -- because,

19   clearly, things before and after can be relevant -- but to

20   the extent that the argument is that there was fundamental

21   misrepresentation about the company, how would something that

22   happens after the last interaction be something that defense

23   counsel should be required to search for and produce.

24         MR. LEE:  Happy to address that.  And the first

25   point to make with respect to this is who this person is,

1    right?

2            Their initial disclosures -- this is Exhibit J to my

3    colleague's declaration in support of our motion -- describes

4    Mr. Zikas as the chief scientist of Sunday Group and the

5    Mobby Project.  So I actually question this idea that there is

6    only two officers.  He has a C suite executive title.  He is

7    the chief scientist of the Mobby Project.

8            Now, the misrepresentations at issue with respect to

9    Mobby were, you know, at or around the time of the investment,

10   there were various representations made about the imminence of

11   the Mobby Project, how far along it had come, how close it was

12   being to being listed on the exchange.  We are now five years

13   past that date, and it still has not been listed.  And, in

14   fact, you have pleadings that were made -- you know, their

15   answer that was submitted last year said, well, this is all

16   going to be obviated by the fact that the Mobby Token is going

17   to be shortly listed.  They've been saying that to us for the

18   better part of five years.

19           So if you looked at, you know, later communications,

20   and we find out that the chief scientist of the Mobby Project

21   is saying we're no where near close to completion.  If he's

22   saying that in 2023 or 2024, then that would -- that would,

23   definitionally, belie the notion that back in 2020, the things

24   that they were saying about the imminency of the Mobby Token

25   were true.

```
1              THE COURT:  Were true?

2              MR. LEE:  Yes.

3              THE COURT:  That's like looking at COVID, saying

4    that what CDC was saying when we first discovered it was a lie

5    because they didn't understand how the virus was going to

6    behave, and so their initial misrepresentations were wrong.

7    They were wrong.  But, it was their best estimate at the time

8    based on the information they had.

9          It's a different example.  I understand, here, we

10   don't have an unknown virus.  I get the distinction.  But, I

11   still think it's possible that you could believe something

12   genuinely in '17 or '16, and in '19 figure out you were wrong.

13             MR. LEE:  Yeah.  But the relevancy test -- and

14   I also want to bring in the proportionality in question here

15   to, right?  The relevancy of could it lead to discovery of

16   admissible evidence?

17             THE COURT:  Yeah, but that's not really the

18   standard here anymore.  It's proportionality.

19             MR. LEE:  Exactly.  Proportionality.

20             THE COURT:  Right?  And we do have a lot of

21   money at issue.  I understand that.

22             MR. LEE:  Yeah, the proportionality.  And

23   they've identified a person who used Signal to -- and he is a

24   C suite employee, and the question is, uh --

25             THE COURT:  Go ahead.
```

1              MR. LEE:  -- since he is the chief scientist,

2    there is any number of things he could be saying after, you

3    know, 2018, that would be relevant to the Mobby Project and,

4    you know, it's readiness at the time.  You know, if he did say

5    something -- and this is entirely plausible -- if he did

6    say --

7              THE COURT:  But if he -- I'm sorry to interrupt

8    you.

9              MR. LEE:  Sure.

10              THE COURT:  But he joins in '19.  He's the chief

11    scientist in '19.

12              MR. LEE:  Sure.

13              THE COURT:  I'm not going to debate whether he's

14    a C suite because you can call people anything you want.  It

15    doesn't make them an officer.  But let's set that aside for a

16    second because I'm not sure that that's definitive here.

17          I come in at '19.  I spend six months looking at it

18    and I say, guys, you got it wrong.  You got it wrong.  There's

19    no way that we're going to be ready.

20          Does that make the representation false in '17 or

21    '16 or '15 or whenever it happened?

22              MR. LEE:  I can --

23              THE COURT:  Right?

24              MR. LEE:  I can certainly imagine -- you know,

25    you can find, obviously, you can always say, well, there might

```
1    be communications that aren't relevant, but the question is

2    could you find relevant communications that are?  So let me

3    modify your hypothetical.  Let's say he comes in and he said

4    you guys haven't been working on this thing in years -- and

5    the reason I'm using this is we're finding, you know,

6    indications that this is true.  If he comes in and he says,

7    what have you guys been doing for the past three years?  Like,

8    no engineers have been -- you were raising all this money.

9    You didn't hire any engineers for the past three years.  How

10   could you possibly --

11              THE COURT:  Okay.  So --

12              MR. LEE:  -- you know, that would be a very

13   damning -- sorry.

14              THE COURT:  So give me a timeframe because I'm

15   not going to require in perpetuity unless there's some basis

16   for doing so for a search.  So assuming he uses Signal in '19,

17   those kinds of comments would have occurred within the first

18   six months, a year, of him being there?

19              MR. LEE:  We had agreed, I think, for a relevant

20   period for production.  I apologize.  I don't have it off the

21   top of my head.  My colleague may be able to find it.

22              THE COURT:  If Ms. Mena would look for that,

23   that would be great.

24              MR. LEE:  I think it was that or around --

25   somewhere around the time that we filed the lawsuit, right?
```

```
 1    And so -- now, again, we could -- we could make --
 2                THE COURT:  Go ahead.
 3                MR. LEE:  We could also have discussions
 4    about -- again, they actually put in their answer, which they
 5    filed with the Court last year, representations that the Mobby
 6    Token was about to be -- you know, was about to be listed.
 7    That's not true because it hasn't --
 8                THE COURT:  Mr. Lee --
 9                MR. LEE:  Yeah.
10                THE COURT:  -- I am not making factual
11    determinations.
12                MR. LEE:  Sure.
13                THE COURT:  And I was always offended as a
14    practitioner, and I am still offended by arguments that are
15    dispositive of a case in the middle of such highly contested
16    discovery that something is or is not true is not known at
17    this point.  And I understand you're a zealous advocate, but I
18    would caution you because you're going to lose me with that
19    kind of stuff.
20                MR. LEE:  Sure.  Sure.  Let me rephrase.
21           They said in July of last year the Mobby Token is
22    about to be listed.
23                THE COURT:  Uh-huh.
24                MR. LEE:  We can draw our own conclusions as to
25    whether -- well, one thing I can say is it has not been
```

1    listed --

2                    THE COURT:  Fair enough.

3                    MR. LEE:  -- as of this date.

4                    THE COURT:  And so this is all, I think, to

5    address Your Honor's question as to, well, could there be

6    anything that is both relevant and proportionate?

7                    And when you look at -- we're talking about

8    collecting from one person's device.  Now, again, I don't

9    know -- you know, what I heard was that the hook that we have,

10   legally, that you're allowed to get at these communications,

11   is that if they sign a contracting agreement, you have the

12   legal right.  I've heard from opposing counsel --

13                   THE COURT:  Contracting agreement that says that

14   everything you do belongs to me, the Sunday Group.

15                   MR. LEE:  Correct.

16                   THE COURT:  Not just signing an agreement.

17                   MR. LEE:  That's right.

18                   And what I heard from opposing counsel is that he

19   started but did not complete the project of seeing do any

20   of these other custodians have that same language.  We know

21   of at least one, and so we would argue that, like if there

22   are others, then they also are custodians where you

23   should collect.

24                   THE COURT:  Yeah, it would depend on who they

25   are.  That's what I would have to say.

1      So, with respect to Mr. Zikas, are you contending

2   that from his start date until the filing date, which is

3   August 16th, 2022, they should do a search for responsive

4   documents?

5      MR. LEE:  Yeah, well, and I believe that we had

6   negotiated a slightly later end date for discovery.

7      THE COURT:  I need to know what it is.

8      MR. LEE:  But, whatever that is.  Yeah.  Yeah,

9   we can get that to Your Honor.

10      THE COURT:  Mr. Magleby, a search of

11   Mr. Zikas -- and believe me, I'm not going to grant 17

12   searches here because we have to -- there's just got to be a

13   limit; a start and an end.  And if you start finding more

14   documents, then, hopefully, the two of you can work this out

15   because you really don't want me to decide how you're going to

16   conduct discovery in this case.

17      So for Mr. Zikas, from his start date to

18   August 16th, 2022 -- my chosen date.  That's the date that

19   the Complaint was filed -- is that something you want to be

20   heard further on?  Or, if the Court orders for responsive

21   documents -- and if you're going to do the search, you might

22   as well search for everything because we don't want to do --

23   right? -- we don't want to do this multiple times -- for

24   documents responsive to the document request, including

25   Signal communications on Mr. Zikas's devices for the period

43

1    of his start date, his association, through August 16th of

2    2022.

3              Do you want to be heard on that?

4              MR. MAGLEBY:  Ever so briefly.

5              And, Your Honor, I am more than happy to have you

6    decide all the discovery disputes.

7              THE COURT:  I don't have the time to do that.

8              MR. MAGLEBY:  I know.  And we'll try to avoid

9    coming back, believe me.  Message received.

10             But what I want to say is I'm not aware of any claim

11   in the Complaint that says it's a forward-looking fraud claim.

12   You've made this representation without intending -- without

13   intending to honor it.

14             THE COURT:  But that's not the only claim.

15   Fraud isn't the only claim.

16             MR. MAGLEBY:  There are additional claims,

17   correct.  That's correct.

18             THE COURT:  So -- and there are -- there are

19   counterclaims.  And if there is something that would disprove

20   a counterclaim, they would, technically, have the right to

21   that, if they've requested the document through an RFP.

22             MR. MAGLEBY:  Yes.

23             THE COURT:  So I think that we have to be

24   broader than the fraud claim in saying responsive documents,

25   documents responsive to the RFPs that would rely -- that would

—44—

1    lie -- not rely -- lie on, remain on, access to Mr. Zikas's

2    electronic devices because we know he is an advisor and he is

3    subject to the language in the contract that I think provides

4    enough basis to say you have a legal right.  You have the

5    authority to access that because everything he does about this

6    project belongs to the Sunday Group.  That seems, to me, to

7    give you enough authority.

8            If he resists, you will have to explain that to

9    Mr. Lee and then to the Court and we can deal with that.

10           MR. MAGLEBY:  Yeah.

11           THE COURT:  But we start with the premise that,

12   hopefully, he won't.

13           MR. MAGLEBY:  Understood.  And, Your Honor, the

14   only other things that I was going to say, I think you've

15   covered in terms of what did and didn't happen, but I do have

16   to say in June or July of 2024, the coins were minted.  That

17   did happen.  The coins have been going through beta testing

18   and, in fact, this week, all of the Mobby purchasers received

19   their invitation to obtain those coins.

20           THE COURT:  Okay.

21           MR. MAGLEBY:  With that, Your Honor, I

22   understand the Court's ruling.

23           THE COURT:  Okay.  So Mr. Zikas is being ordered

24   to produce, through his association with the Sunday Group,

25   the -- or I should say the Sunday Group is being ordered to

1    produce documents responsive to the document requests that lie

2    on Mr. Zikas's electronic devices.  This includes Signal, but

3    is not limited to Signal.

4         Now, is there any -- at this point, we don't know

5    that there's any other contractor who has language in an

6    agreement that contractor signed, that advisor signed, that

7    gives Sunday Group a basis in law for obtaining information

8    from private sources; however -- and I know this bleeds over

9    to other -- to other issues that are before me -- it seems

10   that the case law -- and let me get it, and let's just jump to

11   it because there's just no way to avoid it at this point --

12   that -- and I just want to find my -- because I collected my

13   case law and my reasoning on this.  Yeah, here it is.

14        Okay.  So this is current.  Okay?  We are talking

15   only current employees and current advisors who are subject to

16   language such as "everything that you do for us belongs to

17   us."  "Us" being the Sunday Group.  Okay?  That's what this is

18   limited to.  That the case law -- one case that I found that I

19   thought just succinctly said it is Waymo, W-a-y-m-o, LLC

20   versus Uber Technologies, 2017 Westlaw, 11917910, Northern

21   District of California, August of 2017.  And the court upheld

22   a magistrate judge's decision requiring the production of

23   responsive documents in the custody or control or possession

24   of the officers of the company, the defendant's company

25   because the entity seeking to -- an entity seeking to avoid

1    production could not escape its duty to produce responsive

2    documents simply by choosing to conduct business through

3    personal e-mails of its officers.

4            Now, I understand that's limited to officers, but

5    the case law, otherwise, is fairly clear that with respect to

6    current employees, or current individuals over whom there is

7    current employees because they have a relationship with the

8    company, and current individuals who are contracted, where

9    there is a legal basis under that contract, for the

10   production, the control of documents such that the company

11   would be required to produce, there is sufficient case law

12   that says that those documents should be produced.

13           I looked at Valcor.  I looked at Smith -- I'm sorry.

14   State Farm.  Why did I say Smith?  -- State Farm.  The Valcor

15   Engineering is a Central District of California case, a case

16   that wasn't cited by you all, and it's something I found.

17   It's 218 WL 11703108.  It relies on Mathew Enterprise, Inc.

18   versus Chrysler, 2015, West Law 8482256, which is a California

19   case -- and I'm sorry.  I don't have which district in

20   California written down -- oh, yes I do.  It's Northern

21   District also.  And it's 2013.  That the cases, Valcor,

22   Mathew, even State Farm, they all focus on the same thing;

23   whether there's a legal basis.  That legal basis could be law,

24   meaning statute.  It could be a contract.  It could be some

25   other argued basis in law -- well, the court said there's

1    nothing that says a fiduciary duty is sufficient -- that would

2    require current employees to provide access.  And I think that

3    with respect to anything that is ordered today, where the

4    employees may have responsive documents -- I just don't know

5    how you get around that -- but you have to produce if they

6    have used their personal phones, their personal computers just

7    because Sunday Group decided not to issue domains or computers

8    or cell phones, that that can't be the basis for saying you

9    have no duty to produce.

10           Mr. Magleby, what I think of is a motion for

11    spoliation.  And there is none here, and I'm not suggesting

12    that there is.  But, if a company -- not your company.  Not

13    Sunday Group -- but if a company could avoid the duty to

14    retain responsive documents by saying, hey, guys, we're not

15    going to give you anything; no e-mail, no devices, no cell

16    phone, so we have no responsibility here, then it would --

17    that ability would sort of defeat the whole notion of a

18    corporation or business operation's duty to retain documents

19    once litigation is reasonably foreseeable.  Right?  And

20    that -- so it's a backwards -- it's the application of the

21    spoliation standard that I'm saying if it's applied logically,

22    there has to be some duty of a corporation to say to its

23    current employees that if we are going to -- if you are going

24    to use personal devices, I still -- company, "I" -- still have

25    that responsibility to ensure, reasonably, right, that things

1    are maintained so that if I am ever sued, I have documents to

2    protect myself.  Otherwise you wouldn't -- not only would you

3    not have what the other side is looking for, but you might not

4    have what you need, right?  It just doesn't make any sense

5    that that can be the "get out of jail free" card -- I'm dating

6    myself from the Monopoly -- for not retaining documents and

7    not producing documents.

8            Now, does this have to be the nth degree of

9    searches?

10           No.  It has to be reasonable.  You have to say to

11   your employees, you must send to me, or to our counsel, all

12   documents on your electronic devices that fall in these

13   categories -- and I'm not going to give you the categories.

14   I'm going to say it's what would be responsive, and what would

15   reasonably be in their possession.  So if it is a receptionist

16   or, you know, what is he or she going to have?  Probably,

17   virtually, nothing.  If is a chief engineer, probably much

18   more.  Right?

19           So, you have to use your judgment.  And I'm not

20   going to parse through that.  But, with your current

21   employees, that is my sense.

22           Now, tell me why you think you shouldn't have

23   to do that.

24           MR. MAGLEBY:  Just to make sure I understand the

25   Court's question.  Are you talking about the employees?  Or

49

```
 1    are you including the advisors?

 2                    THE COURT:  Employees.

 3                    MR. MAGLEBY:  Employees.  Um --

 4                    THE COURT:  Current employees.

 5                    MR. MAGLEBY:  Current employees.

 6                    THE COURT:  And what they have to produce to

 7    you, so that you can then review them for relevance,

 8    privilege, whatever you feel is appropriate, so they're giving

 9    them to you, that are responsive to the RFPs that have been

10    propounded.

11                    MR. MAGLEBY:  Sure.  And I think my answer --

12    and I'm going to try to track what you've said, Your Honor,

13    and truly be responsive -- my answer is, of course, the logic

14    makes sense, and a company can't just say, hey, guess what,

15    everybody, use your gmail account, and use Signal, and use

16    your phone, and we'll never, you know, have another document

17    that can be discovered.

18            That's not what happened here, and I know you

19    weren't suggesting that.

20                    THE COURT:  I was not.

21                    MR. MAGLEBY:  The majority, all except maybe

22    five, have Sunday Group domain e-mails.  Admittedly, everybody

23    has a personal phone.  But in this case because of the scope

24    of the pleadings and the allegations, even applying the

25    broader standard that you've discussed, which is it's not just
```

1   about fraud in these three years, an maybe there was something

2   that was said between these people later on, it becomes

3   overwhelmingly expensive and burdensome.  I mean there's -- I

4   don't know -- 16, 17 -- there's four or five employees.

5   There's 16 or 17 contractors.  And they're at various

6   different levels in the company.  I think they're in seven

7   different countries.  It's going to take a lot of time and

8   money.  And what we've done in this case is we've imaged

9   phones.  We've imaged Mr. Pack's phone.  We've imaged

10  Mr. Mitsuishi's phone.  This is not a -- there's been some

11  comments about litigation holes and things like that.  Nothing

12  has been deleted.  Everything has been kept.  They keep their

13  e-mails, including -- not only is it the right thing to do,

14  but this is a tech company.  The tech is locked down.  It is

15  preserved.  Stuff is backed up.  We've produced 60,000 pages

16  from it.  And the further we get away from 2018, I think, the

17  less and less relevant it becomes and proportionality starts

18  to matter more and more.  And then we get into -- I think we

19  ought to.  And, of course, it's up to the Court to decide --

20  balance the issues have privacy and employee relations because

21  it becomes --

22          THE COURT:  Well, we're not talking about

23  anything that would be private; let's go to lunch.  I'm angry

24  with you because you --

25          MR. MAGLEBY:  Yeah.

1          THE COURT:  -- didn't respond to my e-mail.

2          MR. MAGLEBY:  Yeah.

3          THE COURT:  I'm not talking about that stuff.

4    They don't even have to send it to you.

5          MR. MAGLEBY:  Okay.  And that maybe addresses --

6    maybe I didn't understand.  That addresses my concern.

7          I'm concerned about saying to an employee, hey, you

8    have to give me your phone.

9          THE COURT:  No, no.  I'm saying they have to

10   look on their phone.  They -- we are going to start from the

11   perspective of trusting people because you're going to tell

12   them they have a duty to do this.  You're going to say here

13   are the categories.  Mr. Smith, here are the five things

14   you are to look for.  Mr. Jones, here are the 12 things.

15   Miss, whatever, Armstrong, here are the four things.  Because

16   everybody is not going -- you're going to go through the RFPs.

17   You're going to say here are the ones that are relevant to

18   Mr. Smith.  Here are the ones to Mr. Jones.  Here are the ones

19   to Mr. Armstrong.

20         Now, I realize Mr. Lee may want more, but that's

21   where we're starting, and we're starting at 2015.  Let's start

22   in January of '15.  Now let's go to the end of '18.  That

23   gives three full years, '15, '16, '17, '18.  I knew as soon

24   as I said it, it was four years, but I said three years

25   initially.  So, it's four years.

1               MR. MAGLEBY:  Yes.

2               THE COURT:  We're going to start with those four

3     years, and you're going to identify the RFP, and you're going

4     to identify the individual, and you are going to communicate

5     with each an attorney-client privilege that says here are the

6     things you must look for for these four years, and you must

7     send them to me.

8               And we're talking about the individuals who do not

9     have company e-mail for purposes of e-mail searches.  Now for

10    phones, that would mean some, like, either Signal -- I

11    always -- I'm just not a technology person -- WhatsApp.  I

12    think that things disappear from WhatsApp though.  Whatever

13    their communication system is, it would include that.

14              MR. MAGLEBY:  Yes.

15              THE COURT:  And they are going to have to tell

16    you I don't have anything on my text.

17              And I use myself as an example, only as an example,

18    not because I'm talking about me.  I keep no texts.  I was

19    involved in a labor and employment for years.  I tell people

20    everywhere, get rid of what's on your texts if they are your

21    personal phones but you use them for work.  So, there are two

22    text strings on my phone; my sister and my daughter, because I

23    don't even talk to my husband by text.

24              MR. MAGLEBY:  Uh-huh.

25              THE COURT:  There are two -- because he doesn't

1    text -- but there are two.  So, no one is ever going to see

2    anything on my phone that's work related because it's my

3    sister and my daughter.

4          So if they don't have them, then your response has

5    to be this is what they searched for.  This is what they had.

6    This is what they didn't have.  Right?  That's it.  Then

7    Mr. Lee can argue with you about why they don't have it or

8    whatever he wants to argue.  But, that's where we're starting.

9    And this time period is not with prejudice.  If there's a

10   reason to expand the time period, I'm not precluding you from

11   being able to do so, Mr. Lee, but we have to start somewhere,

12   and it has to be reasonable enough that Mr. Magleby and his

13   team can do this without being buried in a world of paper

14   forever, or a world of electronic communications forever.

15         So, that's going to be for these current employees,

16   all electronic communications.  For the current employees, we

17   are taking out e-mail because they have -- they have Sunday

18   Group e-mail, and they better not be talking about Sunday

19   Group on their gmail accounts.  But if you find that they are,

20   you're going to have to ask them to give you that information.

21               MR. MAGLEBY:  Well, and I want to be clear, they

22   have sent -- some of the employees that do not have Sunday

23   Group e-mail accounts have sent e-mails from their personal

24   account.

25               THE COURT:  Right.  I understand that.

1                    MR. MAGLEBY:  Okay.

2                    THE COURT:  I'm talking about the ones who do

3    have Sunday Group --

4                    MR. MAGLEBY:  Oh.

5                    THE COURT:  -- they don't have to look in their

6    personal e-mails unless they tell you that they were using it.

7                    MR. MAGLEBY:  I understand.

8                    THE COURT:  Right?

9                    MR. MAGLEBY:  I misunderstood.  Now I

10   understand.

11                   THE COURT:  Right.  For those who have Sunday

12   Group domain names, they do not have to search their personal

13   e-mails, but you have to confirm with them that they are not

14   using their personal e-mail for anything substantive.  It's

15   not are we getting together for drinks at the corner bar

16   tonight, right?

17                   MR. MAGLEBY:  Understood.

18                   THE COURT:  Okay.

19                For individuals who do not have Sunday Group domain,

20   they must search e-mail and other communication forums.  And

21   that's, generally, across the board.  And that's employees.

22   Now we haven't -- and that's current employees.

23                I'm going to tell you what my instinct is on former

24   employees because this seems replete in the case law, which is

25   a duty to ask them to search.  There does -- I have seen

1    nothing in the law -- and I've looked all over the nation --

2    that gives a company a legal right to require a former

3    employee -- separating advisors out here, somebody under

4    contract because it might depend on what a contract says --

5    but a former employee to produce documents on behalf of a

6    company.  But, the case law is, as State Farm said -- and that

7    is the case that plaintiff's relied on most heavily -- is that

8    you -- there is sort of that minimal duty to request their

9    cooperation.  And that is what I am asking -- telling you you

10   need to do.  But, you can argue with me.

11        So, you would reach out to the former employees and

12   say, Dear Mr. Whoever:  I know you left Sunday Group two years

13   ago.  We are in litigation.  I have been ordered by the Court

14   to ask you if you're willing to search your electronic devices

15   for documents that are responsive -- that touch these five

16   subjects -- whatever they are.

17        Again, you're going to decide, based on their job,

18   their longevity with the company, whatever it was.  You're not

19   reaching out to every single person.  You're reaching out to

20   those individuals who are among these former employees who

21   played a role in the development.  We're not talking about the

22   people who are cleaning the garbage cans or whatever else it

23   is, right?  We're talking about people reasonably related to

24   the operation of Sunday Group as it relates to Mr. Nakamura's

25   investments in the Sunday Group, right?  And you're going to

1    reach out and you're just going to ask them.

2                    MR. MAGLEBY:  Yep.

3                    THE COURT:  And it's the same time period.  So

4    if they left before '15, or they didn't start until after '18,

5    right, January 1 to December 31, then you don't have to reach

6    out at all because that's the relevant time period right now.

7    And if they did, you're reaching out and you're asking them,

8    and then you're going to give responses.  You're going to

9    supplement responses to -- for Mr. Lee that says here's what

10   we did.  Here's what we got.

11                   Now, we got to get to current advisors and former

12   advisors.  Mr. Lee, I'm going to turn back to you.  With

13   advisors, people who don't have a legal -- let me say this

14   differently.  Somebody whose contract does not say everything

15   you do for me belongs to me, in whatever words that appears.

16   It doesn't have to say it in those words, obviously.

17                   What is the basis in law for requiring those people

18   to produce documents, whether they're current or former

19   advisors?  And I think if the guy associated with UCLA in

20   particular because I think of all the things that he may be

21   involved in -- I think it's a he -- and all the ways he may

22   use his phone, and all the information that maybe he has

23   transferred something to a local device that may have

24   something to do with Sunday Group.  Where is it that Sunday

25   Group can say to him if there isn't this thing in his

1    contract, you must go look for this for me?

2              MR. LEE:  Sure.  Yeah.  And, actually -- so I

3    think this Professor Kleinrock that --

4              THE COURT:  That's the guy.

5              MR. LEE:  That's who you are referring to, yes.

6    He, actually, may not be a good example because he actually

7    has -- he actually has a Sunday Group e-mail address.

8              THE COURT:  Okay.

9              MR. LEE:  So he's kind of a different -- but if

10   what you're saying is that they're an advisor, but they have

11   not signed any sort of formal a agreement that legally binds

12   them, at least the way I understood, you know, the concept

13   of possession, custody or control, where you got this

14   relationship, is that it kind of falls within the same realm

15   as State Farm, which is you ask them, right?  Because I think

16   it follows the same under -- you know, you have an obligation

17   to try to get them to cooperate.  Whether or not they

18   cooperate with you, if they -- if they just say, no, I won't

19   do it, then, you know, then I guess he can come back to --

20   opposing counsel can come back to me and say they won't

21   agree.  I got to go subpoena them.  But at least I understand

22   that that avenue has been -- has -- that they've gone through

23   that avenue.

24             THE COURT:  Do you have any case in the Ninth

25   Circuit that has required that?

1          MR. LEE:  Not required it, Your Honor.  No.

2          THE COURT:  Yeah.  I didn't find anything that

3    really said -- I mean Smith, I read it.  But when you look at

4    the cases that I was talking about before, Mathew Enterprise

5    and Valcor, they really take a much narrower -- sorry -- a

6    narrower view of the responsibility.  And in Valcor, they

7    rejected a decision called Miniace -- that's how I'm saying

8    it.  I'm assuming it's an Italian name -- M-i-n-i-a-c-e versus

9    Pacific Maritime.  And this had to do with board members, and

10   the court found the defendant hadn't even -- the current board

11   members -- the court found that there was no -- that the

12   plaintiff had not provided a legal basis for requiring current

13   board members to produce because the defendant did not have

14   possession, custody or control over current board members

15   private e-mails.  In that case the Court found that the

16   written briefing was devoid of facts that would have

17   demonstrated control, and didn't provide a legal basis.  And

18   they rejected the reasoning of a -- of the M-i-n-i-a-c-e,

19   Miniace, Miniace versus Pacific Maritime.  Miniace is at 2006

20   WL 335389, by the way.

21          MR. LEE:  That's helpful.

22          THE COURT:  And so I just don't see the Ninth

23   Circuit cases -- there's certainly no Ninth Circuit law on

24   this, but I don't see the district courts going as far as

25   Smiths -- I keep saying that -- State Farm, and so I'm just

1    wondering where the authority is for even requiring that

2    request.

3            MR. LEE:  Well, some of this, Your Honor, I

4    think, was, I guess, more practical in nature because,

5    obviously, from where I'm sitting, I have no visibility into

6    what any given custodian's advisory agreement says, what the

7    provisions are, and whether it gives us legal hook.  And so we

8    were -- obviously, when we propound this, and we ask that

9    certain custodians provide certain information, if they -- you

10   know, if there is no legal hook, then, yeah, then we -- if we

11   decide we need their information, well, then, we go subpoena

12   them.  But we've not received -- and it sounds like based on,

13   you know, what opposing counsel was representing, I don't

14   think even he's completed the exercise of finding out, okay,

15   well, which one of these have that and which one of them

16   don't?

17           And so I think if I see where Your Honor is going,

18   if you're simply going to order all of this with respect to

19   the people where you do have that legal authority, at a

20   minimum, if they identify who it is, then we could say, fine.

21   All right.  We'll work with you on that through the company.

22   And then everybody else, we can go subpoena them if we feel

23   like we need to do that.  That seems imminently practical.

24           THE COURT:  I agree.

25           MR. LEE:  But we actually had to get to this

1  point in order to -- in order to, I guess, come up with that

2  solution.

3           THE COURT:  All right.

4           So, Mr. Magleby, if I were to order -- and I'm not

5  sure I'm there yet -- that with respect to any current

6  advisor, or former advisor, whose agreement says that

7  everything you do for the company belongs to the company, and

8  for those former I add the caveat, and something that

9  indicates that even when you are advising relationship ends,

10  it still belongs to us, right?

11           MR. MAGLEBY:  Uh-huh.

12           THE COURT:  Why would there not be a legal basis

13  for those advisors to be asked; current, produce; former, do

14  you mind producing documents proportionate to the needs of the

15  case, that you identify, the subject matters that you identify

16  for the four years I've given you?

17           Does that make sense or I can say it again.

18           MR. MAGLEBY:  I think I understand.  And, again,

19  trying to be directly responsive --

20           THE COURT:  That's good.

21           MR. MAGLEBY:  -- and also battling my advocate

22  nature, I just have to say State Farm, there was no objection

23  to the request.  And so while logic is there, it's a little

24  different here because we do object.  However, I see where

25  Your Honor is going, which is, yeah, but why shouldn't I just

1    order you to go and ask?  And I get that as well.

2            And, again, it's a combination of burden,

3    proportionality, employee nightmare, you know, people are

4    sensitive --

5            THE COURT:  How many people are we talking about

6    because that is important.  You know, if you were talking

7    about 150, I would agree with you.  If you were talking about

8    two, I would say that's easy, right?  So there's those bright

9    lines, right?

10            MR. MAGLEBY:  Yes.

11            THE COURT:  So how many are we talking about?

12    Do you have a sense?

13            MR. MAGLEBY:  Yes.  And so just to put a little

14    flavor to that, my guess -- swag, if you will -- is about 20.

15            THE COURT:  And of those 20, how many are

16    current?

17            MR. MAGLEBY:  I think about 15 or 16.

18            THE COURT:  Okay.

19            MR. MAGLEBY:  So I think there's four or five

20    former -- and, you know, the list I've been looking at is out

21    of footnote 3 of our opponent's brief, the opening motion.

22    So, I guess it's possible there are additional ones, but what

23    I've been running to ground is the persons in footnote 3.

24            THE COURT:  Got it.

25            MR. MAGLEBY:  None of them are janitors or

1   receptionists.  There was an office they built out in 2020,

2   and COVID came along and nobody ever worked there.  So,

3   they've had to hire people from all over the world and they're

4   scattered about.

5                    So I -- I'm sorry.  Let me get back to your

6   question.  Current or former --

7                    THE COURT:  Right.  So look at the 15 current.

8   And we'll just use that number as an approximate, right?

9                    MR. MAGLEBY:  Sure.

10                   THE COURT:  It could be 10, could be 17,

11  whatever.  If we look at the 15 current, the burdensome

12  argument of saying for years January 1, '15 through December

13  31 of '18, here are the four topics you have to respond to.

14  Here are the five you have to respond to.

15                   MR. MAGLEBY:  Yeah.

16                   THE COURT:  That's a lot.  I agree.  Certainly

17  if it was all 42, it would be extraordinary.

18                   MR. MAGLEBY:  Yeah.

19                   THE COURT:  Are there, among those -- and I

20  know Mr. Lee isn't going to like this, but we'll give him a

21  chance -- are there, among those in footnote 3, that you would

22  say are more prominent --

23                   MR. MAGLEBY:  More important?

24                   THE COURT:  More important -- better word to

25  use.

1          MR. MAGLEBY:  Yes, there are.  And I have their

2     titles written down here.  But, you know, it's -- I think

3     Dr. Zikas is probably at the top, or near the top.  There is

4     somebody named Muhammad Ishaq, who is in Pakistan because of

5     Visa trouble.  I think he's probably near the top.  And below

6     that I'm less certain.

7          I think the other point I wanted to say was I

8     just -- before I forget -- Mr. Lee said we don't have any

9     visibility.  And I wasn't sure if he was referring to at the

10    beginning of the case or now, but I want to be clear on the

11    record that we have produced everybody's agreement, whether

12    it's a consulting agreement, an employment agreement, whether

13    it's a draft agreement, they have all been produced.  And so

14    they have the ability to find those and go through them.  I

15    was looking at them in terms of preparing for this hearing,

16    but I don't think it's my ability, nor do I want to be charged

17    with making the determination of which agreements my opponents

18    contend contain that language.

19          THE COURT:  Got it.

20          MR. MAGLEBY:  Having said all of that, I can

21    see where the Court is going and, you know, if the answer is

22    we go ask them to search their phones, then we will comply

23    with that order.

24          THE COURT:  But of the 15, if I were going to,

25    say, start smaller --

1          MR. MAGLEBY:  Yeah.

2          THE COURT:  -- do you gentlemen think that you

3    can agree on a subset?  I mean first, of course, it has to be

4    somebody would was an advisor between 1-1-15 through 12-31-18.

5          Second, it has to be somebody who was involved in

6    a way that would implicate the issues that Mr. Nakamura --

7    Dr. Nakamura has raised in the case; or, that Sunday Group has

8    raised in counterclaims.

9          MR. MAGLEBY:  Yeah.

10          THE COURT:  So I can leave it to you to

11    negotiate that set, with Mr. Lee being responsible to first

12    review the agreements of all those individuals to determine

13    if they have the obligation.  If they don't, then the

14    question -- we can decide the second -- is whether Mr. Magleby

15    has an obligation to even ask.

16          MR. MAGLEBY:  Yeah.

17          THE COURT:  But let's start with the premise

18    that there's some subset of these advisors who are current

19    who had something in a contract that said everything you do

20    belongs to Sunday Group, and we have a timeframe.  Do you

21    two think that you can agree on a subset of those and what

22    Mr. Magleby will ask them for?

23          MR. LEE:  Happy to have that meet and confer.

24    And I'm optimistic, you know, that we could --

25          THE COURT:  That you could do that?

1           MR. LEE:  Yeah.  I'm guardedly optimistic that

2    we could come to an agreement.

3           THE COURT:  All right.

4           MR. MAGLEBY:  Guardedly optimistic as well.  And

5    I -- you know, just to volunteer, I think what we should do

6    while Mr. Lee and his team are looking for the agreements and

7    deciding what they think they need, is we'll get a list.

8    We'll take that list from footnote 3, and we'll figure out

9    everybody's title and their start and stop dates or, you know,

10   that kind of information, and their job duties, so we can

11   provide it to Mr. Lee as part of a meaningful meet and confer.

12          THE COURT:  All right.

13          MR. LEE:  That will be helpful.

14          THE COURT:  So with respect to everybody who is

15   listed in footnote 3 of ECF number 100, the Court is ordering

16   the following:  That Mr. Lee is to -- or his -- counsel for

17   plaintiff.  Let me put it that way -- counsel for plaintiff is

18   to review the agreements that have been produced to determine

19   whether the agreements as applicable to each of those

20   individuals contains language that would provide the basis for

21   the legal obligation; meaning, the possession, custody or

22   control of Sunday Group to gather documents responsive to the

23   requests for production for the time periods January 1 of '15

24   through December 31 of '18.

25          Defense counsel will, simultaneously, find start and

1  stop dates for each of these individuals.  Start dates might

2  be obvious from the agreements.  Stop dates would not.  But,

3  stop and start dates and job titles and/or brief descriptions

4  that will be provided to Mr. Lee.

5       After that information is exchanged, then the

6  parties must have a meet and confer about what subject

7  matters -- who among the fifteen will receive requests from

8  defense counsel to search electronic devices for responsive

9  documents to what subject matters.

10       And that will take care of a good deal of what's

11  left to discuss from the Motion to Compel, and I may run out

12  of time, ultimately, here because I have criminal proceedings

13  this afternoon.

14       With respect to former advisors, are any of the

15  individuals, Mr. Lee, as far as you know, in footnote 3 of

16  ECF number 100 on page 8, former advisors, or do you believe

17  they're all current, or they're mixed.

18            MR. LEE:  Uh, I'd -- we'd have to go back and

19  look, Your Honor.

20            THE COURT:  Okay.

21            MR. LEE:  And I'm not sure that we would always

22  be in possession of information that would let us know.

23            THE COURT:  I think for former advisors, I'm

24  going to ask the parties to agree on a process where they are

25  identified.  They have to be former advisors during the

1  relevant time period.  They have to be former advisors that

2  are relevant to the subject matter of this litigation for

3  claims and counterclaims.  And then a discussion and,

4  hopefully, agreement as to whether any of them had a legal

5  obligation to maintain documents -- not maintain -- legal

6  obligation, establishing the ownership of all that they did

7  for Sunday Group as belonging to Sunday Group and, if they

8  did, then a discussion about who among them would be asked --

9  not required, asked -- if they are willing to search for

10  responsive documents.  If you cannot come to an agreement, we

11  will get to the end and I will tell you what I want you to do

12  on things you cannot agree upon.

13              MR. LEE:  Okay.

14              THE COURT:  All right.  And the transcript of

15  the proceeding will be the order of the Court, so I'm trying

16  to be very clear on these things.

17              All right.  We are also talking about -- let's see

18  the list -- the Signal -- my pages got out of order.  This is

19  why you should always staple your pages.

20              MR. LEE:  Your Honor, if I can --

21              THE COURT:  Oh --

22              MR. LEE:  -- be of help --

23              THE COURT:  -- Mr. Hashimoto.

24              MR. LEE:  Yeah.

25              THE COURT:  -- Mr. Hashimoto's communications.

1    So, he was a finance guy.  A guy in finance, CFO.  Whatever

2    his title was, it doesn't matter, but he's --

3              MR. LEE:  We've heard him described as CFO,

4    slash, accountant in various contexts.

5              THE COURT:  Okay.  And I understand that you

6    claim that money was mismanaged.

7              MR. LEE:  Right.

8              THE COURT:  And that's why you believe he might

9    have relevant information, proportionate and relevant

10   information.

11             MR. LEE:  Sure.

12             THE COURT:  But, the defendants have said

13   everything that he communicated -- that all of his

14   communications were in Japanese and to be useful for this

15   litigation, they would -- anything that was relevant and

16   proportional would have to be translated and would have to be

17   reviewed for attorney-client privilege.

18             With respect to the translation, why shouldn't

19   plaintiff assist with the cost of that, if I order production?

20   Because attorney-client privilege review would have to be

21   defense's obligation.  But, translation?  Why wouldn't

22   plaintiff have to share in that, especially given the

23   resources we're talking about here?  We're not talking about

24   somebody who doesn't have resources.

25             MR. LEE:  Yeah.  So, uh -- some of this, I

—69—

1   think, may get into the -- how you might go about this

2   process.  You know, one of the things they said in their

3   brief, which we were surprised by, was they were saying that

4   they aren't aware of any electronic discovery platform that

5   can search in Japanese.  That's not our experience.  You know,

6   relativity is the -- I know you're intimately familiar with

7   many of the E-discovery, you know, platforms.  That's the most

8   common one, and they've got a whole web page talking about

9   this is how you conduct searches in Japanese.

10          So, this -- they had trained this --

11          THE COURT:  So I'm not talking about searching.

12   I'm talking about translation.

13          MR. LEE:  Sure.  Yeah, well --

14          THE COURT:  Translations.

15          MR. LEE:  -- and that's why I wanted to talk

16   about the overarching process because --

17          THE COURT:  Okay.

18          MR. LEE:  -- they made it sound like what they

19   need to do is take all of his Japanese e-mail, translate them

20   into English, and then run searches on them so that you could

21   figure out what's responsive and what is not, which would

22   mean that, yes, you'd be translating tens of thousands of

23   documents.  That is not the way I have ever engaged in foreign

24   language -- you know, and I've engaged in lots of, kind of,

25   foreign language reviews.  There are Japanese speakers.  You

1    know, Mr. Hashimoto himself, by definition, is a Japanese

2    speaker.  You can formulate search terms in Japanese and

3    search for them, and they would, essentially, be the

4    equivalence of the English terms that we have used.  That,

5    significantly, narrows down -- or at least that's the idea of

6    search terms -- is that significantly narrows down the scope

7    of the Japanese language e-mails that would have to be

8    reviewed and potentially translated.

9            And so, sure, we would be -- we would be open to

10   doing something like that, but as you may have seen in our

11   papers, what we are asking for is, well, can you run -- we are

12   told how many documents Mr. Hashimoto had in the aggregate,

13   but we were trying to figure out, well, what percentage of

14   those actually hit terms, either in English or Japanese, and

15   this is where we ran into an impasse, like, they would not

16   give us, you know, the hit counts when you run them.  Because

17   no one is saying give us all 20,000 or whatever of his

18   documents, give us the ones that actually hit search terms

19   pursuant to the protocol that we've already agreed with.

20            THE COURT:  So, wait.  Can I stop you?

21            MR. LEE:  Sure.

22            THE COURT:  You've agreed to a search term

23   protocol.

24            MR. LEE:  Yeah.  We had come up, mutually, with

25   various different search terms that people have been using.

1          THE COURT:  And is there any -- has there been

2    any discussion between the parties, among the parties

3    regarding the cost associated with running those searches and

4    reviewing those searches?

5          MR. LEE:  We've not had a discussion about that.

6          THE COURT:  Okay.  All right.

7          MR. LEE:  You know, because I think the

8    threshold question as to whether they should run those terms,

9    there was no agreement on that.

10          THE COURT:  Okay.

11          MR. LEE:  So, I mean, our suggestion was, you

12    know, to try to deal with this, is do a search, use both

13    English and Japanese terms.  Tell us what comes back.  And

14    then we will meet and confer over -- you know, if you tell us

15    it's still 15,000 e-mails, then we can have discussions about

16    how to narrow those terms.  That is what you -- we always do

17    in civil electronic discovery.

18          If it narrows it down really significantly, then

19    maybe we've got something, and maybe the number of documents

20    that need to be translated from Japanese is much smaller.

21          But that was -- but this is why, from a protocol

22    standpoint, that's what we wanted to do.

23          THE COURT:  And the cost of all that searching

24    would be borne solely by defendant?

25          MR. LEE:  Uh, from what I understand, I'm not

1  sure that the searching costs anything.  The review and

2  processing --

3              THE COURT:  Well, you have to hire somebody to

4  do that.

5              MR. LEE:  And this was the place where I was a

6  little confused.  They have been -- they've represented to us

7  they already have an electronic discovery vendor that has been

8  helping them with this.  We saw in their papers they said that

9  they're not aware of any ability to search in Japanese.  I was

10  actually very surprised by that.

11              THE COURT:  I understand.  You said that.

12              MR. LEE:  So if they already have a vendor,

13  and maybe there was a misunderstanding, and it turns out, no,

14  we can run Japanese characters across this, it's not my

15  understanding that that costs anything, other than maybe just

16  a per hour time for the technician just to watch the search.

17  It's not my understanding that running the search is a

18  significant process --

19              THE COURT:  When I say "running the search," I

20  don't mean, technically, running the search.

21              MR. LEE:  Sure.

22              THE COURT:  I mean from you have to prepare the

23  queries, do the technical work, then you hit the button to run

24  it, then you get the responses.  I understand that.  And then

25  somebody looks through the responses, presumably,

73

1    electronically also.

2                    MR. LEE:  Yeah.

3                    THE COURT:  That's something that I have done,

4    so I understand.  But, there's going to be some costs to

5    putting this together for purposes of hitting the button that

6    says "run."  Okay?

7                    MR. LEE:  Well, I think we'd be open having that

8    discussion, but since they wouldn't even agree to do it in the

9    first instance, there was no discussion about cost sharing.

10                   THE COURT:  All right.

11              So, tell me, when did Mr. -- do you know when

12   Mr. Hashimoto started with Sunday Group?

13                   MR. LEE:  I don't know that offhand, Your Honor.

14                   THE COURT:  All right.

15              Mr. Magleby, how long has Mr. Hashimoto been CFO,

16   slash, whatever --

17                   MR. MAGLEBY:  Finance manager is one title.

18                   THE COURT:  Right.

19                   MR. MAGLEBY:  I'm not denying that he may have

20   been called CFO.  I don't know.  Finance manager is what

21   they've told me.  I believe he started in around 2017.  Again,

22   I could be wrong.  That's my best estimate.

23              And just to be clear, there are -- some of his

24   e-mails are in -- they're mixed.  Like, there's some English

25   and there's some Japanese.  And just to be clear, to the

1    extent Mr. Hashimoto had an e-mail with either Mr. Mitsuishi

2    or Mr. Pack, or anybody else with the Sunday Group domain

3    name, and to the extent there was a hit on any of the 45

4    search terms that our opponents gave us in that e-mail, it has

5    been produced.  So there's probably -- I can't remember if

6    it's 1500 documents and 4,000 pages -- there's some number of

7    e-mails from Mr. Hashimoto that have already been captured

8    because they had been sent to somebody with the Sunday Group

9    domain name and there was a hit. So, what that excludes is

10   e-mails in Japanese.

11          And Mr. Lee said a couple of things that I need to

12   respond to.  One is, well, they need to give us the hit list

13   of Japanese and English.  Well, we don't have a Japanese hit

14   list.  I'm just a small town Utah lawyer.  I have other

15   clients in Japan and I've had a few international clients, but

16   I have not been through this process.  What would have been

17   helpful is when we said we're not aware of a system that

18   does this, if our opponents had said, well, you could use

19   Relativity and we'll share the cost.  And that was not

20   offered.

21          So what we thought we wanted to do, or had to do,

22   was because since we, the lawyers, have to review these

23   things, at some point they've got to turn into English, and

24   especially if you're going to give them to a jury in the

25   United States.  And so we thought that our vendor -- we use a

75

```
 1   smaller Nimble vendor that is a third the cost of Relativity,

 2   which seems to get more expensive every month, and I don't

 3   like their platform anyway, this Nimble vendor said we think

 4   we can run an AI thing that will translate the Japanese into

 5   English.  We said great.  Do it -- even though we tried to get

 6   our opponents to share the cost and they said no -- we got the

 7   results back and we tested it against Google Translate, and we

 8   didn't like it.  Not that Google Translate is the be all of

 9   everything, but it's actually pretty good.

10          And so we're at this point where if there's

11   something in English -- and by the way, especially if it has

12   involved Mr. Pack, who is not a Japanese speaker, so anything

13   of substance has English in it, we think it's been produced.

14   And searching -- there's 60,000 pages for Mr. Hashimoto, and I

15   can only imagine --

16          THE COURT:  Japanese only?

17          MR. MAGLEBY:  Either in Japanese or Japanese and

18   English.  And I actually brought an example that I can show

19   the Court.

20          THE COURT:  I understand how people -- I grew up

21   in a multi-lingual family --

22          MR. MAGLEBY:  Yeah.

23          THE COURT:  -- people speak lots of different

24   languages at the same time, mixing words.

25          MR. MAGLEBY:  Yeah, yeah.
```

1              THE COURT:  So, I get that.

2              MR. MAGLEBY:  It goes back and forth.

3          So, we're open to a solution.  But, to us, it

4    feels --

5              THE COURT:  So why can't that solution be that

6    if there's a shared cost for developing -- well, you have the

7    search terms -- for developing whatever the cost is associated

8    with running the search on the Japanese terms for a time

9    period that we have to agree upon, unless you already have,

10   then the question becomes how many hits are there?  If there

11   are 15,000, I think was the number Mr. Lee used as an example,

12   he would say, well, we need to narrow it further, to see if we

13   can get it down to fewer.  If it's 5,000, you might still need

14   to.  That's a lot of documents to translate.

15             MR. MAGLEBY:  Right.

16             THE COURT:  But if Mr. Lee says he wants 5,000

17   documents translated, then I think you have to share the cost

18   of that translation.  Absolutely.

19             It sort of depends on what the outcome is.  But, the

20   start is -- and I don't see -- we need to talk about this --

21   for a relevant time period, given that there's financial

22   mismanagement as part of the allegation, that there isn't

23   potential relevance and proportionality here.  The

24   proportionality will depend on what the results are, right?

25   Again, if there are 60,000 pieces of communication that have

1    to be translated, we have a problem.  If there are 5,000, I

2    still understand the expense, but I see it as less of a

3    problem.  If there are 500, even less, right?  So, we need to

4    get that initial run.  If it's from his start date through --

5    I know, Mr. Lee, you wanted probably through the present.  But

6    if we had to pick a shorter --

7                 MR. LEE:  I can meet and confer with opposing

8    counsel on what the end date should be.

9                 THE COURT:  That would be?

10            All right.  So if we, you know --

11                MR. LEE:  Happy to meet and confer.  Yeah.

12                THE COURT:  I'm happy to take it to a date

13    shortly after the end ever the investment period, right?  So

14    January -- the 2018 date, I think it's March or April, you

15    know, to the end of the year, the beginning of next year, but

16    we're not going to go on into perpetuity into 2025.  We're

17    just not going to do that.  It's just not going to demonstrate

18    that something was mismanaged in '15, '16, '17, or '18.

19    Something in ' '19 might, right?  Some report in ' '19 because

20    you report -- accounting is typically -- I don't know if this

21    is true in Japan, the year after the year, so you need the '

22    '19 year.  But I don't know if you need -- if there's a

23    corrected report for '18, you would be entitled to that.  But

24    I don't know that you need information, necessarily, after

25    '18.

1          But, I will allow you all to negotiate this.  Is

2    that -- do you have enough understanding of what each other

3    wants now, you think, to do that?

4          Mr. Lee says yes.

5          Mr. Magleby?

6          MR. MAGLEBY:  Yes, I -- you know, our original

7    bid was 5,000 that we thought would work and they said no.

8          THE COURT:  Okay.

9          MR. MAGLEBY:  So our position has always about

10   share the costs with us.  Don't just -- I mean we've got a

11   billionaire on the other side, and we have a company with

12   limited resources that wants to safeguard investor money.

13         THE COURT:  So we're going to share the cost of

14   the search -- not the review for attorney-client privilege.

15   That's your cost.

16         MR. MAGLEBY:  Sure.  Yeah.

17         THE COURT:  But we're going to share the cost of

18   the search.  We're going to share the cost of translation.

19   Whether the review, once translated, if Mr. Magleby, if you

20   want to review to ensure relevance, to ensure produceability,

21   you have to bear that cost.

22         MR. MAGLEBY:  Yes.

23         THE COURT:  As you would for any documents

24   anyway.

25         MR. MAGLEBY:  Yes.

1          THE COURT:  But search and translation, shared.

2    Reviewed, yours.  Time period to be decided --

3          MR. LEE:  Yeah, we'll negotiate.

4          THE COURT:  -- terms to be decided.

5          MR. LEE:  Yeah.

6          THE COURT:  All right.

7          I think that's everything -- declarations is the

8    last thing.

9          At this juncture, Mr. Lee, I'm not going to order

10    the production or the preparation of any declarations from

11    anybody associated with defendants counsel or named parties or

12    unnamed parties.  I'm not saying that there wouldn't be a time

13    when I might require that.  But, right now, I am denying that

14    request.

15          MR. LEE:  Okay.

16          THE COURT:  And that takes me to plaintiff --

17    defendant's requests -- or Motion to Compel.  And with respect

18    to that, I think there are the communications between and

19    among -- I'm not sure if it's just between, or it may be also

20    among Mr. -- Dr. Nakamura and other investors.  And then it is

21    the financial history.  His experience with both investing and

22    trading in digital currency.

23          I'm going to start with the other investors.  You

24    did search.  You produced some documents.  Mr. Magleby, I

25    think, is clearly not satisfied with the search.  I don't

 1    know that I -- I understand a Premier Law Firm in Japan was

 2    involved in this search. The Premier Law Firm in Japan has no

 3    responsibility to this court, and I have no power over them.

 4    And I don't even know whether that firm has any understanding

 5    of the obligations under federal law to search and produce.

 6    It's not that I'm suggesting they've done something unthwart.

 7    I'm saying that they may just not have the experience and

 8    expertise to know this.  On the other hand, if this were one

 9    of the international firms that has offices in the United

10    States -- I go back to Baker McKenzie, Jones Day, Pickett, you

11    know.  I don't know who has offices in Japan -- if it was like

12    that, then they might have that understanding because they may

13    be involved in U.S.-based litigation all the time, for all I

14    know.  So, first, I would need more information.  But my

15    inclination is that the -- that I need U.S. lawyers involved

16    in this search.  I don't know if you have U.S. lawyers

17    associated with your practice that are Japanese fluent, both

18    reading and -- reading is really what's going to be required.

19    Not speaking.  And there are differences.  You know, sometimes

20    people read another language better than they speak it because

21    they take time to translate it in their heads, and sometimes

22    it's people who have only spoken it and never tried to read

23    it.  There are all sorts of iterations of this.

24          So, I just would be far more comfortable if I knew

25    that your firm had done a search, and your firm had done

—81—

1   reviews, and your firm had confirmed and could confirm that

2   they produced everything that is responsive.  Because,

3   clearly, there were communications and, clearly, there were

4   communications that at one time -- I don't know if it's still

5   true -- had not been produced.  Sometimes things are lost.

6   Sometimes that's spoliation.  Sometimes it's not.

7              So, tell me where things stand on that.

8              MR. LEE:  So, yeah, it was a self-collection

9   that was done by Dr. Nakamura --

10             THE COURT:  Yeah, that's the first problem.

11             MR. LEE:  -- you know, with instructions by us.

12             THE COURT:  By "us," meaning who is "us"?

13             MR. LEE:  My firm.

14             THE COURT:  Your firm.

15             MR. LEE:  Yeah, my firm.  And we had, um -- and,

16   you know, I will note that if you read their papers, that is

17   the same thing that -- the self-collection was done by

18   defendants as well, you know, when it came to their

19   custodians.

20             THE COURT:  Right.

21             MR. LEE:  And so this is something that both

22   sides have essentially said, you know, we will work to try and

23   reasonably collect things.  Especially when you're dealing

24   with -- like, because, they're focusing on his phone.  And

25   both sides, I think, have said, yeah, there is burden

1    associated with this.  We, though, did go and do that

2    collection on the phone.  And both sides, I think, had

3    followed that protocol.  They identified some places where

4    they said, well, we think there are other places or other

5    types of communications you can look for, and we went and we

6    did that, and we produced everything.

7            And I guess from our perspective, what's being asked

8    is that the phone be imaged --

9                THE COURT:  Right.  I wasn't going there yet.

10               MR. LEE:  Yeah.

11               THE COURT:  I'm asking what you did to search.

12   And you're saying you gave instructions to Dr. Nakamura --

13               MR. LEE:  Yeah.

14               THE COURT:  -- and said self-search, which is

15   the same thing that we're asking defense to do.  Except for

16   in this case, he didn't produce the documents that were the

17   communications with the sumo wrestler -- and I don't remember

18   his name, and I don't mean to be disrespectful --

19               MR. LEE:  None of us will remember the name, I

20   don't think.

21               THE COURT:  Right.  And, with the gentleman who

22   prepared some talking points -- my words, not theirs -- about

23   how to make a complaint, how to contact the SEC to make the

24   complaint.

25               MR. LEE:  Uh-huh.

1          THE COURT:  And we also have the one, the text

2    that was produced by the sumo wrestler, where Dr. Nakamura is

3    saying I didn't consult with anybody, and I included you all

4    in this, and it's not what I would ordinarily do, but I did

5    that here.  And then you have the names of the people

6    appearing in a response from the Nevada Secretary of State's

7    Securities Division saying can you give me contact information

8    for these 17, and no responsive documents to that.  It just

9    seems like things are missing.

10          MR. LEE:  Well, we did do another production.

11          THE COURT:  Okay.

12          MR. LEE:  And we, you know, we provided -- we

13    did another search for that.  That is the part that we said --

14    we involved the other firm in going and finding the names of

15    all the investors, looking for that and collecting it and

16    producing it.

17          THE COURT:  So you asked the Japanese firm

18    with whom you're associated on this case, to look for

19    communications between Dr. Nakamura and these 17 individuals?

20          MR. LEE:  Yeah.  And, obviously, the reason why

21    we do that is they are the Japanese speakers.

22          THE COURT:  Right.

23          MR. LEE:  Right.  As Your Honor pointed out,

24    right?  Like that is -- it would have been nice if we had a

25    native speaker, you know, but we didn't have that luxury, so

1    we were working with the Japanese speaking firm --

2                    THE COURT:  Okay.

3                    MR. LEE:  -- and trying to collect that

4    information.

5                    THE COURT:  And they've done that?

6                    MR. LEE:  Yes.

7                    THE COURT:  And they've given you everything

8    they found?

9                    MR. LEE:  Correct.

10                   THE COURT:  And they have told you that they are

11   certain that this is everything?

12                   MR. LEE:  That has been produced.

13                   THE COURT:  That they are certain that they have

14   gotten everything that exists on Dr. Nakamura's phone?

15                   MR. LEE:  Yes.  They -- they have done the -- we

16   told them here's the list of investors.  They've gone through

17   that with them and they said, yes, this is what they were able

18   to find.

19                   THE COURT:  All right.  So there's -- so has --

20                   MR. LEE:  And, again, we're open -- and this

21   is the thing.  Both sides have been doing some variant

22   of self-collection.

23                   THE COURT:  Sure.

24                   MR. LEE:  We go back to each other and we say,

25   hey, based on what we -- what came through, we think that

1    there are other things that you should produce.  And we've

2    been working cooperatively with that.  We have been doing that

3    with defense counsel since July of last year.  When it comes

4    to Mr. Mitsuishi and Mr. Pack, you know, we are still getting,

5    according to Mr. Magleby, messages from Mr. Pack as late as

6    last week.

7              We all understand that this can be an imperfect

8    process, and we're meeting and conferring with them.  And, you

9    know, so that is -- that has been the process, and so --

10             THE COURT:  But it sounds like there's nothing

11   more to do here with respect to Dr. Nakamura's communication

12   with the other investors.  You're telling me that's been

13   exhausted.

14             MR. LEE:  That's right.

15             THE COURT:  Is that not right?

16             MR. LEE:  Yeah.

17             Now, again, what I will -- the only other thing I

18   will note is after we had done that, and we had, I think,

19   submitted our opposition to their Motion to Compel, we got

20   another letter from opposing counsel identifying certain other

21   things.  I don't know -- I have not had a chance to drill down

22   on what those issues are, whether it's this issue or something

23   else.

24             THE COURT:  Well, they sent you an 11 page

25   letter that detailed what they thought was missing from

1  Dr. Nakamura's communications with the other investors and the

2  SEC.

3           MR. LEE:  I believe that's an earlier

4  communication.  That's the one that we responded to.

5           THE COURT:  All right.

6           MR. LEE:  There was another one that came, I

7  think, which identified some different issues, and we said,

8  look, we're always willing to meet and confer with you to try

9  and, you know, address any sort of issues.  The same way that

10  we've been doing with you.  So --

11           THE COURT:  So have you talked to -- I don't

12  want to -- I -- I'm being careful because I -- I'm not asking

13  you to disclose any attorney-client privilege.

14           MR. LEE:  Of course.

15           THE COURT:  My concern is does Dr. Nakamura, who

16  is also not somebody who is what I would say, perhaps, truly

17  familiar with the consent of spoliation under American law,

18  right, federal law, I wouldn't expect him to be.  I don't know

19  anything about Japanese laws, right?

20           MR. LEE:  Understood.

21           THE COURT:  This has nothing to do with his

22  sophistication.  It's not something I would expect.  But,

23  my concern is that you will get a spoliation motion and

24  because there will be things, obviously, missing, and maybe

25  Dr. Nakamura needs to understand what the consequences of

1  that could be, and that his -- his need to be very certain

2  that he has found everything and produced everything, and is

3  able to explain why he doesn't have the rest -- like I could

4  say I keep zero texts, and always keep zero texts.  I delete

5  them as soon as I'm done with the conversation or session --

6  so, you know, he can explain why he doesn't have them, so you

7  have a defense to a spoliation motion because that's what I

8  would anticipate could be coming.

9           MR. LEE:  Absolutely.

10          THE COURT:  Because these communications are

11  definitely relevant and proportionate to their counterclaims.

12  I realize they are not terribly relevant to Dr. Nakamura's

13  claims, but to the counterclaims, they are.

14          MR. LEE:  Yeah.  Understood.

15          THE COURT:  And that is my concern.

16          Mr. Magleby, with that caveat, I don't know what

17  else I can require here, except for a forensic examination.

18  And I can't say all judges are reluctant, but until I know

19  that Dr. Nakamura has really exhausted his ability to search

20  and provided you everything, and an explanation for why he

21  doesn't have other things, I don't know that a forensic

22  examination is really warranted here.  There has to be,

23  generally, in my practice, meaning my practice on the bench,

24  not my practice as a litigator, but some kind of warning

25  that gives a party an opportunity to avoid that forensic

1    examination before I'm going to order it.

2                MR. MAGLEBY:  Your Honor, yes, I totally

3    understand.  Let me just -- I've been taking some notes, and I

4    think I understand your questions.  I would like to just take

5    a shot at hitting them all at once, and then you can come back

6    to me.

7                THE COURT:  Go ahead.

8                MR. MAGLEBY:  The first thing I want to say is

9    we did not do a self-collection.  What we did is we imaged the

10   phones.  We gathered all of the e-mails.  And then we ran

11   searches on them.  The lawyers had possession of the data, not

12   the client.  The lawyers had possession of the data.  And then

13   we ran the search terms that were given to us by the other

14   side.  And then the lawyers decided what was responsive.

15            I don't know -- and there's no document in the

16   record.  There's no declaration from Dr. Nakamura.  I don't

17   know what is means when he self-collected, except that the

18   first time he did it, he missed the sumo wrestler -- and it's

19   Kasinasato (phonetic), but we call him the sumo wrestler

20   because it's easier.  He missed those communications.  The

21   second time they came back and they gave us those

22   communication, and then they gave us a whole bunch of other

23   communications with the Token purchasers, right?  So that

24   means his search missed, twice, big categories.

25            And then the third time -- and this is the 11-page

1    letter.  You got it, right?  -- we went through.  And the

2    problems with that second production include things, like,

3    giant time gaps that don't make any sense at all, so they're

4    just missing in the middle of text streams, one as long as a

5    year of missing information.  Some of the Token purchasers,

6    there's zero communications with them.  I think five of them.

7    Some of them -- oh, and then there's numerous references to

8    specific documents, including a reference, for example, hey,

9    I'm putting together a summary of all our interactions with

10   Todd Mitsuishi and what we think he did wrong, and I will

11   e-mail it to you.  And we don't have that.  And, there are

12   similar specific instances.

13        So, now, not once, not twice, but three times,

14   whatever Mr. Nakamura is doing, and whatever this Premier Law

15   Firm is doing isn't working.

16        I'm not asking for his devices to be delivered to a

17   forensic expert for spoliation review -- although I think

18   after this third letter, if I have to come back, I think I

19   could meet that burden.  I would like to avoid that.

20        What I think ought to happen is what we,

21   colloquially, call in Utah, the goose-gander rule.  So, our

22   opponents are hammering us to give them more and more and more

23   documents, and we have spent tens of thousands of dollars on

24   databases and forensic consultants and E-discovery.  We have

25   probably spent over a $100,000 on attorney time, and the

1    answer we get back from them is you've got what you're going

2    to get, and it's about 1800 pages.  And then Mr. Lee says,

3    well, we're happy to meet and confer with you.

4             Everybody is happy to meet and confer whether you're

5    eye sitting in the courtroom.  When we sent our 11-page

6    letter, what we said was, please tell us by May 7th if

7    you're going to agree or disagree to go and look for these

8    missing documents, these gaps in communications, the document

9    that refers to this write-up that is being done about

10   Mr. Mitsuishi.  Please tell us by May 7th, just yes or no, are

11   you going to go look for this stuff.  And then we would like

12   to set a deadline for you to produce it, and if you need more

13   time, that's fine too.

14            We didn't get a response to that letter.  So I've

15   been, you know, told --

16            THE COURT:  You both go back and forth about how

17   you don't respond.

18            MR. MAGLEBY:  Yeah.

19            THE COURT:  And I really wish you all would just

20   keep talking to each other.

21            Go ahead.

22            MR. MAGLEBY:  Yeah, yeah.  But the

23   implication -- I'm responding to what Mr. Lee said --

24            THE COURT:  Yeah.

25            MR. MAGLEBY:  -- which is we're happy to meet

1    and confer, as if it wasn't us meeting and conferring about

2    these very specific documents.

3                    THE COURT:  So if I ordered Mr. -- Dr. Nakamura

4    to allow the Japanese law firm to image his phone, and the

5    Japanese law firm to do a search pursuant to your 11-page

6    letter, but also pursuant to the original request, and respond

7    by a certain date with a supplemental response to the document

8    request, that would go a long ways to a beginning of resolving

9    the issue.

10            Is that fair?

11                    MR. MAGLEBY:  That is exactly right.  That's

12    exactly where we're going.

13                    THE COURT:  Okay.  So we're --

14                    MR. MAGLEBY:  Except, with a caveat.

15                    THE COURT:  Yes.

16                    MR. MAGLEBY:  I don't want it to be the Japanese

17    law firm.  I want it to be the U.S. law firm.

18                    THE COURT:  But that means that Mr. Nakamura

19    doesn't have his phone for some period of time because it has

20    to be sent to the United States.

21                    MR. MAGLEBY:  Ah.  I understand the distinction.

22    I'm sorry.  I didn't understand.

23                    THE COURT:  Right.

24                    MR. MAGLEBY:  There's got to be somebody in

25    Japan that can do the image and hand him his phone back.  You

1    know, generally, it takes six to eight hours.

2                    THE COURT:  Right.  And hands his phone back.

3                    MR. MAGLEBY:  And can do the image, hand him his

4    phone back, send the image to the United States; go into his

5    e-mail files, grab the PST file, if it's Outlook, send the PST

6    file to the United States, have the Fenwick firm do it.

7    They've told us they can search Japanese characters.  They've

8    got Relativity.  It sounds like they already have that

9    capacity.  We would love to have them do exactly what we did

10   for them.

11                   THE COURT:  So, Mr. Lee, if I order Dr. Nakamura

12   to give his phone -- deliver his phone to a forensic imaging

13   entity that is in his area -- I don't know where he lives in

14   Japan -- and have that phone imaged, and then delivered to

15   the Japanese firm, who would then deliver it to you for

16   searching, and to the extent that there is translation, that

17   cost would be shared, just as the other side would be shared,

18   and the cost associated with the searching can be shared, but

19   the searching, that is the searching if there's something from

20   the -- the cost of the forensic imaging could be shared.  The

21   searching you're going to do, your firm is going to do.

22                   Let me restate it.  Dr. Nakamura delivers his phone

23   to a forensic imager in Japan, reputable, obviously.

24                   MR. LEE:  Yeah.  And we know people who can do

25   that.

1          THE COURT:  They image it.  That firm images the

2   phone, delivers the image to the Japanese firm, who delivers

3   the phone, that image, to you, and then you search.  To the

4   extent there is a cost for the imaging, that is to be shared.

5   To the extent there is cost of translation, that is to be

6   shared.  The search, however, is for your firm to do, and not

7   to be shared, just as the search that Mr. Magleby's firm is

8   doing to determine what's relevant and produceable or

9   privileged or whatever it is being borne by him.

10          What is the problem with doing that?  That resolves

11   the whole thing.  Dr. Nakamura is without his phone for

12   half-a-day, hopefully, and we're done.

13          MR. LEE:  So, Your Honor, if that's what

14   you're -- if that's what you're contemplating, again, we don't

15   see the need for it, but we are fine, you know, agreeing to

16   that in the interest of compromise.

17          THE COURT:  All right.  That's the order of the

18   Court.  And we have to talk about time period here, but there

19   are two more things to talk about.

20          Yes, Mr. Magleby.

21          MR. MAGLEBY:  Just the same thing with his

22   e-mail because --

23          THE COURT:  Well, the e-mail is on the cell

24   phone.  Does -- we don't know.

25          MR. MAGLEBY:  I assume that some e-mail is on --

1   the cell phones don't hold that much.

2               THE COURT:  I see.

3               MR. MAGLEBY:  They hold texts.  The e-mail,

4   there's got to be a server --

5               THE COURT:  Doesn't that require the -- either a

6   entity to come to where Dr. Nakamura is to image a computer,

7   or for him to deliver -- which I would not require him to do,

8   actually.  If you want his -- because the focus has been the

9   phone.  If you want -- I'm concerned about his e-mail and what

10  period of time are we talking about because there are probably

11  going to be tens of thousands of things on that e-mail that

12  have absolutely nothing to do with this case.

13              MR. MAGLEBY:  That is true.  We have probably --

14  I mean I don't know if we have -- we might have -- I mean

15  Hashimoto has 60,000, right, pages that we've identified.

16  There is probably tens of thousands of documents in our

17  client's possession, or hundreds of thousands, maybe a

18  million, right?  So, yes, Dr. Nakamura might have a bunch of

19  stuff on there, but how hard is it to find the words Mobby,

20  Mitsuishi, Jim Pack, Sunday Group, all domain names, e-mails

21  to or from --

22              THE COURT:  So you're going to have to share the

23  cost of that if you want that done.

24              MR. MAGLEBY:  Well --

25              THE COURT:  Just as they are sharing the cost of

1    the search, as I said --

2                    MR. MAGLEBY:  Sure.

3                    THE COURT:  -- by the third party.  That cost.

4    Not the review.  The search.

5                    MR. MAGLEBY:  Right.

6                    THE COURT:  So if you want to develop search

7    terms, you're going to share 50/50 of the cost of the forensic

8    imaging party, of imaging the phone and imaging his personal

9    computer device, and searching and producing -- not

10   reviewing -- that -- the responsive documents.  That requires

11   some -- Dr. Nakamura -- I mean he's a -- you know, he -- your

12   group is in the business of what this case is about.

13                   MR. MAGLEBY:  Yes.

14                   THE COURT:  Dr. Nakamura is not.

15                   MR. MAGLEBY:  No, that's right.  That's right.

16   That's right.

17                   THE COURT:  And not in the business.  I'm not

18   saying he doesn't have sophistication --

19                   MR. MAGLEBY:  No, I know.

20                   THE COURT:  -- I'm saying in the business,

21   right?  So -- my sister is a doctor.  I can't imagine what's

22   on her e-mail that has absolutely nothing to do with a lot of

23   things, right?

24                   MR. MAGLEBY:  Yes.

25                   THE COURT:  So that -- so I just want to be

1    careful that to the extent that there's any patient or

2    research or anything that's related to his medical practice

3    and his responsibilities, I'm not even sure that that should

4    be imaged.  That concerns me.

5                    MR. MAGLEBY:  I have answers.  I have solutions.

6            So, I, again, am not asking for a forensic image,

7    not asking to take the hard drive or anything like that.  I

8    should know, but I don't know whether he uses Outlook or gmail

9    or some combination.  But, you know, if it's, for example,

10   Office 365 Outlook, what you can do is you can -- there's one

11   of two ways to do it.  One way to do is is you backup what's

12   called the PST file, and that's everything, and you send it

13   off to your E-discovery company, and you get --

14                   THE COURT:  We're not going to do that because

15   that's going to have all sorts of information that should not

16   leave Dr. Nakamura's sole possession and control.

17                   MR. MAGLEBY:  Okay.  Then --

18                   THE COURT:  Because of the nature of what he

19   does.

20                   MR. MAGLEBY:  Fair enough.

21           And then the second option -- and again, if he uses

22   Office 365, Office 365 comes with a litigation suite.  I think

23   they call it something like that.  So within that litigation

24   suite, you can plug in the search terms and it will export a

25   smaller PST file, which you can then take and send out for

1  review or processing.

2          Now, we're talking about here -- I mean the nice

3  thing is, right, virtually -- I would say virtually every

4  communication he has that says Mobby, Jim Pack, Todd

5  Mitsuishi, Sunday Group, Kleinrock, all of those are going

6  to be responsive.  Footnote, there may be privileged

7  information.  So, let's find a way, with the cooperation

8  of Mr. Lee and his office, and an IT professional -- and

9  Dr. Nakamura is a billionaire.  He's got people that work for

10 him.  He probably has an IT professional who can communicate

11 with the lawyers, which is what we do.  Run those search

12 terms.  Get the results.  Ship them off to the lawyers.

13          THE COURT:  All right.

14          MR. MAGLEBY:  What I don't want is Dr. Nakamura

15 going through those search terms --

16          THE COURT:  I understand.

17          MR. MAGLEBY:  -- and deciding --

18          THE COURT:  So what I'm --

19          MR. MAGLEBY:  Yeah.

20          THE COURT:  -- going to allow is --

21          MR. LEE:  Could I make one point, Your Honor

22 though?

23          THE COURT:  Yes.  Go ahead.

24          MR. LEE:  So keep in mind, like, what -- this is

25 the asymmetry that's built into this, like, we're asking to

1  search through Dr. Nakamura's personal e-mails, right?

2          THE COURT:  Well, we're searching other people's

3  personal e-mail also.

4          MR. LEE:  Well, no, and that -- that's,

5  actually, the point I was going to raise, like, there was no

6  suggestion that when it came to searching the personal e-mail

7  accounts of these other -- the Sunday Group associated people,

8  that -- it was my understanding -- and tell me if I heard

9  this wrong -- it's my understanding that they were going to

10  basically self-collect the e-mails that were business related.

11  It was not, like, there's an outside party that's going to

12  these people, searching through their Yahoo! accounts --

13          THE COURT:  But they have a much smaller -- they

14  have a much smaller and limited subject matter.  First of all,

15  they have nothing to do with the counterclaim.  And this is

16  really about the counterclaim, not about Dr. Nakamura's claim.

17          MR. LEE:  Uh-huh.

18          THE COURT:  So we're talking about different

19  claims.

20          MR. LEE:  Sure.

21          THE COURT:  We're talking about Dr. Nakamura

22  admittedly engaging in conversations with the SEC and with the

23  State of Nevada.  And we're looking for a very specific set of

24  communications.  And given the history of the production here

25  by Dr. Nakamura and the Japanese firm, I have concern that

1    there isn't an understanding of what needs to be produced,

2    without impugning anybody's intent here, reputation or

3    otherwise, without a describing -- better word -- any ill

4    intent here.  I don't know that there's a real understanding.

5    And so I need you to do that.  I'm trying to figure out how I

6    get you to be able to do that, where we're sharing the cost of

7    getting you that information.  Everything up to getting that

8    information to you -- including translation -- so getting what

9    you can review, is to be shared.  How do we do it so that we

10   protect Dr. Nakamura's nonlitigation-related communications

11   from exposure?  How do we do that?

12          Now, Mr. Magleby has said that there's a way to do

13   that.  This is beyond my knowledge.  I -- Dr. Nakamura's got

14   to be a very busy person, with a lot of responsibilities.

15   This is not where he should be spending his time.  And I don't

16   know that he probably has the motivation to do that.  I

17   understand why.  I'm not, again, suggesting bad intent here.

18                 MR. LEE:  Sure.

19                 THE COURT:  We need somebody else to do this.

20          I'm going to order you to figure out how to get this

21   done.

22                 MR. LEE:  Okay.

23                 THE COURT:  All right?  Sharing all costs up to

24   the review of the documents in English by your firm, Mr. Lee.

25                 MR. LEE:  Okay.

1          THE COURT:  That is your cost.  And then you

2    produce and supplement.

3          MR. LEE:  Understood.

4          THE COURT:  All right?

5          MR. LEE:  Yeah.

6          MR. MAGLEBY:  Your Honor, just one caveat.  And,

7    actually, it matters not much to me, but it's going to matter

8    to my client.  We paid the cost of --

9          THE COURT:  That's all water under the bridge.

10         MR. MAGLEBY:  -- the imaging and the stuff that

11   we did on our side.

12         THE COURT:  Water under the bridge.

13         MR. MAGLEBY:  Understood.

14         THE COURT:  Going forward --

15         MR. MAGLEBY:  Gotcha.

16         THE COURT:  -- you're sharing costs going

17   forward.

18         MR. MAGLEBY:  Understood, Your Honor.  Thank

19   you.  Now I have asked, the Court has ruled, and I will

20   explain the Court's ruling to our client.

21         THE COURT:  Okay.  They can be upset.

22         All right.  The last piece is the production with

23   respect to Dr. Nakamura's sophistication, really, and

24   financial wherewithal, the relative financial wherewithal with

25   respect as it's related to -- in comparison to -- better

1    phrase -- his investments in digital currency.

2            I read several of the Japanese cases that were

3    translated.  I have to be honest, I didn't read them all.

4    They weren't scannable -- they weren't submitted in searchable

5    format, pdf --

6                MR. MAGLEBY:  Oh.

7                THE COURT:  -- which meant I had to look at

8    everything.  Please make sure going forward everything is

9    searchable.  So, I only read three of them.  I skimmed the

10   others.

11           Under the CCA, the Japanese law, it is clear -- and

12   I think this would be true in the United States too -- when

13   you're talking about fraud and justifiable reliability, the

14   example came to me of the novice purchaser of a digital

15   currency the first time ever, and Sam Bankman-Fried -- not a

16   great guy, but nonetheless, sophisticated, right?  If somebody

17   said something to him, he would clearly know if it was not

18   something he should rely upon.  The person who is purchasing a

19   digital currency for the first time has no idea what they're

20   doing.  Me included.

21           So, Dr. Nakamura's sophistication does matter.

22   How -- the question is does trading, and who does the

23   trading -- because if it is, and I'll just use an example,

24   Schwab or Merrill Lynch, right, and he's not directing the

25   trading in Bitcoin, that doesn't seem to me to be relevant to

1   anything because he's not controlling it.  He may have given

2   some general direction, right?  There might be a buy number,

3   a sell number, but he's not, day-to-day, directing that.  If

4   he has self-directed -- you can be a Schwab self-directed,

5   Merrill -- they all have TD -- Waterhouse, whatever it is,

6   they all have self-direction now, if you want.  If he is

7   self-directing, then I understand why it might be relevant.

8           I don't know which he uses.  He may use a

9   combination.  He may have used one at the beginning, right,

10  when he first started.  He may have done it himself and now

11  has a brokerage that handles it for him.  I do not know.  But,

12  I do think that his investment history and I saw is relevant

13  and proportionate to the needs of the case.

14          Now, the RFPs asked for -- it's RFP number 10 and

15  '19, and then interrogatory number 6, asked for a 10-year

16  period looking backwards.  Well, if we measure it from 2023,

17  if we go back to 20 -- 2013, two years before he started

18  investing in the Sunday Group's projects -- project or

19  projects -- that seemed reasonable to me.  But going forward

20  past '18, Mr. Magleby, why would what he did after '18 show

21  what he would reasonably be able to rely upon in a year prior

22  to that?

23          I understand he may have gained sophistication

24  subsequent, or maybe stepped away from the whole subject

25  matter.  But either way it wouldn't be relevant to, or have

1    any bearing on what he should reasonably have been relying on

2    in '15, '16, '17, and '18, if he was --

3                MR. MAGLEBY:  Agree.

4                THE COURT:  -- making investments.  So the stop

5    date is going to be --

6                MR. MAGLEBY:  Agree.

7                THE COURT:  -- March -- is it March of '18?

8                MR. MAGLEBY:  March of 2018, or the Complaint

9    says early 2018.  But then the Bit Club contract was signed in

10   March of 2018.

11               THE COURT:  So we're going to start in March of

12   '18.  So, the time period for any of these searches --

13               MR. MAGLEBY:  Okay.

14               THE COURT:  -- and I haven't said what's going

15   to be searched yet -- is July of 2013 to March of 2018.

16           Now, what's going to be searched?

17           Do you -- do you have any idea, Mr. Lee, how or what

18   Dr. Nakamura -- how Dr. Nakamura chose to engage in this en

19   investment process?  Was he using a brokerage?  If we're

20   talking about non-Mobby Group.  Okay?  We're talking about

21   non -- right?  Because we're talking about what his

22   sophistication was when it got to Mobby.  So, nonMobby, do you

23   have any idea how he went about doing this?

24               MR. LEE:  Not enough where I would have

25   confidence representing anything to the Court, Your Honor.

1          THE COURT:  Okay.

2          MR. LEE:  I think I, directionally, understand

3  what he was doing, but I would hate to misstate anything, so,

4  you know --

5          THE COURT:  Fair enough.

6          MR. LEE:  But -- well, let me make one

7  distinction on this, just to clarify.

8          THE COURT:  Okay.

9          MR. LEE:  And this, I think, goes to some of our

10  position on this.  You have to draw, I think, a distinction

11  between investing in a currency and investing in a company.

12  And I think these are meaningful difference, right?  Because

13  if you're saying I buy Bitcoin, right?  Right now, buying

14  Bitcoin, you buy if there's an exchange out there, there's a

15  market for it.  You would treat that very differently, as

16  opposed to I'm investing in a company that's developing a

17  Crypto currency that is going to have certain properties that

18  it's going to make it -- you know, and that's what Mobby is.

19  Mobby was going to be this Crypto currency that was going to

20  be used to, essentially, track user feedback.  It would be

21  kind of like Yelp is built into your currency.  Your investing

22  in a company versus investing in a currency.  And, obviously,

23  you're sophistication and background, I -- you know, we would

24  submit, is very different for the two.  So our proposed

25  solution to this was what he invested in with Mobby or with

1    the Bit Club or investing in Sunday Group, is you're investing
2    in the company.
3                    THE COURT:  Uh-huh.  I understand.
4                    MR. LEE:  So we said, well, we will give you his
5    investment history that parallels that.  Anything regarding --
6                    THE COURT:  Well, you said you would give them a
7    summary that he was going to draft.
8                    MR. LEE:  Uh, well, we were open to them
9    propounding an interrogatory on us, where we would have to
10   submit under oath, you know, the -- you know, this is what --
11                   THE COURT:  Well, why wouldn't they be entitled
12   to look at any documents related to that investment history if
13   it was limited to a company?
14          With the level of distrust that exists here, why
15   would -- he could redact --
16                   MR. LEE:  We would be open --
17                   THE COURT:  -- bank numbers.  He could redact
18   account numbers.  You know, things that --
19                   MR. LEE:  If we were able to come to that
20   limitation, I think we would certainly be open to say
21   documents sufficient to show these.  You know, probably not
22   all documents because that would be overbroad.  But, like, if
23   you wanted documents sufficient to show investments in these
24   types of ventures -- you know, Crypto ventures is, I think,
25   how he phrased it.

1    But simply saying, you know, just give us every

2  transaction that he did in Bitcoin or Ether, we just did not

3  see how that would relate to sophistication when it comes to

4  investing in a Crypto company.  And that was, you know, I

5  think the distinction that we were drawing.  And it would

6  certainly simplify things quite a bit.

7         THE COURT:  And it was the transactions that I

8  was going to address with Mr. Magleby because I agree there --

9  depending the level and the frequency and -- let me say it

10  differently.  You know, your average person who thinks, eww,

11  I'll buy some Bitcoin and be cool, you know.  Yeah, that's

12  nothing, right?  But if somebody is tracking Crypto currencies

13  across the market -- and there are tons of them -- and the

14  issuing of new coins and the failing of coins and, you know,

15  selling their product two weeks before the coin goes bankrupt,

16  or whatever it is -- I may not be using the right terminology,

17  but I hope you're getting my -- it might show some level of

18  sophistication or understanding of digital currency that I,

19  clearly, don't have.

20         MR. LEE:  Uh-huh.

21         THE COURT:  On the other hand, I agree with you

22  that I decide, oh, you know, Bitcoin hit X, some large number,

23  I'm going to take some profit and sell today, does not say

24  that I have sophistication for purposes of engaging in an

25  investment in Mobby.  So I see the distinction.

1          Mr. Magleby, I see --

2               MR. MAGLEBY:  Yes.

3               THE COURT:  -- that distinction.  So I don't

4    think that every transaction is appropriate here.  I'm not

5    even sure how you would distinguish proportional transactions

6    from nonproportional transactions; meaning transactions that

7    might be informative and transactions that would not be

8    informative about sophistication.  That's what I mean by

9    proportional and nonproportional.

10              MR. MAGLEBY:  Yes.

11              THE COURT:  And I do see that the investing, and

12   not just a summary, but documents regarding investing in

13   crypto ventures, clearly, are relevant, certainly for the time

14   period we talked about, '13, for two years before he gets

15   involved is in your client's business.  That is clearly -- and

16   through his last investment -- is sufficiently related to be

17   produceable, the documents and the summary.  But the -- I

18   don't know --

19              MR. MAGLEBY:  Like the day-to-day trading?

20              THE COURT:  Like, if I'm just buying, if I'm

21   just buying Bitcoin --

22              MR. MAGLEBY:  Yeah.

23              THE COURT:  Or Ether, or whatever the DOGE coin

24   might -- Donald Trump's coin -- it doesn't matter, right?

25   Does it really matter, you know?

1    I want a coin.  I told my husband that, but he said
2    I couldn't have one, so --
3              MR. MAGLEBY:  Yeah, I've got answers.  I think I
4    have answers, and I totally understand your concern as
5    something, you know, we had hoped to get to.  We didn't get to
6    it.  But, you know, jumping to the end, perhaps once the Court
7    enters its order, we can meet and confer now that Mr. Nakamura
8    will receive the message that he is going to have to produce
9    documents.
10             THE COURT:  Fair enough.
11             MR. MAGLEBY:  We haven't been able to break
12   through that yet.  And I'm not blaming Mr. Lee.  I understand.
13   I've had billionaire clients.
14             In terms of the difference and the distinction
15   between investing in a company and investing in a currency,
16   that is a valid distinction.  In this case, though,
17   Dr. Nakamura did both, right?
18             So he invested in Sunday Group, $350,000 under the
19   Subscription Agreement in April of 2015.
20             THE COURT:  And he bought the coin.
21             MR. MAGLEBY:  And he bought the coin.
22             THE COURT:  I understand.
23             MR. MAGLEBY:  And buying the coin is -- I mean
24   the coin hasn't been issued yet, but --
25             THE COURT:  But he bought the coin within the

1    concept of this entity.  It wasn't just a coin out on the

2    market, I'm going to go buy Bitcoin --

3                MR. MAGLEBY:  That's right.

4                THE COURT:  -- or DOGE coin, or whatever the

5    coin is.

6                MR. MAGLEBY:  That's right.  That's right.

7    That's right.  For sure they're related.  For sure they're

8    related.  But, if he is very sophisticated in Crypto

9    matters -- so it's -- you know, it's one thing if you're an

10   investor, right?  I mean let's start at the broadest level and

11   looking at what the cases say.  At the broadest level, what

12   the cases say is your wealth is relevant.  And some of those

13   cases --

14                THE COURT:  But that's the tax return issue,

15   which I'll get to.

16                MR. MAGLEBY:  Which we'll get to.

17           But going down from that, so they say your wealth is

18   relevant, and they say a hundred million in some of those

19   cases, which I looked up last night is 695,000 as a net worth.

20   It seems to make you sophisticated in Japan.  Then you go down

21   one level below that, which is do your invest -- does your

22   investment income exceed your salary?  That's a relevant

23   consideration.  And then you get down to your investment

24   experience generally.  So does Nakamura, Dr. Nakamura invest

25   in all kinds of startup companies?

—110—

1          That's not before the Court.  That's the next

2    request that we've got out there, but I'm just marching from

3    greater to smaller under Japanese case law.

4          And then below that is your investment experience in

5    the relevant market, which is where we are right this instant.

6    And what I would say is it depends.  His buying and selling of

7    Bitcoin or other Crypto currencies, it depends.

8          So, for example, if he directs it, and he invests in

9    20 different coins, and the investment is the equivalent of

10   what he invested in the Mobby coin, that is evidence that he

11   knows some coins are going to make it and some are not, and he

12   has a high risk tolerance, and a bunch of those coins are

13   going to have failed, and he's not going to have sued the coin

14   issuer -- or maybe he is.  So --

15          THE COURT:  Well, wouldn't it be --

16          MR. MAGLEBY:  -- how do we figure that out?

17   That's your question, right?  How do we figure that out?

18          THE COURT:  Right.  Because if he's buying

19   Bitcoin now, that's not relevant.  But if he's buying the

20   latest coin that's being issued by the Trump family, it might

21   be.

22          MR. MAGLEBY:  Yeah.

23          THE COURT:  Although I don't know that anybody

24   is doing that because they think they're going to make money.

25          MR. MAGLEBY:  Agreed.

—111—

1              THE COURT:  But I do -- I do understand the

2    distinction.  And I think where I'm going to start is,

3    clearly, Crypto venture investments 2013 through '18, the

4    dates provided.

5              MR. MAGLEBY:  Yeah.

6              THE COURT:  A summary in response to an

7    interrogatory, and documents that are related to those --

8    reasonably related to those investment add ventures,

9    appropriately produced.

10            Mr. Lee, to the extent there's anything that is

11    appropriate -- and I think it might all be confidential -- but

12    also if there's something to be redacted, a birth date, a

13    social security-styled number -- I don't know what Japan

14    issues -- that's fine.  But otherwise, confidential.

15             MR. LEE:  Yeah.  We've worked cooperatively on

16    issues like that before and had no issue.

17             THE COURT:  All right.

18            Then with respect to investment, I think I'm going

19    to have to let you guys talk about this first.  Candidly, I do

20    not have the expertise to make the distinctions here.  What I

21    could say is that if it's an investment at the beginning of

22    the issuance of the coin, it's, clearly, more relevant than if

23    it's an well established coin, like Bitcoin, just an example.

24    There are other well established coins.

25             MR. MAGLEBY:  Uh-huh.

1          THE COURT:  So, that could be.  So if he were

2    making investments at the beginning, at the first issuance, at

3    the beginning of an issuance, the first month, the first

4    couple of months, something where you don't know what's going

5    to happen, that would be more relevant.

6          Every trade is not relevant.

7          MR. MAGLEBY:  Yeah.

8          THE COURT:  Every purchase and sale is not

9    relevant.  Again, it has to be during this time period.  And,

10   you have to try to negotiate because --

11         MR. MAGLEBY:  We could do that.

12         THE COURT:  -- what if he decides to sell

13   whatever it is number because he's giving his daughter a

14   present or his -- and I'm making this up.  I don't know that

15   he has a daughter, right?

16         My point is there are lots of things that motivate

17   people to buy or sell.  I remember my father giving me stock

18   in his company, Times Mur (phonetic) -- that doesn't exist

19   anymore -- as a present when I turned 21, right?

20         MR. MAGLEBY:  Uh-huh.

21         THE COURT:  And it was wonderful at the time,

22   right?  But, that's why he bought it for me, right?

23         It's just an example that came to my mind.  That's

24   why I said his daughter.

25         So, I just -- you're going to have to work together

1    to narrow this sufficiently because he does not have to

2    produce every transaction that he's engaged in in those five

3    years, or anything that is brokerage, nondirected, right?

4              MR. MAGLEBY:  Yeah.

5              THE COURT:  If it's a brokerage buying and

6    selling, he doesn't have to produce that.  If it's only if

7    itself directed, which can be through a brokerage, but it's

8    got to be self-directed.  I mean he's making the decision or

9    he's doing it himself, and it has to be reasonably related

10   to demonstrating the sophistication in Crypto currency

11   development, marketing, and selling the -- that thing, that

12   Crypto currencies, which I know nothing about.

13             MR. MAGLEBY:  And I understand that and the

14   Court's order.

15             Just to round it out.  So only the plaintiff knows

16   what documents the plaintiff has, of course, which is our

17   problem, but --

18             THE COURT:  You're the only one who knows what

19   documents you have.

20             MR. MAGLEBY:  That's right.  Exactly.

21             So we're operating in the dark.  But one thing I

22   have learned in my long time doing this job, is that wealthy

23   people often track -- sometimes to the penny -- their assets

24   and their profitability.  And so, for example, is there a

25   spreadsheet out there that says here are all of Dr. Nakamura's

1    Crypto currency investments, and here is his return on

2    investment because maybe he sits down and he looks at them and

3    he says that's too risky.  I want to move it.  I want to exit

4    this one.  Those summary documents --

5                    THE COURT:  If there is a summary, it would be

6    responsive.  But, not of transactions --

7                    MR. MAGLEBY:  Right.  Okay.

8                    THE COURT:  -- of investments.  If he tracks his

9    investments, yes.

10                   MR. MAGLEBY:  What if he tracks -- I want to

11   make sure I understand what the Court said, so I don't get

12   into an unnecessary fight with Mr. Lee.  If there's a summary

13   of investments, yes.  What if there's a summary of here is the

14   results of owning Crypto currency for the year 2015, owning

15   Crypto currency for the year 2013, you know, that shows the

16   different Crypto currencies that he's purchased or invested

17   in, his return on investment?

18                   THE COURT:  For each Crypto currency?

19                   MR. MAGLEBY:  Yeah.

20                   THE COURT:  Because his tax returns -- and we're

21   going to get to not the wholesale production of tax returns --

22                   MR. MAGLEBY:  Okay.

23                   THE COURT:  -- because for all I know, he could

24   own an apartment building somewhere.

25                   MR. MAGLEBY:  Yeah.

1          THE COURT:  It wouldn't be relevant.

2          Total income I get versus income from Crypto

3    currency I guess, but not the details of all of that,

4    necessarily.  But, anyway, that's a different subject matter.

5          Why would that not provide you what you are seeking?

6    Because if it's year by year --

7          MR. MAGLEBY:  Yeah.

8          THE COURT:  -- you would know what the return

9    was.  You might not know it's point A versus point B, but you

10   would know that in 2016, he lost half a million dollars -- I'm

11   using American numbers --

12         MR. MAGLEBY:  Yeah.

13         THE COURT:  -- half a million dollars in Crypto

14   currency investments, right?  You would get that.

15         So, I think that's how we deal with it.  If he has a

16   spreadsheet where he tracks it, yes; investments, not trades.

17   Trades I'm leaving for you to figure out.

18         MR. MAGLEBY:  Okay.

19         THE COURT:  And then with respect to tax

20   returns, my inclination -- I have zero knowledge about what

21   is included in a Japanese tax return; however, given what

22   Dr. Nakamura's profession is, he's going to have, I am sure,

23   the equivalent of things like K-1s, and other business-related

24   documents in his tax returns that deal with his medical

25   practice.  And I don't, literally, mean treating people.  I

1    mean his profession of medicine versus his investments.

2            Total income.  Tax return, if there is a page 1 of a

3    1040 style document, yes.  And Crypto currency-related tax

4    information.  But I don't know why everything else would be

5    necessary.  In other words, that would be it.  Just those

6    things.

7            MR. LEE:  So you're saying the -- produce the

8    returns for -- I guess we'll talk about the period.

9            THE COURT:  '13 through '18 is what we're

10   talking about.

11           MR. LEE:  So, 2013 to 2018.  We redact

12   everything except for total income.  And then anything related

13   to Crypto currency --

14           THE COURT:  Yeah, you know how the first page of

15   a 1040 has so much of what you can -- you know, there are

16   different things that go into that total income, not just that

17   top line that shows what the total income is.  But there's

18   other pieces on that 1040 where you enter amounts that you've

19   earned from other sources, like if you got child support --

20   not an issue here.  It's just something that I know is on the

21   1040.  Not something that I ever dealt with.  That's not my

22   point.  It's just something that I know that it's on there.

23           So, what I'm looking for is that sort of summary

24   page, if it exists for Japanese tax returns.  And I don't know

25   it doesn't.

1              MR. LEE:  I couldn't tell you, yeah.

2              THE COURT:  So a summary page, if it exists,

3    similar to the basic 1040 form, that two pages, right?  That

4    first page and second page ever the 1040 form that summarizes

5    everything.  And then Crypto currency-related tax filings.

6    That's it.

7              And you're going to have to figure out what it is,

8    and I don't know if Mr. Magleby knows either.  I have no idea.

9    I thought about researching it, but I remember being counsel,

10   when I took the bench almost six years ago, don't do the

11   research for your people that are appearing before you.  So I

12   resisted, even though I wanted to.  I did look up Mobby just

13   to understand.  I was, like, what is this?  I have no idea.  I

14   still don't have any real idea, but I looked it up.

15             MR. LEE:  Yeah.  So I'm thinking about, you

16   know, what it is that you're talking about, and I understand,

17   like -- because we were -- we were, I think, had the same

18   trajectory, which is, like, we understood that production of

19   something regarding his net worth would make sense.  But, we

20   are also very sensitive about the tax return privilege.  And

21   this is something that, you know, was not dealt with at all in

22   opposing counsel's papers.  Like this is -- these tax returns

23   are seriously disfavored.  This is why we were suggesting that

24   we could come up with some sort of summary.

25             And so if there is -- you know, if there would

1    be some sort of way, we just want to be able to get the

2    information to them without having to take some of these tax

3    returns and produce it, especially a foreign tax return where

4    I don't think anybody in the room has any idea about what that

5    would end up looking like.

6              THE COURT:  Well, you're going to have to

7    look -- I imagine if I put into Google what does a Japanese

8    tax return look like.  But I don't know, do you file them like

9    we do here with the centralized government?  Does he have a

10   city, county?

11             If you live in New York you have -- if you live in

12   Manhattan, you have the County of New York's tax returns --

13   that's where I grew up -- you have the City of New York's tax

14   returns.  You have the State of New York's tax.  And you have

15   your federal tax return.  It's ridiculous.

16             So, I have no idea what Japan requires.  And he

17   doesn't have to produce duplicates, right?  It would seem to

18   me whatever collects singularly, the type of information that

19   is in the first two pages, as I said, of the 1040, and the

20   Crypto specific, that's all I'm suggesting that be produced,

21   and nothing else.  And it's not even redacted.  If you can

22   pull out the pages and just produce those pages, you don't

23   have to redact anything, except for identifying, personal

24   identifying information.

25             So, that's all -- but I don't know.  And I'm going

1    to have to leave that to you to figure out.  It's the total

2    income and that generalized source of where that total comes

3    from if that exists in Japan.  For example, in the U.S., you

4    would have your salary.  You would have your interest income.

5    You would have things like child support income, or other

6    forms of other income that would go in that summary page,

7    without just breaking it down.  And then there are all the

8    attachments that go with our tax returns.  It's just the

9    Crypto currency tax piece, the investment.  And if it is

10   intermingled with other things, it will have to be redacted

11   because you're just going to show the Crypto portion of the

12   tax return.  That's it.  I don't know how better to describe

13   it.

14           Does that make sense?

15           MR. LEE:  I guess the thing I'm struggling with

16   is why the -- of all the different types of financial

17   documents you could use to get this information, why would we

18   focus on the tax returns.  Those are the ones that are

19   privileged.

20           THE COURT:  Because they are filed with the

21   government and we presume they're accurate.  And then there's

22   no argument about who put the numbers together and what the

23   source of those numbers are, and whether documents to support

24   the source of those numbers have to be produced.  This will

25   avoid all of that for Dr. Nakamura.  Because if he filed this

1    with the centralized government of the country of Japan, I

2    would presume that what's in there is honest.  There would be

3    no question about it.

4                    MR. LEE:  Yeah.  That's why I struggle with it

5    because if we -- if it was viewed as that being the most

6    reliable source, why would the law place such strong

7    protections around --

8                    THE COURT:  Well, I have --

9                    MR. LEE:  -- them as being privileged?

10                   THE COURT:  -- required production of tax

11   returns.  In every single employment case, you produce tax

12   returns for the employee who is claiming lost wages.  They're

13   produced all the time.  They're not that sacred.

14                   MR. LEE:  Uh-huh.

15                   THE COURT:  There are circumstances where

16   they're sacred.  You can't just get them for the purpose of

17   getting them.  You can't get them for punitive damages before

18   they're awarded, right, before you get to a punitive damage

19   award.  But this is a case where the case law from the -- from

20   Japan that I read very clearly, easily, demonstrated that a

21   person's overall financial wherewithal, in comparison to the

22   subject matter at issue, was relevant to their sophistication.

23   So I'm applying Japanese law here, doesn't make me terrible

24   comfortable, but that's what I'm being required to do.

25                   MR. LEE:  I understand.

1          THE COURT:  And I'm trying to make it as narrow

2    as possible.

3          MR. LEE:  Okay.  So -- yeah, and this guidance

4    is actually super helpful.  So I think what we'll do is, you

5    know, since none of us know exactly what they look like, I

6    think we've gotten enough guidance from your that I can meet

7    and confer with opposing counsel and say, look, here's what we

8    propose to do.  We can all do our homework on what these

9    returns generically look like, and then come to some agreement

10   as to what they will look like in this specific case.

11          THE COURT:  All right.

12          So with respect to disagreements over what was

13   discussed today, no more motions.  One document.  The issue

14   for each side.  And you submit it.  And I will hold a hearing.

15   I can do it -- now that I've met you all, by Zoom, so you

16   don't have to travel if you don't want to.  You're always

17   welcome.  And we can work out where the disagreements -- where

18   you've gotten stuck.  Right?  You don't need to do a second

19   Motion to Compel.  It's --

20          MR. LEE:  Okay.  So --

21          THE COURT:  -- a joint document.  We got stuck

22   on the tax returns.  Here is my -- here is Dr. Nakamura's

23   position, and here is defense's position, right --

24          MR. LEE:  Yeah.

25          THE COURT:  -- whatever it is.  If it's, you

1  know, succinct, yes, but it needs to have enough information.

2  But I'll remember this, trust me.  I will remember this.  So

3  it doesn't need to reiterate everything.  And then I will hold

4  a hearing and we will work it out.  Or if I find a clear

5  answer, I'll issue a written order.  But I will do that, and

6  it will be far faster than doing motion practice back and

7  forth.

8            MR. LEE:  That's actually greatly appreciated.

9  I know many courts do those shortened letter brief kind of

10 over discovery disputes.  And I think that would actually be

11 very useful.

12           THE COURT:  Just I want it on the record because

13 everything should be on the record.

14           MR. LEE:  Sure.

15           THE COURT:  So whatever you prepare, you file.

16           MR. LEE:  Yeah.

17           THE COURT:  Yeah.

18       Okay.  Now, when does discovery close?  I was trying

19 to find it.

20           MR. MAGLEBY:  Your Honor, I have one more --

21           MR. LEE:  It has closed.  I mean we were

22 proposing --

23           THE COURT:  Okay.  Then we need to reopen it.

24           MR. LEE:  We were proposing August 1st,

25 though --

1          THE COURT:  That's not long enough.

2          MR. LEE:  -- given what's transpired today,

3   like, you know, honestly, Your Honor, I think we should get

4   together and --

5          THE COURT:  Propose something?

6          MR. LEE:  Yeah.  After -- this will take a while

7   to digest, I think, on both sides.

8          THE COURT:  That's right.  And I would say give

9   yourselves time, right?  If you have families, if you have

10  summer vacations coming up, I'm not -- I'm not saying you have

11  to do this by August 1st.  I don't think that's realistic.  By

12  the end of the year might be good, you could get through this

13  all, you know, including deposition, which I know I have

14  before me, but I haven't looked at yet.  That would be good.

15  But if it takes a little longer, there's a lot at stake here.

16  This is not a simple case.  It's not a small dispute.  So I

17  don't want to rush you.  So I will let you propose and submit

18  to me a stipulated discovery plan with dates that are

19  appropriate as to all issues that we've discussed.

20          MR. MAGLEBY:  Okay.

21          THE COURT:  All right?

22          MR. MAGLEBY:  That we can do.

23       Two remaining issues, but I don't want to interrupt

24  the Court.

25          THE COURT:  Go ahead.  That's -- yeah.

1            MR. MAGLEBY:  The issue number one is the

2    deposition.  You, obviously, are aware of our Motion to Compel

3    the deposition.  As you said it's not before you today, so --

4            THE COURT:  I haven't even looked at it.

5            MR. MAGLEBY:  Okay.  Fair enough.

6         And then the second issue is we have a bit of a

7    kerfuffle over how much -- whether and how much additional

8    written discovery would be allowed.

9            So, fact discovery cutoff expired.  Everybody had

10   served their written discovery as of that date.  We've

11   negotiated, I think on our side, we said unlimited subpoenas,

12   maybe six interrogatories, 20 RFPs, 20 RFAs.  That was our

13   proposal.  Our opponents want, I think, unlimited RFA is for

14   sure, maybe unlimited RFPs.  I anticipate the argument that I

15   will hear from the other -- and I'm just trying to cut right

16   to the chase -- that I will hear interest my friends on the

17   other side is, well, what if we discover new documents in the

18   supplemental production and, as a result, we want to serve

19   supplemental written discovery?

20           Hard for me to argue with that.  But if there's

21   going to be additional written discovery that wasn't

22   propounded under the prior schedule, it ought to be limited

23   to new information that is discovered from subsequent

24   productions, instead of a do over.  And in particular, I'm

25   worried when I hear unlimited RFAs.  I just picked up a case

1    in Hawaii and there's over a RFAs.  It's like they tried to --

2              THE COURT:  Well, I never grant unlimited

3    anything, so you don't have to worry about that.

4              MR. MAGLEBY:  Okay.

5              THE COURT:  But we'll talk to Mr. Lee about what

6    you -- I'm not a fan --

7              MR. LEE:  Yeah, I don't think this is in front

8    of the Court right now --

9              THE COURT:  -- of unlimited anything.  And I

10   don't know that's what you asked for.  But to the extent

11   unlimited anything was asked for, it seems to me that that

12   just allows for just burdensomeness that is ridiculous.  I

13   personally think the requests for admissions are useless, but

14   that's a personal opinion.

15        So, I would say what -- have you propounded any RFAs

16   yet, Mr. Lee, do you know?

17             MR. LEE:  I don't -- I think we have propounded

18   a handful, but -- and again, there is no limit on them in --

19             THE COURT:  But I can limit them.

20             MR. LEE:  Yeah, of course.  But, yeah, I mean I

21   don't think we've propounded, like, a lot.

22             THE COURT:  Okay.

23             MR. LEE:  So.

24             THE COURT:  If you had to pick a number right

25   now, which I'm asking you to do that would be -- remember,

1   this is all without prejudice.  It's not that you could ever

2   seek to expand the number, but, you know, why would something

3   like 50 not be enough?  You don't need to authenticate

4   documents.  They're self-authenticating.  Most business

5   records are self-authenticating under federal law.  You can

6   all stipulate to authentication of documents.

7            MR. LEE:  Without prejudice, 50 sounds like a

8   fine number.

9            THE COURT:  Okay.  Fifty RFAs?

10           MR. LEE:  Yeah.

11           THE COURT:  And RFPs, requests for production.

12  I think there's been a lot of those already, and I don't know

13  if there's any -- are there any that are out there that have

14  been propounded and not responded to yet?  There shouldn't be

15  because discovery is closed.

16           MR. LEE:  None that haven't been responded to,

17  no.

18           THE COURT:  Okay.  All right.

19       Now I've required the production of documents on

20  both sides here, and response to interrogatories, to the

21  extent that anything is responsive to an interrogatory or

22  document request, there must be supplementation, along with

23  the production, right?

24       Okay.  So, is there something in addition that we

25  know?  I mean if I say 20 RFPs, without prejudice again --

1          MR. LEE:  That's fine.

2          THE COURT:  20 RFPs.  You're definitely going to

3    be able to take Dr. Nakamura's deposition.  Are there

4    interrogatories that you want to propound in addition to what

5    you propounded before you do that?

6              Mr. Magleby?

7          MR. MAGLEBY:  No.

8          THE COURT:  Okay.

9          MR. MAGLEBY:  I'm -- I would -- I may be jumping

10   ahead.  Sometime in the next 60 to 90 days, I would just like

11   to be able to talk to Dr. Nakamura.

12         THE COURT:  I have so much on my plate.  I'll do

13   my best.

14         MR. MAGLEBY:  I understand.

15         THE COURT:  This took a lot to get through, to

16   just digest.

17         MR. MAGLEBY:  I understand.

18         MR. LEE:  Understood.

19         THE COURT:  What additional interrogatories are

20   you foreseeing, Mr. Lee?  Any?

21         MR. LEE:  Well, I hate to commit to that based

22   on -- I, typically, like to have various contentious

23   interrogatories at the end of written discovery so that I can

24   try to narrow the scope of issues for trial.  I actually -- I

25   think we've made good pro guest on finishing written

1    discovery.  But given all of that, what's going to transpire,

2    it's hard to predict.

3                THE COURT:  Right.  But if you were going to do

4    contention interrogatories when discovery is already closed,

5    given what I already said, I envision a huge number.  And I

6    just -- that's just not going to be permitted here.

7                MR. LEE:  The only thing I would note, Your

8    Honor, is I don't --

9                THE COURT:  And there is a limit under the

10   Federal Rules.

11               MR. LEE:  -- we weren't asking for any sort of

12   expanded number.  It's just we have not -- we have not used up

13   the --

14               THE COURT:  Twenty-five.

15               MR. LEE:  -- number that we get under the

16   statute.  And we are just simply saying that I think what

17   opposing counsel was saying was we're not going to agree to

18   extend the discovery cutoff unless you agree to propound no

19   more written discovery.  And we were just saying, look, you

20   know, if we haven't used up our ROGs, we should be -- at least

21   have that.  And then if we can show good cause for more, we'll

22   do that.  That's all we were saying.

23               THE COURT:  And that will be the order of the

24   Court.

25               MR. LEE:  Okay.

1              THE COURT:  That's what you get.

2              MR. LEE:  Okay.

3              THE COURT:  All right.  For purposes of the

4   record, ECF number 109, 110, 112 and -- I'm missing the -- I'm

5   sorry -- 99 and 100 is plaintiff's Motion to Compel, granted

6   in part, denied in part, consistent with the record.

7              Defendant's Motion to Compel, ECF numbers 110 and

8   112, granted in part, denied in part, consistent with the

9   record.

10             ECF number 114, the Motion to Extend Discovery,

11  granted.  The parties will submit a stipulation providing the

12  details of the extension of discovery to the Court.  And any

13  disagreement or problems that arise with respect to what the

14  Court has ordered today is to be presented in a joint

15  document, with each parties' position represented, after which

16  the Court will either hold a hearing or issue a written

17  opinion.

18             The transcript of the proceedings is the order of

19  the Court.

20             I have criminal proceedings that start in 30

21  minutes, so, everyone, we are adjourned.

22             Thank you very much.

23             MR. LEE:  Thank you Your Honor.  And really

24  appreciate your thoughtfulness in all of this.  That was very

25  thorough and really appreciate it.

1          MR. MAGLEBY:  Is there a specific name for that

2    joint motion?  I'm a stickler for that stuff.  I want to name

3    it the right thing so if you're looking through the docket

4    list, you know, you're like, you know, I searched for the word

5    "joint discovery motion."

6          THE COURT:  I get a filing -- every single

7    federal judge on the bench across the nation gets a filing

8    every single day of everything that was filed with their

9    initials on it.  The list isn't -- even though there are

10   five - to 600 things before me, the list isn't that long.  I

11   look at everything.

12         MR. LEE:  Yeah, we -- I have a case in the

13   Northern District, we're doing this all the time, so we can

14   work on that.

15         THE COURT:  You can call it anything you want

16   that's reasonable.

17         MR. MAGLEBY:  Okay.

18         THE COURT:  Thank you.

19

20         (Court Adjourned.)

21

22

23

24

25

1                              -oOo-

2

3        I certify that the foregoing is a correct
         transcript from the record of proceedings
4        in the above-entitled matter.

5

          \s\ Kathryn M. French              June 4, 2025
6        _____    _____

7        KATHRYN M. FRENCH, RPR, CCR                DATE
         Official Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25